No. 23-10246

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————

STATE OF TEXAS; AMERICAN ASSOCIATION OF PRO-LIFE
OBSTETRICIANS & GYNECOLOGISTS; CHRISTIAN MEDICAL & DENTAL
ASSOCIATIONS,

Plaintiffs-Appellees,

v.

XAVIER BECERRA; UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES; CENTERS FOR MEDICARE AND MEDICAID
SERVICES; KAREN L. TRITZ; DAVID R. WRIGHT,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of Texas

———————————

## BRIEF FOR APPELLANTS

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

LEIGHA SIMONTON
  *United States Attorney*

MICHAEL S. RAAB
McKAYE L. NEUMEISTER
NICHOLAS S. CROWN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7231*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellants are all governmental parties.  5th Cir. R. 28.2.1.

*/s/ McKaye L. Neumeister*
McKaye L. Neumeister

## STATEMENT REGARDING ORAL ARGUMENT

The government respectfully requests oral argument in this case.  The district court issued a permanent injunction against the Department of Health and Human Services and the Centers for Medicare and Medicaid Services based upon the court's conclusion that a non-binding guidance document issued by those agencies is contrary to law.  The injunction warrants vacatur on numerous grounds, and defendants believe that oral argument will be of substantial benefit to this Court in understanding the important issues in this case.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................v

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION ..............................................................3

STATEMENT OF THE ISSUES...................................................................4

STATEMENT OF THE CASE.....................................................................4

    A.    The Emergency Medical Treatment and Labor Act (EMTALA) ..............4

    B.    Federal Enforcement Under EMTALA.......................................7

    C.    EMTALA Guidance on Emergency Care for Pregnant Patients...............8

    D.    Prior Proceedings.........................................................11

SUMMARY OF ARGUMENT.................................................................. 16

STANDARD OF REVIEW ..................................................................... 18

ARGUMENT .................................................................................... 18

I.    The Guidance Is Not Final Agency Action Subject to Review........................... 18

II.    The Guidance Is Fully Consistent with EMTALA. ............................................. 25

    A.    EMTALA Requires Doctors to Offer Abortion Care to Individuals When That Care Is the Necessary Stabilizing Treatment for an Emergency Medical Condition......................................25

    B.    The District Court's Contrary Conclusion Rests on a Fundamental Misreading of EMTALA. ........................................28

        1.    EMTALA encompasses abortion care as potential stabilizing treatment for pregnant individuals. ................................29

2.      EMTALA does not create equal and independent statutory obligations to both a pregnant individual and her "unborn child." ................................................................................................32

3.      EMTALA itself governs the resolution of any purported intra-statutory conflict. .......................................................................41

4.      The district court's remaining analysis is unavailing. ......................44

III.   The Medicare Act Does Not Require Notice and Comment Here. ................... 46

IV.   The Injunction Is Overbroad. ................................................................. 49

CONCLUSION ............................................................................................... 54

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Arrington v. Wong,*
   237 F.3d 1066 (9th Cir. 2001) ........................................................ 5

*AT&T v. EEOC*
   270 F.3d 973 (D.C. Cir. 2001) ..................................................... 22

*Azar v. Allina Health Servs.,*
   139 S. Ct. 1804 (2019) .................................................. 17, 47, 48

*Baby K, In re,*
   16 F.3d 590 (4th Cir. 1994) ...................................................... 23, 26

*Bennett v. Spear,*
   520 U.S. 154 (1997) ........................................................ 18, 21, 23

*Bostock v. Clayton County,*
   140 S. Ct. 1731 (2020) ............................................................ 29-30

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ...................................................... 50, 51, 52

*California v. United States,*
   No. C-05-328-JSW, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008) ............................ 20

*Central & S.W. Servs., Inc. v. U.S. EPA,*
   220 F.3d 683 (5th Cir. 2000) ...................................................... 53, 54

*Cherukuri v. Shalala,*
   175 F.3d 446 (6th Cir. 1999) ............................................ 20, 24, 26, 48

*Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund,*
   138 S. Ct. 1061 (2018) ............................................................. 37

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC,*
   710 F.3d 579 (5th Cir. 2013) ....................................................... 50

*Dobbs v. Jackson Women's Health Org.,*
   142 S. Ct. 2228 (2022) .............................................................. 2

*Draper v. Chiapuzio,*
   9 F.3d 1391 (9th Cir. 1993) ........................................................ 26

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ................................................................ 49, 51

*Hardy v. New York City Health & Hosp. Corp.*,
   164 F.3d 789 (2d Cir. 1999) ................................................................ 26

*John Doe #1 v. Veneman*,
   380 F.3d 807 (5th Cir. 2004) ........................................................ 50, 52

*Luminant Generation Co. v. EPA*,
   757 F.3d 439 (5th Cir. 2014) ........................................................ 21, 22

*Morin v. Eastern Me. Med. Ctr.*,
   780 F. Supp. 2d 84 (D. Me. 2010) ...................................................... 20

*National Pork Producers Council v. U.S. EPA*,
   635 F.3d 738 (5th Cir. 2011) ........................................................ 18, 19

*New York v. U.S. HHS*,
   414 F. Supp. 3d 475 (S.D.N.Y. 2019) ................................................ 20

*ODonnell v. Harris County*,
   892 F.3d 147 (5th Cir. 2018), *overruled on other grounds by*
   *Daves v. Dallas County*, 22 F.4th 522 (5th Cir. 2022) .................................. 50

*Peoples Nat'l Bank v. Office of Comptroller of Currency of U.S.*,
   362 F.3d 333 (5th Cir. 2004) .............................................................. 21

*Perez v. Mortgage Bankers Ass'n*,
   575 U.S. 92 (2015) .............................................................................. 52

*Reed v. Taylor*,
   923 F.3d 411 (5th Cir. 2019) .............................................................. 33

*Ritten v. Lapeer Reg'l Med. Ctr.*,
   611 F. Supp. 2d 696 (E.D. Mich. 2009) .............................................. 20

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ............................................................................ 53

*Texas v. EEOC*
   933 F.3d 433 (5th Cir. 2019) ........................................................ 18, 24

*Texas v. Rettig*,
   987 F.3d 518 (5th Cir. 2021), *cert. denied*,
   142 S. Ct. 1308 (2022) ................................................................ 18, 20

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
   989 F.3d 368 (5th Cir. 2021) ....................................................... 53

*Texas Educ. Agency v. U.S. Dep't of Educ.*,
   908 F.3d 127 (5th Cir. 2018) ....................................................... 40

*Town of Chester v. Laroe Estates, Inc.*,
   581 U.S. 433 (2017) ..................................................................... 49

*United States v. Adams*,
   40 F.4th 1162 (10th Cir. 2022) ................................................... 34

*United States v. Castelo-Palma*,
   30 F.4th 284 (5th Cir. 2022) ....................................................... 18

*United States v. Idaho*,
   No. 1:22-CV-329-BLW, 2022 WL 3692618 (D. Idaho Aug. 24, 2022) ........... 27, 45

*Whitman v. American Trucking Ass'ns*,
   531 U.S. 457 (2001)......................................................................37

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................... 49-50

## Statutes:

Administrative Procedure Act (APA):
   5 U.S.C. § 702 .............................................................................. 3
   5 U.S.C. § 703 .............................................................................. 3
   5 U.S.C. § 704 ............................................................................ 18

Born-Alive Infants Protection Act of 2002:
   1 U.S.C. § 8 ......................................................................... 34, 38
   1 U.S.C. § 8(a) ............................................................................ 34
   1 U.S.C. § 8(b) ............................................................................ 34

Emergency Medical Treatment and Labor Act (EMTALA),
   Pub. L. No. 99-272, 100 Stat. 82 (1986)............................................35-36
     § 9121(b), 100 Stat. at 166..................................................................36
      42 U.S.C. § 1395dd ............................................................ 1, 39
      42 U.S.C. § 1395dd(a) ...................................................... 5, 33
      42 U.S.C. § 1395dd(b) ........................................................... 27

42 U.S.C. § 1395dd(b)(1) ................................................................. 6, 25, 29, 33
42 U.S.C. § 1395dd(b)(1)(A) ................................................................. 23, 27
42 U.S.C. § 1395dd(b)(2) ................................................................. 25, 33, 42, 43
42 U.S.C. § 1395dd(c) ................................................................................. 33
42 U.S.C. § 1395dd(c)(1) ............................................................................ 33
42 U.S.C. § 1395dd(c)(1)(A)(ii) ................................................................. 6, 39, 40
42 U.S.C. § 1395dd(c)(2)(A) ................................................................. 39, 40
42 U.S.C. § 1395dd(d) ................................................................................. 22
42 U.S.C. § 1395dd(d)(1)(A) ....................................................................... 7
42 U.S.C. § 1395dd(d)(1)(B) ..................................................................... 7, 8
42 U.S.C. § 1395dd(d)(2)(A)-(B) ................................................................. 37
42 U.S.C. § 1395dd(e) ................................................................................. 38
42 U.S.C. § 1395dd(e)(1) ................................................................. 5, 35, 49
42 U.S.C. § 1395dd(e)(1)(A) ....................................................................... 38
42 U.S.C. § 1395dd(e)(1)(A) (1988) ............................................................ 36
42 U.S.C. § 1395dd(e)(1)(A)(i) ................................................................. 27, 34, 38
42 U.S.C. § 1395dd(e)(1)(A)(i)-(iii) ............................................................. 6
42 U.S.C. § 1395dd(e)(1)(B) ................................................................. 27, 39
42 U.S.C. § 1395dd(e)(2) ............................................................................. 5
42 U.S.C. § 1395dd(e)(2)(C) (1988) ............................................................ 36
42 U.S.C. § 1395dd(e)(3) ............................................................................ 49
42 U.S.C. § 1395dd(e)(3)(A) ....................................... 6, 23, 25, 26, 29, 39, 48
42 U.S.C. § 1395dd(f) ................................................................. 6, 23, 24, 26

Pub. L. No. 101-239, 103 Stat. 2106 (1989):
    § 6211(c)(3)(B), 103 Stat. at 2246 ............................................................ 40
    § 6211(c)(5)(B), 103 Stat. at 2246 ............................................................ 40
    § 6211(h), 103 Stat. at 2248 ................................................................... 36

10 U.S.C. § 1093 ................................................................................. 30

20 U.S.C. § 1688 ................................................................................. 30

22 U.S.C. § 5453(b) ............................................................................. 30

22 U.S.C. § 7704(e)(4) ......................................................................... 30

25 U.S.C. § 1676 ................................................................................. 30

28 U.S.C. § 1291 ................................................................................... 4

28 U.S.C. § 1331 ................................................................................... 3

28 U.S.C. § 1346 ......................................................................................... 3

28 U.S.C. § 1361 ......................................................................................... 3

42 U.S.C. § 238n ....................................................................................... 30

42 U.S.C. § 280h-5(a)(3)(C) ..................................................................... 30

42 U.S.C. § 300a-6 .................................................................................... 30

42 U.S.C. § 300a-7 .................................................................................... 30

42 U.S.C. § 300a-7(c)(1) ...................................................................... 9, 19

42 U.S.C. § 300a-8 .................................................................................... 30

42 U.S.C. § 300z-10 .................................................................................. 30

42 U.S.C. § 405(g) ...................................................................................... 7

42 U.S.C. § 1320a-7a .............................................................................. 7, 8

42 U.S.C. § 1320a-7a(e) ............................................................................. 7

42 U.S.C. § 1395 *et seq.* ............................................................................ 4
    42 U.S.C. § 1395 ................................................................................ 45
    42 U.S.C. § 1395cc ............................................................................. 4
    42 U.S.C. § 1395cc(a)(1)(I)(i) ........................................................... 5
    42 U.S.C. § 1395cc(b)(2)(A) ............................................................. 7
    42 U.S.C. § 1395cc(h) ........................................................................ 7
    42 U.S.C. § 1395hh(a)(2) ................................................... 14, 17, 46

42 U.S.C. § 1397ee(c)(7) .......................................................................... 30

42 U.S.C. § 2996f(b)(8) ............................................................................ 30

42 U.S.C. § 12584a(a)(9) .......................................................................... 30

42 U.S.C. § 18023(a)-(c) ........................................................................... 30

42 U.S.C. § 18023(d) ................................................................................ 30

Tex. Health & Safety Code § 170A.002(b) ........................................... 12

**Regulations:**

42 C.F.R. § 489.24(a)(1)(i) ................................................................. 5

42 C.F.R. § 489.24(a)(1)(i)-(ii) ......................................................... 25

42 C.F.R. § 489.24(a)(1)(ii) ............................................................... 6

42 C.F.R. § 489.24(b) ......................................................................... 39

42 C.F.R. § 489.24(d)(2)(i) ................................................................. 6

42 C.F.R. § 489.24(g) ........................................................................22

42 C.F.R. § 489.24(h) ........................................................................ 22

42 C.F.R. § 489.53(d) .......................................................................... 7

42 C.F.R. § 498.5(c) ............................................................................ 7

42 C.F.R. § 498.90(a)(1) ..................................................................... 7

42 C.F.R. pt. 1005 ............................................................................... 7
    42 C.F.R. § 1005.2 ...................................................................... 7
    42 C.F.R. § 1005.21 .................................................................... 7

Exec. Order No. 13952,
    *Protecting Vulnerable Newborn and Infant Children,*
    85 Fed. Reg. 62,187 (Oct. 2, 2020) ............................................. 34

**Rules:**

Fed. R. Civ. P. 54(b) ........................................................................ 12

Fed. R. Civ. P. 60 ............................................................................... 3

**Legislative Materials:**

H.R. 3128, 99th Cong. (July 31, 1985) ...........................................31

H.R. Rep. No. 99-241, pt. 1 (1985)................................................... 7

H.R. Rep. No. 99-241, pt. 3 (1985).................................................................... 4, 7

H.R. Rep. No. 99-453 (1985)................................................................................31

H.R. Rep. No. 101-386 (1989)..............................................................................36

**Other Authorities:**

CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are*
    *Pregnant or Are Experiencing Pregnancy Loss* (Sept. 17, 2021),
    https://perma.cc/65CQ-YLUQ ................................................................. 8, 19

OCR, *Guidance on Nondiscrimination Protections Under the Church*
    *Amendments for Health Care Personnel* (Sept. 17, 2021),
    https://perma.cc/FKH7-LZS2............................................................. 9, 19, 20

CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are*
    *Pregnant or Are Experiencing Pregnancy Loss* (July 11, 2022),
    https://perma.cc/APU6-ATP7 .................................................................... 9

**INTRODUCTION**

At stake in this appeal is the well-being of women whose health is threatened by emergency medical conditions that can arise during pregnancy. Sepsis, seizures, uncontrollable bleeding, organ failure, cardiac arrest—all of these can result from pregnancy-related complications, and all can lead to devastating medical consequences. Texas asserts that it is a State's prerogative to permit such harms—and to restrict medically necessary emergency care in federally funded hospitals—through state abortion bans. But that is untenable: It jeopardizes the lives and health of individuals experiencing emergency pregnancy complications, and it forces emergency-room physicians to withhold treatment in the face of a patchwork of state restrictions and uncertain exceptions. Federal law precludes that result. The Supremacy Clause does not authorize Texas to permit here what Congress has prohibited.

Under federal law, all Medicare-participating hospitals with an emergency department must undertake certain obligations to individuals who present to the emergency department experiencing a medical emergency. The Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, guarantees patients be offered "necessary stabilizing treatment" for their "emergency medical conditions." Some pregnant patients experience medical emergencies in which a treating physician determines that pregnancy termination (*i.e.*, abortion care), with the patient's consent, is the necessary stabilizing treatment. In those circumstances, EMTALA requires that

hospitals offer that treatment, even in situations where doing so directly conflicts with state law.

The Centers for Medicare and Medicaid Services (CMS)—the component of the Department of Health and Human Services (HHS) that administers Medicare—issued a guidance document and letter after the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), to remind hospitals of their existing and continuing obligations under EMTALA.  Plaintiffs here—Texas and two medical associations—contend that the Guidance mandates that providers perform "elective abortions" in excess of the agency's authority and contrary to various statutory restrictions.  In a sweeping order, the district court held the Guidance substantively and procedurally unlawful, and issued an injunction against enforcing "the Guidance and Letter's interpretation of EMTALA" "within the State of Texas or against" any member of a plaintiff organization.  ROA.1113.

The court erred in several respects.  The Guidance is not final agency action subject to judicial review because it is not new and does not determine any legal rights or obligations:  Instead, it repeats a straightforward and well-settled understanding of EMTALA's requirements.

The Guidance likewise does not exceed the statute.  It merely reiterates EMTALA's fundamental requirement that hospitals offer necessary stabilizing treatment to pregnant patients experiencing emergency medical conditions.  EMTALA does not categorically exclude any emergency medical condition, or any form of

stabilizing treatment, from its reach. Rather, it requires that medical providers assess whether an emergency medical condition exists, determine the necessary stabilizing treatment, and offer that treatment. The statute's stabilizing obligations protect pregnant patients suffering from conditions that pose severe threats to their life and health no less than non-pregnant patients. EMTALA does not exempt any form of medical care from comprising necessary stabilizing treatment, and there is no basis for creating plaintiffs' desired carve-out to exclude medically necessary treatment that involves abortion care.

The Guidance additionally satisfies the Medicare Act's procedural requirements. And in any event, the injunction is overbroad: It prohibits federal agencies from enforcing EMTALA's requirements against plaintiffs as applied to *all* emergency abortion care—even life-saving treatments to which no plaintiff objects. This Court should reverse.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 5 U.S.C. §§ 702 and 703, and 28 U.S.C. §§ 1331, 1346, and 1361. ROA.182. The district court entered a preliminary injunction on August 23, 2022. ROA.889-955. The court entered partial final judgment converting the preliminary injunction into a permanent injunction on December 20, 2022, ROA.1101-1102, and amended its judgment on plaintiffs' motion under Federal Rule of Civil Procedure 60 on January 13, 2023, ROA.1112-1113. The

government timely appealed on March 10, 2023.  ROA.1117.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The questions presented are:

1.     Whether the district court erred in concluding that CMS's July 2022 Guidance concerning the application of EMTALA to certain abortion care constituted final agency action.

2.     Whether the Guidance is consistent with EMTALA.

3.     Whether the district court erred in concluding that the Guidance was required to undergo notice and comment under the Medicare Act.

4.     Whether the district court's injunction is overbroad.

## STATEMENT OF THE CASE

### A.     The Emergency Medical Treatment and Labor Act (EMTALA)

Medicare is a federally funded program administered by the Secretary of HHS. The program pays healthcare providers or insurers for services under certain circumstances.  *See* 42 U.S.C. § 1395 *et seq.*  Participation in Medicare is voluntary, and each provider agrees to certain conditions to receive Medicare funding.  *See id.* § 1395cc.

Congress enacted EMTALA in 1986, based on "a growing concern about the provision of adequate emergency room medical services to individuals who seek care, particularly as to the indigent and uninsured."  H.R. Rep. No. 99-241, pt. 3, at 5 (1985).

4

"The overarching purpose of EMTALA is to ensure that patients, particularly the indigent and underinsured, receive adequate emergency medical care." *Arrington v. Wong*, 237 F.3d 1066, 1073-74 (9th Cir. 2001) (alterations and quotation marks omitted). EMTALA applies to every hospital that has an emergency department and participates in Medicare. *See* 42 U.S.C. § 1395dd(e)(2). To receive federal funding, such hospitals must agree to comply with EMTALA. *See id.* § 1395cc(a)(1)(I)(i).

Under EMTALA, when an individual presents to a Medicare-participating emergency department and requests examination or treatment, the hospital must provide an appropriate medical-screening examination "to determine whether or not an emergency medical condition" exists. 42 U.S.C. § 1395dd(a); *see also* 42 C.F.R. § 489.24(a)(1)(i). The term "emergency medical condition" means:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
>> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
>> (ii) serious impairment to bodily functions, or
>> (iii) serious dysfunction of any bodily organ or part; or
>
> (B) with respect to a pregnant woman who is having contractions—
>> (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or
>> (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.

42 U.S.C. § 1395dd(e)(1).

If the provider determines that an individual has an emergency medical condition, "the hospital must provide either—(A) … for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility in accordance with" certain requirements.  42 U.S.C. § 1395dd(b)(1); *see* 42 C.F.R. § 489.24(a)(1)(ii).  The hospital may also "admit[] th[e] individual as an inpatient in good faith in order to stabilize the emergency medical condition."  42 C.F.R. § 489.24(d)(2)(i).

The statute defines "to stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility."  42 U.S.C. § 1395dd(e)(3)(A).  EMTALA requires that hospitals offer stabilizing treatment where "the health" of the individual is "in serious jeopardy," or where a condition could result in a "serious impairment to bodily functions" or a "serious dysfunction of any bodily organ or part."  *Id.* § 1395dd(e)(1)(A)(i)-(iii).[1]

EMTALA contains an express preemption provision, preserving state laws "except to the extent that the requirement directly conflicts with a requirement of this section."  42 U.S.C. § 1395dd(f).  This provision does "not preempt stricter state laws,"

---

[1] A hospital may also "transfer" such an individual, but only if the transfer meets certain requirements, *e.g.*, that the medical benefits of the transfer outweigh the risks. 42 U.S.C. § 1395dd(c)(1)(A)(ii).

*i.e.*, state laws requiring emergency care in addition to EMTALA's mandates.  H.R. Rep. No. 99-241, pt. 1, at 4 (1985); *see* H.R. Rep. No. 99-241, pt. 3, at 5 (expressing a desire to add "federal sanctions" as a supplement to state-law duties "to provide necessary emergency care").

## B.  Federal Enforcement Under EMTALA

Federal enforcement of EMTALA is a complaint-driven process.  If a hospital "fails to comply substantially" with Medicare's conditions of participation, CMS may seek to terminate its participation in the program.   42 U.S.C. § 1395cc(b)(2)(A). Hospitals, however, are entitled to written notice and a hearing, 42 C.F.R. § 489.53(d), administrative appeals, *id.* § 498.5(c), and judicial review in federal district court, *id.* § 498.90(a)(1); 42 U.S.C. § 1395cc(h) (incorporating 42 U.S.C. § 405(g)).

If HHS determines that a hospital "negligently" violated EMTALA, it may seek civil monetary penalties through an enforcement action, during which the hospital has the right to a hearing before an Administrative Law Judge, and the right to appeal the judge's determination.   *See* 42 U.S.C. § 1395dd(d)(1)(A) (incorporating 42 U.S.C. § 1320a-7a); 42 C.F.R. §§ 1005.2, 1005.21; *see also id.* pt. 1005.  Final determinations to impose sanctions are reviewable in federal courts of appeals.  42 U.S.C. § 1320a-7a(e).

For physicians, HHS may seek to impose civil monetary penalties for "negligent[]" EMTALA violations and may seek "exclusion from participation" in Medicare for "gross and flagrant or … repeated" violations. 42 U.S.C. § 1395dd(d)(1)(B).  Such physicians receive the same administrative and judicial review

process as for hospitals assessed civil monetary penalties. *See id.* (incorporating 42 U.S.C. § 1320a-7a).

### C. EMTALA Guidance on Emergency Care for Pregnant Patients

**1.** Over the years, CMS has reminded hospitals on occasion that their EMTALA obligations extend to pregnant individuals and, in some circumstances, may include abortion care. In September 2021, the agency issued guidance that "[e]mergency medical conditions involving pregnant patients may include, but are not limited to: ectopic pregnancy, complications of pregnancy loss, or emergent hypertensive disorders, such as preeclampsia with severe features." CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss* 4 (Sept. 17, 2021), https://perma.cc/65CQ-YLUQ (September 2021 Guidance). The document—which plaintiffs do not challenge here—reminded hospitals that "[s]tabilizing treatment could include medical and/or surgical interventions (e.g., dilation and curettage (D&C), removal of one or both fallopian tubes, anti-hypertensive therapy, etc.)." *Id.* And it noted that EMTALA "requires that all patients receive … stabilizing treatment[] … if necessary, irrespective of any state laws or mandates that apply to specific procedures," and that EMTALA "preempts any directly conflicting state law or mandate that might otherwise prohibit such treatment." *Id.* The document was clear, however, that it did "not contain new policy," and its purpose was "to remind hospitals of their existing obligation to comply with EMTALA." *Id.* at 1.

8

At the same time, HHS's Office for Civil Rights (OCR) issued guidance regarding the Church Amendments, which prohibit covered entities from discriminating against any healthcare worker "because he performed or assisted in the performance of a lawful sterilization procedure or abortion." 42 U.S.C. § 300a-7(c)(1). HHS stated that "[l]awful abortions under the Church Amendments … include abortions performed in order to stabilize a patient when required under [EMTALA]," noting that "[e]mergency medical conditions involving pregnant patients may include, but are not limited to, ectopic pregnancy, miscarriage, or pre-eclampsia." OCR, *Guidance on Nondiscrimination Protections Under the Church Amendments for Health Care Personnel* 2 (Sept. 17, 2021), https://perma.cc/FKH7-LZS2 (OCR Guidance).

**2.** Ten months later, CMS issued the guidance document challenged in this litigation. *See* ROA.214-219 (July 2022 Guidance or Guidance).[2] It notes that "[t]his memorandum is being issued to remind hospitals of their existing obligation to comply with EMTALA and does not contain new policy." ROA.214 (emphasis omitted). Its "purpose" is "to restate existing guidance for hospital staff and physicians regarding their obligations under [EMTALA] in light of new state laws prohibiting or restricting access to abortion." ROA.215.

---

[2] This document, *Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss* (July 11, 2022), is available at https://perma.cc/APU6-ATP7.

Like its predecessors, the July 2022 Guidance states that "[e]mergency medical conditions involving pregnant patients may include, but are not limited to, ectopic pregnancy, complications of pregnancy loss, or emergent hypertensive disorders, such as preeclampsia with severe features." ROA.214, 217.  It explains that "[s]tabilizing treatment could include medical and/or surgical interventions (e.g., methotrexate therapy, dilation and curettage (D&C), removal of one or both fallopian tubes, anti-hypertensive therapy, etc.)." ROA.217.  The document also reminds that EMTALA "preempts any directly conflicting state law or mandate that might otherwise prohibit or prevent such treatment." ROA.214 (emphasis omitted).

The July 2022 Guidance reiterates that "[t]he determination of an emergency medical condition is the responsibility of the examining physician or other qualified medical personnel." ROA.214 (emphasis omitted).  It explains that, "[i]f a physician believes that a pregnant patient presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA," then the physician "must provide" stabilizing treatment—which can include abortion, if the doctor believes "that abortion is the stabilizing treatment necessary to resolve that condition." ROA.214 (emphasis omitted).  As with the "determination of an emergency medical condition," however, the Guidance repeats that "[t]he course of stabilizing treatment is under the purview of the physician or qualified medical personnel." ROA.217.  It also states that "[a] hospital's EMTALA obligation ends when a physician or qualified medical person

10

has made a decision" that, for example, "no emergency medical condition exists." ROA.217-218.

The Secretary also issued a letter to healthcare providers announcing the July 2022 Guidance, echoing that providers' "professional and legal duty to provide stabilizing medical treatment" under EMTALA "preempts any directly conflicting state law or mandate that might otherwise prohibit such treatment." ROA.221-222 (July 2022 Letter or Letter). Like the Guidance, the Letter emphasizes that both "the determination of an emergency medical condition" and "[t]he course of treatment necessary to stabilize such emergency medical conditions" are "under the purview of the physician or other qualified medical personnel." ROA.221. And like the Guidance, the Letter states that EMTALA's preemption provision applies only if the provider "believes that … abortion is the stabilizing treatment necessary to resolve" an emergency medical condition. ROA.221.

### D.    Prior Proceedings

**1.**    Texas filed this action challenging the July 2022 Guidance under the Administrative Procedure Act (APA), Medicare Act, and freestanding *ultra vires* theories based on the Spending Clause, non-delegation doctrine, and Tenth Amendment. ROA.35. Two weeks later, Texas amended the complaint, adding as co-plaintiffs the American Association of Pro-Life Obstetricians & Gynecologists (AAPLOG) and Christian Medical & Dental Associations (CMDA), two organizations representing

11

medical professionals. ROA.180-181. The amended complaint also included Religious Freedom Restoration Act and Free Exercise Clause claims. ROA.208-209.

Three weeks after the original complaint, plaintiffs moved for a preliminary injunction. *See* ROA.258, 265. The federal government opposed and moved to dismiss. ROA.445. The district court denied the government's motion and instead granted preliminary relief. ROA.889. The court concluded that plaintiffs were likely to succeed on two claims: the APA claim that the Guidance exceeds statutory authority and the notice-and-comment claim under the Medicare Act. ROA.927-947.

**2.** The district court entered an amended judgment under Rule 54(b), granting permanent injunctive relief "for the reasons stated in" its preliminary-injunction order, and stayed plaintiffs' remaining claims pending appeal. ROA.1112; *see* ROA.1101 (original judgment); Fed. R. Civ. P. 54(b).

In awarding relief, the district court rejected the government's justiciability arguments. The court reasoned that Texas had shown an Article-III injury because the Guidance harms the State's "sovereign interests." ROA.906. The court focused on Texas's "trigger law," which prohibits abortions except when, among other things, the pregnant patient has "a life-threatening physical condition aggravated by, caused by, or arising from a pregnancy that places the female at risk of death or poses a serious risk of substantial impairment of a major bodily function." ROA.891 (quoting Tex. Health & Safety Code § 170A.002(b)). According to the court, the Guidance harms Texas because it "interprets EMTALA to supersede Texas law and to permit abortions in

contexts beyond that permitted by" the exceptions enumerated under § 170A.002(b), "interprets a federal statute to preempt state law," and "interfere[s] with the enforcement of state law." ROA.906-908.

The district court also found that AAPLOG and CMDA had an Article-III injury, concluding that their members oppose "elective" abortions where the pregnant woman's life "is not at stake," and that "the Guidance threatens" punishment "for failure to perform abortions that violate their religious or moral beliefs or medical judgment." ROA.911-912 (quotation marks omitted). The court found that all plaintiffs had suffered a "procedural injury" from a lack of notice-and-comment rulemaking. ROA.909.

The district court likewise determined that the Guidance is final agency action subject to judicial review. The court reasoned that the Guidance was the consummation of a decision-making process, that it bound agency enforcement staff and threatened serious consequences for violations of EMTALA, and that it noted that countervailing state laws would be preempted. ROA.919-927.

On plaintiffs' APA claim, the district court concluded that the Guidance exceeded HHS's authority by offering an impermissible construction of EMTALA. ROA.927-943. The court interpreted EMTALA to impose on providers equal, independent statutory obligations to both a "pregnant woman and her unborn child." ROA.930. The court reasoned that those duties can conflict when a woman is experiencing a pregnancy-related medical emergency, and viewed EMTALA as leaving

that conflict unresolved.  ROA.930-931.  The court thus perceived a statutory gap to be filled by state abortion laws, and consequently found that EMTALA does not preempt such laws.  ROA.932-937.  Accordingly, the court concluded that "the Guidance stands contrary to the statute" by "purport[ing] to resolve the conflict between the health of the pregnant woman and the unborn child where EMTALA does not" and "by claiming" as a result "that state abortion laws are preempted."  ROA.938.

On plaintiffs' procedural claims, the district court concluded that HHS did not comply with the Medicare Act's distinct notice-and-comment requirements. ROA.943-947.[3]  In the court's view, the Guidance is a "rule, requirement, or other statement of policy … that establishes or changes a substantive legal standard governing the scope of benefits" and thus was required to be "promulgated by the Secretary by regulation."  42 U.S.C. § 1395hh(a)(2).

The district court also found that the equities favored plaintiffs.  ROA.947-951. It stated that procedural harm is "by definition" irreparable, that Texas's sovereign interests "can only be remedied by enjoining the Guidance's interpretation of EMTALA," ROA.948, and that AAPLOG and CMDA's members faced "severe penalties for their inevitable violation of the Guidance's requirements with regards to abortion."  ROA.948-949.

---

[3] The court declined to resolve plaintiffs' APA notice-and-comment claim. ROA.944-945 (noting differences between statutory requirements).

The court identified no irreparable harm on the other side of the ledger. The court observed that "Texas law already contains exceptions for abortions in life-threatening circumstances," ROA.949, and reasoned that HHS could not rely on its interest in advising the public "of its construction of EMTALA" if HHS had "issued the Guidance unlawfully," ROA.950. The court also stated that the Guidance "provides no exceptions" and requires providers to "perform abortions that violate their beliefs." ROA.951.

The district court issued the following injunction:

(1) The defendants may not enforce the Guidance and Letter's interpretation that Texas abortion laws are preempted by EMTALA; and

(2) The defendants may not enforce the Guidance and Letter's interpretation of EMTALA—both as to when an abortion is required and EMTALA's effect on state laws governing abortion—within the State of Texas or against AAPLOG's members and CMDA's members.

ROA.1113.

The government moved for clarification, noting that the injunction could be read to sweep beyond plaintiffs' asserted injuries. *See* ROA.1002; *see also* ROA.953-954, 1112-1113. The government explained that the court had described the plaintiffs' harms as stemming from a "conflict" between the Guidance's interpretation of EMTALA, on the one hand, and the restrictions on abortion care under either Texas law or plaintiffs' beliefs, on the other. ROA.1003. Yet the injunction prohibited *all* applications of the Guidance and Letter as to plaintiffs—including life-saving abortion care permitted by Texas law and consistent with the organizational plaintiffs' beliefs.

15

ROA.1002-1005.   In denying the motion, the court explained that the injunction "contains no exception for abortions permitted by state law" or by any plaintiff-member's beliefs.  ROA.1078.

## SUMMARY OF ARGUMENT

I.    The district court erroneously concluded that the Guidance constitutes final agency action subject to judicial review.  The Guidance is not "final" because it is not new and has no force of law.   Instead, it tracks prior (unchallenged) guidance documents and repeats the well-settled statutory understanding among courts and practitioners alike.  The Guidance likewise does not pre-determine any plaintiff's rights or obligations.  It simply repeats EMTALA's requirements, which, as relevant, apply only if a qualified provider determines both that (1) the individual has an emergency medical condition as defined by EMTALA and (2) abortion is the stabilizing treatment necessary to resolve that condition.  And it is the statute, not the Guidance, that defines and requires stabilizing treatment—and from which any legal consequences flow.

II.    The Guidance reiterates providers' existing statutory obligations and is thus fully consistent with EMTALA.  Under EMTALA, pregnant individuals presenting to a hospital emergency department and experiencing emergency medical conditions must be offered the necessary stabilizing medical treatment, which—in certain circumstances and when consistent with the provider's reasonable medical judgment—unambiguously requires offering abortion care.  In concluding that the Guidance is an impermissible construction of EMTALA, the district court misread the statute's plain

16

text. The text provides no basis for excluding medically necessary abortion care from the scope of stabilizing treatment. Nor does it create separate and equivalent statutory obligations to both a pregnant individual and her "unborn child." Consequently, no conflict between a provider's statutory duties arises when a medical emergency threatens the health of both the pregnant individual and her fetus. And even if such an intra-statutory conflict existed, EMTALA would mandate the means of resolving it through the statute's informed-consent framework. There is simply no internal conflict that EMTALA leaves unresolved and no resulting gap in the statute to be filled by state abortion laws. The Guidance correctly reiterates that any state law barring the provision of abortion care when it constitutes the necessary stabilizing medical treatment directly conflicts with EMTALA and is preempted.

**III.** The Guidance was not required to undergo notice-and-comment rulemaking under the Medicare Act. The Guidance is not a "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard." 42 U.S.C. § 1395hh(a)(2). Rather, the "statute itself" imposes the policy at issue and "supplies the controlling legal standard." *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816-17 (2019) (emphasis omitted). The Guidance reiterates the statute by stating that identifying both an emergency medical condition (as defined by EMTALA) and the necessary stabilizing treatment is under the purview of the medical provider.

**IV.** Finally, the district court's injunction is overbroad. The court enjoined the enforcement of EMTALA's requirements within Texas, and against all members of

17

the organizational plaintiffs, as to *all* abortion care—even life-saving treatments that Texas law does not prohibit, and to which no plaintiff objects. Any injunction should be limited to care that would actually contravene both Texas law and plaintiffs' asserted religious objections.

## STANDARD OF REVIEW

This Court reviews de novo the district court's legal rulings. *United States v. Castelo-Palma*, 30 F.4th 284, 286 (5th Cir. 2022). The scope of the injunction is likewise reviewed de novo. *Texas v. EEOC*, 933 F.3d 433, 450 (5th Cir. 2019).

## ARGUMENT

### I.    The Guidance Is Not Final Agency Action Subject to Review.

**A.**    The July 2022 Guidance is not final agency action subject to judicial review under 5 U.S.C. § 704. To constitute final agency action, any "rights, obligations, or legal consequences" created by a challenged action "must be new," *Texas v. Rettig*, 987 F.3d 518, 529 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 1308 (2022), and the challenged action must determine a party's legal "rights or obligations," *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted). Agency action is not "final" if it "merely restate[s]" a statutory requirement or "merely reiterate[s] what has already been established." *National Pork Producers Council v. U.S. EPA*, 635 F.3d 738, 756 (5th Cir. 2011).

**1.**    The Guidance is not final agency action because it "does not contain new policy." ROA.214 (emphasis omitted); *see Rettig*, 987 F.3d at 529. By its terms, the Guidance "remind[s] hospitals of their existing obligation to comply with EMTALA."

18

ROA.214 (emphasis omitted).    In doing so, it "merely restate[s]" EMTALA's requirements and "reiterate[s]" obligations that had "already been established." *National Pork*, 635 F.3d at 756.

Prior guidance documents confirm that the July 2022 Guidance was not "new." By September 2021, HHS had already reminded hospitals that "[e]mergency medical conditions involving pregnant patients may include, but are not limited to:  ectopic pregnancy, complications of pregnancy loss, or emergent hypertensive disorders, such as preeclampsia with severe features."   ROA.521 (alteration in original) (quoting September 2021 Guidance 4, https://perma.cc/65CQ-YLUQ).  That earlier guidance repeated that "[s]tabilizing treatment could include medical and/or surgical interventions (e.g., dilation and curettage (D&C), removal of one or both fallopian tubes, anti-hypertensive therapy, etc.)."   ROA.521 (alteration in original) (quoting September 2021 Guidance 4).

Also in September 2021, HHS's Office for Civil Rights issued separate guidance regarding EMTALA and abortion care.  OCR Guidance 2, https://perma.cc/FKH7-LZS2.  The agency addressed the Church Amendments, which prohibit covered entities from discriminating against any healthcare worker "because he performed or assisted in the performance of a lawful sterilization procedure or abortion."   42 U.S.C. § 300a-7(c)(1).  That guidance explained that "[l]awful abortions under the Church Amendments … include abortions performed in order to stabilize a patient when required under [EMTALA]," noting that "[e]mergency medical conditions involving

pregnant patients may include, but are not limited to, ectopic pregnancy, miscarriage, or pre-eclampsia."  OCR Guidance 2.

None of these reminders breaks new ground.  Rather, they reflect the pre-existing understanding of EMTALA's "stabilization" requirements shared among courts and medical providers.  *See Rettig*, 987 F.3d at 529.

Courts have long recognized that EMTALA's definition of "stabilization" is "not given a fixed or intrinsic meaning," but instead "is purely contextual or situational" and "depends on the risks associated with the transfer and requires the transferring physician, faced with an emergency, to make a fast on-the-spot risk analysis." *Cherukuri v. Shalala*, 175 F.3d 446, 449-50 (6th Cir. 1999).  Courts have similarly recognized that abortion care can constitute stabilizing treatment.  *See, e.g.*, *New York v. U.S. HHS*, 414 F. Supp. 3d 475, 537-39 (S.D.N.Y. 2019); *Morin v. Eastern Me. Med. Ctr.*, 780 F. Supp. 2d 84, 93-96 (D. Me. 2010); *Ritten v. Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d 696, 712-18 (E.D. Mich. 2009); *California v. United States*, No. C-05-328-JSW, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008).  The Guidance echoes this understanding by reiterating that "[t]he course of stabilizing treatment is under the purview of the physician or qualified medical personnel," and that "the determination of an emergency medical condition is the responsibility of the examining physician or other qualified medical personnel." ROA.217; *see* ROA.221 (Letter).

Practitioners likewise have long understood that EMTALA's stabilization requirements could encompass abortion care in certain circumstances:  namely, *if* the

medical provider determines that such care is the requisite stabilizing treatment for a specific emergency medical condition. *See* ROA.576 (Dr. Peaceman Declaration ¶ 7) ("I understand, and have long understood, EMTALA to require necessary stabilizing treatment including termination of pregnancy in [certain] instances."); *see also* ROA.568-569 (Dr. Carpenter Declaration ¶ 15); ROA.583 (Dr. Haider Declaration ¶ 7); ROA.596-597 (Dr. Nordlund Declaration ¶¶ 15-16). The Guidance tracks well-settled views by emphasizing that the provider's professional determinations are paramount. *See* ROA.214, 217; *see also* ROA.221 (Letter).

**2.**    The Guidance also does not determine plaintiffs' legal "rights or obligations." *Bennett*, 520 U.S. at 178 (quotation marks omitted). Agency action is non-final when, as here, "an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party." *Luminant Generation Co. v. EPA*, 757 F.3d 439, 442 & n.7 (5th Cir. 2014) (quotation marks omitted); *see Peoples Nat'l Bank v. Office of Comptroller of Currency of U.S.*, 362 F.3d 333, 337 (5th Cir. 2004) ("[A] non-final agency order is one that does not of itself adversely affect [plaintiffs] but only affects [their] rights adversely on the contingency of future administrative action." (quotation marks omitted)).

The Guidance is non-final because it has no independent legal force. As noted, the Guidance repeats statutory requirements that attach once a qualified provider has determined both that (1) the woman "is experiencing an emergency medical condition as defined by EMTALA" *and* (2) "abortion is the stabilizing treatment necessary to

resolve that condition." ROA.214 (emphasis added); ROA.221 (Letter). The Guidance also reaffirms that a hospital need not offer stabilizing treatment if "a physician or qualified medical person has made a decision" that "no emergency medical condition exists." ROA.217-218; *see* ROA.221 (Letter).

Even when HHS believes that a provider has violated EMTALA, any "adverse legal consequences will flow only if" a statutory violation is found at the end of a future enforcement proceeding, subject to judicial review. *See Luminant Generation*, 757 F.3d at 442; *see also supra* pp. 7-8; 42 U.S.C. § 1395dd(d); 42 C.F.R. § 489.24(g), (h); *AT&T v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001) (explaining that agency's expressed "view of the law" is non-final when it "has force only to the extent the agency can persuade a court to the same conclusion"). The Guidance "does not itself determine [plaintiffs'] rights or obligations." *Luminant Generation*, 757 F.3d at 442.[4]

**B.**    The court's order misconstrued both the statute and the Guidance. The court reasoned that the Guidance determines "rights or obligations" because it "binds" the agency to the legal position that a "physician 'must' provide an abortion as stabilizing treatment if he or she believes it is necessary to stabilize the pregnant woman," ROA.922-923, because the agency may impose certain penalties for "EMTALA violations," ROA.923, and because the Guidance "removes adherence to

---

[4] The district court did not independently analyze whether the Letter is final agency action. *See* ROA.921-926. Regardless, the Letter is not "final" for the same reasons that the Guidance is not final agency action.

state abortion laws as a valid defense in administrative EMTALA-enforcement proceedings," ROA.924.

None of these points supports a finding of final agency action. Even under the court's description, any legal consequences "flow" not from the Guidance, but from EMTALA itself. *See Bennett*, 520 U.S. at 178. The statute, not the Guidance, requires "such treatment as may be required to stabilize" an emergency medical condition. 42 U.S.C. § 1395dd(b)(1)(A). The statute, not the Guidance, defines "stabilize" as "provid[ing] such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(A). And the statute, not the Guidance, preempts "any State or local law requirement"—or removes any state-law defense—"to the extent that the requirement directly conflicts with a requirement of this section." *Id.* § 1395dd(f); *see In re Baby K*, 16 F.3d 590, 597 (4th Cir. 1994) (holding § 1395dd(f) preempts state law that "permits physicians to refuse to provide" stabilizing treatment as defined by EMTALA).

The Guidance, by contrast, describes potential applications of the statute to hypothetical facts. But again, it emphasizes that its descriptions apply only if *the provider* both concludes that the patient is "experiencing an emergency medical condition as defined by EMTALA," *and* "that abortion is the stabilizing treatment necessary to resolve that condition." ROA.214 (emphasis omitted); *see* ROA.221-222 (Letter). The Guidance does not dictate how a provider must make those determinations. ROA.217,

221; *Cherukuri*, 175 F.3d at 449.  Nor does the Guidance purport to create any binding analytical method to determine when abortions may be required by EMTALA.[5]

The district court's reliance on *Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019), underscores the errors in its analysis.  *See* ROA.926.  In that case, this Court concluded that an EEOC guidance document was "final" agency action because it "direct[ed] … decisions about which employers to refer for enforcement actions," "limit[ed] discretion respecting the use of certain evidence," and "create[d] safe harbors protecting private parties from adverse action."  *Texas*, 933 F.3d at 442-43.

The July 2022 Guidance shares none of those features.  It has no "analytical method" beyond the one detailed in EMTALA, no "limit[ation]" on the use of evidence or on the physician's judgment regarding what constitutes stabilizing treatment, and no "safe harbor" guaranteeing any specific outcome in any particular case.  Instead, the Guidance repeats that identifying an emergency medical condition and necessary stabilizing treatment is "under the purview of the physician or qualified medical personnel."  ROA.217; *accord* ROA.214; ROA.221-222.  Nor could the Guidance itself provide a legally operative "safe harbor"; rather, it is the statute that does so.  *See* 42 U.S.C. § 1395dd(f) (providing that state-law requirements are preempted only "to the

---

[5] The district court also cited *United States v. Idaho*, No. 1:22-CV-329 (D. Idaho), a pending action in which a preliminary injunction issued against enforcement of an Idaho statute that directly conflicts with EMTALA.  *See* ROA.925.  But that suit "is based on EMTALA itself rather than the Guidance," ROA.925, and thus provides no support for a finding of finality regarding the Guidance.

extent that the requirement directly conflicts with *a requirement of this section*" (emphasis added)); ROA.218 (repeating that "*EMTALA's* preemption of state law could be enforced … in a variety of ways, potentially including as a defense to a state enforcement action" (emphasis added)).

## II.    The Guidance Is Fully Consistent with EMTALA.

### A.    EMTALA Requires Doctors to Offer Abortion Care to Individuals When That Care Is the Necessary Stabilizing Treatment for an Emergency Medical Condition.

**1.**    Under EMTALA, Medicare-participating hospitals must (barring an appropriate transfer) offer to provide "stabilizing treatment" to all individuals who present to emergency departments when the individual is experiencing an "emergency medical condition."  42 U.S.C. § 1395dd(b)(1).  For such individuals, hospitals "must provide" "further medical examination and such treatment as may be required to stabilize the medical condition."  *Id.*; *see* 42 C.F.R. § 489.24(a)(1)(i)-(ii).  A hospital "is deemed to meet" this requirement if it "offers the individual" the examination and treatment and "informs the individual … of the risks and benefits," and the individual refuses treatment.  42 U.S.C. § 1395dd(b)(2).

EMTALA frames the stabilization requirement in general terms.  The statute does not exempt any form of medical care from potentially qualifying as stabilizing treatment.  And EMTALA mandates a specific form of stabilizing treatment in only one circumstance:  where a pregnant woman is in labor.  *See* 42 U.S.C. § 1395dd(e)(3)(A) ("The term 'to stabilize' means, … with respect to an emergency medical condition

described in paragraph (1)(B), to deliver (including the placenta).'").  Otherwise, the statute leaves to the relevant medical professionals the determination of what "medical treatment of the condition" is "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual."  *Id.*; *Cherukuri*, 175 F.3d at 449-50 (observing that meaning of "stabilized" is "purely contextual or situational").

EMTALA, moreover, "do[es] not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section."  42 U.S.C. § 1395dd(f).  As courts of appeals have recognized, EMTALA preempts state law where it is either physically impossible for a hospital or physician to comply with both state law and their obligations under EMTALA, or where state law stands as an obstacle to the accomplishment of Congress's objectives in enacting EMTALA.  *See Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999); *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993) (per curiam).  One such circumstance occurs where state law permits (or, as here, requires) medical professionals to refuse requisite stabilizing treatment.  *See Baby K*, 16 F.3d at 597 (holding that state law permitting physicians to refuse to provide care that they deemed "medically or ethically inappropriate" directly conflicted with EMTALA's stabilization requirement).

**2.**    EMTALA's framework functions in the same way when the individual presenting to an emergency department is pregnant.  Congress expressly contemplated that pregnant women would be among those experiencing an "emergency medical

26

condition." 42 U.S.C. § 1395dd(e)(1)(A)(i), (B). When a pregnant individual "comes to a hospital and the hospital determines that the individual has an emergency medical condition," absent appropriate transfer, "the hospital must provide … such treatment as may be required to stabilize the medical condition." *Id.* § 1395dd(b).

Various conditions can arise during, or be exacerbated by, pregnancy that may constitute "emergency medical conditions." These include, for example, preterm premature rupture of membranes, pre-eclampsia, and eclampsia. *See* ROA.565-567 (Dr. Carpenter Declaration ¶¶ 10-13). For some emergency medical conditions, a physician could determine that the stabilizing treatment is abortion care. ROA.564-569 (Dr. Carpenter Declaration ¶¶ 8-15); ROA.575-578 (Dr. Peaceman Declaration ¶¶ 5-10); ROA.583-585 (Dr. Haider Declaration ¶¶ 7-13); ROA.593-596 (Dr. Nordlund Declaration ¶¶ 9-14). In those circumstances, EMTALA requires that such treatment be offered to the pregnant individual and provided upon informed consent. 42 U.S.C. § 1395dd(b)(1)(A), (2); *see United States v. Idaho*, No. 1:22-CV-329-BLW, 2022 WL 3692618, at *3-4, *8 (D. Idaho Aug. 24, 2022) ("[W]hen pregnant women come to a Medicare-funded hospital with an emergency medical condition, EMTALA obligates the treating physician to provide stabilizing treatment, including abortion care.").

**3.** The July 2022 Guidance reflects a straightforward reading of EMTALA's text: The statute requires providers to offer stabilizing treatment when medically necessary, and it does not categorically exempt any categories of emergency conditions from requiring stabilizing treatment or any categories of medical care from constituting

stabilizing treatment.  *See* ROA.214, 217; *see also* ROA.221-222 (Letter).  The Guidance likewise reminds hospitals that abortion care cannot be categorically excluded from consideration as appropriate stabilizing treatment, "irrespective of any state laws or mandates that [might] apply."  ROA.218.  The Guidance reiterates that EMTALA assigns to Medicare-participating hospitals and their physicians the role of determining both whether an emergency medical condition exists, and what medical procedures "may be necessary" to stabilize the patient.  *See* ROA.217 ("The course of stabilizing treatment is under the purview of the physician or qualified medical personnel."); *see* ROA.221 (Letter).  And it reminds hospitals of the clear import of EMTALA's preemption provision:  A state law that "directly conflicts" with EMTALA—such as by prohibiting the procedure that would constitute the requisite stabilizing treatment— is preempted.  ROA.214, 218; *see* ROA.221-222 (Letter).  The Guidance, and the Secretary's accompanying letter, are wholly consistent with the EMTALA statute.

## B.    The District Court's Contrary Conclusion Rests on a Fundamental Misreading of EMTALA.

In rejecting that straightforward interpretation of EMTALA, the district court read ambiguity and an internal conflict into the statute where none exists.  First, the court attached undue significance to the fact that EMTALA does not reference abortion care (notwithstanding that the statute does not call out any form of care that might constitute stabilizing treatment).  Second, the court misread the statute as imposing independent and equal duties to both a pregnant woman and an "unborn child."

ROA.929. Third, the court overlooked that EMTALA resolves any purported conflict

even if such duties were in tension.

### 1. EMTALA encompasses abortion care as potential stabilizing treatment for pregnant individuals.

The district court stressed that EMTALA does not expressly address how its

requirements apply when the requisite stabilizing treatment involves abortion care.

ROA.928-929; *see* ROA.889 (characterizing "EMTALA's text" as "silent as to

abortion"). On that basis, the court concluded that EMTALA does not speak to the

specific question at issue, and that the July 2022 Guidance is thus a gap-filling

construction of the statute. ROA.929, 931 n.12. But the court manufactured ambiguity

where none exists.

By its plain terms, EMTALA encompasses abortion care as potential stabilizing

treatment. When an individual presents to an emergency department with an

emergency medical condition, a hospital must offer "such treatment as may be required

to stabilize the medical condition." 42 U.S.C. § 1395dd(b)(1). The statute defines "to

stabilize" in relevant part as "to provide such medical treatment of the condition as may

be necessary to assure, within reasonable medical probability, that no material

deterioration of the condition is likely to result from or occur during" transfer. *Id.*

§ 1395dd(e)(3)(A). EMTALA's broad definition does not exclude any form of medical

care from potentially qualifying as stabilizing treatment. The district court thus erred

in excluding medically necessary abortion care from the statutory text. *See Bostock v.*

*Clayton County*, 140 S. Ct. 1731, 1747 (2020) ("[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule.").

By not expressly naming "abortion" care as treatment that could meet EMTALA's definition of "stabilize," EMTALA treats such care the same as all other potential treatments for emergency medical conditions.  It would be impossible (and unnecessary) for the statute to anticipate and list every conceivable emergency medical condition that could arise and its corresponding stabilizing treatment.  Rather than list specific procedures, EMTALA mandates whatever a medical provider concludes is medically necessary to stabilize whatever condition is present.  The intentionally broad scope of EMTALA's framework speaks directly to the circumstances covered by the Guidance.

In citing the lack of explicit references to abortion care, the district court drew the incorrect inference.  When Congress creates special rules governing abortion—or excludes abortion care from otherwise-applicable rules—it does so expressly.  *See, e.g.*, 10 U.S.C. § 1093; 20 U.S.C. § 1688; 22 U.S.C. §§ 5453(b), 7704(e)(4); 25 U.S.C. § 1676; 42 U.S.C. §§ 238n, 280h-5(a)(3)(C), 300a-6, 300a-7, 300a-8, 300z-10, 1397ee(c)(7), 2996f(b)(8), 12584a(a)(9).  But Congress did no such thing in EMTALA.[6]  In fact, the

---

[6] Moreover, when Congress enacted special rules governing abortion coverage in the Affordable Care Act, *see* 42 U.S.C. § 18023(a)-(c), in the same section it specified that "[n]othing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including [EMTALA]," *id.* § 18023(d).  The juxtaposition of those subsections further

*Continued on next page.*

same bill through which Congress ultimately enacted EMTALA included a separate proposed program which (unlike EMTALA) would have expressly carved out abortion. *Compare* H.R. 3128, 99th Cong., § 124, at 33-42 (July 31, 1985) (language that became EMTALA), *with id.* § 302, at 125 (excluding abortion from other proposed program's authorized activities). But Congress did not include such language in EMTALA itself (and did not enact the other program either). *See* H.R. Rep. No. 99-453, at 601 (1985) (Conf. Rep.). The omission of abortion care in EMTALA demonstrates that Congress did not intend to carve out such stabilizing treatment.

Indeed, even plaintiffs have recognized throughout this litigation that stabilizing treatment under EMTALA can involve pregnancy termination. They agreed that ectopic pregnancies are "obviously treatable under EMTALA." ROA.1133-1134; *see* ROA.280 ("No one disputes that, in some tragic cases, stabilizing treatment may result in the death of an unborn child—such as the treatment of an ectopic pregnancy."). Plaintiffs further agreed that a premature rupture of membranes that threatens a pregnant woman's life could be treated under EMTALA. ROA. 1135, 1138. That is dispositive: Nothing in the statutory text permits plaintiffs to limit the operation of the stabilization requirement only to the circumstances in which they think pregnancy termination should be permitted.

---

underscores Congress's understanding that EMTALA requires consensual abortion care when a healthcare professional concludes it constitutes necessary stabilizing treatment.

### 2. EMTALA does not create equal and independent statutory obligations to both a pregnant individual and her "unborn child."

The linchpin of the district court's analysis was a misreading of the statutory text: The court misconstrued EMTALA as imposing on providers "equal obligations" to both the pregnant woman and her "unborn child" in the context of an emergency medical condition. *See* ROA.930 ("[I]n the case of a pregnant woman, a physician's duty to screen and to stabilize or transfer appropriately *applies equally to the pregnant woman and her unborn child.*" (emphasis added)). The court incorrectly reasoned that, when a pregnant woman presents with an emergency medical condition that might require abortion care as the stabilizing treatment, such obligations come into "conflict," which "the statute does not resolve." ROA.930. The court then relied on this "conflict" to conclude both that EMTALA does not require abortion care, ROA.929, and that the Guidance was contrary to EMTALA, ROA.929-938.[7]

---

[7] The court's interpretation of EMTALA to impose equal and independent duties to both the pregnant woman and her "unborn child" undergirds its entire statutory analysis. *See* ROA.929 ("duty of emergency care to an unborn child"); ROA.929 ("EMTALA creates obligations to stabilize both a pregnant woman and her unborn child …." (emphasis omitted)); ROA.930 ("EMTALA imposes obligations with respect to both the pregnant woman and her unborn child."); ROA.930 ("[A] physician's duty to screen and to stabilize or transfer appropriately applies equally to the pregnant woman and her unborn child."); ROA.931 ("independent EMTALA obligations to the child"); ROA.933 ("Congress imposed the obligations to screen, stabilize, and transfer equally to the pregnant woman and her unborn child."); ROA.937 ("a doctor's duties to a pregnant woman and her unborn child"); ROA.938 ("the physician's statutory duty to stabilize the health of the 'unborn child'"); ROA.942 ("EMTALA imposes equal stabilization obligations with respect to the unborn child …."); ROA.943 ("the doctor has a duty to both").

32

The court's reading of EMTALA to impose such independent and equal statutory duties is fundamentally flawed. From a single reference to an "unborn child," the court devised a legal regime in which the pregnant individual and her fetus are on equal footing. But in doing so, the court gave talismanic significance to two "words standing alone" and ignored "surrounding structure and other contextual cues that illuminate meaning." *Reed v. Taylor*, 923 F.3d 411, 415 (5th Cir. 2019). Reading the phrase "unborn child" within the statutory text and structure as a whole makes clear that the court's conflict is illusory.

     **a.**    The screening, stabilization, and transfer obligations in subsections (a), (b), and (c) of the statute expressly create a duty only to individuals. It is to "any individual" who "comes to the emergency department" and on whose behalf "a request is made … for examination or treatment" that a hospital's duty arises to "provide for an appropriate medical screening examination." 42 U.S.C. § 1395dd(a). A hospital's obligation to offer stabilizing treatment arises if it determines that "the individual has an emergency medical condition," *id.* § 1395dd(b)(1); and "the individual" must be informed of risks and benefits and can give "informed consent to refuse such examination and treatment," *id.* § 1395dd(b)(2). And EMTALA restricts transfer "until [the] individual [is] stabilized." *Id.* § 1395dd(c) (emphasis omitted); *see id.* § 1395dd(c)(1) ("If an individual at a hospital has an emergency medical condition which has not been stabilized ….").

The term "individual" as used in EMTALA—to identify the persons to whom the medical provider owes obligations—does not include the fetus. An "individual" is expressly defined through the Dictionary Act to "include every infant member of the species homo sapiens who is born alive at any stage of development." 1 U.S.C. § 8(a); *see id.* § 8(b) (defining "born alive"); *see also United States v. Adams*, 40 F.4th 1162, 1170 (10th Cir. 2022) (collecting cases interpreting § 8 to exclude fetuses). By expressly creating a duty only to individuals with respect to screening, stabilization, and transfer, Congress did not also extend those duties to the "unborn."[8] Indeed, in acknowledging the possibility that an individual could be pregnant, EMTALA carefully distinguishes between "the individual" (denoting the "pregnant woman") and "her unborn child." 42 U.S.C. § 1395dd(e)(1)(A)(i). Accordingly, in the context of emergency medical conditions arising during a pregnancy, the individual to whom EMTALA creates obligations—and grants the ability to refuse consent—is the pregnant woman.

**b.** The district court nonetheless concluded that "a physician's duty" under EMTALA "to screen and to stabilize or transfer appropriately applies equally to the pregnant woman and her unborn child." ROA.930. The court grounded this

---

[8] A 2020 Executive Order addressing the intersection of EMTALA and the Born-Alive Infants Protection Act of 2002, 1 U.S.C. § 8, echoed this understanding. *See* Exec. Order No. 13952, *Protecting Vulnerable Newborn and Infant Children*, 85 Fed. Reg. 62,187, 62,187 (Oct. 2, 2020) (recognizing that EMTALA guarantees "each individual's right to an appropriate medical screening examination and to either stabilizing treatment or an appropriate transfer," and "the Born-Alive Infants Protection Act, 1 U.S.C. 8, makes clear that all *infants born alive* are individuals for purposes of [EMTALA] and are therefore afforded the same legal protections as any other person" (emphasis added)).

conclusion solely on the reference to an "unborn child" in clause (e)(1)(A)(i). ROA.930.
The relevant provision states:

> The term "emergency medical condition" means—
>> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
>>> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
>>> (ii) serious impairment to bodily functions, or
>>> (iii) serious dysfunction of any bodily organ or part[] ….

42 U.S.C. § 1395dd(e)(1). In referring to a pregnant individual's "unborn child" in defining the term "emergency medical condition," EMTALA did not alter the identity of the party to whom the statute's obligations run. Rather, Congress indicated that it perceived serious threats to the health of the fetus as posing a threat to the pregnant woman herself. This reference clarified the scope of medical conditions that can trigger the statute's obligations, entitling pregnant women to stabilizing treatment where an emergency condition threatens their own health or the health of their "unborn child."[9]

The effect of this reference is apparent from the relevant statutory history. As originally enacted, EMTALA's definition of "emergency medical condition" did not take account of the health of a pregnant patient's fetus. *See* Pub. L. No. 99-272,

---

[9] Contrary to the district court's suggestion (ROA.938-940), it is understandable that the July 2022 Guidance did not focus on this reference to the "unborn child." As the government explained below (ROA.1204-1205), the Guidance reiterated hospitals' statutory obligations regarding a subset of emergency medical conditions and potential stabilizing treatment—those threatening pregnant patients and requiring abortion care.

§ 9121(b), 100 Stat. 82, 166 (1986) (codified at 42 U.S.C. § 1395dd(e)(1)(A) (1988))
("placing the patient's health in serious jeopardy"). At the time, any risks to the "unborn
child" were relevant only to determining whether a patient was in "active labor." *Id.*
(codified at 42 U.S.C. § 1395dd(e)(2)(C) (1988)). Congress amended the definition of
"emergency medical condition" more than three years later to its current form. Pub. L.
No. 101-239, § 6211(h), 103 Stat. 2106, 2248 (1989). The change "[p]rovid[ed] that
'emergency medical condition' *also applies* to a condition that places in serious jeopardy
the health of the woman or her unborn child." H.R. Rep. No. 101-386, at 838 (1989)
(Conf. Rep.) (emphasis added) (paragraph titled "*Clarification of 'emergency medical condition'
definition*").

Before this amendment became effective in 1990, if a pregnant woman came to
an emergency room without being in labor and had a medical condition that jeopardized
the health of her fetus—but not (yet) her own health—the hospital was arguably under
no obligation to offer her stabilizing treatment. After this amendment, EMTALA
requires hospitals to offer the pregnant woman stabilizing treatment for that condition.
But under subsections (a), (b), and (c), a hospital's affirmative duties under EMTALA
still run to the pregnant individual.

**c.** The district court's analysis is premised on the notion that, by expanding
the definition of "emergency medical condition" in clause (e)(1)(A)(i), Congress
fundamentally altered the scope of recipients of the screening, stabilization, and transfer
duties imposed in subsections (a), (b), and (c), and imposed a silent limitation on what

kind of medical care can qualify as stabilizing treatment under paragraph (e)(3). But there is no indication that Congress intended to radically alter the rest of the statute through this limited change. "Congress does not 'hide elephants in mouseholes.'" *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1071-72 (2018) (quoting *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). If Congress intended its amendment in clause (e)(1)(A)(i) to result in the exclusion of pregnancy termination as a form of stabilizing treatment under EMTALA, it would have said so clearly—as Congress so often has under other statutes. *See, e.g.*, *supra* p. 30.[10]

The text of EMTALA demonstrates that Congress did not intend this result. To have any basis in the statute, the court's conclusion necessarily treated the single reference to "unborn child" in the "Definitions" subsection as redefining the term "individual" as it appears throughout EMTALA. *See* ROA.1219 (Preliminary Injunction Hearing Transcript 102) ("In the case of a pregnant woman, the individual means the pregnant woman and her unborn child."). The plain text cannot support such a reading.

**i.** Subsection (e) expressly defines six terms: "emergency medical condition," "participating hospital," "to stabilize," "stabilized," "transfer," and

---

[10] Similarly, when Congress sought to incorporate state law elsewhere in EMTALA, it did so expressly. *See* 42 U.S.C. § 1395dd(d)(2)(A)-(B) (authorizing actions for "damages available … under the law of the State in which the hospital is located"). This further undermines the proposition that Congress silently incorporated state-law abortion restrictions into the definition of permissible stabilizing treatment under paragraph (e)(3). *See* ROA.933.

"hospital." 42 U.S.C. § 1935dd(e) ("Definitions"). It does not purport to specially define "individual" for purposes of EMTALA, which is separately defined by the Born-Alive Infants Protection Act, 1 U.S.C. § 8. Nor can clause (e)(1)(A)(i) be read to redefine "individual." The text specifies medical conditions that could result in "placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy." 42 U.S.C. § 1395dd(e)(1)(A)(i). The key phrase is "the health of the individual": When the individual is a "pregnant woman," the parenthetical text requires hospitals to consider more broadly whether either "the health of the woman or her unborn child" are in serious jeopardy in determining whether an emergency medical condition exists. But, as the text of (e)(1)(A)(i) makes clear, the "pregnant woman" is still the relevant "individual" for purposes of EMTALA.

**ii.** Additional cues in subparagraph (e)(1)(A) reinforce the conclusion that the term "unborn child" does not impose equal and separate obligations—nor redefine the meaning of "individual." The term "unborn child" is referenced only in clause (i), but not in clauses (ii) or (iii). *See* 42 U.S.C. § 1395dd(e)(1)(A). As a result, the scope of possible emergency medical conditions that affect a pregnant woman's health more broadly includes "serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part." *Id.* Even for the key provision that takes account of the health of an "unborn child," the "individual" pregnant woman receives greater protection. *Id.*

**iii.**    EMTALA's other references to a pregnant woman's "unborn child" further undermine the district court's interpretation of (e)(1)(A)(i).  In subsection (c) governing transfers, EMTALA lists risks to "the unborn child" and their health as a factor to consider in evaluating whether the transfer of a patient is permissible in "the case of a woman in labor."  42 U.S.C. § 1395dd(c)(2)(A); *see id.* § 1395dd(c)(1)(A)(ii); *see also* 42 C.F.R. § 489.24(b) (defining "labor" to mean "the process of childbirth beginning with the latent or early phase of labor and continuing through the delivery of the placenta").  Similarly, subsection (e) defines "emergency medical condition" to include circumstances in which "a pregnant woman … is having contractions" and a transfer "may pose a threat to the health or safety of the woman or the unborn child."  42 U.S.C. § 1395dd(e)(1)(B).

As the text makes clear, those provisions are relevant only to one half of EMTALA's scope:  circumstances where a woman is *already in labor.  See* 42 U.S.C. § 1395dd (title: "Examination and treatment for emergency medical conditions and *women in labor*" (emphasis added)).  The only way "to stabilize" that kind of condition is for "the woman [to] deliver[] the child and the placenta."  42 C.F.R. § 489.24(b); *see* 42 U.S.C. § 1395dd(e)(3)(A).  The question at issue here, by contrast, is whether EMTALA creates equal and separate obligations to a fetus—and thus permits exemptions to the available stabilizing treatment—under the other half of its scope:  "emergency medical conditions" more generally.  The statute sensibly considers risks to the health of an "unborn child" in determining whether a hospital may permissibly transfer a woman in

labor, which generally implies the impending post-viability delivery of a live child. But this says nothing about whether the statute establishes discrete obligations with respect to an "unborn child" in other circumstances, and does not suggest that Congress intended to mandate the further gestation of a fetus at the expense of the mother's health when emergency complications arise.

EMTALA's other references to "unborn child" do not rescue the district court's construction. To the contrary, they underscore that when Congress required providers to consider the health of an "unborn child" in carrying out EMTALA's obligations, it said so expressly. Those provisions also demonstrate that Congress expressly differentiated between an "individual" and an "unborn child" throughout the statute. *See* 42 U.S.C. § 1395dd(c)(1)(A)(ii) ("risks to the individual and, in the case of labor, to the unborn child"); *id.* § 1395dd(c)(2)(A) ("risks to the individual's health and, in the case of a woman in labor, the health of the unborn child"). Adding those references to the statute in the 1989 amendments would have been wholly unnecessary if—as the district court appeared to assume—the amendment to (e)(1)(A)(i) in fact redefined "individual" to include "unborn child." *See* Pub. L. No. 101-239, § 6211(c)(3)(B), (5)(B), 103 Stat. at 2246. The district court's decision renders those references superfluous. *See Texas Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 133 (5th Cir. 2018) (reiterating presumption against superfluity).

    **d.** The district court erred in concluding that a single reference to the health of an "unborn child" in the "Definitions" subsection of EMTALA established

independent and equal statutory obligations to both a pregnant woman and her fetus. The reference merely operates to expand the scope of emergency medical conditions for which a pregnant woman must be offered treatment, as the individual to whom the statutory duties run. EMTALA thus contains no unresolved internal conflict between competing statutory obligations that would permit recourse to state law (or any other source) for resolution.

### 3.     EMTALA itself governs the resolution of any purported intra-statutory conflict.

Even if there were a conflict between independent statutory obligations to a pregnant "individual" and her "unborn child," the district court erred in overlooking that EMTALA mandates the means of resolving it. *See* ROA.929 ("EMTALA provides no roadmap for doctors when their duty to a pregnant woman and her unborn child may conflict."). In answering "who must resolve that conflict," the court concluded that "doctors must—in accordance with state law." ROA.931. But that is question-begging: The court based this conclusion on its view that EMTALA does not preempt state laws addressing circumstances where fetal and parental health are in conflict. *See* ROA.937, 942.

Viewed as a whole, EMTALA establishes which party will resolve any conflict between the pregnant woman's health and the health of her fetus: the pregnant woman. Under paragraph (b)(2), if the pregnant individual is experiencing an emergency medical condition, the individual must be offered the necessary stabilizing treatment for that

condition and informed of the risks and benefits. 42 U.S.C. § 1395dd(b)(2). Then "the individual (or a person acting on the individual's behalf)" must decide whether to consent to or refuse the treatment. *Id.* EMTALA thus contemplates that it is the pregnant woman who must weigh the risks to herself and to her fetus—in consultation with, for example, her physician, family, conscience, and faith—and decide whether to continue a dangerous pregnancy.

Even under the district court's mistaken interpretation, EMTALA's informed-consent framework would resolve any conflict that the court perceived. *See supra* Part II.B.2. Under the court's reading, if a pregnant individual were to present to a participating hospital's emergency department, both she and her fetus would be screened for emergency medical conditions. If the individual were experiencing such a condition (condition A) and her fetus were also experiencing such a condition (condition B), then the physician would need to separately determine the medical treatment necessary to stabilize the individual's condition (treatment A) and to stabilize the fetus's condition (treatment B). The physician would then be required to offer treatment A to the pregnant individual and explain its risks and benefits, and separately offer treatment B to the person acting on behalf of the fetus with the requisite explanation. Even under this scenario, it would be for the pregnant individual to decide whether to consent or refuse treatment A, and for the fetus's representative to consent or refuse treatment B.

42

This process also would resolve the court's hypothetical in which only the pregnant individual has an emergency medical condition upon arriving at the emergency room, but an emergency medical condition arises with respect to her "unborn child" during treatment.  *See* ROA.942-943.  Under the district court's framing, the physician would need to determine stabilizing treatment for the new emergency condition, offer that treatment to the person acting on the fetus's behalf, and permit that person to make an informed decision regarding whether to consent to treatment.

It would generally be the pregnant woman, however, who acts as her fetus's representative under paragraph (b)(2).[11]  And it is unrealistic to view a pregnant woman and her fetus as wholly separate patients for screening and treatment purposes.  In practice, the tandem processes that the district court's framing would require (*see supra* pp. 42-43) would not truly be distinct.  The pregnant woman and her fetus would be screened together; an emergency medical condition that threatens one likely would threaten the other; the physician would inform the pregnant woman of the risks and benefits to both of providing the necessary stabilizing treatment (including other emergency medical conditions that could arise).  And the pregnant woman ultimately would provide informed consent or refusal on behalf of both herself and her fetus.

---

[11] Unless there is "a person acting on the [pregnant] individual's behalf," 42 U.S.C. § 1395dd(b)(2), in which case this person would act on behalf of the fetus as well.

Thus, contrary to the district court's suggestion, EMTALA does not assign the resolution of purported conflicts to doctors acting in compliance with state law. *See* ROA.931, 942. Even if the physician had "independent EMTALA obligations to the child," ROA.931, the statute would direct how the physician would satisfy those obligations: by offering stabilizing treatment and informing the "unborn child's" representative—the pregnant woman—of the risks and benefits, then providing such treatment upon consent. The statute leaves the balancing of those risks and benefits, and the ultimate decision, up to the pregnant woman.

### 4. The district court's remaining analysis is unavailing.

The district court's remaining analysis only underscores its misunderstanding of EMTALA.

**a. Preemption.** The district court concluded that there was no direct conflict between EMTALA and state laws addressing abortion, and thus EMTALA does not preempt such laws and the July 2022 Guidance is contrary to the statute for suggesting otherwise. *See* ROA.931-938. This conclusion wholly depends on the court's misreading of EMTALA. *See* ROA.937 ("[EMTALA] does not resolve how stabilizing treatments must be provided when a doctor's duties to a pregnant woman and her unborn child possibly conflict. That question is left unanswered. Accordingly, there is no direct conflict, and EMTALA leaves it to the states."); ROA.932 (similar). Properly understood, EMTALA preempts state laws that restrict abortion care in circumstances where abortion care constitutes the necessary medical treatment for an

emergency medical condition. *See supra* Part II.A. If a physician found herself in a situation where EMTALA would require her to provide consensual abortion care as stabilizing treatment, but such care would be barred by state law, it would be impossible for the physician to comply with both state and federal law. Accordingly, as applied to that circumstance, EMTALA would preempt the state abortion restriction. *See* ROA.933 (construing § 1395dd(f) as an "ordinary conflicts-preemption provision" satisfied by impossibility preemption); *Idaho*, 2022 WL 3692618, at *8-10.

**b.    Interference with the practice of medicine.** Finally, the district court concluded (ROA.940-941) that the July 2022 Guidance impermissibly interferes with the practice of medicine, contrary to the Medicare Act. *See* 42 U.S.C. § 1395 ("Nothing in this subchapter shall be construed to authorize … any supervision or control over the practice of medicine or the manner in which medical services are provided …."). As with preemption, this point is premised on the court's misimpression that the Guidance has "chang[ed] the statutory calculus." ROA.941. Instead, the Guidance reiterates hospitals' existing obligations under EMTALA and the fact that these obligations apply in the same manner where "abortion is the stabilizing treatment necessary to resolve [an emergency medical] condition." ROA.214 (emphasis omitted). The Guidance respects that decisions regarding "[t]he course of treatment necessary to stabilize such emergency medical conditions" are left to the professional judgment of the relevant medical personnel. ROA.217; *see* ROA.221-222 (Letter). The Guidance thus does not interfere with the practice of medicine any more than EMTALA itself.

45

By contrast, state laws that bar the provision of abortion care when it constitutes the necessary stabilizing treatment under EMTALA interfere with doctors' ability to exercise their medical judgment and respond to emergency situations, with potentially disastrous consequences for pregnant women. *Cf.* Plaintiff's Original Petition for Declaratory Judgment and Application for Permanent Injunction, *Zurawski v. State*, No. D-1-GN-23-968 (353d D. Ct., Travis Cty., Mar. 6, 2023), https://perma.cc/8ADE-LTDQ.

\* \* \*

The July 2022 Guidance is fully consistent with the statute in reiterating providers' existing obligations under EMTALA. There is no internal conflict between statutory duties to a pregnant woman and her "unborn child" that EMTALA leaves unresolved. There is thus no gap in the statute to be filled by state laws governing abortion. Accordingly, any such state law that would restrict the provision of abortion care as necessary stabilizing medical treatment under EMTALA is preempted. The district court's judgment should be reversed with respect to plaintiffs' APA claim.

## III. The Medicare Act Does Not Require Notice and Comment Here.

Under § 1395hh(a)(2) of the Medicare Act, an agency must engage in notice-and-comment rulemaking when promulgating a "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing … the payment for services." 42 U.S.C. § 1395hh(a)(2). Notice-and-comment is not required, however, if the "statute itself" imposes the policy at issue or "supplies the controlling

legal standard." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816-17 (2019) (emphasis omitted).

Neither the Guidance nor the Letter were subject to § 1395hh(a)(2)'s notice-and-comment provision. Those documents are not an agency "rule, requirement, or other statement of policy" because, as explained above, they do not alter EMTALA's generally applicable mandate to provide stabilizing treatment for emergency medical conditions—both of which are determined by providers. For similar reasons, the Guidance and Letter did not "establish[] or change[] a substantive legal standard" because any obligations derive from EMTALA itself. *See supra* Part II.A; *Allina*, 139 S. Ct. at 1816-17 (recognizing that § 1395hh(a)(2) is not triggered where the relevant requirement comes from the "statute itself," and there is no "'gap'-filling policy" at issue (emphasis omitted)).

The district court's contrary conclusion overlooks the documents' text. The court reasoned that the Guidance "established or changed a 'substantive legal standard'" because "EMTALA does not address abortion or how doctors should respond when both the mother and the unborn child have emergency medical[] conditions." ROA.946 (quoting *Allina*, 139 S. Ct. at 1810). But the Guidance does not establish "how doctors should respond" either. Rather, it addresses obligations that EMTALA itself imposes only if two conditions are met: if a medical provider both (1) "*believes that a pregnant patient* presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA," and (2) concludes in their

professional judgment "that abortion is the stabilizing treatment necessary to resolve that condition." ROA.214 (emphasis altered); *see also* ROA.217 ("The course of stabilizing treatment is under the purview of the physician or qualified medical personnel."); ROA.221-222 (Letter; similar).

In these respects, the Guidance (and Letter) mirror EMTALA's objective and context-specific definitions. *See, e.g.*, 42 U.S.C. § 1395dd(e)(3)(A) (defining "to stabilize" as "provid[ing] such medical treatment of the [emergency medical] condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur"). They also track the settled understanding that EMTALA's definition of "stabilized" "is purely contextual or situational," and thus "depends on the risks associated with" a particular case and "requires the transferring physician, faced with an emergency, to make a fast on-the-spot risk analysis." *Cherukuri*, 175 F.3d at 449-50.

The Supreme Court's decision in *Allina Health Services v. Azar* does not alter this conclusion. *Allina* held that HHS's announcement regarding how it would calculate Medicare payments for all providers "was at least a 'statement of policy' because it 'let the public know the agency's current ... adjudicatory approach' to a critical question involved in calculating payments for thousands of hospitals nationwide." 139 S. Ct. at 1810 (alterations omitted) (ellipsis in original); *id.* at 1811 (characterizing the policy at issue as "affect[ing] a hospital's right to payment"). Here, in contrast, the Guidance and Letter do not set an adjudicatory approach affecting the substance of a physician's

48

determination whether an individual is experiencing an emergency medical condition. Nor do they dictate how a physician would conclude that abortion is the necessary stabilizing treatment. Rather, they leave those calculations to the medical provider, *see* ROA.214, 217, 221-222, and the relevant definitions to the statute, 42 U.S.C. § 1395dd(e)(1), (3).

## IV.    The Injunction Is Overbroad.

At a minimum, this Court should narrow the injunction, which sweeps far beyond plaintiffs' asserted harms. The district court enjoined HHS from enforcing EMTALA's requirements against plaintiffs as applied to *all* abortion care—even life-saving treatments to which no plaintiff objects. *See* ROA.1113. This Court should limit any injunctive relief to the discrete situations where applying the "Guidance and Letter's interpretation of EMTALA," ROA.1113, would actually contradict Texas law or a plaintiff-organization member's religious beliefs.

**A.**    Constitutional principles restrict a federal court's power to issue injunctions. Because Article-III "standing is not dispensed in gross," plaintiffs must establish standing "separately for each form of relief sought." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (quotation marks omitted). The Constitution also requires that each "remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018).

Equity reinforces these constitutional constraints. Injunctions "do[] not follow from success on the merits as a matter of course." *Winter v. Natural Res. Def. Council,*

*Inc.*, 555 U.S. 7, 32 (2008). Even when a court issues injunctive relief, the remedy must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 586 (5th Cir. 2013) ("[A] court must narrowly tailor an injunction to remedy the specific action which gives rise to the order." (quotation marks omitted)). An injunction "must be vacated" if it "is not narrowly tailored to remedy the specific action which gives rise to the order." *ODonnell v. Harris County*, 892 F.3d 147, 155, 163 (5th Cir. 2018) (quoting *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)), *overruled on other grounds by Daves v. Dallas County*, 22 F.4th 522 (5th Cir. 2022) (en banc).

The injunction here flouts those teachings. From a constitutional perspective, the injunction departs from plaintiffs' asserted injuries: Texas asserted a conflict between the Guidance and the State's sovereign interest in restricting access to abortion care, *see* ROA.276, 898, while AAPLOG and CMDA posited a conflict between the Guidance and certain members' religious convictions forbidding so-called "elective" abortions, *see* ROA.276-278, 898, 901-902. In both instances, plaintiffs' claimed injuries turned on abortion care that would *violate* state law or their beliefs, respectively. *See* ROA.901 (finding "an injury to [Texas's] sovereign interest based on the differences between the Guidance's interpretation of EMTALA and Texas's laws governing when abortions are permitted"); ROA.914 (finding injury based on organizational-plaintiff

50

members' "refus[al] to perform abortions that are elective—that is, not necessary to save the life of the mother").

But the district court did not craft a remedy "tailored to redress … plaintiff[s'] particular injury." *Gill*, 138 S. Ct. at 1934. Instead, the court enjoined HHS from enforcing EMTALA's requirements against plaintiffs as applied to *all* abortion care—even life-saving treatments to which no plaintiff objects. *E.g.*, ROA.889 (noting that Texas law "allow[s] abortions in life-threatening conditions"); ROA.912 ("[B]oth organizations and their members do not object to abortions where it is necessary to save the mother's life."); *see also* ROA.280 (plaintiffs' concession that "stabilizing treatment may result in the death of an unborn child"); ROA.1133-1136 (similar). The court even acknowledged that the injunction "contains no exception for abortions permitted by state law" or by any AAPLOG- or CMDA-member's beliefs. ROA.1078 (order on motion for clarification). It thus lacked power to issue such untethered relief. *See Gill*, 138 S. Ct. at 1934 (cautioning that "standing is not dispensed in gross" (quotation marks omitted)).

The injunction likewise contravenes equitable principles. Under the district court's framing, it would have provided "complete relief" by enjoining only the type of emergency care that would violate state law and plaintiffs' beliefs. *See Califano*, 442 U.S. at 702. The court's balance-of-harms analysis, for example, focused on situations when "the Guidance would require abortion where Texas would not," ROA.949, and on organization members who "object" to so-called elective abortions "on medical, ethical,

and religious grounds," ROA.951. The court even discounted the harm to the government and public because Texas law allows "abortions in life-threatening circumstances," ROA.949, and because the organizational plaintiffs "do not object to abortions where it is necessary to save" the pregnant woman's "life," ROA.912. But by enjoining enforcement of the Guidance and Letter as applicable even to life-saving abortion care, ROA.1113, the court fashioned relief "more burdensome to the defendant than necessary," *Califano*, 442 U.S. at 702, and failed to "narrowly tailor an injunction to remedy the specific action which gives rise to the order," *John Doe #1*, 380 F.3d at 818.

This Court should also narrow the sprawling injunction because it is acutely disruptive. It harms the government by interfering with HHS's ability "to advise the public of [its] construction of the statutes and rules which it administers." *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quotation marks omitted). The injunction also threatens avoidable harms to the public—particularly pregnant women in their most vulnerable moments. As explained in the government's declarations, "[t]he tenets of EMTALA are fundamental to the practice of Emergency Medicine." ROA.593. But by enjoining EMTALA's requirements in the context of life-saving abortion care, the injunction increases the risk that pregnant individuals would be denied the "stabilizing" treatment that an organizational-plaintiff member would otherwise offer, or that Texas law would allow. *Cf.* ROA.563-570 (physician declaration describing emergency conditions for which abortion could be life-saving stabilizing care

52

under EMTALA); ROA.575-578 (similar); ROA.583-586 (same); ROA.592-596 (same). Nothing in the district court's balancing analysis supports this inequitable and unnecessary outcome.

**B.**    Contrary to the district court's conclusion, plaintiffs' alleged "procedural injury" from a "lack of notice and comment," ROA.953, does not justify this expansive injunction. Plaintiffs' allegations of procedural injury did not license the district court to expand the injunction beyond the minimum scope necessary to remedy their asserted concrete harms. *Cf. Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[A] procedural right *in vacuo*[] is insufficient to create Article III standing.").

In fact, any notice-and-comment violation here would not support an injunction at all. "Remand, not vacatur"—and certainly not an injunction—is "generally appropriate" relief for a failure to conduct notice and comment when (as here) there is "a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021). Even if plaintiffs' notice-and-comment claims had merit, the defects identified by plaintiffs would be readily amenable to correction on remand: the alleged failure to employ certain procedures, to consider explicitly all relevant factors, or to articulate fully the agency's decision-making. *See, e.g., Central & S.W. Servs., Inc. v. U.S. EPA*, 220 F.3d 683, 702 (5th Cir. 2000) (remanding without vacatur where the agency did not properly respond to all comments or explain one aspect of its decision); *Texas Ass'n of Mfrs.*, 989 F.3d at 389-90 (remanding without vacatur where the agency

53

had not properly employed notice-and-comment procedures and had failed to consider relevant factors).

Remand without vacatur is especially appropriate here because vacatur or injunctive relief "would be disruptive." *Central & S.W. Servs.*, 220 F.3d at 692; *see supra* pp. 52-53. At the very least, this Court should narrow the injunction to applications that would violate Texas law or an organizational member's religious beliefs.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

LEIGHA SIMONTON
*United States Attorney*

MICHAEL S. RAAB

*/s/ McKaye L. Neumeister*
McKAYE L. NEUMEISTER
NICHOLAS S. CROWN
*Attorneys, Appellate Staff*
*Civil Division, Room 7231*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

May 2023

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

*/s/ McKaye L. Neumeister*
McKaye L. Neumeister

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,910 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ McKaye L. Neumeister*
McKaye L. Neumeister

**ADDENDUM**

# TABLE OF CONTENTS

EMTALA, 42 U.S.C. § 1395dd ..........................................................................A1

Born-Alive Infants Protection Act, 1 U.S.C. § 8 ...........................................A7

42 U.S.C. § 1395hh(a)(1)-(2) ...........................................................................A7

**42 U.S.C. § 1395dd**

**§ 1395dd. Examination and treatment for emergency medical conditions and women in labor**

**(a) Medical screening requirement**

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

**(b) Necessary stabilizing treatment for emergency medical conditions and labor**

**(1) In general**

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either--

**(A)** within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

**(B)** for transfer of the individual to another medical facility in accordance with subsection (c).

**(2) Refusal to consent to treatment**

A hospital is deemed to meet the requirement of paragraph (1)(A) with respect to an individual if the hospital offers the individual the further medical examination and treatment described in that paragraph and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such examination and treatment, but the individual (or a person acting on the individual's behalf) refuses to consent to the examination and treatment. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment.

**(3) Refusal to consent to transfer**

A hospital is deemed to meet the requirement of paragraph (1) with respect to an individual if the hospital offers to transfer the individual to another medical facility in accordance with subsection (c) and informs the individual (or a person acting on

the individual's behalf) of the risks and benefits to the individual of such transfer, but the individual (or a person acting on the individual's behalf) refuses to consent to the transfer. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such transfer.

## (c) Restricting transfers until individual stabilized

### (1) Rule

If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B)), the hospital may not transfer the individual unless--

**(A)(i)** the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,

**(ii)** a physician (within the meaning of section 1395x(r)(1) of this title) has signed a certification that[12] based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or

**(iii)** if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1395x(r)(1) of this title), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and

**(B)** the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

### (2) Appropriate transfer

An appropriate transfer to a medical facility is a transfer--

**(A)** in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

---

[12] So in original. Probably should be followed by a comma.

**(B)** in which the receiving facility--

**(i)** has available space and qualified personnel for the treatment of the individual, and

**(ii)** has agreed to accept transfer of the individual and to provide appropriate medical treatment;

**(C)** in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of the transfer, including records related to the individual's emergency medical condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed written consent or certification (or copy thereof) provided under paragraph (1)(A), and the name and address of any on-call physician (described in subsection (d)(1)(C)) who has refused or failed to appear within a reasonable time to provide necessary stabilizing treatment;

**(D)** in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; and

**(E)** which meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred.

## (d) Enforcement

### (1) Civil money penalties

**(A)** A participating hospital that negligently violates a requirement of this section is subject to a civil money penalty of not more than $50,000 (or not more than $25,000 in the case of a hospital with less than 100 beds) for each such violation. The provisions of section 1320a-7a of this title (other than subsections (a) and (b)) shall apply to a civil money penalty under this subparagraph in the same manner as such provisions apply with respect to a penalty or proceeding under section 1320a-7a(a) of this title.

**(B)** Subject to subparagraph (C), any physician who is responsible for the examination, treatment, or transfer of an individual in a participating hospital, including a physician on-call for the care of such an individual, and who negligently violates a requirement of this section, including a physician who--

**(i)** signs a certification under subsection (c)(1)(A) that the medical benefits reasonably to be expected from a transfer to another facility outweigh the risks associated with the transfer, if the physician knew or should have known that the benefits did not outweigh the risks, or

**(ii)** misrepresents an individual's condition or other information, including a hospital's obligations under this section,

is subject to a civil money penalty of not more than $50,000 for each such violation and, if the violation is gross and flagrant or is repeated, to exclusion from participation in this subchapter and State health care programs. The provisions of section 1320a-7a of this title (other than the first and second sentences of subsection (a) and subsection (b)) shall apply to a civil money penalty and exclusion under this subparagraph in the same manner as such provisions apply with respect to a penalty, exclusion, or proceeding under section 1320a-7a(a) of this title.

**(C)** If, after an initial examination, a physician determines that the individual requires the services of a physician listed by the hospital on its list of on-call physicians (required to be maintained under section 1395cc(a)(1)(I) of this title) and notifies the on-call physician and the on-call physician fails or refuses to appear within a reasonable period of time, and the physician orders the transfer of the individual because the physician determines that without the services of the on-call physician the benefits of transfer outweigh the risks of transfer, the physician authorizing the transfer shall not be subject to a penalty under subparagraph (B). However, the previous sentence shall not apply to the hospital or to the on-call physician who failed or refused to appear.

**(2) Civil enforcement**

**(A) Personal harm**

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

**(B) Financial loss to other medical facility**

Any medical facility that suffers a financial loss as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for financial loss, under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

**(C) Limitations on actions**

No action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought.

**(3) Consultation with quality improvement organizations**

In considering allegations of violations of the requirements of this section in imposing sanctions under paragraph (1) or in terminating a hospital's participation under this subchapter, the Secretary shall request the appropriate quality improvement organization (with a contract under part B of subchapter XI) to assess whether the individual involved had an emergency medical condition which had not been stabilized, and provide a report on its findings. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall request such a review before effecting a sanction under paragraph (1) and shall provide a period of at least 60 days for such review. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall also request such a review before making a compliance determination as part of the process of terminating a hospital's participation under this subchapter for violations related to the appropriateness of a medical screening examination, stabilizing treatment, or an appropriate transfer as required by this section, and shall provide a period of 5 days for such review. The Secretary shall provide a copy of the organization's report to the hospital or physician consistent with confidentiality requirements imposed on the organization under such part B.

**(4) Notice upon closing an investigation**

The Secretary shall establish a procedure to notify hospitals and physicians when an investigation under this section is closed.

## (e) Definitions

In this section:

**(1)** The term "emergency medical condition" means--

**(A)** a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--

**(i)** placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

**(ii)** serious impairment to bodily functions, or

**(iii)** serious dysfunction of any bodily organ or part; or

**(B)** with respect to a pregnant woman who is having contractions--

**(i)** that there is inadequate time to effect a safe transfer to another hospital before delivery, or

**(ii)** that transfer may pose a threat to the health or safety of the woman or the unborn child.

**(2)** The term "participating hospital" means a hospital that has entered into a provider agreement under section 1395cc of this title.

**(3)(A)** The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta).

> **(B)** The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), that the woman has delivered (including the placenta).

**(4)** The term "transfer" means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person.

**(5)** The term "hospital" includes a critical access hospital (as defined in section 1395x(mm)(1) of this title) and a rural emergency hospital (as defined in section 1395x(kkk)(2) of this title).

## (f) Preemption

The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section.

## (g) Nondiscrimination

A participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, neonatal intensive care units, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual.

## (h) No delay in examination or treatment

A participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) or further medical examination and treatment required under subsection (b) in order to inquire about the individual's method of payment or insurance status.

**(i) Whistleblower protections**

A participating hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(A)(iii) or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

## 1 U.S.C. § 8

### § 8. "Person", "human being", "child", and "individual" as including born-alive infant

**(a)** In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the words "person", "human being", "child", and "individual", shall include every infant member of the species homo sapiens who is born alive at any stage of development.

**(b)** As used in this section, the term "born alive", with respect to a member of the species homo sapiens, means the complete expulsion or extraction from his or her mother of that member, at any stage of development, who after such expulsion or extraction breathes or has a beating heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, regardless of whether the umbilical cord has been cut, and regardless of whether the expulsion or extraction occurs as a result of natural or induced labor, cesarean section, or induced abortion.

**(c)** Nothing in this section shall be construed to affirm, deny, expand, or contract any legal status or legal right applicable to any member of the species homo sapiens at any point prior to being "born alive" as defined in this section.

## 42 U.S.C. § 1395hh

### § 1395hh. Regulations

### (a) Authority to prescribe regulations; ineffectiveness of substantive rules not promulgated by regulation

**(1)** The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter. When used in this subchapter, the term "regulations" means, unless the context otherwise requires, regulations prescribed by the Secretary.

**(2)** No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).

\* \* \* \*