No. 23-10246

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STATE OF TEXAS; AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS,

*Plaintiffs-Appellees*

v.

XAVIER BECERRA; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CENTERS FOR MEDICARE AND MEDICAID SERVICES; KAREN L. TRITZ; DAVID R. WRIGHT,

*Defendants-Appellants*

On Appeal from the United States District Court for the Northern District of Texas
(No. 5:22-CV-185-H)

**BRIEF OF *AMICI CURIAE* COUNTY OF SANTA CLARA, CALIFORNIA AND 11 ADDITIONAL CITIES AND COUNTIES IN SUPPORT OF DEFENDANT-APPELLANTS AND IN SUPPORT OF REVERSAL**

James R. Williams
*County Counsel, County of Santa Clara*
Kavita Narayan
Meredith A. Johnson
Rachel A. Neil\*
70 West Hedding Street, Ninth Floor, East Wing
San José, CA 95110
*Attorneys for Amici Curiae*

(*Complete Listing of Amici Curiae on Next Page*)

## ***Complete Listing of Amici Curiae***

The County of Santa Clara, California

Travis County, Texas

King County, Washington

The County of Milwaukee, Wisconsin

The County of Marin, California

The County of Monterey, California

The County of Los Angeles, California

The City of Austin, Texas

The City of Madison, Wisconsin

The City of Northampton, Massachusetts

The City of Philadelphia, Pennsylvania

The City and County of San Francisco, California

## CERTIFICATE OF INTERESTED PERSONS

1.      Case No. 23-10246, *State of Texas v. Xavier Becerra.*

2.      Pursuant to Federal Rule of Appellate Procedure 26.1(a), Federal Rule of Appellate Procedure 29(a)(4)(A), and Fifth Circuit Rule 28.2.1, amici curiae cities and counties need not furnish a certificate of interested persons because they are governmental entities.

Respectfully submitted,


*/s/ Rachel A. Neil*_____
Rachel A. Neil

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ...................................................................... ii

**INTERESTS OF *AMICI CURIAE*** ...................................................1

**ARGUMENT** ...................................................................................2

  **I.  Delaying or Denying Abortion to Patients Experiencing Serious Pregnancy Complications Endangers Patients' Health and Risks Their Lives** ................................................................................................4

    **A.  Preeclampsia and Eclampsia** ...........................................5

    **B.  Preterm Premature Ruptured Membranes**............................8

    **C.  Ectopic Pregnancy** ........................................................10

  **II.  Patients with Chronic Illness May Require Abortion to Protect Their Health and/or to Allow Them to Access Treatment for Their Illness** ..........12

    **A.  Cancer** ......................................................................13

    **B.  Cardiac Conditions** .....................................................14

    **C.  Renal Conditions** .......................................................15

  **III.  Denying or Delaying the Treatment of Patients with Pregnancy Complications Threatens to Erode Public Trust in Healthcare Providers and Thereby Undermine the Public Health and Welfare** ......................................16

**Conclusion**.......................................................................................21

**CERTIFICATE OF COMPLIANCE** .......................................................24

**STATEMENT UNDER FRAP 29(a)(4)(E)**.............................................25

i

# TABLE OF AUTHORITIES

**Cases**

*United States v. Idaho*, No. 22-cv-00329 (D. Idaho Aug. 25, 2022).......................12

**Statutes**

Tex. Health & Safety Code § 170A.001 ......................................................................5

Tex. Health & Safety Code § 170A.002(b) ...............................................................11

Tex. Health & Safety Code § 245.002(1)(C) .............................................................11

**Other Authorities**

Am. College of Obstet. & Gyn., Code of Professional Ethics 2 (Dec. 2018) .....5, 10

Am. College of Obstet. & Gyn., *Pregnancy and Heart Disease*, Prac. Bull. No. 212
   (May 2019)............................................................................................................15

Am. College of Obstet. & Gyn., *Tubal Ectopic Pregnancy*, Prac. Bull. No. 193
   (March 2018) ........................................................................................................10

Carly Parnitzke Smith, *First, do no harm: institutional betrayal and trust in health
   care organizations*, 10 J. Multidisc. Healthcare 133 (2017) ...............................17

Catherine Jane Golics *et al.*, *The impact of disease on family members: a critical
   aspect of medical care*, 106 J. Royal Soc. Med. 399 (2013), https://www.ncbi.
   nlm.nih.gov/pmc/articles/PMC3791092/.............................................................20

Center for Disease Control and Prevention, *Pregnancy-Related Deaths in the
   United States* (Nov. 16, 2022), https://www.cdc.gov/hearher/pregnancy-related-
   deaths/index.html .................................................................................................12

*Cervical Cancer*, Mayo Clinic (Dec. 14, 2022), https://www.mayoclinic.org/ diseases-conditions/cervical-cancer/diagnosis-treatment/drc-20352506 ............13

Consumer Financial Protection Bureau, *Medical Debt Burden in the United States* (2022), https://files.consumerfinance.gov/f/documents/cfpb_medical-debt- burden-in-the-united-states_report_2022-03.pdf..................................................20

*Ectopic Pregnancy*, Am. College of Obstet. & Gyn. (July 2022), https://www.acog. org/womens-health/faqs/ectopic-pregnancy. .......................................................10

*Ectopic Pregnancy*, Mayo Clinic (March 12, 2022), https://www.mayoclinic.org/ diseases-conditions/ectopic-pregnancy/symptoms-causes/syc-20372088 .... 10, 11

Johanna Birkhäuer et al., *Trust in the health care professional and health outcomes: A meta-analysis*, Pub. Libr. Sci. ONE, Feb. 7, 2017...........................19

Laura Santhanam, *How abortion bans will likely lead to more deadly infections*, PBS NewsHour (July 27, 2022, 2:13 PM EST), https://www.pbs.org/newshour/ health/how-abortion-bans-will-likely-lead-to-more-deadly-infections...............18

Maria L. Gonzalez Suarez et al., *Renal Disorders in Pregnancy: Core Curriculum 2019*, 73 Am. J. Kidney Disease 119 (2019).......................................................16

Nao Oguro et al., *The impact that family members' health care experiences have on patients' trust in physicians*, BMC Health Serv. Rsch., Oct. 19, 2021 ...........18

*Preeclampsia*, Mayo Clinic (Apr. 15, 2022), https://www.mayoclinic.org/diseases- conditions/preeclampsia/symptoms-causes/syc-20355745 ....................................6

*Promoting Cancer Early Diagnosis*, World Health Organization, https://www.who. int/activities/promoting-cancer-early-diagnosis (last visited May 8, 2023).........14

Roman Lewandowski et al., *Restoring patient trust in healthcare: medical information impact case study in Poland*, BMC Health Serv. Rsch., Aug. 24, 2021..........................................................................................................19

*Sepsis*, Mayo Clinic (Jan. 19, 2021), https://www.mayoclinic.org/diseases-conditions/sepsis/symptoms-causes/syc-20351214................................................9

Thomas A. LaVeist et al., *Mistrust of Health Care Organizations is Associated with Underutilization of Health Services*, 44 Health Servs. Rsch. 2093 (2009)..19

Timothy P. Hanna et al., *Mortality due to cancer treatment delay: systematic review and meta-analysis*, Brit. Med. J., Nov. 4, 2020 .......................................14

*What is Sepsis?*, Center for disease Control and Prevention (Aug. 9, 2022), https://www.cdc.gov/sepsis/what-is-sepsis.html ....................................................9

Whitney Arey et al., *A Preview of the Dangerous Future of Abortion Bans—Texas Senate Bill 8*, New England J. of Med. (Aug. 4, 2022), https://www.nejm.org/doi/full/10.1056/NEJMp2207423 ........................................................................17

Z.H. Xiao et al., *Outcome of premature infants delivered after prolonged premature rupture of membranes before 25 weeks of gestation*, 90 Eur. J. Obstet. Gyn. Reprod. Bio. 67 (May 1, 2000)....................................................................8

## INTERESTS OF *AMICI CURIAE*[1]

*Amici curiae* are counties and cities across the United States that maintain public health departments, own or operate hospitals or clinics, or otherwise fund healthcare services for their residents. Amici are geographically diverse jurisdictions that range in size, specifically, the County of Santa Clara, California; Travis County, Texas; King County, Washington; County of Milwaukee, Wisconsin; County of Marin, California; County of Monterey, California; County of Los Angeles, California; City of Austin, Texas; City of Madison, Wisconsin; City of Northampton, Massachusetts; City of Philadelphia, Pennsylvania; and City and County of San Francisco, California.

As local governments, amici are responsible, both in practice and often by legal mandate, for protecting the health and wellbeing of our communities. Many local governments provide direct medical services focused on serving indigent and other underserved populations. In addition, local governments provide emergency medical transportation and public health services, operate law enforcement agencies and jail facilities, maintain public infrastructure, assist vulnerable children and the elderly, promote economic security, and respond to public emergencies.

---

[1] Amici curiae submit this amicus brief with the consent of all parties, pursuant to Federal Rule of Appellate Procedure 29(a)(2). No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici curiae or their counsel made a monetary contribution to this brief's preparation or submission.

1

Accordingly, amici have a strong interest in ensuring public safety and welfare in the medical sphere and beyond.

Moreover, by virtue of their role in safeguarding public health and/or providing healthcare services, amici are knowledgeable about the circumstances in which abortion can be medically necessary, and the potentially severe medical and public health consequences—both at an individual level and a community-wide level—of delaying or denying care in such cases. Amici submit this brief to provide critical context about the significant and dangerous consequences for patients and for public welfare of stripping away the legal protections that ensure timely access to that care.

## ARGUMENT

As local governments responsible for protecting the health and welfare of our communities—including, for example, by protecting public health, providing direct medical services, promoting economic security, and providing emergency response services—amici respectfully urge the Court to reverse the district court's judgment. Stripping away legal protections that ensure patients have timely access to medically necessary abortions—such as the protections set out in the Emergency Medical Treatment & Labor Act ("EMTALA") and described in the U.S. Health and Human Services Department's Guidance and Letter ("HHS Guidance")—will expose patients experiencing dangerous pregnancy complications to significant, potentially

life-threatening health repercussions that will in turn have a harmful ripple effect throughout the community.  Because prompt treatment is often critical to protecting a patient's health, the consequences of delaying medically necessary abortions can be extreme and may mean the difference between life and death for a patient, with devastating consequences for the patient's family and community.

Even under the absolute best medical circumstances, pregnancy imposes significant stress on a patient's body and on major bodily functions.  In cases involving dangerous health complications, continuing a pregnancy can cause severe, and even fatal, illness or injury.  In such circumstances, doctors must act quickly to safeguard patients' health and minimize the risk to patients' lives.  However, without legal protections that ensure timely care for patients experiencing serious pregnancy complications, patients in states with restrictive abortion laws may be forced to suffer greatly as their health deteriorates, sometimes irreparably, while physicians delay critical, health-preserving care.

In addition to endangering individual patients, eliminating protections that ensure timely access to care threatens to harm public health more broadly by undermining patients' trust that the healthcare system will be responsive to their needs or the needs of their loved ones.  Patient trust is fundamental to healthcare providers' ability to treat patients, encourage healthy behaviors, and facilitate positive health outcomes for the public.  Without that trust, patients may become

skeptical that they can obtain the care they need and, as a result, delay or altogether forgo seeking important care.  When segments of the population do not or cannot access adequate health care, the wellbeing of the entire community is undermined. For the foregoing reasons, amici respectfully urge the Court to reverse the district court's judgment.

## I.    Delaying or Denying Abortion to Patients Experiencing Serious Pregnancy Complications Endangers Patients' Health and Risks Their Lives.

As set forth above, amici are local governments that maintain public health departments, own or operate hospitals or clinics, or otherwise fund healthcare services for their residents.  As entities that are broadly responsible for ensuring the safety and wellbeing of our communities—and do so, in part, by providing and facilitating access to healthcare—amici have a strong interest in ensuring that the laws governing healthcare institutions promote, rather undermine, both individual patient health and broader public welfare.

At the individual patient level, amici have an interest in minimizing dangerous health conditions and complications that sometimes arise during pregnancy and can render access to abortion necessary to protect pregnant patients' health and minimize the risk to their lives.  Requiring doctors to delay abortions for patients suffering from such complications, contrary to their medical judgment, threatens patients' health and will in some cases cause maternal deaths that could have been avoided.

Numerous pregnancy-related conditions, including but not limited to preeclampsia and eclampsia, preterm premature rupture of membranes, and ectopic pregnancies, pose serious risks to patient health and, if not treated in a timely or urgent manner, can prove fatal.[2] Enjoining application of the protections set out in EMTALA and the HHS Guidance risks the health and survival of pregnant patients with these and other conditions. As set forth more fully in Section III of this brief, denying timely and necessary care not only deprives each pregnant patient of their most fundamental rights, it also threatens lasting consequences to the public health and welfare. As entities charged with *protecting* the public health, amici have a strong interest in preventing these harms.

## A.     Preeclampsia and Eclampsia

One area where emergency abortion care can be necessary is when a patient suffers from preeclampsia or eclampsia. Preeclampsia is a complication of pregnancy characterized by high blood pressure, proteinuria (i.e., elevated levels of

---

[2] While the Texas "trigger law" prohibiting abortion provides an exception where the patient "has a life-threatening physical condition" related to the pregnancy that places the patient's life at risk or poses a "serious risk of substantial impairment of a major bodily function," Tex. Health & Safety Code § 170A.002(b), in practice this may not be the benevolent life-saving exception it appears to be. Rather, all too often, delaying medically necessary abortions *until* the point at which the patient is at serious risk means gambling with the patient's life and health. This is harmful to patients and, by forcing physicians to delay care rather than allowing them to make decisions based on their sound medical judgment, it runs contrary to the fundamental principle of medical ethics that physicians must prioritize their patients' health and welfare in all medical assessments. *See* Am. College of Obstet. & Gyn., Code of Professional Ethics 2 (Dec. 2018).

protein in urine), and/or other signs of kidney problems.[3]   In severe cases, preeclampsia can cause organ damage, placental abruption, severe uterine bleeding, stroke or other brain injury, and even death.[4]   Eclampsia—which is one of the leading causes of maternal mortality worldwide—is an extremely dangerous complication of severe preeclampsia that is characterized by the onset of seizures or coma.

These conditions can progress rapidly and unpredictably.   Thus, while preeclampsia can be managed in many cases—thereby allowing a patient to safely continue the pregnancy—patients suffering from eclampsia or severe preeclampsia prior to fetal viability may require an abortion to avoid severe, potentially life-threatening health consequences.   Given the rapid and unpredictable nature of the condition, it is essential that doctors be able to act quickly to safeguard patients' health and lives—which they may be constrained or chilled from doing should this Court uphold the district court's judgment barring application of the protections set forth in EMTALA and the HHS Guidance.[5]

---

[3] *See* Am. College of Obstet. & Gyn., *Gestational Hypertension and Preeclampsia*, Prac. Bull. No. 222 (Dec. 2018); *Preeclampsia*, Mayo Clinic (Apr. 15, 2022), https://www.mayoclinic.org/diseases-conditions/preeclampsia/symptoms-causes/syc-20355745.

[4] *See* Am. College of Obstet. & Gyn., *Gestational Hypertension and Preeclampsia*, Prac. Bull. No. 222 (Dec. 2018); *Preeclampsia*, Mayo Clinic (Apr. 15, 2022), https://www.mayoclinic.org/diseases-conditions/preeclampsia/symptoms-causes/syc-20355745.

[5] *See* Am. College of Obstet. & Gyn., *Gestational Hypertension and Preeclampsia*, Prac. Bull. No. 222 (Dec. 2018).

Indeed, delaying the availability of abortion in cases of preeclampsia or eclampsia—even by as little as a day or two—can have *catastrophic* repercussions, including permanent damage to the pregnant patient's heart, kidneys, liver, lungs, and/or brain.[6]  A delay in receiving care may also result in irrevocable damage to the patient's uterus because of severe hemorrhaging, which may require doctors to perform a hysterectomy that would have been unnecessary had the patient received timely care—and even if a hysterectomy is not required, the damage caused by hemorrhage may hinder the patient's ability to have future successful pregnancies. Finally, in the worst cases, delays in providing a medically necessary abortion to a patient suffering from severe preeclampsia and/or eclampsia can cost the patient's life.

In sum, when dealing with serious pregnancy complications like preeclampsia and eclampsia, even small differences in the timing of care can make the difference between recovery and permanent injury, and between life and death.  This throws into sharp relief the critical role of EMTALA in ensuring that pregnant patients who are experiencing emergency medical conditions receive *timely* care, and the consequences of the district court's decision to discard those essential protections.

---

[6] *See id.*

### B.    Preterm Premature Ruptured Membranes

Another dangerous pregnancy complication that requires urgent care is preterm premature rupture of the membranes of the amniotic sac. During a typical pregnancy, the membranes will rupture at or around full term, at which point the patient will go into labor. But when the membranes rupture very early in a pregnancy—i.e., long before fetal viability—this complication poses significant health risks to the pregnant patient. Once the membranes rupture, the amniotic fluid that surrounds the embryo or fetus (which is essential to fetal development) typically drains away. However, if the pregnancy is still in the very early stages, the patient may not go into labor.

At this point, the patient faces a serious risk of infection because the placenta and fetus remain inside the uterus, even though the pregnancy is failing. Even if signs of a fetal heartbeat remain, the chances are very low that a pregnancy involving extremely early rupture could be carried to the point of successful delivery.[7] Meanwhile, allowing the pregnancy to continue despite the ruptured membranes puts the pregnant patient's health in grave danger. If doctors do not promptly terminate the pregnancy, the patient is at risk of developing an infection that could

---

[7] *See* Z.H. Xiao et al., *Outcome of premature infants delivered after prolonged premature rupture of membranes before 25 weeks of gestation*, 90 Eur. J. Obstet. Gyn. Reprod. Bio. 67, 67, 70 (May 1, 2000) (describing the low chance of survival for infants who are delivered before 22 weeks because of premature rupture). By contrast, if the membranes rupture closer to viability, there is a greater likelihood that physicians will be able to perform a successful premature delivery.

in turn lead to sepsis—a life-threating condition in which the body's response to infection causes inflammation and blood clotting that impairs blood flow and can damage vital organs and even lead to death.[8]  Moreover, even if the patient survives, sepsis increases patients' risk of suffering infections in the future.

Complications arising from delays in care can also cause hemorrhaging or scarring of the uterus that permanently impairs fertility.  In some cases, patients may be forced to undergo a hysterectomy due to the advanced progression of the infection, preventing them from being able to get pregnant in the future.  These severe physical harms are compounded with the psychological distress and trauma that patients—including patients who very much hoped for and wanted the pregnancy, and who may want future pregnancies—will suffer from being forced, against their wishes and contrary to their medical providers' judgment, to carry a pregnancy that is no longer viable yet continues to cause physical suffering and threaten their long-term health and reproductive ability.[9]  Once again, it is critical that providers be able to provide care, without delay, in such situations.

---

[8] *See Sepsis*, Mayo Clinic (Jan. 19, 2021), https://www.mayoclinic.org/diseases-conditions/sepsis/symptoms-causes/syc-20351214; *see also What is Sepsis?*, Center for disease Control and Prevention (Aug. 9, 2022), https://www.cdc.gov/sepsis/what-is-sepsis.html.

[9] Unnecessarily delaying medically necessary abortions, to the detriment of patient health and at the risk of their lives, is contrary to medical ethics in general.  *See* Am. College of Obstet. & Gyn., *Code of Professional Ethics* 2 (Dec. 2018).  And delaying care is particularly egregious where the fetus's development is no longer compatible with life—including, for example, in many cases of preterm premature rupture.  Other conditions that are incompatible with survival of the fetus outside of the womb include: ectopic pregnancy (pregnancy implants outside of the uterus);

### C.     Ectopic Pregnancy

Another dangerous pregnancy condition that requires the kind of urgent medical care that EMTALA and the HHS Guidance are designed to ensure is ectopic pregnancy.[10]  During a typical pregnancy, the fertilized egg implants in the lining of the uterus and begins to develop.  In an ectopic pregnancy, however, the fertilized egg implants and begins to grow outside of the normal uterine lining.[11]  The most common type of ectopic pregnancy is a tubal pregnancy, in which the fertilized egg implants in a fallopian tube.  Other types of ectopic pregnancies include cervical (implanted in the cervix); Caesarean scar (implanted in a Caesarean section scar on the uterus); ovarian (implanted in an ovary); and abdominal (implants outside of the womb in another part the abdomen).  An ectopic pregnancy *cannot* be carried to term and is extremely dangerous.  If left untreated, ectopic pregnancy can cause severe and permanent health consequences up to and including death.  For example, in a

---

anencephaly (fatal condition where the brain and skull of the fetus do not develop); and congenital diaphragmatic hernia (fatal condition that prevents lungs from developing).

[10] *See* Am. College of Obstet. & Gyn., *Tubal Ectopic Pregnancy*, Prac. Bull. No. 193 (March 2018).

[11] *Id.; see also Ectopic Pregnancy*, Mayo Clinic (March 12, 2022), https://www.mayoclinic.org/diseases-conditions/ectopic-pregnancy/symptoms-causes/syc-20372088; *Ectopic Pregnancy*, Am. College of Obstet. & Gyn. (July 2022), https://www.acog.org/womens-health/faqs/ectopic-pregnancy.

tubal pregnancy, the fallopian tube can rupture, causing heavy internal bleeding and risking organ damage, reduced fertility, and death.[12]

While Texas law appears to exclude termination of an ectopic pregnancy from its ban on abortion,[13] ectopic pregnancies are just one of several conditions that may require timely provision of an abortion to preserve patient health and minimize the risk to the patient's life. Furthermore, there is no guarantee that states' restrictions on abortion will necessarily include an exception for ectopic pregnancy. For example, until recently, Idaho had taken the position that terminations of ectopic pregnancies qualify as abortions subject to Idaho's stringent abortion ban.[14] These discrepancies in the legal characterization of ectopic pregnancies and their termination only highlight the importance of laws, like EMTALA, that safeguard patient health throughout the United States by ensuring timely access to medically necessary care.

The pregnancy complications discussed above illustrate, but do not fully capture, the severe and even life-threatening consequences if patients suffering from serious pregnancy complications are denied medically necessary abortions or are needlessly forced to wait to receive such care. Research shows that most maternal

---

[12] *See Ectopic Pregnancy*, Mayo Clinic (March 12, 2022), https://www.mayoclinic.org/diseases-conditions/ectopic-pregnancy/symptoms-causes/syc-20372088.

[13] *See* Tex. Health & Safety Code §§ 170A.001, 245.002(1)(C).

[14] Transcript of Oral Argument at 24:19-25:12, *United States v. Idaho*, No. 22-cv-00329 (D. Idaho Aug. 25, 2022), at ECF No. 96.

deaths in the United States are preventable.[15]  Requiring doctors to risk patient health by delaying or denying health-preserving care, contrary to their medical judgment, will surely exacerbate this public health problem at the cost of patients' lives and health and to the detriment of their communities.  As local governments, amici seek to protect public health and welfare, and therefore urge the Court to reverse the district court's decision below.

## II.    Patients with Chronic Illness May Require Abortion to Protect Their Health and/or to Allow Them to Access Treatment for Their Illness.

In addition to patients with the pregnancy-specific conditions discussed in Part I, *supra*, pregnant patients who suffer from chronic illnesses may require timely access to abortion to protect their health or allow for treatment of an underlying illness.  Exacerbation of existing chronic disease can take a tremendous toll on the health and economic wellbeing of patients, their families, and their communities, and in some cases can place the patient's life in grave danger.  As entities responsible for promoting public health and welfare, amici have a strong interest in preventing these harms.  Chronic diseases that can make continuation of a pregnancy dangerous to the patient's life or health include, but are not limited to, cancer, cardiac disease, and renal disease.  This section will discuss each of these examples in turn.

---

[15] *See* Center for Disease Control and Prevention, *Pregnancy-Related Deaths in the United States* (Nov. 16, 2022), https://www.cdc.gov/hearher/pregnancy-related-deaths/index.html.

### A.     Cancer

Patients who are diagnosed with cancer before or during pregnancy may need a prompt abortion to protect their health.  Depending on the type and severity of the cancer, treatment may be incompatible with continuing the pregnancy.  For example, in the case of cervical cancer, lifesaving treatment sometimes requires removal of the cervix and uterus, which is inconsistent with continuing the pregnancy.[16] Furthermore, treatment for certain types of cancer—including cervical cancer and breast cancer—can involve radiation therapy.  Depending on the location and severity of the cancer and the stage of fetal development, radiation therapy may also be incompatible with continuing the pregnancy.  In cases where cancer is detected after the point of fetal viability, physicians may be able to perform an early delivery to allow the patient to seek cancer treatment; but in other cases, an abortion may be necessary to allow for timely treatment.

Delaying or denying an abortion to cancer patients under these circumstances has serious potential health consequences.  Because many cancers can progress rapidly, early treatment is critical to increasing a patient's chances of going into remission and reducing the likelihood of recurrence.[17]  Furthermore, delaying cancer

---

[16] *Cervical Cancer*, Mayo Clinic (Dec. 14, 2022), https://www.mayoclinic.org/diseases-conditions /cervical-cancer/diagnosis-treatment/drc-20352506.

[17] *See* Timothy P. Hanna et al., *Mortality due to cancer treatment delay: systematic review and meta-analysis*, Brit. Med. J., Nov. 4, 2020, at 1, 4-5, 10 ("Even a four week delay of cancer

treatment against the patients' wishes and contrary to their doctors' medical judgment may force patients to undergo more intrusive or risky cancer treatments than would otherwise have been necessary, once again placing the patient's health and/or life at risk.

### B.    Cardiac Conditions

Patients who suffer from certain cardiac conditions may be unable to sustain a pregnancy without risking severe harm to their health.  In such cases, timely access to an abortion may be medically necessary to prevent the patient's heart condition from deteriorating and avoid placing the patient's life at risk.  Thus, state restrictions that force doctors to delay these medically necessary abortions, contrary to the physician's medical judgment and the patient's wishes, pose a significant risk to patients' health.

Pregnancy places a significant, additional strain on almost all vital organs, including the heart.  For patients with heart conditions, this additional strain can pose a serious health risk.  Conditions that may place a patient at risk during pregnancy include, for example, pulmonary hypertension (blood vessels in the lungs have very high blood pressure), aortic dilation (aorta dilated and prone to rupture), heart valve disease (heart valves do not open and close properly), and cardiomyopathy

---

treatment is associated with increased mortality."); *see also Promoting Cancer Early Diagnosis*, World Health Organization, https://www.who.int/activities/promoting-cancer-early-diagnosis (last visited May 8, 2023).

(condition of the heart muscle that makes it difficult for the heart to pump).[18] Delaying the provision of an abortion to a patient with serious heart conditions—as doctors may feel forced to do under several states' trigger laws—may place the patient at a significant risk of blood clots, heart failure, or stroke. These, in turn, can cause damage to a patient's heart or brain, which would significantly impact the patient's quality of life and life expectancy and, in the worst cases, could cause death.

## C.    Renal Conditions

Like patients who suffer from heart conditions, patients with kidney disease also face a higher risk of severe health complications during pregnancy. As a result, these patients may need to terminate a pregnancy to avoid grave heath consequences. During pregnancy, the kidneys are required to filter significantly more blood volume than usual. This increased strain on the kidneys can aggravate preexisting renal insufficiency and/or renal failure, which can result in permanent kidney damage that lasts even after the pregnancy ends.[19] If denied timely access to an abortion, patients who suffer from renal insufficiency but were previously able to function without dialysis may deteriorate to the point where they need dialysis. In more extreme cases, a patient's condition may deteriorate to the point where, even with dialysis,

---

[18] *See* Am. College of Obstet. & Gyn., *Pregnancy and Heart Disease*, Practice Bulletin No. 212 (May 2019).

[19] *See* Maria L. Gonzalez Suarez et al., *Renal Disorders in Pregnancy: Core Curriculum 2019*, 73 Am. J. Kidney Disease 119, 128 (2019).

the kidneys cannot function well enough for the patient to survive. In those cases, patients will need a kidney transplant, or else their condition will prove fatal. Patients with kidney disease are also at a heightened risk of developing preeclampsia (discussed in Part I.A, *supra*) which can progress in a rapid and unpredictable manner. This underscores the importance of ensuring physicians can act without delay to provide medically necessary abortions to patients suffering from serious health complications. Local governments have an important interest in promoting public health and preventing unnecessary harm to our communities. For this reason, amici respectfully urge the Court to reverse the district court's erroneous decision.

### III. Denying or Delaying the Treatment of Patients with Pregnancy Complications Threatens to Erode Public Trust in Healthcare Providers and Thereby Undermine the Public Health and Welfare.

As discussed above, denying or delaying the treatment of patients with pregnancy complications has serious consequences at the individual level. Beyond that, it also threatens to undermine trust in the healthcare system more broadly, particularly among under-served communities, to the detriment of public health and community wellbeing. As local governments tasked with promoting public welfare, amici have a strong interest in preventing these harms.

Put simply, forcing physicians to delay or deny medically necessary abortions to patients suffering from serious health conditions is likely to undermine patients' confidence that healthcare professionals are willing and able to help them. Research

16

shows that patients who have negative medical experiences or feel betrayed by medical institutions are more likely to disengage from healthcare systems and less likely to adhere to medical advice.[20]   This would exacerbate existing medical skepticism and further erode trust in medical practitioners and institutions—trust that is foundational to effective patient care.  Furthermore, even patients who have a high degree of trust in healthcare providers and systems may find their confidence irreparably shaken if physicians withhold necessary medical care or force patients to "get sicker" and endure potentially life-threatening health complications before providing needed care.[21]   For example, in response to newly-effective abortion restrictions, some physicians in Texas are delaying abortions for patients who present with ruptured membranes prior to fetal viability; in several instances the physicians waited until the patient developed sepsis—a life-threatening condition— before providing care.[22]

---

[20] Carly Parnitzke Smith, *First, do no harm: institutional betrayal and trust in health care organizations*, 10 J. Multidisc. Healthcare 133, 137, 140-42 (2017).

[21] *See* Whitney Arey et al., *A Preview of the Dangerous Future of Abortion Bans—Texas Senate Bill 8*, New England J. of Med. (Aug. 4, 2022), https://www.nejm.org/doi/full/10.1056/ NEJMp2207423 (describing a patient's anger and sadness at having to either "wait[], and … potentially get sicker," or fly to another state and risk having a medical emergency in transit).

[22] *Id.*; *see also* Laura Santhanam, *How abortion bans will likely lead to more deadly infections*, PBS NewsHour (July 27, 2022, 2:13 PM EST), https://www.pbs.org/newshour/health/how-abortion-bans-will-likely-lead-to-more-deadly-infections (Texas physician describing a sharp increase in the number of patients experiencing sepsis or hemorrhage during pregnancy).

These dangerous and harmful medical encounters are likely to negatively affect individual patients' and the larger community's relationships with healthcare providers and the healthcare system. Both patients who suffer serious health complications because of physicians' inaction and their loved ones may find it difficult to trust the healthcare system in the future. Indeed, research shows that patients who feel that a relative has received poor or inadequate health care tend to report a loss of trust in their *own* healthcare providers and the healthcare system and are more likely to avoid seeking medical care.[23] This ripple effect means that negative health repercussions of delaying or denying medically necessary abortions extend far beyond the outcome of those specific incidents and threaten to harm public health more broadly by undermining trust in, and engagement with, the health care system.

The harmful consequences of this loss of trust are hard to overstate. Public trust is fundamental to healthcare professionals' ability to treat patients, encourage healthy behaviors, and facilitate positive health outcomes more broadly. Among other things, trust in healthcare professionals is associated with patients engaging in beneficial health behaviors and reporting higher satisfaction with their health care,

---

[23] Nao Oguro et al., *The impact that family members' health care experiences have on patients' trust in physicians*, BMC Health Serv. Rsch., Oct. 19, 2021, at 2, 9-10.

improvement in symptoms, and better quality of life as it relates to health.[24] Conversely, mistrust of healthcare providers contributes to delays in seeking care, which can lead to worse healthcare outcomes.[25]  Patients who distrust medical providers are also more likely to fail to follow the medical advice they are given.[26] Undermining confidence in healthcare professionals, therefore, has serious consequences for the public health.

But the impact on patients and the broader community does not end there. Worsened health outcomes negatively affect many aspects of community wellbeing beyond individual physical health.  Delays in seeking out or receiving medical care can result in more costly and intensive medical interventions.  The burden of increased medical expenses, in turn, can have serious and destabilizing repercussions for families and communities.  Some families struggling to pay medical expenses resort to payday lenders or sacrifice necessities like food and clothing to pay for medical care, and medical debt is a leading cause of bankruptcy in the United

---

[24] *See* Roman Lewandowski et al., *Restoring patient trust in healthcare: medical information impact case study in Poland*, BMC Health Serv. Rsch., Aug. 24, 2021, at 2; *see also* Johanna Birkhäuer et al., *Trust in the health care professional and health outcomes: A meta-analysis*, Pub. Libr. Sci. ONE, Feb. 7, 2017, at 10.

[25] *See* Thomas A. LaVeist et al., *Mistrust of Health Care Organizations is Associated with Underutilization of Health Services*, 44 Health Servs. Rsch. 2093, 2102-03 (2009).

[26] *Id.* at 2100.

States.[27]    Furthermore, the increased medical costs that result from delayed healthcare intervention limit the funding available for local jurisdictions that offer safety net healthcare services to provide the preventative and primary care services that help produce better health outcomes for the public.

Worsened public health outcomes can also negatively affect important areas such as school attendance and participation, familial relationships and stress, career advancement, and worker productivity.[28]  For example, children's frequent illness and doctor's appointments can interfere with their school attendance while simultaneously limiting their parents' ability go to work and to progress in their careers.  Meanwhile, parents struggling with serious health complications may have trouble finding the time or energy to help their children complete homework or to plan family bonding activities, while also managing their own health and potentially strained finances.  Each of these has cascading effects on the wellbeing of families and communities in both the short and long term, which further underscores the importance of preserving public health and promoting trust in, and with engagement with, the healthcare system.   But the district court's decision below does the

---

[27] Consumer Financial Protection Bureau, *Medical Debt Burden in the United States*, 29-30 (2022), https://files.consumerfinance.gov/f/documents/cfpb_medical-debt-burden-in-the-united-states_report_2022-03.pdf.

[28] Catherine Jane Golics *et al.*, *The impact of disease on family members: a critical aspect of medical care*, 106 J. Royal Soc. Med. 399, 401-03 (2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3791092/.

Case: 23-10246     Document: 36-1     Page: 28     Date Filed: 05/08/2023

opposite: it weakens the protections that ensure timely access to emergency care and threatens—to the detriment of public welfare—to undermine trust that the healthcare system will protect patients' health and respond to their needs.

## IV.  Conclusion

For the reasons set forth above, amici respectfully urge the Court to reverse the district court's judgment.

Dated: May 8, 2023                    Respectfully submitted

                                      JAMES R. WILLIAMS
                                      County Counsel, County of Santa Clara

                                      By: */s/ Rachel A. Neil*
                                          RACHEL A. NEIL
                                          70 West Hedding Street
                                          Ninth Floor, East Wing
                                          San José, CA 95110

                                      *Attorneys for Amici Curiae*

                                      *(Additional Counsel Listed on Next Page)*

21

***Additional Counsel for Amici Curiae***

DELIA GARZA
County Attorney, Travis County
P. O. Box 1748
Austin, Texas 78767
*Attorney for Travis County, Texas*

LEESA MANION (she/her)
Prosecuting Attorney
King County Prosecuting Attorney's Office
516 3rd Avenue
Seattle, WA 98104
*Attorney for King County, Washington*

MARGARET C. DAUN
Corporation Counsel
Milwaukee County Office of Corporation Counsel
901 N 9th Street, Suite 303
Milwaukee, WI 53233
*Attorney for County of Milwaukee, Wisconsin*

BRIAN E. WASHINGTON
County Counsel, County of Marin
3501 Civic Center Drive, Rm. 275
San Rafael, CA 94903
*Attorney for the County of Marin, California*

LESLIE J. GIRARD
County Counsel, County of Monterey
168 West Alisal Street, 3rd Floor
Salinas, CA 93901
*Attorney for County of Monterey, California*

DAWYN HARRISON
County Counsel
Jon Scott Kuhn
Steven De Salvo
500 W. Temple Street
Los Angeles, CA 90012

*Attorneys for the County of Los Angeles, California*

ANNE L. MORGAN
City Attorney
City of Austin Law Department
P.O. Box 1546
Austin, TX 78767-1546
*Attorney for City of Austin, Texas*

MICHAEL HAAS
City Attorney, City of Madison
210 Martin Luther King Jr. Blvd, Rm. 401
Madison, WI  53703
*Attorney for City of Madison, Wisconsin*

ALAN SEEWALD
Northampton City Solicitor
One Roundhouse Plaza, Suite 304
Northampton, MA  01060
*Attorney for City of Northampton, Massachusetts*

DIANA P. CORTES
City Solicitor
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
*Attorney for the City of Philadelphia, Pennsylvania*

DAVID CHIU
City Attorney
City Hall Room 234
One Dr. Carlton B. Goodlett Place
San Francisco, CA 94102
*Attorney for the City and County of San Francisco, California*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 4,884 words, excluding the parts of the brief exempted by Rule 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman.  As permitted under Fifth Circuit Rule 32.1, the footnotes have been prepared using 12-point font.

Respectfully submitted,

*/s/ Rachel A. Neil*_____

Rachel A. Neil

## STATEMENT UNDER FRAP 29(a)(4)(E)

1.      No counsel for a party authored this brief in whole or in part;

2.      No party or a party's counsel contributed money that was intended to fund preparing or submitting the brief; and

3.      No person other than the amici curiae or their counsel contributed money that was intended to fund preparing or submitting the brief.

## CERTIFICATE OF SERVICE

I hereby certify that on, May 8, 2023, the foregoing document was filed with the Clerk of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

By: */s/ James Lemus*_____

James Lemus