No. 23-10246

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

STATE OF TEXAS; AMERICAN ASSOCIATION OF PRO-LIFE
OBSTETRICIANS & GYNECOLOGISTS; CHRISTIAN MEDICAL &
DENTAL ASSOCIATIONS,

Plaintiffs-Appellees,

v.

XAVIER BECERRA; UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES; CENTERS FOR MEDICARE AND
MEDICAID SERVICES; KAREN L. TRITZ; DAVID R. WRIGHT,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Northern District of Texas

_____

**BRIEF FOR STATES OF CALIFORNIA, NEW YORK, ARIZONA,
COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS,
MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN,
MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NORTH
CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND,
WASHINGTON, AND THE DISTRICT OF COLUMBIA AS AMICI
CURIAE IN SUPPORT OF APPELLANTS AND REVERSAL**

Letitia James
  *Attorney General*
  *State of New York*
Barbara D. Underwood
  *Solicitor General*
Ester Murdukhayeva
  *Deputy Solicitor General*
Galen Sherwin
  *Special Counsel for Reproductive*
*Justice*
Laura Etlinger
  *Assistant Solicitor General*
  *of Counsel*
Office of the Attorney General
The Capitol
Albany, NY 12224
(518) 776-2028
Laura.Etlinger@ag.ny.gov

Rob Bonta
  *Attorney General State of*
  *California*
Renu R. George
  *Senior Assistant Attorney General*
Karli Eisenberg
  *Supervising Attorney General*
California State Bar No. 281923
David Houska
Hayley Penan
  *Deputy Attorneys General*
California Department of Justice
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 210-7913
Kari.Eisenberg@doj.ca.gov

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellants are all governmental parties. 5th Cir. R. 28.2.1.

　_/s/　Karli Eisenberg_____
Karli Eisenberg

# TABLE OF CONTENTS

**Page**

Introduction and Interests of Amici Curiae ................................................... 1

Argument ......................................................................................... 3

I.    EMTALA Has Long Been Interpreted to Require the
      Treatment of Pregnancy-Related Conditions That Need
      Emergency Abortion Care ............................................................ 3

II.   For Decades, States Have Understood That Abortion
      Care Is Part of Emergency Care. ................................................. 13

III.  Failure to Provide Emergency Abortion Care When
      Required Causes Serious Harms to Patients and Leads to
      Spillover Effects in Other States. ............................................. 16

      A.    Prohibiting Physicians from Providing Emergency
            Abortions Egregiously Harms Pregnant Patients. ........ 16

      B.    Prohibiting Physicians from Providing Emergency
            Abortion Care Harms Amici States. ........................... 21

Conclusion ..................................................................................... 28

# TABLE OF AUTHORITIES

**Page**

<small>CASES</small>

*Bryan v. Rectors & Visitors of the Univ. of Va.*
  95 F.3d 349 (4th Cir. 1996) ...........................................................9

*Burditt v. U.S. Dep't Health & Hum. Servs.*
  934 F.2d 1362 (5th Cir. 1991) .............................................. 7, 10

*City of Akron v. Akron Ctr. for Reprod. Health*
  462 U.S. 416 (1983)................................................................ 12

*Cleland v. Bronson Health Care Grp., Inc.*
  917 F.2d 266 (6th Cir. 1990) .......................................................9

*Doe* v. *Bolton*
  410 U.S. 179 (1973)................................................................ 12

*In re Baby "K"*
  16 F.3d 590 (4th Cir. 1994) .........................................................9

*ITT Educ. Servs. v. Arce*
  533 F.3d 342 (5th Cir 2008) ..................................................... 16

*June Med. Servs. LLC v. Kliebert*
  250 F. Supp. 3d 27 (M.D. La. 2017) ............................................9

*McDougal v. Lafourche Hosp. Serv. Dist. No. 3*
  No. 92-cv-2006, 1993 U.S. Dist. LEXIS 7381 (E.D. LA.
  May 24, 1993)..............................................................................8

*Morales v. Sociedad Española de Auxilio Mutuo y Beneficencia*
  524 F.3d 54 (1st Cir. 2008)..........................................................8

*Morin v. Eastern Me. Med. Ctr.*
  779 F. Supp. 2d 166 (D. Me. 2011)..............................................8

*New York v. U.S. Dep't Health & Hum. Servs.*
  414 F. Supp. 3d 475 (S.D.N.Y. 2019) ..................................... 8, 9

# TABLE OF AUTHORITIES
## (continued)

Page

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*
 951 F. Supp. 2d 891 (W.D. Tex. 2013) .......................................................9

*Planned Parenthood of Wis., Inc. v. Van Hollen*
 738 F.3d 786 (7th Cir. 2013) .......................................................9

*Ritten v. Lapeer Reg'l Med. Ctr.*
 611 F. Supp. 2d 696 (E.D. Mich. 2009) .......................................................8

*Roberts v. Galen of Va., Inc.*
 525 U.S. 249 (1999).......................................................10

*Roe v. Wade*
 410 U.S. 113 (1973).......................................................12

*Zurawski v. Texas*
 D-1-GN-23-000968 (Mar. 6, 2023).......................................................20, 21

**FEDERAL STATUTES**

42 U.S.C.
 § 1395dd .......................................................1
 § 1395dd(a).......................................................4
 § 1395dd(a)-(c).......................................................5
 § 1395dd(b)(2).......................................................12
 § 1395dd(b)-(c).......................................................40, 6
 § 1395dd(e)(1)(A).......................................................5, 6, 11
 § 1395dd(e)(1)(B).......................................................5
 § 1395dd(e)(3)(A).......................................................5
 § 1395dd(e)(3)(B).......................................................5

Pub. L. 99-272, 100 Stat. 164, 164-165 (1986).......................................................5

**FEDERAL REGULATIONS**

42 C.F.R.
 § 489.24(d)(2)(i) .......................................................4

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Regulation for the Enforcement of Federal Health Care
      Provider Conscience Protection Laws*, 76 Fed. Reg. 9,968,
      9,973 (Feb. 23, 2011).................................................................7

**MISCELLANEOUS AUTHORITIES**

Am. Coll. of Obstetricians & Gynecologists (ACOG), *Facts
      Are Important: Understanding Ectopic Pregnancy* (2022),
      https://www.acog.org/advocacy/facts-are-
      important/understanding-ectopic-
      pregnancy#:~:text=An%20ectopic%20pregnancy%20occurs
      %20when,%2C%20ovary%2C%20and%20cesarean%20scar ............... 17

ACOG, *Facts Are Important: Abortion Is Healthcare* (2022),
      https://www.acog.org/advocacy/facts-are-
      important/abortion-is-healthcare ............................................. 13

Amanda Michelle Gomez, *Abortion providers in the D.C.
      region are calling for protection*, WAMU 88.5 Am. U.
      Radio (July 19, 2022), https://tinyurl.com/ktpe8w7z.............................. 23

Andrea MacDonald et al., *The Challenge of Emergency
      Abortion Care Following the Dobbs Ruling*, 328 JAMA
      1691 (Nov. 1, 2022)......................................................... 18, 19

Angie Leventis Lourgos, *Abortions in Illinois for Out of State
      Patients Have Skyrocketed*, Chi. Trib. (Aug. 4, 2022),
      https://www.chicagotribune.com/news/breaking/ct-illinois-
      abortion-increase-post-roe-20220802-
      eottdwcfnjfjxdvbfgd4kwefwu-story.html................................. 23

Anjali Nambiar et al., *Maternal Morbidity and Fetal Outcomes
      Among Pregnant Women at 22 Weeks' Gestation or Less
      with Complications in 2 Texas Hospitals After Legislation
      on Abortion*, 227 Am. J. Obstetrics & Gynecology 648-50
      (July 4, 2022), https://www.ajog.org/article/S0002-
      9378(22)00536-1/fulltext......................................................... 20

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

Aria Bendix, *How Life-Threatening Must a Pregnancy Be to End It Legally?*, NBC News (June 30, 2022), https://www.nbcnews.com/health/health-news/abortion-ban-exceptions-life-threatening-pregnancy-rcna36026 ........................... 18, 19

Belle Taylor-Mcghee, *Doctors on Dobbs: Abortion Providers Bear Witness to the Devastating Effects of Roe's Overturn*, Ms. Magazine (Oct. 24, 2022), https://msmagazine.com/2022/10/24/abortion-doctors-womens-health-pregnancy-overturn-roe-v-wade/ ................................. 20

Caitlin Myers et al., *Abortion Access Dashboard*, https://experience.arcgis.com/experience/6e360741bfd84db7 9d5db774a1147815 ................................................................. 23

Carrie Feibel, *Because of Texas abortion law, her wanted pregnancy became a medical nightmare,* Tex. Trib. (Aug. 3, 2022), https://www.texastribune.org/2022/08/03/texas-abortion-law-pregnancy/ .......................................................... 21

Cindy Carcamo, *A California desert town has long been an abortion refuge for Arizona and Mexico. Now it's overwhelmed*, L.A. Times (July 20, 2022), https://www.latimes.com/california/story/2022-07-20/planned-parenthood-clinic-in-this-conservative-desert-town-is-now-a-refuge-for-arizonans-seeking-abortions ......................... 25

Claire Morley et al., *Emergency department crowding: A systematic review of causes, consequences and solutions*, 13 PLOS ONE e0203316 (2018), https://journals.plos.org/plosone/article?id=10.1371/journal. pone.0203316 ....................................................................... 26

Eleanor Klibanoff, *Doctors Report Compromising Care out of Fear of Texas Abortion Law*, Tex. Trib. (June 23, 2022), https://www.texastribune.org/2022/06/23/texas-abortion-law-doctors-delay-care/ ......................................................... 20

# TABLE OF AUTHORITIES
## (continued)

**Page**

Eleanor Klibanoff, *How Texas' abortion laws turned a
heartbreaking fetal diagnosis into a cross-country journey*,
Tex. Trib. (Sept. 20, 2022),
https://www.texastribune.org/2022/09/20/texas-abortion-
ban-complicated-pregnancy/ ................................................... 20

Elizabeth Cohen & Danielle Herman, *Why a woman's doctor
warned her not to get pregnant in Texas*, CNN (Sept. 10,
2022), https://www.cnn.com/2022/09/09/health/abortion-
restrictions-texas/index.html ................................................... 21

Elizabeth Cohen & John Bonifield, *Texas woman almost dies
because she couldn't get an abortion,* CNN (Nov. 16, 2022),
https://www.cnn.com/2022/11/16/health/abortion-texas-
sepsis/index.html ................................................................... 21

Eric Nadel & Janet Talbot-Stern, *Obstetric and Gynecologic
Emergencies*, 15 Emergency Med. Clinics of N. Am. 389
(1997) ......................................................................................6

Frances Stead Sellers & Fenit Nirappil, *Confusion Post-Roe
Spurs Delays, Denials for Some Lifesaving Pregnancy Care*,
Wash. Post (July 16, 2022)
https://www.washingtonpost.com/health/2022/07/16/abortio
n-miscarriage-ectopic-pregnancy-care/ ................................... 19

Gabor Kelen et al., *Emergency Department Crowding: The
Canary in the Health Care System*, NEJM Catalyst (Sept.
28, 2021),
https://catalyst.nejm.org/doi/full/10.1056/CAT.21.0217 ................. 26, 27

Geoffrey Chamberlain & Philip Steer, *ABC of Labour Care:
Obstetric Emergencies,* 318 BMJ 1342 (1999),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1115721/ .....................6

# TABLE OF AUTHORITIES
## (continued)

Hannah Metzger, *Colorado Democrats advance ban of
'deceptive' ads, 'abortion reversal' for crisis pregnancy
centers*, Colo. Politics (Mar. 30, 2023),
https://www.coloradopolitics.com/legislature/democrats-
target-abortion-reversal-crisis-pregnancy-centers-
colorado/article_e5c4fa2e-cf1d-11ed-bff6-
ef208a330dd2.html ................................................................... 24

HHS & Dep't of Just., *Health Care Fraud and Abuse Control
Program Annual Report for Fiscal Year 2019* (2020),
https://oig.hhs.gov/publications/docs/hcfac/FY2019-
hcfac.pdf ...................................................................................7

HHS, Off. of Inspector Gen., *Semi-Annual Report to Congress:
April 1 - September 30, 2015* (2015),
https://oig.hhs.gov/reports-and-
publications/archives/semiannual/2015/sar-fall15.pdf .............................7

HHS, Off. of Inspector Gen., *Semi-Annual Report to Congress:
April 1, 2007 - September 30, 2007* (2007),
https://oig.hhs.gov/publications/docs/semiannual/2007/Semi
annualFinal2007.pdf ...................................................................7

HHS, Off. of Inspector Gen., *Semi-Annual Report to Congress:
October 1, 1999 - March 30, 2000* (2000),
https://oig.hhs.gov/publications/docs/semiannual/2000/00sse
mi.pdf .......................................................................................7

Ian Millhiser, *No one knows when it is legal to perform
medically necessary abortions in Texas*, Vox (Mar. 12,
2023),
https://www.vox.com/politics/2023/3/12/23631278/supreme
-court-abortion-texas-medically-necessary-sepsis-zurawski .................. 22

J. David Goodman & Azeen Ghorayshi, *Women Face Risks as
Doctors Struggle With Medical Exceptions on Abortion*,
N.Y. Times (July 20, 2022),
https://www.nytimes.com/2022/07/20/us/abortion-save-
mothers-life.html ................................................................... 20

# TABLE OF AUTHORITIES
## (continued)

**Page**

Joseph Zibulewsky, *The Emergency Medical Treatment and Active Labor Act (EMTALA): What It Is and What It Means for Physicians,* 14 Baylor Univ. Med. Ctr. Proc. 339 (2001), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1305897/ ...................... 4

Kari White et al., *Out-of-State Travel for Abortion Following Implementation of Texas Senate Bill 8*, Tex. Pol'y Evaluation Project (Mar. 2022), https://sites.utexas.edu/txpep/files/2022/03/TxPEP-out-of-state-SB8.pdf ........................................... 23

Karma Dickerson, *More out-of-state patients begin arriving in California for reproductive health services*, Fox 40 News (Sept. 20, 2022), https://fox40.com/news/fox40-focus/out-of-state-patients-reproductive-health-abortion-california/ ..................... 25

Kate Zernike, *Medical Impact of Roe Reversal Goes Well Beyond Abortion Clinics, Doctors Say*, N.Y. Times (Sept. 10, 2022), https://www.nytimes.com/2022/09/10/us/abortion-bans-medical-care-women.html ....................................................... 20

Laura Kusisto, *Doctors Struggle with Navigating Abortion Bans in Medical Emergencies*, Wall Street J. (Oct. 13, 2022), https://www.wsj.com/articles/doctors-struggle-with-navigating-abortion-bans-in-medical-emergencies-11665684225?mod=politics_lead_pos9 ........................................... 22, 26

Lauren Sue, *Texas woman, hospitalized with blood-filled cysts, forced to wait 5 days to abort nonviable fetus,* Daily Kos (Sept. 8, 2022), https://www.dailykos.com/stories/2022/9/8/2121531/--Perfect-example-of-Texas-ban-Woman-waited-5-days-frail-vomiting-in-pain-for-abortion-care ....................................... 21

Lisa Wolf et al., *Triage Decisions Involving Pregnancy-Capable Patients: Educational Deficits and Emergency Nurses' Perceptions of Risk*, 52 J. Continuing Educ. Nursing 21 (2021) ....................................................................... 6

# TABLE OF AUTHORITIES
## (continued)

**Page**

Margot Sanger-Katz et al., *Interstate Abortion Travel Is Already Straining Parts of the System*, N.Y. Times (July 23, 2022), https://www.nytimes.com/2022/07/23/upshot/abortion-interstate-travel-appointments.html ........................................................... 22

Marielle Kirstein et al*., 100 Days Post-Roe: At Least 66 Clinics Across 15 US States Have Stopped Offering Abortion Care*, Guttmacher Inst., (Oct. 6, 2022), https://www.guttmacher.org/2022/10/100-days-post-roe-least-66-clinics-across-15-us-states-have-stopped-offering-abortion-care ........................................................................................... 24

Marisa Kendall, *Demand has quadrupled at some California abortion clinics since Roe fell*, Mercury News (Jan. 1, 2023), https://www.mercurynews.com/2023/01/01/demand-has-tripled-quadrupled-at-california-abortion-clinics-since-roe-fell/ ................................................................................................. 25

Matt Bloom & Bente Berkland, *Wait Times at Colorado Clinics Hit Two Weeks as Out-of-State Patients Strain System*, KSUT (July 28, 2022), https://www.ksut.org/health-science/2022-07-28/wait-times-at-colorado-abortion-clinics-hit-2-weeks-as-out-of-state-patients-strain-system ................................. 23

Matthew Foley et al., *Financial Impact of Emergency Department Crowding*, 12 W. J. Emergency Med. 192-97 (May 2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3099606/ .................... 26

Megan Burbank, *Who is traveling to Washington for abortion care?*, Crosscut (Nov. 14, 2022), https://crosscut.com/equity/2022/11/who-traveling-washington-abortion-care ........................................................ 24

Memorandum from Dirs., Quality, Safety & Oversight Grp. & Survey & Operations Grp., CMS, to State Survey Agency Dirs. (Sept. 17, 2021), https://www.cms.gov/files/document/qso-21-22-hospital.pdf .................. 7

## TABLE OF AUTHORITIES
### (continued)

Page

Mikaela Smith et al., *Abortion Travel Within the United States: An Observational Study of Cross-State Movement to Obtain Abortion Care in 2017*, 10 The Lancet – Reg'l Health: Americas art. 100214 (Mar. 3, 2022), https://www.sciencedirect.com/science/article/pii/S2667193X2200031X?via%3Dihub ........................................................................ 22

Nathan S. Richards, *Judicial Resolution of EMTALA Screening Claims at Summary Judgment*, 87 N.Y.U.L. Rev. 591 (May 2012), https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-87-2-Richards.pdf. ............................................................................... 4

Nina Martin et al., *The Extraordinary Danger of Being Pregnant and Uninsured in Texas*, Propublica (Dec. 6, 2019), https://www.propublica.org/article/the-extraordinary-danger-of-being-pregnant-and-uninsured-in-texas .................................. 21

Oriana Gonzalez & Nicole Cobler, *Influx of Out-of-State Patients Causes Abortion Delays*, Axios (Sept. 12, 2022), https://www.axios.com/local/austin/2022/09/12/texans-out-of-state-patients-abortions-delays ...................................... 22, 24

Peter Holley, *When Does the Life of a Pregnant Texan Count Under the State's New Abortion Ban?*, Tex. Monthly (Aug. 16, 2022), https://www.texasmonthly.com/news-politics/when-does-pregnant-texan-life-count-under-new-abortion-ban/ ........................................................................ 21

*Planned Parenthood centers in SoCal report dramatic increase in abortion patients from out of state*, ABC 7 News (July 6, 2022), https://abc7.com/planned-parenthood-abortion-orange-county-san-bernardino/12023682/ ............................................ 25

Rachel Jones et al., *New Evidence: Texas Residents Have Obtained Abortions in at Least 12 States That Do Not Border Texas*, Guttmacher Inst. (Nov. 9, 2021), https://tinyurl.com/yc294xyy ..................................................................... 24

## TABLE OF AUTHORITIES
### (continued)

Rebecca Greenberg, *Queens abortion clinic sees uptick in out-of-state patients*, Spectrum News NY1 (Sept. 08, 2022), https://www.ny1.com/nyc/queens/news/2022/09/08/queens-abortion-clinic-sees-uptick-in-out-of-state-patients. ............................... 25

Renee Hsia et al., *California hospitals serving large minority populations were more likely than others to employ ambulance diversion*, 31 Health Affairs 1767-76 (Aug. 2012), https://www.healthaffairs.org/doi/10.1377/hlthaff.2011.1020 ............... 27

Reuters, *Fact Check – Termination of Pregnancy Can Be Necessary to Save a Woman's Life, Experts Say* (Dec. 27, 2021), https://www.reuters.com/article/factcheck-abortion-false/fact-check-termination-of-pregnancy-can-be-necessary-to-save-a-womans-life-experts-say-idUSL1N2TC0VD ............................................................. 16, 17

Samantha Artiga et al., *What are the Implications of the Overturning of Roe v. Wade for Racial Disparities?*, KFF (Jul. 5, 2022), https://www.kff.org/racial-equity-and-health-policy/issue-brief/what-are-the-implications-of-the-overturning-of-roe-v-wade-for-racial-disparities/ ................................... 27

Sarah Friedmann, *What a Medical Emergency for an Abortion Actually Means, According to OB/GYNs*, Bustle (June 6, 2019), https://www.bustle.com/p/what-a-medical-emergency-for-abortion-actually-means-according-to-obgyns-17929296 .................................................... 17

Sarahn Wheeler & Allison Bryant, *Racial and Ethnic Disparities in Health and Health Care*, 44 Obstet Gynecol Clin. N. Am. 1-11 (Mar. 2017) .................................................. 27

**TABLE OF AUTHORITIES**
**(continued)**

Page

Sarai Rodriguez, *Emergency Department (ED) Overcrowding
    Leads to Worse Health Outcomes*, Patient Engagement HIT
    (Nov. 14, 2022),
    https://patientengagementhit.com/news/emergency-
    department-ed-overcrowding-leads-to-worse-health-
    outcomes ................................................................................................ 27

Selena Simmons-Duffin, *Her miscarriage left her bleeding
    profusely. An Ohio ER sent her home to wait,* NPR (Nov. 15,
    2022), https://www.npr.org/sections/health-
    shots/2022/11/15/1135882310/miscarriage-hemorrhage-
    abortion-law-ohio .................................................................................... 20

Society of Fam. Plan., *#WeCount Report*  (2023),
    https://www.societyfp.org/wp-
    content/uploads/2023/03/WeCountReport_April2023Releas
    e.pdf ........................................................................................................ 23

Stephen Bohan, *Americans Deserve Better Than 'Destination
    Hallway' in Emergency Departments and Hospital Wards*,
    STAT News (Aug. 1, 2022),
    https://www.statnews.com/2022/08/01/americans-deserve-
    better-than-destination-hallway-emergency-department/ ........................ 26

Tina Reed, *Defining "Life-Threatening" Can Be Tricky in
    Abortion Law Exceptions*, Axios (June 28, 2022),
    https://www.axios.com/2022/06/28/abortion-ban-
    exceptions-women-medical-emergencies.................................................. 18

Wash. State Dep't of Health, *Hospital Reproductive Health
    Services for Ferry County Memorial Hospital* (Aug. 29,
    2019), https://doh.wa.gov/sites/default/files/hospital-
    policies/FerryCountyRHSF.pdf ................................................................ 15

Wash. State Dep't of Health, *Hospital Reproductive Health
    Services for Lourdes Hospital* (Sept. 3, 2019),
    https://doh.wa.gov/sites/default/files/hospital-
    policies/LourdesRHSF.pdf ....................................................................... 15

**TABLE OF AUTHORITIES**
**(continued)**

                                                                    **Page**

Wash. State Dep't of Health, *Hospital Reproductive Health
    Services for Virginia Mason Memorial Hospital* (Aug. 30,
    2019),
    https://doh.wa.gov/sites/default/files/legacy/Documents/230
    0/HospPolicies/VirginiaMasonMemorialRHSF.pdf ............................. 15

Whitney Arey et al., *A Preview of the Dangerous Future of
    Abortion Bans-Texas Senate Bill 8*, 387 New Eng. J. Med.
    388 (2022),
    https://www.nejm.org/doi/full/10.1056/NEJMp2207423 ....................... 20

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

Amici States of California, New York, Arizona, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Washington, and Washington, D.C. submit this brief in support of reversal of the final partial judgment entered in the District Court for the Northern District of Texas, granting plaintiffs' request for injunctive relief. In this case, plaintiffs, the State of Texas and anti-abortion organizations with physician members, challenge guidance from the Centers for Medicare and Medicaid Services (CMS) and a letter from the U.S. Department of Health and Human Services (HHS) (together, CMS guidance) that restate hospitals' obligation under the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, to provide abortion services when needed to stabilize a patient experiencing an emergency medical condition. The district court issued an injunction enjoining defendants from enforcing EMTALA, as restated in the CMS Guidance—"both as to when an abortion is required and EMTALA's effect on state laws governing abortion"—within the State of Texas or against the members of the plaintiff anti-abortion organizations. ROA.1113.

Amici have a substantial interest in this case. As healthcare providers to millions of residents, amici are both subject to EMTALA and serve as regulators of

1

healthcare: amici own and operate public hospital systems, employ healthcare personnel, and license and regulate the many other healthcare providers that operate within our jurisdictions. Amici thus have a strong interest in clear guidance regarding the obligations imposed by EMTALA. Amici also have a strong interest in protecting the rights of their residents who may need emergency medical care while present as students, workers, or visitors in Texas and any other jurisdictions where the members of the plaintiff organizations provide care. In addition, if patients in Texas are denied necessary emergency abortion care, they may travel to Amici States to receive the emergency care they need. These States would thus experience additional pressures on their already overwhelmed hospital systems, especially in rural and underserved areas in border regions that are most significantly affected.

EMTALA, enacted in 1986, has long been a crucial tool in ensuring that all individuals who come to a hospital emergency department are afforded an appropriate medical screening to determine whether they have an emergency medical condition and assuring that patients are not transferred or discharged until they receive medical treatment to stabilize any such condition. Amici submit this brief to highlight that EMTALA has long been interpreted to cover emergency medical conditions involving or affecting pregnancy for which necessary stabilizing treatment may include abortion care. That straightforward interpretation

of EMTALA, repeated in the CMS guidance, derives from the statute's text and ensures that individuals with pregnancy-related emergency medical conditions receive the care they need to prevent death or serious impairment. The district court's contrary conclusion—that Congress intentionally did not address in EMTALA when abortion services are required and that the CMS guidance therefore is unauthorized—is not supported by the statutory text and fails to account for the statute's legislative history and context. The district court's order also fails to account for the experience of other States, including the issues raised by Amici based on their experience as healthcare providers. Amici know from direct experience that emergency abortion care is necessary to avoid serious harmful outcomes (including death) in numerous situations. Failure to provide stabilizing abortion care will cause harm to patients and spillover effects in other States. The district court erred in failing to properly consider these harms in entering a partial final judgment granting permanent injunctive relief.

## ARGUMENT

### I.    EMTALA HAS LONG BEEN INTERPRETED TO REQUIRE THE TREATMENT OF PREGNANCY-RELATED CONDITIONS THAT NEED EMERGENCY ABORTION CARE.

EMTALA applies to any hospital that operates an emergency department and participates in Medicare—criteria that are met by virtually every hospital in the

United States.[1] Under EMTALA, if "any individual" presents at a hospital's emergency department for examination or treatment, the hospital must provide an appropriate medical screening to determine whether an emergency medical condition exists. 42 U.S.C. § 1395dd(a). If the screening indicates the patient has an emergency medical condition, the hospital cannot transfer or discharge the patient until it provides "treatment as may be required to stabilize the medical condition," unless the transfer is specifically authorized by the statute. *Id.* § 1395dd(b)-(c). The hospital may also admit the patient as an inpatient in good faith to stabilize the emergency medical condition. 42 C.F.R. § 489.24(d)(2)(i). An "emergency medical condition" is "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in" (i) placing the health of the individual in serious jeopardy, or with respect to a pregnant individual, the health of the individual or the fetus, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part. 42 U.S.C.

---

[1] *See* Joseph Zibulewsky, *The Emergency Medical Treatment and Active Labor Act (EMTALA): What It Is and What It Means for Physicians,* 14 Baylor Univ. Med. Ctr. Proc. 339, 340 (2001), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1305897/; Nathan S. Richards, *Judicial Resolution of EMTALA Screening Claims at Summary Judgment*, 87 N.Y.U. L. Rev. 591, 601 & n.52 (May 2012), https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-87-2-Richards.pdf.

§ 1395dd(e)(1)(A). Stabilizing the emergency medical condition involves providing "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual." *Id.* § 1395dd(e)(3)(A). An emergency medical condition also exists with respect to a pregnant individual who is having contractions, when there is inadequate time for a safe transfer before delivery or such transfer may pose a threat to the health or safety of the pregnant individual or the fetus. *Id.* § 1395dd(e)(1)(B). Stabilizing the patient in this circumstance means delivering the baby.[2] *Id.* § 1395dd(e)(3)(B). Nothing in EMTALA excludes any conditions or categories of medical care from the statute's requirements.

There are many emergency medical conditions relating to pregnancy that do not involve active labor, including traumatic placental abruption (separation), hemorrhages, pre-labor rupture of membranes, placenta previa, amniotic fluid embolism, intrauterine fetal death, ectopic pregnancy, and emergent hypertensive

---

[2] Active labor has always been separately addressed in the statute because it might not otherwise necessarily be covered by the definition of emergency medical condition. *See* former 42 U.S.C. § 1395dd(a)-(c), Pub. L. 99-272, 100 Stat. 164, 164-165 (1986) (requiring medical screening and stabilizing treatment of emergency medical conditions or active labor).

disorders, such as preeclampsia with severe features.[3] These conditions all trigger the obligation under EMTALA to provide stabilizing care since if left untreated, all of them would reasonably be expected to result in serious jeopardy to the individual's health, serious impairment to bodily functions, or serious dysfunction of a bodily organ if immediate treatment is not provided. *See id.* § 1395dd(e)(1)(A). Absent a handful of exceptions not relevant here, EMTALA mandates that the individual with such a condition cannot be transferred or discharged until the hospital provides stabilizing treatment. *See id.* § 1395dd(b)-(c).

For decades, the federal government and courts throughout the country have interpreted EMTALA to require treatment for emergency conditions relating to pregnancy that do not involve active labor and have concluded that such treatment may include emergency abortion care. More than a decade ago, in 2011, HHS acknowledged that EMTALA may require abortion care in appropriate circumstances in a rule implementing federal conscience-refusal laws that might

---

[3] *See* Geoffrey Chamberlain & Philip Steer, *ABC of Labour Care: Obstetric Emergencies,* 318 BMJ 1342, 1342-45 (1999), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1115721/; Eric Nadel & Janet Talbot-Stern, *Obstetric and Gynecologic Emergencies*, 15 Emergency Med. Clinics of N. Am. 389, 389-97 (1997); Lisa Wolf et al., *Triage Decisions Involving Pregnancy-Capable Patients: Educational Deficits and Emergency Nurses' Perceptions of Risk*, 52 J. Continuing Educ. Nursing 21, 21-29 (2021).

otherwise allow a physician to refuse to perform an abortion.[4] And in September 2021, CMS issued guidance restating that emergency medical conditions include pregnancy-related conditions and describing required stabilizing treatment as including abortion care when medically indicated.[5] CMS and HHS's Office of Inspector General has also brought enforcement actions against hospitals for EMTALA violations involving pregnancy-related emergency medical conditions. *See Burditt v. U.S. Dep't Health & Hum. Servs.*, 934 F.2d 1362, 1367-76 (5th Cir. 1991) (affirming enforcement action against hospital where pregnant individual presented with extreme hypertension).[6]

---

[4] *See Regulation for the Enforcement of Federal Health Care Provider Conscience Protection Laws*, 76 Fed. Reg. 9,968, 9,973 (Feb. 23, 2011).

[5] *See* Memorandum from Dirs., Quality, Safety & Oversight Grp. & Survey & Operations Grp., CMS, to State Survey Agency Dirs. (Sept. 17, 2021), https://www.cms.gov/files/document/qso-21-22-hospital.pdf.

[6] *See also* HHS & Dep't of Just., *Health Care Fraud and Abuse Control Program Annual Report for Fiscal Year 2019*, at 45 (2020), https://oig.hhs.gov/publications/docs/hcfac/FY2019-hcfac.pdf (internet) (describing enforcement action involving pregnant individual suffering from preeclampsia); HHS, Off. of Inspector Gen., *Semi-Annual Report to Congress: April 1 – September 30, 2015*, at 37 (2015), https://oig.hhs.gov/reports-and-publications/archives/semiannual/2015/sar-fall15.pdf (same, pregnant individual having symptoms of abdominal and lower back pain); HHS, Off. of Inspector Gen., *Semi-Annual Report to Congress: April 1, 2007 – September 30, 2007*, at 26 (2007), https://oig.hhs.gov/publications/docs/semiannual/2007/SemiannualFinal2007.pdf (same, symptoms of vaginal bleeding, cramps, and decreased fetal movement); HHS, Off. of Inspector Gen., *Semi-Annual Report to Congress: October 1, 1999 – March 30, 2000*, at 32-33 (2000),

Courts throughout the country have consistently found pregnancy-related emergency conditions not involving active labor to fall within the scope of EMTALA. *See, e.g.*, *Morales v. Sociedad Española de Auxilio Mutuo y Beneficencia*, 524 F.3d 54, 55-62 (1st Cir. 2008) (ectopic pregnancy); *Morin v. Eastern Me. Med. Ctr.*, 779 F. Supp. 2d 166, 168-69, 185 (D. Me. 2011) (woman 16 weeks pregnant having contractions without fetal cardiac activity); *McDougal v. Lafourche Hosp. Serv. Dist. No. 3*, No. 92-cv-2006, 1993 U.S. Dist. LEXIS 7381, at *1 (E.D. LA. May 24, 1993) (pregnant patient presented with vaginal bleeding). Courts have also consistently interpreted EMTALA as requiring abortion services when needed to stabilize an emergency medical condition. *See Ritten v. Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d 696, 712-18 (E.D. Mich. 2009) (applying EMTALA's anti-retaliation provision to doctor who refused to transfer patient in unstable condition who may have needed abortion); *see also New York v. U.S. Dep't Health & Hum. Servs.*, 414 F. Supp. 3d 475, 538 (S.D.N.Y. 2019) (holding that federal rule allowing physicians to refuse to perform or assist with abortion was not in accordance with law as it would "create[], via regulation, a conscience exception to EMTALA's statutory mandate"). Numerous courts have held that patients of physicians who perform abortions must be admitted to the emergency

---

https://oig.hhs.gov/publications/docs/semiannual/2000/00ssemi.pdf (same, symptom of sharp abdominal pain).

room under EMTALA regardless of whether the treating physician has admitting privileges at the hospital. *See, e.g.*, *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 787-88 (7th Cir. 2013); *June Med. Servs. LLC v. Kliebert*, 250 F. Supp. 3d 27, 64 (M.D. La. 2017), *rev'd on other grounds sub nom.*, *June Med. Servs. LLC v. Gee*, 905 F.3d 787 (5th Cir. 2018), *rev'd sub nom., June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103 (2020); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 951 F. Supp. 2d 891, 899-900 (W.D. Tex. 2013), *rev'd on other grounds*, 748 F.3d 583 (5th Cir. 2014). Under the reasoning of these decisions, if a patient presented at the emergency room with an incomplete abortion, EMTALA would require that the patient receive stabilizing emergency abortion care. *See June Med. Servs.*, 250 F. Supp. 3d at 62, 64.

Finally, courts have long interpreted EMTALA as protecting patients from "being turned away from emergency rooms for non-medical reasons." *Bryan v. Rectors & Visitors of the Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996). Thus, "courts have declined to read exceptions into EMTALA's mandate," including exceptions allowing transfers based on a physician's religious, moral, or ethical refusal to provide specified stabilizing treatment. *New York*, 414 F. Supp. 3d at 537 (collecting cases); *see In re Baby "K"*, 16 F.3d 590, 597 (4th Cir. 1994); *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 272 (6th Cir. 1990) (observing that EMTALA's plain text prohibits a hospital from refusing treatment based on

"political or cultural opposition"). Consequently, liability for the failure to provide stabilizing treatment is not dependent on the physician's or hospital's motive. *Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 253 (1999); *see Burditt*, 934 F.2d at 1373 (same, failure to effect proper transfer).

On July 11, 2022, CMS issued the guidance challenged here in the form of a memorandum addressed to state agency directors, to reiterate EMTALA's obligations regarding patients who are pregnant or experiencing pregnancy loss. ROA.300-305. The CMS guidance restates EMTALA's requirement that determinations regarding whether an individual has an emergency medical condition and, if so, what stabilizing treatment is needed before transfer or discharge, are medical determinations for which the treating physician is responsible. ROA.300, 303. The guidance also notes that numerous pregnancy-related conditions may constitute emergency medical conditions under EMTALA, including ectopic pregnancy, complications of pregnancy loss, or emergent hypertensive disorders, such as preeclampsia with severe features. ROA.300, 303. And the guidance reminds hospitals and physicians that if the treating physician determines that abortion is the appropriate stabilizing medical treatment for an emergency medical condition, EMTALA requires that the physician provide that treatment if the hospital has the capacity for such treatment. ROA.300. That guidance adheres to a long and consistent line of authority, including

interpretations by the federal government, courts, and hospitals to impose the obligations identified in the guidance. *Supra* p. 17-24.

In concluding otherwise, the district court erroneously interpreted EMTALA as imposing potentially conflicting duties with respect to the health of a pregnant individual and the fetus, a conflict the court concluded Congress intentionally left for state law to resolve. ROA.930-931. The court noted that such conflict could arise whenever stabilizing treatment might include abortion, reasoning that the abortion itself could precipitate an emergency medical condition because it places the health of the fetus in serious jeopardy. ROA.943. But a fetus does not have a condition requiring "immediate medical attention" when stabilizing abortion is offered under EMTALA; instead, the abortion is proposed as the appropriate stabilization for a pregnant person's emergency medical condition. *See* 42 U.S.C. § 1395dd(e)(1)(A). Under such circumstances, a physician has a duty under EMTALA to provide stabilizing treatment to the pregnant individual.

In rare circumstances where both the pregnant individual and the fetus simultaneously have emergency medical conditions, the text of EMTALA resolves any potential conflict in the physician's duties by leaving to the pregnant patient the choice whether to prioritize their own health through stabilizing abortion care or prioritize the fetus and continue gestation. EMTALA expressly leaves the choice to the patient: the pregnant individual can grant consent or refuse consent

for either treatment. *See* 42 U.S.C. § 1395dd(b)(2) (hospital's duty to provide necessary stabilizing treatment is deemed met where it offers the individual the treatment, explains the risks and benefits of treatment, and the individual refuses to consent). EMTALA by its plain terms thus treats abortion the same as any other stabilizing medical treatment and, as the district court acknowledged, "creates no express exceptions for possible stabilizing treatments." ROA.934. And this is not surprising given that EMTALA was enacted in 1986 against the backdrop of a constitutionally protected right to access abortion. *See City of Akron v. Akron Ctr. for Reprod. Health,* 462 U.S. 416 (1983); *Roe v. Wade*, 410 U.S. 113 (1973). Indeed, in 1983, the Supreme Court had reaffirmed both "the fundamental right" to abortion recognized in *Roe* and the fact that, because it is a right to a medical procedure, the physician must "'be given 'the room he needs to make his best medical judgment,'" a judgment that "encompasses both assisting the woman in the decisionmaking process and implementing her decision should she choose abortion." *City of Akron,* 462 U.S. at 427 (quoting *Doe* v. *Bolton*, 410 U.S. 179, 192 (1973)). Thus, when Congress amended EMTALA in 1989 to specifically include in the definition of emergency medical condition, a condition that if not immediately treated would likely place the health of the fetus in serious jeopardy, it did not change the fundamental structure of the statute, which requires the provision of necessary stabilizing treatment—without exception—unless the

12

individual needing such treatment refuses to consent or transfer is medically

warranted.

## II.  FOR DECADES, STATES HAVE UNDERSTOOD THAT ABORTION CARE IS PART OF EMERGENCY CARE.

Hospitals in Amici States regularly provide abortion care to stabilize many

emergency medical conditions, including severe pregnancy complications,

complications of early pregnancy loss, pre-labor rupture of membranes, ectopic

pregnancy, emergent hypertensive disorders such as preeclampsia with severe

features, and incomplete abortion. Often, pregnant patients face unforeseeable

emergency medical conditions and need abortion care to protect their lives and

prevent severe and disabling injury to their health, regardless of whether they

wanted and intended the pregnancy. As the American College of Obstetricians and

Gynecologists has explained, pregnancy complications "may be so severe that

abortion is the only measure to preserve a woman's health or save her life."[7] In

Amici States' experience, emergent conditions and conditions likely to become

emergent can require abortion care to avoid serious adverse results.

Accordingly, abortion care has regularly been provided by hospitals in Amici

States to stabilize emergency medical conditions. In New York, for example, from

---

[7] Am. Coll. of Obstetricians & Gynecologists (ACOG), *Facts Are Important: Abortion Is Healthcare* (2022), https://www.acog.org/advocacy/facts-are-important/abortion-is-healthcare.

2019 through 2021, 16,216 abortions were performed for patients presenting at the emergency department, with 2,969 abortion procedures performed within the emergency department, 5,244 abortion procedures performed for persons during an inpatient stay after presenting to the emergency department, and 8,003 abortion procedures performed by ambulatory surgery.[8] In Massachusetts, from 2019 through 2022, 1,866 MassHealth patients received abortion services in a hospital emergency department.

Provider accounts likewise demonstrate that abortion is a regular and critical part of emergency healthcare. A physician at Oregon's public academic health center, Oregon Health & Science University, described often receiving transfers that require urgent or emergent pregnancy termination, including pregnant patients with hemorrhages due to placentas previa and placental abruptions, peri-viable premature rupture of membranes with sepsis, peri-viable severe decompensating preeclampsia, acute leukemia, ectopic pregnancies, and hemorrhaging miscarriage, among other conditions. The Illinois Department of Public Health's Office of Women's Health and Family Services similarly reported instances of treating pregnant patients needing emergency surgery to end the pregnancy. Providers at

---

[8] Note that the data for 2020-2021 is not yet finalized and may be underinclusive. For the 2019-2021 data, medication abortion was the predominant method for procedures within the emergency department (2,596 of the 2,969 procedures), but made up only a small percentage of the abortions performed in the inpatient (277 of 5,244) and ambulatory surgery (69 of 8,003) settings.

one New Jersey hospital have also reported the regular use of abortion in emergency settings to treat miscarriage where the uterus is infected or at risk of infection, ectopic pregnancies, severe preeclampsia, and molar pregnancy (nonviable abnormally fertilized egg that can act like a malignancy and is at high risk of metastasizing), for which no other treatment is available. And in Washington, hospitals regularly provide abortions to stabilize many emergency medical conditions. Indeed, some Washington hospitals that do not regularly provide abortion care in non-emergency settings explicitly permit treatment of emergency conditions that are required under EMTALA.[9]

---

[9] *See, e.g.*, Wash. State Dep't of Health, *Hospital Reproductive Health Services for Ferry County Memorial Hospital*, at 1-2 (Aug. 29, 2019), https://doh.wa.gov/sites/default/files/hospital-policies/FerryCountyRHSF.pdf (hospital does not provide abortions in non-emergency settings, but "[t]reatment of miscarriages and ectopic pregnancy would fall under the EMTALA protocols"); Wash. State Dep't of Health, *Hospital Reproductive Health Services for Lourdes Hospital*, at 1 (Sept. 3, 2019), https://doh.wa.gov/sites/default/files/hospital-policies/LourdesRHSF.pdf (hospital does not provide abortions in non-emergency settings, but "[o]perations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman (patient) are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child"); Wash. State Dep't of Health, *Hospital Reproductive Health Services for Virginia Mason Memorial Hospital*, at 1-2 (Aug. 30, 2019), https://doh.wa.gov/sites/default/files/legacy/Documents/2300/HospPolicies/VirginiaMasonMemorialRHSF.pdf (provides surgical abortions to treat pregnancy complications or in pregnancies involving congenital abnormality).

### III. FAILURE TO PROVIDE EMERGENCY ABORTION CARE WHEN REQUIRED CAUSES SERIOUS HARMS TO PATIENTS AND LEADS TO SPILLOVER EFFECTS IN OTHER STATES.

The district court's judgment prohibiting enforcement of EMTALA's requirements, restated in the CMS guidance, in Texas and for members of the plaintiff anti-abortion organizations, will endanger the health of patients in Texas and elsewhere, and will further pressure the already overwhelmed capacity of hospitals in Amici States. In granting permanent injunctive relief, the court also must consider the balance of hardships between the parties and whether the public would be disserved by a permanent injunction. *See, e.g.*, *ITT Educ. Servs. v. Arce*, 533 F.3d 342, 347 (5th Cir 2008).

### A. Prohibiting Physicians from Providing Emergency Abortions Egregiously Harms Pregnant Patients.

Pregnancy- and miscarriage-related complications can be emergency medical conditions requiring urgent stabilizing treatment that can include abortion; in such case any failure or delay in providing necessary abortion care puts the pregnant patient's life or health at risk.[10] As one example, a physician explained that a clear

---

[10] *See, e.g.*, Reuters, *Fact Check – Termination of Pregnancy Can Be Necessary to Save a Woman's Life, Experts Say* (Dec. 27, 2021), https://www.reuters.com/article/factcheck-abortion-false/fact-check-termination-of-pregnancy-can-be-necessary-to-save-a-womans-life-experts-say-idUSL1N2TC0VD (discussing, for example, that placental abruption presents a risk of hemorrhage, which if left untreated, threatens the pregnant person's life and that preeclampsia if not treated quickly can result in the pregnant person's death);

sign of uterine infection can be life threatening "because there is an extremely high risk that the infection inside of the uterus spreads very quickly into [the patient's] bloodstream and she becomes septic. If she continues the pregnancy it comes at a very high risk of death."[11] Another observed, "under certain conditions, continuing a pregnancy could significantly increase the morbidity risk for the pregnant person or even jeopardize their life. . . . [F]or people with certain cardiovascular disease conditions, like Eisenmenger's syndrome and pulmonary hypertension, carrying a pregnancy could cause as high as a 40% risk of maternal death."[12]

Confusion regarding the legality of abortion as emergency medicine harms patients. As one physician explained, "'[e]mergency' exists on a continuum," and if the law does not clearly enable physicians to determine when a patient has an emergency medical condition, then it forces "a physician [to] withhold evidence-based care until a patient develops an unambiguous emergency with significantly

---

ACOG, *Facts Are Important: Understanding Ectopic Pregnancy* (2022), https://www.acog.org/advocacy/facts-are-important/understanding-ectopic-pregnancy#:~:text=An%20ectopic%20pregnancy%20occurs%20when,%2C%20ovary%2C%20and%20cesarean%20scar (advising that "[a]n untreated ectopic pregnancy is life threatening; withholding or delaying treatment can lead to death").

[11] Reuters, *Fact Check – Termination of Pregnancy*, *supra* note 10.

[12] Sarah Friedmann, *What a Medical Emergency for an Abortion Actually Means, According to OB/GYNs*, Bustle (June 6, 2019), https://www.bustle.com/p/what-a-medical-emergency-for-abortion-actually-means-according-to-obgyns-17929296.

increased morbidity and mortality, such as septic shock and multisystem organ failure."[13] Such delays produce grave risks because physicians cannot easily forecast when a pregnant patient's death or a serious impairment becomes imminent during a medical emergency.[14] The risks are exacerbated by the fact that "[m]any pregnant individuals are young and healthy; thus, they are able to compensate for severe physiologic derangements and might not appear ill until very late in their course of critical illness."[15] As Lisa Harris, a University of Michigan professor of reproductive health, discussed, "there are many circumstances in which it is not clear whether a patient is close to death."[16] She explained, "It's not like a switch that goes off or on that says, 'OK, this person is bleeding a lot, but not enough to kill them,' and then all of a sudden, there is

---

[13] Andrea MacDonald et al., *The Challenge of Emergency Abortion Care Following the Dobbs Ruling*, 328 JAMA 1691-92 (Nov. 1, 2022).

[14] *See* Tina Reed, *Defining "Life-Threatening" Can Be Tricky in Abortion Law Exceptions*, Axios (June 28, 2022), https://www.axios.com/2022/06/28/abortion-ban-exceptions-women-medical-emergencies. For example, Utah-based obstetrician Lori Gawron explained that if a pregnant patient experiences a ruptured membrane in the second trimester, there is a much greater risk of infection to the pregnant woman, and "[i]f the infection progresses to sepsis, the maternal life is absolutely at risk. But we can't say how long that will take or how severe the infection will get in that individual." *Id.*

[15] MacDonald et al., *supra*, note 13.

[16] Aria Bendix, *How Life-Threatening Must a Pregnancy Be to End It Legally?*, NBC News (June 30, 2022), https://www.nbcnews.com/health/health-news/abortion-ban-exceptions-life-threatening-pregnancy-rcna36026.

bleeding enough to kill them. . . . It's a continuum, so even how someone knows where a person is in that process is really tricky.'"[17]

However, data reflects that "withholding evidence-based care to have clear documentation of an unambiguous threat to life is dangerous."[18] As one article described, "each hour of delayed care increases the patient's likelihood of dying by approximately 4%."[19] Thus, "the longer emergency abortions are delayed, the greater risk that lifesaving interventions might not be effective and pregnant individuals could experience morbidity and mortality."[20]

Regrettably, patients in Texas have already suffered such harms.[21] Post-*Dobbs*, determining when an abortion is allowed under Texas law has "become fraught with uncertainty and legal risk," forcing doctors to "significantly alter the care they provide to women whose pregnancy complications put them at high risk

---

[17] *Id.* Dr. Harris also impressed that the confusion about where the medical emergency becomes life-threatening enough to warrant intervention under state law is a difficult point, stating "What does the risk of death have to be, and how imminent must it be? Might abortion be permissible in a patient with pulmonary hypertension, for whom we cite a 30-to-50% chance of dying with ongoing pregnancy? Or must it be 100%?" *Id.*

[18] MacDonald et al., *supra* note 13.

[19] *Id.*

[20] *Id.*

[21] *See* Frances Stead Sellers & Fenit Nirappil, *Confusion Post-*Roe *Spurs Delays, Denials for Some Lifesaving Pregnancy Care*, Wash. Post (July 16, 2022), https://www.washingtonpost.com/health/2022/07/16/abortion-miscarriage-ectopic-pregnancy-care/.

of harm."[22] Pregnancy care "isn't as clear cut as the [Texas] law makes it out to be,
doctors say, and fear of criminal prosecution has led medical professionals to delay
or deny care they otherwise would have provided."[23] This has had a direct,
detrimental effect on maternal morbidity and mortality in Texas.[24] And, sadly,

---

[22] J. David Goodman & Azeen Ghorayshi, *Women Face Risks as Doctors Struggle With Medical Exceptions on Abortion*, N.Y. Times (July 20, 2022), https://www.nytimes.com/2022/07/20/us/abortion-save-mothers-life.html.

[23] Eleanor Klibanoff, *How Texas' abortion laws turned a heartbreaking fetal diagnosis into a cross-country journey*, Tex. Trib. (Sept. 20, 2022), https://www.texastribune.org/2022/09/20/texas-abortion-ban-complicated-pregnancy/; *see also* Kate Zernike, *Medical Impact of Roe Reversal Goes Well Beyond Abortion Clinics, Doctors Say*, N.Y. Times (Sept. 10, 2022), https://www.nytimes.com/2022/09/10/us/abortion-bans-medical-care-women.html; Selena Simmons-Duffin, *Her miscarriage left her bleeding profusely. An Ohio ER sent her home to wait,* NPR (Nov. 15, 2022), https://www.npr.org/sections/health-shots/2022/11/15/1135882310/miscarriage-hemorrhage-abortion-law-ohio (internal quotation marks omitted); Belle Taylor-Mcghee, *Doctors on Dobbs: Abortion Providers Bear Witness to the Devastating Effects of Roe's Overturn*, Ms. Magazine (Oct. 24, 2022), https://msmagazine.com/2022/10/24/abortion-doctors-womens-health-pregnancy-overturn-roe-v-wade/; Eleanor Klibanoff, *Doctors Report Compromising Care out of Fear of Texas Abortion Law*, Tex. Trib. (June 23, 2022), https://www.texastribune.org/2022/06/23/texas-abortion-law-doctors-delay-care/; Whitney Arey et al., *A Preview of the Dangerous Future of Abortion Bans—Texas Senate Bill 8*, 387 New Eng. J. Med. 388 (2022), https://www.nejm.org/doi/full/10.1056/NEJMp2207423; *Zurawski v. Texas*, D-1-GN-23-000968 (Mar. 6, 2023) (alleging plaintiffs "and countless other pregnant people in Texas have been denied necessary and potentially life-saving obstetrical care because medical professionals throughout the state fear liability under Texas's abortion bans"). The named plaintiff, Amanda Zurawski, for example, was "forced to wait until she was septic to receive abortion care, causing one of her fallopian tubes to become permanently closed." *Zurawski v. Texas, supra*, at 1.

[24] Anjali Nambiar et al., *Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less with Complications in 2 Texas Hospitals After Legislation on Abortion*, 227 Am. J. Obstetrics & Gynecology 648-

examples abound of pregnant Texans nearly dying because of Texas law and

confusion about the availability of abortions as emergency care.[25]

### B.  Prohibiting Physicians from Providing Emergency Abortion Care Harms Amici States.

The district court's judgment will cause significant harms in Amici States.

Severe restrictions on abortion care in Texas have already placed extreme strain on

---

50 (July 4, 2022), https://www.ajog.org/article/S0002-9378(22)00536-1/fulltext (study at two Texas hospitals post-S.B. 8 found that when an expectant-management approach was used for pregnancy complications (observation-only care until serious infection develops or fetus cardiac activity ceases), the rate of serious maternal morbidity (57%) is almost double that occurring with immediate termination of pregnancy in similar clinical circumstances (33%)).

[25] *See, e.g.*, Elizabeth Cohen & John Bonifield, *Texas woman almost dies because she couldn't get an abortion,* CNN (Nov. 16, 2022), https://www.cnn.com/2022/11/16/health/abortion-texas-sepsis/index.html; *Zurawski, v. Texas*, D-1-GN-23-000968 (Mar. 6, 2023); Carrie Feibel, *Because of Texas abortion law, her wanted pregnancy became a medical nightmare,* Tex. Trib. (Aug. 3, 2022), https://www.texastribune.org/2022/08/03/texas-abortion-law-pregnancy/; Lauren Sue, *Texas woman, hospitalized with blood-filled cysts, forced to wait 5 days to abort nonviable fetus,* Daily Kos (Sept. 8, 2022), https://www.dailykos.com/stories/2022/9/8/2121531/--Perfect-example-of-Texas-ban-Woman-waited-5-days-frail-vomiting-in-pain-for-abortion-care; Peter Holley, *When Does the Life of a Pregnant Texan Count Under the State's New Abortion Ban?*, Tex. Monthly (Aug. 16, 2022), https://www.texasmonthly.com/news-politics/when-does-pregnant-texan-life-count-under-new-abortion-ban/; Elizabeth Cohen & Danielle Herman, *Why a woman's doctor warned her not to get pregnant in Texas*, CNN (Sept. 10, 2022), https://www.cnn.com/2022/09/09/health/abortion-restrictions-texas/index.html; Nina Martin et al., *The Extraordinary Danger of Being Pregnant and Uninsured in Texas*, Propublica (Dec. 6, 2019), https://www.propublica.org/article/the-extraordinary-danger-of-being-pregnant-and-uninsured-in-texas.

healthcare systems in states in which abortion is available.[26] The court's order will predictably result in even more pregnant people traveling to Amici States to seek medical care, resulting in crowded waiting rooms and increasing waiting times for time-sensitive healthcare services. In fact, Amici States are already seeing patients traveling for emergency abortion care.[27]

As a general matter, studies have repeatedly reflected that abortion restrictions in certain States force many pregnant individuals to travel out of state for care.[28] These numbers have risen as state legislatures pass ever more restrictive

---

[26] *See* Margot Sanger-Katz et al., *Interstate Abortion Travel Is Already Straining Parts of the System,* N.Y. Times (July 23, 2022), https://www.nytimes.com/2022/07/23/upshot/abortion-interstate-travel-appointments.html; Oriana Gonzalez & Nicole Cobler, *Influx of Out-of-State Patients Causes Abortion Delays*, Axios (Sept. 12, 2022), https://www.axios.com/local/austin/2022/09/12/texans-out-of-state-patients-abortions-delays.

[27] Laura Kusisto, *Doctors Struggle with Navigating Abortion Bans in Medical Emergencies*, Wall Street J. (Oct. 13, 2022), https://www.wsj.com/articles/doctors-struggle-with-navigating-abortion-bans-in-medical-emergencies-11665684225?mod=politics_lead_pos9; *see also* Ian Millhiser, *No one knows when it is legal to perform medically necessary abortions in Texas*, Vox (Mar. 12, 2023), https://www.vox.com/politics/2023/3/12/23631278/supreme-court-abortion-texas-medically-necessary-sepsis-zurawski (describing situations where women with serious conditions were forced to travel to Amici States for care).

[28] Mikaela Smith et al., *Abortion Travel Within the United States: An Observational Study of Cross-State Movement to Obtain Abortion Care in 2017*, 10 The Lancet – Reg'l Health: Americas art. 100214 (Mar. 3, 2022), https://www.sciencedirect.com/science/article/pii/S2667193X2200031X?via%3Dihub (in 2017, overall, 8% of women who received an abortion had to cross state

laws. For instance, even before the Supreme Court's decision in *Dobbs*, in the first

four months of Texas's six-week abortion ban, the number of Texans seeking

abortions in neighboring states increased by nearly 600%.[29] In the six months after

*Dobbs*, the average number of abortions performed per month in states that ban or

severely restrict abortion, including Texas, dropped to ten or fewer.[30] As a result,

pregnant individuals from Texas and other abortion-restricting States crossed state

lines in even greater numbers.[31] In Colorado, 94% of individuals seeking practical

---

lines to obtain care—but this number was vastly higher in states with significant
abortion restrictions).

[29] Kari White et al., *Out-of-State Travel for Abortion Following Implementation of Texas Senate Bill 8*, Tex. Pol'y Evaluation Project (Mar. 2022), https://sites.utexas.edu/txpep/files/2022/03/TxPEP-out-of-state-SB8.pdf; *see also* Amanda Michelle Gomez, *Abortion providers in the D.C. region are calling for protection*, WAMU 88.5 Am. U. Radio (July 19, 2022), https://tinyurl.com/ktpe8w7z (highlighting that even clinics in the District of Columbia saw Texans needing abortion care).

[30] Society of Fam. Plan., #WeCount Report 2, 10 (2023), https://www.societyfp.org/wp-content/uploads/2023/03/WeCountReport_April2023Release.pdf.

[31] *E.g.*, Caitlin Myers et al., Abortion Access Dashboard, https://experience.arcgis.com/experience/6e360741bfd84db79d5db774a1147815 (reporting increase in distance for Texans to obtain abortion from 43 miles to 499 miles between March, 2022 and March, 2023); Angie Leventis Lourgos, *Abortions in Illinois for Out of State Patients Have Skyrocketed*, Chi. Trib. (Aug. 4, 2022), https://www.chicagotribune.com/news/breaking/ct-illinois-abortion-increase-post-roe-20220802-eottdwcfnjfjxdvbfgd4kwefwu-story.html (reporting a 700% increase in the number of out-of-state patients served in Illinois); Matt Bloom & Bente Berkland, *Wait Times at Colorado Clinics Hit Two Weeks as Out-of-State Patients Strain System*, KSUT (July 28, 2022), https://www.ksut.org/health-science/2022-07-28/wait-times-at-colorado-abortion-clinics-hit-2-weeks-as-out-of-state-patients-strain-system (100% increase in wait times from before *Dobbs* was decided);

abortion support from an abortion fund were from out of state, including 66% from

Texas alone.[32] In Oregon, one clinic reported an explosion of out-of-state patients,

from fewer than 3 patients per month in the 14 months before *Dobbs* to 24 patients

in September 2022. In Washington, a Pullman clinic within 10 miles of the Idaho

border reported that in July 2022, 78% of patients were from Idaho.[33] An Illinois

clinic reported patients from States other than Missouri and Illinois rose to 40% of

cases, compared to 5% before *Dobbs*.[34] In California, since *Dobbs*, demand has

---

Marielle Kirstein et al., *100 Days Post-Roe: At Least 66 Clinics Across 15 US States Have Stopped Offering Abortion Care*, Guttmacher Inst. (Oct. 6, 2022), https://www.guttmacher.org/2022/10/100-days-post-roe-least-66-clinics-across-15-us-states-have-stopped-offering-abortion-care (discussing how the "dramatic increases in caseloads mean clinic capacity and staff are stretched to their limits, resulting in longer wait times for appointments even for residents of states where abortion remains legal"); *see also* Rachel Jones et al., *New Evidence: Texas Residents Have Obtained Abortions in at Least 12 States That Do Not Border Texas*, Guttmacher Inst. (Nov. 9, 2021), https://tinyurl.com/yc294xyy (seeing Texas patients in at least one clinic in Alabama, Arizona, California, Georgia, Illinois, Indiana, Kansas, Maryland, Ohio, Tennessee, and Washington.).

[32] Hannah Metzger, *Colorado Democrats advance ban of 'deceptive' ads, 'abortion reversal' for crisis pregnancy centers*, Colo. Politics (Mar. 30, 2023), https://www.coloradopolitics.com/legislature/democrats-target-abortion-reversal-crisis-pregnancy-centers-colorado/article_e5c4fa2e-cf1d-11ed-bff6-ef208a330dd2.html (noting also that in January 2023, 750 out-of-state people traveled to Colorado Planned Parenthoods for abortion care, compared to 1,500 total during all of 2021).

[33] *See* Megan Burbank, *Who is traveling to Washington for abortion care?*, Crosscut (Nov. 14, 2022), https://crosscut.com/equity/2022/11/who-traveling-washington-abortion-care.

[34] Gonzalez & Cobler, *supra* note 26.

quadrupled at Planned Parenthood Mar Monte clinics, which serve more than half of the counties in California.[35] Nineteen clinics affiliated with Planned Parenthood of the Pacific Southwest collectively saw a 513% increase in demand following *Dobbs*, increasing wait times for critical reproductive healthcare services.[36] Planned Parenthood of Orange and San Bernardino Counties reported a 900% increase in out-of-state patients seeking abortions following *Dobbs*.[37] A New York City clinic reported a 300% increase in Texas patients post-*Dobbs*.[38]

When Texas hospitals and providers do not provide the emergency abortion care required by EMTALA, as restated in the CMS letter, Amici States' healthcare

---

[35] Marisa Kendall, *Demand has quadrupled at some California abortion clinics since Roe fell*, Mercury News (Jan. 1, 2023), https://www.mercurynews.com/2023/01/01/demand-has-tripled-quadrupled-at-california-abortion-clinics-since-roe-fell/.

[36] Cindy Carcamo, *A California desert town has long been an abortion refuge for Arizona and Mexico. Now it's overwhelmed*, L.A. Times (July 20, 2022), https://www.latimes.com/california/story/2022-07-20/planned-parenthood-clinic-in-this-conservative-desert-town-is-now-a-refuge-for-arizonans-seeking-abortions; Karma Dickerson, *More out-of-state patients begin arriving in California for reproductive health services*, Fox 40 News (Sept. 20, 2022), https://fox40.com/news/fox40-focus/out-of-state-patients-reproductive-health-abortion-california/.

[37] *Planned Parenthood centers in SoCal report dramatic increase in abortion patients from out of state*, ABC 7 News (July 6, 2022), https://abc7.com/planned-parenthood-abortion-orange-county-san-bernardino/12023682/.

[38] Rebecca Greenberg, *Queens abortion clinic sees uptick in out-of-state patients*, Spectrum News NY1 (Sept. 08, 2022), https://www.ny1.com/nyc/queens/news/2022/09/08/queens-abortion-clinic-sees-uptick-in-out-of-state-patients.

systems will inevitably feel the strain, with potentially severe heath and economic effects.[39] For example, a pregnant patient in Tennessee, at risk of severe preeclampsia, was forced to take a six-hour ambulance ride to North Carolina to obtain care, but because of the delay and travel, she arrived with dangerously high blood pressure and signs of kidney failure, undoubtedly requiring more Amici State resources to provide this more intensive critical care.[40]

Emergency departments are already struggling with overcrowding, long wait times, and staff shortages, especially in rural and underserved areas.[41] Any additional influx of patients needing urgent care to address an emergency medical condition will aggravate these stresses, increasing delays, morbidity, and mortality

---

[39] *See* Claire Morley et al., *Emergency department crowding: A systematic review of causes, consequences and solutions*, 13 PLOS ONE e0203316 (2018), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0203316; Matthew Foley et al., *Financial Impact of Emergency Department Crowding*, 12 W. J. Emergency Med. 192-97 (May 2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3099606/.

[40] Kusisto, *supra* note 27.

[41] *See* Stephen Bohan, *Americans Deserve Better Than 'Destination Hallway' in Emergency Departments and Hospital Wards*, STAT News (Aug. 1, 2022), https://www.statnews.com/2022/08/01/americans-deserve-better-than-destination-hallway-emergency-department/ (discussing increasing demands for in-patient and emergency hospital services); Gabor Kelen et al., *Emergency Department Crowding: The Canary in the Health Care System*, NEJM Catalyst (Sept. 28, 2021), https://catalyst.nejm.org/doi/full/10.1056/CAT.21.0217 (discussing that "[e]ven prior to the Covid-19 pandemic, greater than 90% of U.S. EDs found themselves stressed beyond the breaking point at least some of the time").

for all people needing emergency care.[42] Indeed, emergency room overcrowding

can broadly lead to more than a 5% increased mortality rate for patients

experiencing emergency medical conditions.[43] These harms are generally felt most

acutely by racial and ethnic minorities, who already experience disparities in care

access and healthcare outcomes.[44] The district court's judgment prohibiting

defendants from enforcing the reiteration of EMTALA in the CMS guidance

within the state of Texas and against the members of the plaintiff anti-abortion

organizations will worsen those disparities, harming Amici States, their healthcare

systems, and their residents.

---

[42] Kelen et al., *supra* note 41 (describing emergency department overcrowding as a widespread problem and a source of patient harm and "[t]he impact of ED overcrowding on morbidity, mortality, medical error, staff burnout, and excessive cost is well documented").

[43] Sarai Rodriguez, *Emergency Department (ED) Overcrowding Leads to Worse Health Outcomes*, Patient Engagement HIT (Nov. 14, 2022), https://patientengagementhit.com/news/emergency-department-ed-overcrowding-leads-to-worse-health-outcomes.

[44] Renee Hsia et al., *California hospitals serving large minority populations were more likely than others to employ ambulance diversion*, 31 Health Affairs 1767-76 (Aug. 2012), https://www.healthaffairs.org/doi/10.1377/hlthaff.2011.1020; *see also* Sarah Wheeler & Allison Bryant, *Racial and Ethnic Disparities in Health and Health Care*, 44 Obstet Gynecol Clin. N. Am. 1-11 (Mar. 2017); Samantha Artiga et al., *What are the Implications of the Overturning of Roe v. Wade for Racial Disparities?*, KFF (Jul. 5, 2022), https://www.kff.org/racial-equity-and-health-policy/issue-brief/what-are-the-implications-of-the-overturning-of-roe-v-wade-for-racial-disparities/.

# CONCLUSION

The District Court's Amended Judgment should be reversed.

Dated: May 8, 2023

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Barbara D. Underwood
  *Solicitor General*
Ester Murdukhayeva
  *Deputy Solicitor General*
Galen Sherwin
  *Special Counsel for Reproductive Justice*
Laura Etlinger
  *Assistant Solicitor General*
  *Of Counsel*
N.Y. State Bar No. 2725190

Office of the Attorney General
The Capitol
Albany, NY 12224
(518) 776-2028
(518) 915-7723 (fax)
Laura.Etlinger@ag.ny.gov

ROB BONTA
  *Attorney General*
  *State of California*
Renu R. George
  *Senior Assistant Attorney General*

 */s/ Karli Eisenberg*
Karli Eisenberg
  *Supervising Deputy Attorney General*
California State Bar No. 281923
David Houska
Hayley Penan
  *Deputy Attorneys General*

California Department of Justice
1300 I Street
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 210-7913
Karli.Eisenberg@doj.ca.gov

(*Counsel listing continues on next page.*)

KRISTIN K. MAYES
  *Attorney General*
  *State of Arizona*
2005 N. Central Ave
Phoenix, AZ 85004


PHILIP J. WEISER
  *Attorney General*
  *State of Colorado*
1300 Broadway
Denver, CO 80203


WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106


KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French Street
Wilmington, DE 19801


ANNE E. LOPEZ
  *Attorney General*
  *State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813


KWAME RAOUL
  *Attorney General*
  *State of Illinois*
100 West Randolph Street
Chicago, IL 60601


KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155


AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, NV 89701


MATTHEW J. PLATKIN
  *Attorney General*
  *State of New Jersey*
25 Market Street
Trenton, NJ 08625


RAÚL TORREZ
  *Attorney General*
  *State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504


JOSHUA H. STEIN
  *Attorney General*
  *State of North Carolina*
114 W. Edenton Street
Raleigh, NC 27603


ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, OR 97301

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

MICHELLE A. HENRY
  *Attorney General*
  *Commonwealth of Pennsylvania*
Strawberry Square
Harrisburg, PA 17120

ANTHONY BROWN
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, WA 98504

DANA NESSEL
  *Attorney General*
  *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate

Procedure 32(a)(7)(B) because it contains 6,338 words. This brief also complies

with the typeface and type-style requirements of Federal Rule of Appellate

Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft in Times

New Roman 14-point font, a proportionally spaced typeface.

*/s/ Karli Eisenberg*_____
Karli Eisenberg

## CERTIFICATE OF SERVICE

I certify that on May 9, 2023, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I certify that all other participants in this case are registered CM/ECF users and that services will be accomplished by the appellate EM/EC system.

Dated:  May 9, 2023                              */s/  Karli Eisenberg*
                                                  Karli Eisenberg

SA2023301951