No. 23-10246

IN THE

# United States Court of Appeals
# for the Fifth Circuit

---

STATE OF TEXAS; AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS,

*Plaintiffs-Appellees*,

v.

XAVIER BECERRA; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES FOR MEDICARE AND MEDICAID SERVICES; KAREN L. TRITZ; DAVID R. WRIGHT,

*Defendants-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS (LUBBOCK)
NO. 5:22-cv-00185-H

**BRIEF OF AMERICAN COLLEGE OF EMERGENCY PHYSICIANS, AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, AMERICAN MEDICAL ASSOCIATION, SOCIETY FOR MATERNAL-FETAL MEDICINE, ET AL., AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL**

SHANNON ROSE SELDEN
*COUNSEL OF RECORD*
ADAM AUKLAND-PECK
DEBEVOISE &
    PLIMPTON LLP
66 Hudson Blvd.
New York, NY 10001
Tel.: (212) 909-6000
*Counsel to Amici Curiae*

JEFFREY B. DUBNER
SKYE L. PERRYMAN
DEMOCRACY
    FORWARD
    FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel.: (202) 448-9090
*Counsel to Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2. 1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### *Plaintiff-Appellees*
State of Texas
American Association of Pro-Life Obstetricians & Gynecologists
Christian Medical and Dental Association

### *Counsel to Plaintiff-Appellee*
Christopher D. Hilton
Amy S. Hilton
Charles K. Eldred
William David Wassdorf
Ryan Bangert
Julie Marie Blake

### *Defendant-Appellants*
Xavier Becerra, Secretary of U.S. Department of Health and Human Services
United States Department of Health and Human Services
Centers for Medicare and Medicaid Services
Karen L. Tritz
David R. Wright

***Counsel to Defendant-Appellants***
Brian M. Boynton
Leigha Simonton
Michael S. Raab
McKaye L. Neumeister
Nicholas S. Crown

***Amici Curiae***
American Academy of Pediatrics
American College of Emergency Physicians
American College of Obstetricians and Gynecologists
American Medical Association
American Public Health Association
Society for Maternal-Fetal Medicine

***Counsel to Amici Curiae***
Shannon Rose Selden
Adam Aukland-Peck
*Debevoise & Plimpton LLP*

Jeffrey B. Dubner
Skye L. Perryman
*Democracy Forward Foundation*

Dated:        May 15, 2023                    Respectfully submitted,

                                                              /s/ Shannon Rose Selden
                                                              Shannon Rose Selden
                                                                   *Counsel of Record*
                                                              Adam Aukland-Peck
                                                              DEBEVOISE &
                                                              PLIMPTON LLP
                                                              66 Hudson Boulevard
                                                              New York, N.Y. 10001
                                                              (212) 909-6000

Jeffrey B. Dubner
Skye L. Perryman
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, D.C. 20043

*Counsel to Amici Curiae*

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................1

PRELIMINARY STATEMENT ..............................................................5

ARGUMENT ..........................................................................................9

  I.   Providing Stabilizing Treatment for Pregnant Patients with
Emergency Medical Conditions Sometimes Requires Abortion ..........................9

    A.  The Nature of Emergency Care.....................................................9

    B.  Caring for Pregnant Patients Is an Essential Component of
Emergency Medicine ......................................................................11

  II.  When a Physician Determines That Abortion Is the Clinically
Indicated Stabilizing Treatment for an Emergency Medical Condition, It Is
Required by EMTALA........................................................................14

    A.  EMTALA Enshrines Physicians' Commitment to Treating and
Stabilizing Patients.........................................................................14

    B.  The Guidance Correctly Advises That, in Some Situations,
EMTALA Requires Abortion ..........................................................16

    C.  The District Court Misunderstood Key Aspects of EMTALA and
Emergency Medical Practice............................................................17

  III.  The Balance of the Equities and the Public Interest Weigh Against an
Injunction........................................................................................26

    A.  The Injunction Places Pregnant Patients at Risk........................27

    B.  The Injunction Will Particularly Harm Patients in Rural Areas,
Minoritized Patients, and Patients with Low Incomes.....................32

    C.  Forcing Physicians to Decide Between Obeying State Law and
Obeying EMTALA Harms Physicians and the Public Interest .........35

    CONCLUSION...............................................................................39

i

## TABLE OF AUTHORITIES

**Cases**

*Goodman v. Sullivan*, 891 F.2d 449 (2d Cir. 1989)....................................5

*Texas v. Becerra,* No. 5:22-CV-185-H, 2022 WL 3639525 (N.D. Tex.
    Aug. 23, 2022) ......................................................6, 7, 18, 22, 24, 26


**Statutes**

42 U.S.C. § 1395dd..................................................................*passim*

Idaho Code § 18-622.....................................................................36

Tex. Health & Safety Code 245.002.......................................................14


**Other Authorities**

68 Fed. Reg. 53221, (Nov. 10, 2003) (codified at 42 C.F.R. 413, 482,
    and 489) ............................................................................9

ACEP, *Code of Ethics for Emergency Physicians* (Jan. 2017) .............11, 33, 37, 38

ACEP, *Delivery of Emergency Care in Rural Settings* (2017)..............................33

ACEP, *EMTALA Fact Sheet* ...........................................................15, 36

ACEP, Policy Statements, *Definition of Emergency Medicine* (Jan.
    2021...............................................................................9

ACOG Clinical Consensus No. 1, *Pharmacologic Stepwise
Multimodal Approach for Postpartum Pain Management* (Sept.
    2021) ............................................................................31

ACOG, *Code of Professional Ethics* 2 (Dec. 2018) ................................37

ACOG Committee Opinion No. 586, *Health Disparities in Rural
Women*............................................................................33

ACOG Committee Opinion No. 667, *Hospital-Based Triage of Obstetric Patients* ......................................................................10, 13

ACOG Obstetric Care Consensus, *Placenta Accreta Spectrum* (July 2012, reaff'd 2021) ..........................................................................31

ACOG Practice Bulletin No. 183, *Postpartum Hemorrhage* (Oct. 2017) ......................................................................................................31

ACOG Practice Bulletin No. 190, *Gestational Diabetes Mellitus* (Feb. 2018) ......................................................................................................31

ACOG Practice Bulletin No. 198*, Prevention and Management of Obstetric Lacerations at Vaginal Delivery* (Sept. 2018, reaff'd 2022) ......................................................................................................31

ACOG Practice Bulletin No. 200, *Early Pregnancy Loss* (Nov. 2018, reaff'd 2021) ..................................................................................12, 20

ACOG Practice Bulletin No. 217, *Prelabor Rupture of Membranes* (Mar. 2020, reaff'd 2022) ..........................................................12, 21

Agency for Healthcare Rsch. & Quality, *2019 Nat'l Healthcare Quality and Disparities Report*, (2019) ...............................................34

Alicia Naspretto, *'My Heart Broke Into a Million Pieces': The Stories Behind the Texas Abortion Ban Lawsuit*, KXXV 25 ABC, Mar. 8, 2023......................................................................................................30

AMA, *Code of Medical Ethics Opinions on Patient-Physician Relationships* § 1.1.1 (2016) ..........................................................37, 38

AMA, *Principles of Medical Ethics* (2001).............................................38

Anjali Nambiar & Shivani Patel, *Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less with Complications in 2 Texas Hospitals after Legislation on Abortion,* 227 AM. J. OBSTETRICS & GYNECOLOGY 648 (2022).........................31

Ashely Redinger and Hao Nguyen, *Incomplete Abortions,* NATIONAL INSTITUTE OF HEALTH, June 27, 2022 .................................................26

iii

Courtney Carpenter, *League City Family in 'Nightmare' Situation Under Texas Abortion Law*, ABC 13, Sept. 29, 2022 .........................................30

Cleveland Clinic, *High-Risk Pregnancy* .................................................................13

CMS, *Advancing Rural Maternal Health Equity* (May 2022) .........................34, 35

CMS, *Rural Health Strategy* (2018) .......................................................................33

Donna Hoyert, *Maternal Mortality Rates in the United States,* 2021, NAT'L CTR. FOR HEALTH STAT. (Mar. 2023) ......................................................13

Econ. Rsch. Serv., U.S. Dep't of Agric., *Rural America at a Glance* 2 (2021) .................................................................................................................33

Elizabeth Cohen & John Bonifield, *Texas Woman Almost Dies Because She Couldn't Get an Abortion*, CNN, Nov. 16, 2022 .........................29

Elizabeth Cohen et al., *'Heartbreaking' Stories Go Untold, Doctors Say, As Employers 'Muzzle' Them in Wake of Abortion Ruling*, CNN, Oct. 12, 2022 ...................................................................................30

Emily Baumgaertner, *Doctors in abortion-ban states fear prosecution for treating patients with life-threatening pregnancies*, LA TIMES, July 29, 2022 .......................................................................................30

Emily E. Peterson et al., *Vital Signs: Pregnancy-Related Deaths, United States, 2011–2015, and Strategies for Prevention, 13 States, 2013–2017*, 68 MORBIDITY & MORTALITY WKLY. REP. 423 (May 10, 2019) ...............................................................................28

*Four in 5 Pregnancy-related Deaths in the U.S. are Preventable*, CDC, Sept. 19, 2022 ...............................................................................27

Healthcare Cost and Utilization Project, *Emergency Department and Inpatient Utilization and Cost for Pregnant Women: Variation by Expected Primary Payer and State of Residence* (Dec. 14, 2021) .....................28

Juanita Chinn, et al., *Health Equity Among Black Women in the United States*, 30 J. WOMEN'S HEALTH 212 (2021) .......................................34, 35

Katherine Tucker et al., *Delayed Diagnosis and Management of Second Trimester Abdominal Pregnancy*, BMJ CASE REP. 1 (Sept. 2017) .................................................................................................11

Kimberly Kilfoyle et al., *Nonurgent and Urgent Emergency Department Use During Pregnancy: An Observational Study* 216 AM. J. OF OBSTETRICS AND GYNECOLOGY (Feb. 2017).......................................13

Laura Ungar & Heather Hollingsworth, *Despite Dangerous Pregnancy Complications, Abortions Denied*, ASSOCIATED PRESS, Nov. 20, 2022......................................................................................30

Lyndsey S. Benson et al., *Early Pregnancy Loss in the Emergency Department*, J. AM. C. OF EMERGENCY PHYSICIANS OPEN (2021)....32, 33, 34, 35

March of Dimes, *Maternity Care Desert* .................................................32

Michael S. Beeson et al., *The Model of the Clinical Practice of Emergency Medicine*, AM. BOARD OF EMERGENCY MED. (2019) ......................12

Nancy Ochieng et al., *How Many Physicians Have Opted-Out of the Medicare Program?*, KFF (Oct. 22, 2020) .........................................................15

Office of the Ass't Sec'y for Planning & Evaluation, HHS, *Trends in the Utilization of Emergency Dep't Servs., 2009–2018* (Mar. 2021). ...................................................................................................34

*Recommended Medication Regimen for Treatment of Incomplete and Missed Abortion for Less than 13 Weeks Uterine Size*, IPAS, Feb. 14, 2021..................................................................................................25

Robert W. Neumar, *The Zerhouni Challenge: Defining the Fundamental Hypothesis of Emergency Care Research,* 49(5) ANNALS EMERGENCY MED (May 2007).............................................................10

Roosa Tikkanen et al., *Maternal Mortality and Maternity Care in the United States Compared to 10 Other Developed Countries*, COMMONWEALTH FUND (Nov. 18, 2020).............................................................31

Stephanie Emma Pfeffer, *Texas Woman Nearly Loses Her Life After Doctors Can't Legally Perform an Abortion: 'Their Hands Were Tied'*, PEOPLE MAGAZINE, Oct. 18, 2022...........................................................30

Susanna Trost, et al., *Pregnancy-Related Deaths: Data from Maternal Mortality Review Committees in 36 US States, 2017–2019*, CDC, 2022 .................................................................................................................. 27

*Texas Maternal Mortality and Morbidity Review Committee and Department of State Health Services Joint Biennial Report 2022*, Texas Dept. of Health and Human Servs., Dec. 2022 ........................................ 27

*The Diagnosis of Ectopic Pregnancy*, 12018/021 HEALTHCARE SAFETY INVESTIGATION BRANCH (Mar. 2020) .................................................... 11

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are leading medical and public health societies representing physicians, other clinicians, and public health professionals who serve patients in Texas and nationwide.  Among other organizations, they include the American College of Emergency Physicians ("ACEP"), the leading advocate for emergency physicians; the American College of Obstetricians and Gynecologists ("ACOG"), the nation's leading organization of physicians who provide health services unique to people seeking obstetric or gynecologic care; the American Medical Association ("AMA"), the largest professional association of physicians, residents, and medical students in the country; and the Society for Maternal-Fetal Medicine ("SMFM"), the medical professional society for maternal-fetal medicine subspecialists, who are obstetricians with additional training in high-risk pregnancies.

Ensuring access to evidence-based health care and promoting health care policy that improves patient health are central to *amici*'s missions.  *Amici* believe that all patients are entitled to prompt, complete, and unbiased emergency health care that is medically and scientifically sound and is provided in compliance with

---

[1]   This brief is submitted under Federal Rule of Appellate Procedure 29(a) with the consent of all parties.  No counsel for a party authored this brief, in whole or in part, and no counsel for a party, nor any person other than the amici curiae, their members, or their counsel, contributed money that was intended to fund the preparation or submission of this brief.

the federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"). *Amici* submit this brief to explain how EMTALA has been understood and applied in the practice of emergency medicine and the role that abortion care plays in providing the stabilizing treatment required by EMTALA.

*Amici*'s ability to care for their patients in compliance with professional medical ethics requires that they be subject to consistent legal requirements that allow them to provide necessary, clinically appropriate medical care in emergency situations. Accordingly, they have a strong interest in ensuring that EMTALA is correctly understood and implemented. *Amici* are:

**American Academy of Pediatrics (AAP)**: AAP is a professional medical organization dedicated to the health, safety, and well-being of infants, children, adolescents, and young adults. Its membership is comprised of primary care pediatricians, pediatric medical subspecialists, and pediatric surgical specialists, including subspecialists in pediatric emergency medicine and adolescent medicine. AAP is committed to advancing high quality medical care for pregnant adolescents.

**American College of Emergency Physicians (ACEP)**: ACEP is the national medical society representing emergency medicine. Through continuing education, research, public education, and advocacy, ACEP advances emergency care on behalf of its 40,000 emergency physician members and the more than 150 million people they treat on an annual basis. Both by law and by oath, emergency physicians must

care for all patients seeking emergency medical treatment. As with our nation, ACEP members represent a diverse array of personal and political beliefs, yet they are united in the belief that emergency physicians must be able to practice high quality, objective evidence-based medicine without legislative, regulatory, or judicial interference in the physician-patient relationship. Denial of emergency care or delay in providing emergency services on the basis of race, religion, sexual orientation, gender identity, ethnic background, social status, type of illness, or ability to pay is unethical under the Code of Ethics as emergency physicians.

**American College of Obstetricians and Gynecologists (ACOG)**: Representing more than 90% of board-certified OB/GYNs in the United States, ACOG is the nation's premier professional membership organization for obstetrician-gynecologists dedicated to access to high-quality, safe, and equitable obstetric and gynecologic care. ACOG maintains the highest standards of clinical practice and continuing education of its members, promotes patient education, and increases awareness among its members and the public of the changing issues facing women's health care. ACOG is committed to ensuring access for all people to the full spectrum of evidence-based quality reproductive health care, including abortion care, and is a leader in the effort to confront the maternal mortality crisis in the United States. ACOG opposes medically unnecessary laws or restrictions that serve to delay or prevent care and the criminalization of evidence-based medicine. ACOG

has previously appeared as *amicus curiae* in various courts throughout the country, and ACOG's briefs and guidelines have been cited by numerous courts as an authoritative voice of science and medicine relating to obstetric and gynecologic health care.

**American Medical Association (AMA)**:    The AMA is the largest professional association of physicians, residents, and medical students in the United States.    Additionally, through state and specialty medical societies and other physician groups seated in its House of Delegates, substantially all physicians, residents, and medical students in the United States are represented in the AMA's policy-making process.   The AMA was founded in 1847 to promote the art and science of medicine and the betterment of public health, and these remain its core purposes.   AMA members practice in every medical specialty and in every state.

**American Public Health Association (APHA)**:    APHA champions the health of all people and all communities; strengthens the profession of public health; shares the latest research and information; promotes best practices; and advocates for public health issues and policies grounded in scientific research.    APHA represents more than 22,000 individual members and is the only organization that combines a 150-year perspective, a broad-based member community, and the ability to influence federal policy to improve the public's health.

**Society for Maternal-Fetal Medicine (SMFM)**:  Founded in 1977, SMFM is the medical professional society for maternal-fetal medicine subspecialists, who are obstetricians with additional training in high-risk pregnancies.  SMFM represents more than 5,500 members who care for high-risk pregnant people and provides education, promotes research, and engages in advocacy to advance optimal and equitable perinatal outcomes for all people who desire and experience pregnancy. SMFM and its members are dedicated to ensuring that all medically appropriate treatment options are available for individuals experiencing a high-risk pregnancy.

## PRELIMINARY STATEMENT

*Amici* urge this Court to vacate the District Court's injunction (the "Injunction") because it deprives patients of standard, medically-appropriate federally-protected, emergency medical care and, in doing so, endangers the lives and health of patients across the state. *Amici* represent clinicians who regularly treat patients experiencing emergency medical conditions and who have been regulated by EMTALA for the past 36 years.  Each day, thousands of pregnant patients seek care at hospitals for possible emergency medical conditions.  In the vast majority of those cases, doctors and other clinicians are able to provide care that preserves the life and health of the patient and fetus.  But in some cases, that is, tragically, impossible, and a physician concludes that the only treatment that will stabilize the patient is one that will terminate the pregnancy.

In such cases, EMTALA requires nothing more than what medical ethics have always demanded: that the physician provide the care they believe is necessary to stabilize their patient. The updated EMTALA guidance (the "Guidance") issued by the Centers for Medicaid & Medicare Services reflects the way that EMTALA has long been understood and applied. There is nothing novel about requiring physicians who are treating patients with serious emergency medical conditions to provide treatment that will stabilize those conditions rather than allowing their patients' health to deteriorate.

The District Court incorrectly assumed that a neat distinction could be drawn between cases that are emergent and those that are "likely to become emergent."[2] Such a line is utterly imaginary and wholly inconsistent with emergency medicine. Emergency treatment by definition requires physicians to act quickly, often with limited information, to treat and stabilize the patient. Timely care is crucial, as patients' conditions can deteriorate rapidly and with little or no warning. Waiting to treat a condition until it is imminently life-threatening poses a substantial risk that the patient's outcome will be much worse—not only because the condition will deteriorate in the interim but also because the required intervention at that point will often be far more invasive. In providing emergency care, physicians must act swiftly

---

[2]   *See*, *e.g.*, *Texas v. Becerra,* No. 5:22-CV-185-H, 2022 WL 3639525, at 15 (N.D. Tex. Aug. 23, 2022) (hereinafter, "Mem.").

to implement a treatment plan based on their best medical judgment—honed by over a decade of medical education, training, and fellowship, as well as their years of practice, and based on evidence-based guidelines and ethical obligations to meet the patient's individual healthcare needs.

In the case of pregnant patients, well-established clinical guidelines recognize that abortion may be the necessary stabilizing treatment for some emergency conditions—even where the immediate threat to the pregnant patient's life may not be readily apparent.  Although the word abortion is often associated with care provided outside the emergency setting, abortion also includes termination of pregnancy in emergency situations where a fetus will not survive.  Failure to perform an abortion in such situations can threaten the pregnant person's health and life.  An example of such a condition is a first-trimester placental abruption, where the placenta separates from the wall of the uterus and can cause uncontrolled bleeding.

If a doctor concludes that abortion is the necessary stabilizing treatment, then withholding that care is—and always has been—directly contrary to EMTALA's mandate and to bedrock principles of medical ethics.  The District Court was thus incorrect to suggest that the Guidance sets out new requirements or interprets EMTALA in a novel fashion. It does not require hospitals or physicians to do anything that EMTALA and medical ethics do not already require.  It simply recognizes the reality of emergency medicine and reassures doctors that they can

follow their professional obligations and federal law without running afoul of state laws.

Interpreting EMTALA any other way would be a novel, dangerous, and unworkable constraint on how emergency medicine is practiced. We are already seeing, in tragedy after tragedy, the results when physicians treating emergency medical conditions are unable to provide the stabilizing treatment that they deem necessary. Forcing doctors and hospitals to refrain from treating a pregnant patient until they are on death's door will result in increased maternal morbidity, more women unable to have children in the future, and—worst of all, preventable deaths.

Thus, at bottom, this case is not about Texas law. As Defendants-Appellants explain, it is about a guidance document that makes no new law and merely reflects the reality of emergency medicine and how EMTALA has been understood for decades. Accordingly, for the reasons set forth by the Defendants-Appellants and below, the District Court's decision should be reversed.

**ARGUMENT**

I.     **Providing Stabilizing Treatment for Pregnant Patients with Emergency Medical Conditions Sometimes Requires Abortion**

A.     **The Nature of Emergency Care**

"Emergency medicine is the medical specialty dedicated to the diagnosis and treatment of unforeseen illness or injury."[3]  This essential medical specialty includes "initial evaluation, diagnosis, treatment, coordination of care among multiple clinicians or community resources, and disposition of any patient requiring expeditious medical, surgical, or psychiatric care."[4]  Emergency care is not limited to treatment provided in the emergency department (the "ED") but is practiced in a broad variety of settings both within the hospital and in other locations.[5]  Emergency care may be provided to pregnant patients in the ED or in labor and delivery units

---

[3]     ACEP, Policy Statements, *Definition of Emergency Medicine* (Jan. 2021), https://www.acep.org/patient-care/policy-statements/definition-of-emergency-medicine ("ACEP, *Definition of Emergency Medicine*").

[4]     *Id.*

[5]     *Id.*; *see also Clarifying Policies Related to the Responsibilities of Medicare-Participating Hospitals in Treating Individuals with Emergency Medical Conditions*, 68 Fed. Reg. 53221, 53229 (Nov. 10, 2003) (codified at 42 C.F.R. 413, 482, and 489) ("CMS believes that EMTALA requires that a hospital's dedicated emergency department would not only encompass what is generally thought of as a hospital's 'emergency room,' but would also include other departments of hospitals, such as labor and delivery . . . .").

by obstetrician-gynecologists, by family physicians, or by any number of other medical specialists.[6]

It is essential to the life and health of patients that emergency care be provided based on sound medical standards. Emergency physicians identify and treat conditions when patients first present, often making the difficult determination of what care is needed and what specialists should be involved in a time-sensitive situation. Because of the complexities inherent in most health emergencies, physicians must use their medical judgment—honed through years of medical education, training, and experience—to provide evidence-based care that is consistent with clinical guidance and responsive to their patient's individualized needs.

Rapid treatment improves patient outcomes, while delays increase the risk of complications, permanent injury, or death.[7] Rapid treatment is thus a core ethical

---

[6] ACEP, *Definition of Emergency Medicine* ("Emergency medicine is not defined by location but may be practiced in a variety of settings including, but not limited to, hospital-based and freestanding emergency departments (EDs), urgent care clinics, observation medicine units, emergency medical response vehicles, at disaster sites, or via telehealth."); *see also* ACOG Committee Opinion No. 667, *Hospital-Based Triage of Obstetric Patients* (2016, reaff'd 2020).

[7] *See*, *e.g.*, Robert W. Neumar, *The Zerhouni Challenge: Defining the Fundamental Hypothesis of Emergency Care Research*, 49(5) ANNALS EMERGENCY MED, 696–97 (May 2007).

responsibility for physicians in emergency scenarios: "Patients often arrive at the emergency department with acute illnesses or injuries that require immediate care. . . . [E]mergency physicians have little time to gather additional data, consult with others, or deliberate about alternative treatments. Instead, there is a presumption for quick action guided by predetermined treatment protocols." [8] This includes treatment of pregnancy-related emergencies, where "[e]arly diagnosis and treatment are paramount in reducing maternal morbidity and mortality."[9]

### B. Caring for Pregnant Patients Is an Essential Component of Emergency Medicine

Pregnant women[10] regularly seek emergency care—and that care sometimes involves abortion as the treatment. In virtually every shift (and often multiple times a shift), emergency practitioners see pregnant patients presenting with abdominal pain, vaginal bleeding, or other pregnancy-related issues. While not all pregnancy

---

[8] ACEP, *Code of Ethics for Emergency Physicians*, at 4 (Jan. 2017) ("ACEP, *Code of Ethics*").

[9] Katherine Tucker et al., *Delayed Diagnosis and Management of Second Trimester Abdominal Pregnancy*, BMJ CASE REP. 1, 1 (Sept. 2017); *see also, e.g.*, *The Diagnosis of Ectopic Pregnancy*, 12018/021 HEALTHCARE SAFETY INVESTIGATION BRANCH, at para. 3.2.1 (Mar. 2020) ("A delay in or failure to diagnose ectopic pregnancy can be life-threatening to women.").

[10] *Amici* use the term "women" and "she/her" inclusively and recognize that people with female anatomy who do not identify as women can also become pregnant and need emergency care.

complications require emergency intervention, emergencies involving pregnant patients are frequent and dangerous.  For example, when a patient's amniotic sac ruptures before fetal viability, known as periviable premature rupture of the membranes ("PPROM"), the patient is at high risk for serious infection and life-threatening sepsis.[11]  Similarly, a miscarriage (which occurs in approximately 10% of clinically recognized pregnancies) may put a patient at risk of excessive blood loss and serious infection as long as the products of conception remain in the uterus, yet also may involve a pregnancy that will not continue, but in which embryonic or fetal cardiac activity is observed.[12]

The American Board of Emergency Medicine's Model of Clinical Practice of Emergency Medicine, the definitive source and guide to the core content found on emergency physicians' board examinations, contains an entire section devoted to "Complications of Pregnancy."[13]  Nearly all listed conditions are graded as typically

---

[11]  ACOG Practice Bulletin No. 217, *Prelabor Rupture of Membranes*, at e80 (Mar. 2020, reaff'd 2022); *see also* Declaration of Robert James Carpenter, Jr., M.D., J.D., ¶ 10, No. 5:22-CV-185-H, Aug. 15, 2022, ECF No. 41.

[12]  ACOG Practice Bulletin No. 200, *Early Pregnancy Loss*, at e197 (Nov. 2018, reaff'd 2021); *see also* Declaration of Alan Peaceman, M.D., ¶ 9, No. 5:22-CV-185-H, Aug. 15, 2022, ECF No. 41.

[13]  Michael S. Beeson et al., *The Model of the Clinical Practice of Emergency Medicine*, AM. BOARD OF EMERGENCY MED. (2019), https://www.abem.org/public/resources/em-model.

"critical" or "emergent," meaning that they "may progress in severity or result in complications with a high probability for morbidity if treatment is not begun quickly."[14]

Given the risks associated with being pregnant,[15] emergency care providers regularly treat pregnant patients for the emergent medical conditions described above, as well as other trauma that may implicate the pregnancy's safety or viability, like car accidents.[16]  Hospital-based obstetric units collaborate with EDs because "labor and delivery units frequently serve as emergency units for pregnant women."[17]  Hospitals structure these collaborative treatment efforts by establishing

---

[14]   *Id.*

[15]   The U.S. mortality rate associated with live births was a staggering 32.9 per 100,000 live births in 2021, up from 23.8 in 2020.  Donna Hoyert, *Maternal Mortality Rates in the United States, 2021*, Nat'l Ctr. for Health Stat. (Mar. 2023).  Pre-existing conditions and comorbidity with other illnesses further increase the likelihood of pregnancy complications.  *See*, *e.g.*, Cleveland Clinic, *High-Risk Pregnancy*, https://my.clevelandclinic.org/health/diseases/22190-high-risk-pregnancy (describing how preexisting conditions exacerbate the risks of the pregnancy).

[16]   Kimberly Kilfoyle et al., *Nonurgent and Urgent Emergency Department Use During Pregnancy: An Observational Study* 216 Am. J. of Obstetrics and Gynecology, 1, 2 (Feb. 2017).

[17]   *See* ACOG Committee Opinion No. 667, *Hospital-Based Triage of Obstetric Patients* (July 2016, reaff'd 2020).

protocols for cooperation and triage between delivery units and EDs, as well as for the appropriate stabilization of pregnant patients in accordance with EMTALA.[18]

As discussed further below, the clinically recognized, necessary, evidence-based medical treatment for some emergency medical conditions involves medical intervention that ends a pregnancy.[19]  Emergency medicine does not involve the performance of abortions that are not medically indicated—but it may call for abortion in emergency situations to avoid significant harm to the pregnant patient.

II.    **When a Physician Determines That Abortion Is the Clinically Indicated Stabilizing Treatment for an Emergency Medical Condition, It Is Required by EMTALA**

A.    **EMTALA Enshrines Physicians' Commitment to Treating and Stabilizing Patients**

Because of the unique nature of emergency medicine, federal law has, for more than 35 years, required nearly all physicians and hospitals to meet a minimum

---

[18]    *See id.*

[19]    Note that state definitions of abortion vary; what one state defines and prohibits as an abortion may not be defined as such by another state.  For example, procedures to remove an ectopic pregnancy are not defined as abortions under Texas law.  *See* Tex. Health & Safety Code 245.002; Pls.' Br. in Support of Mot. for TRO & Prelim. Inj.("Pls.' Br."), at 8 n.16, No. 5:22-CV-185-H, Aug. 3, 2022, ECF No. 23.  Thus, while Texas's law may not appear on its face to be inconsistent with EMTALA, that is not necessarily the case for other states' laws.

standard of care.[20] EMTALA defines an emergency medical condition as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in placing the health of the individual. . . in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of bodily organ[s]."[21] EMTALA requires that physicians provide treatment to any patient that presents with an emergency condition "until the emergency medical condition is resolved or stabilized."[22]

This mandate requires no more (and often less) than what physicians are taught to view as their ethical and professional responsibility. Faced with a medical emergency, intervening and stabilizing the patient—what EMTALA requires—is the *bare minimum* care that physicians are ethically bound to provide.

---

[20] All physicians and hospitals participating in government funded health care programs are subject to EMTALA. Only about 1% of non-pediatric physicians have opted out of Medicare. Nancy Ochieng et al., *How Many Physicians Have Opted-Out of the Medicare Program?*, KFF (Oct. 22, 2020), https://www.kff.org/medicare/issue-brief/how-many-physicians-have-opted-out-of-the-medicare-program.

[21] 42 U.S.C. § 1395dd(e).

[22] ACEP, *EMTALA Fact Sheet*, https://www.acep.org/life-as-a-physician/ethics--legal/emtala/emtala-fact-sheet/ (last visited Aug. 16, 2022).

EMTALA does not specify the particular treatment that should be provided in a given situation.  Instead, when a physician determines that an individual has an emergency medical condition, they must provide "*such treatment as may be required to stabilize the medical condition.*"[23]  EMTALA properly defers to the medical judgment of the physician(s) responsible for treating the patient to determine how best to achieve the designated objective of stabilization.  That decision-making, in turn, is informed by established clinical guidelines, developed and regularly updated according to the latest advancements in medical science.  Just as EMTALA does not specify particular treatments, it does not allow for physicians to withhold specific treatments for non-medical reasons.  Rather, if a treatment is "required to stabilize the medical condition," it must be provided—full stop.[24]

## B. The Guidance Correctly Advises That, in Some Situations, EMTALA Requires Abortion

As explained above, pregnant patients present to the emergency room on a daily basis, some of whom have (or develop) emergency medical conditions that require stabilizing treatment under EMTALA.  In some cases, the only way to stabilize those patients is by performing an abortion.  When a physician determines that that is the case, EMTALA mandates what their ethical obligations already

---

[23]  42 U.S.C. § 1395dd(b)(1)(A) (emphasis added).

[24]  *Id.*

16

required: providing the patient with the option of stabilizing—and perhaps even life-saving—care.

At its core, this is all that the Guidance says—and this is not legally or conceptually novel. The Guidance explains that "[i]f a physician believes that a pregnant patient presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA, and that abortion is the stabilizing treatment necessary to resolve that condition, the physician *must* offer that treatment to the patient."[25] This is not a new requirement, and, as Appellants explain in more detail,[26] the Guidance creates no new legal obligations. It simply reiterates what the law has required since Congress passed EMTALA in 1986—and what medical ethics required long before that.

### C.  The District Court Misunderstood Key Aspects of EMTALA and Emergency Medical Practice

The District Court's opinion suffered from three key misconceptions of emergency medicine. First, the court believed there was a difference between conditions that are "emergent" and "likely to be emergent."[27] In emergency medicine, no such distinction exists. Second, the court believed that the Guidance's

---

[25]  Pls.' Br., Ex. 1, at Appx. 002.

[26]  *See* Defs. Appellants Br. at 2, 16–25.

[27]  *See* Mem. at 14–16, 26–27.

interpretation of EMTALA would require members of Plaintiffs AAPLOG and CDMA to provide "elective abortions"[28] and would constitute "supervision or control over the practice of medicine or the manner in which medical services are provided" in violation of the Medicare Act.[29]  To the contrary, EMTALA and the Guidance leave the decision within the hands of the provider treating the individual patient and do not require a physician to perform an abortion that they do not believe is necessary.[30]  Third, the District Court treated an "incomplete medical abortion" as a special case in which an emergency abortion is inappropriate,[31] when in practice the necessary treatment will vary from case to case.

<ol><li>The Artificial Distinction Between Urgent and Emergent Has No Place in Emergency Medicine</li></ol>

The District Court held that the Guidance is broader than EMTALA and conflicts with Texas law because "the Guidance says abortion may be required for emergency medical conditions that are likely to become emergent, whereas [Texas

---

[28]  *Id.* at 16–17.

[29]  *See id.* at 52 (citing 42 U.S.C. § 1395).

[30]  Even Plaintiffs-Appellee's have recognized that stabilizing treatment can involve abortions.  *See*, *e.g.*, Br. For Defs. Appellants at 3 (citing ROA 280, 1133-35, 1138).

[31]  *See* Mem. at 16–17.

law] requires the condition to be present."[32]    Under EMTALA and in practice, however, there is no meaningful distinction between an emergency medical condition that is currently emergent and one that is "likely to become emergent."

EMTALA is clear on this point.  The statute provides that "emergency medical condition[s]" are conditions that in "the absence of immediate medical attention" could result in serious harm or place the patient's health in serious jeopardy—not just those that presently threaten the patient's life.[33]  It further sets the standard for "stabiliz[ing]" treatment as "such medical treatment of the condition as may be necessary to *assure, within reasonable medical probability, that no material deterioration of the condition is likely to result* from or occur during the transfer of the individual from a facility."[34]  Thus, stabilizing treatment is necessary if a physician determines that, without immediate medical attention, the patient's condition will deteriorate, placing the patient's health, or even life, in serious jeopardy.  *See infra* at 20–24.

---

[32]  *See id.* at 14 ("[U]nder the Guidance's interpretation, an abortion could be necessary if a physician determines it is necessary to stabilize a condition that is not yet emergent but is likely to become so.").

[33]  *See* 42 U.S.C. § 1395dd(e)(1)(A).

[34]  *Id.* § 1395dd(e)(3)(A) (emphasis added).

This matches the practice of emergency medicine.  There is no clear line between a condition that is life-threatening at the present moment and one that may become life-threatening if not promptly treated.  A patient's vital signs may currently be stable, but they may have a known condition that could cause precipitous deterioration or even sudden death at any moment.  An emergency condition that is currently treatable may suddenly become untreatable, or require far more invasive and risky measures, if care is delayed.  An emergency physician who believed that a patient had an emergency medical condition but declined to provide stabilizing treatment until the patient's death was imminent would be risking the patient's life in contravention of the rules of medical ethics and appropriate standards of care.

This is as much the case with pregnant patients as with any other.  For example, where miscarriage is suspected, prompt care is necessary to assure that the patient's miscarriage does not develop into a septic infection.[35]  Once sepsis has begun, the chance of death and the seriousness of the necessary interventions increases dramatically.[36]  Similarly, when a patient suffers PPROM, "an infection can progress to sepsis wherein multiple body organs and functions can fail"; delay is particularly dangerous because "[a] septic infection can progress quickly" and

---

[35]   *See* ACOG Practice Bulletin No. 200, *Early Pregnancy Loss*, at e197 (Nov. 2018, reaff'd 2021).

[36]   *Id.*

"one cannot reliably predict the acuteness or timing of deterioration of an individual patient."[37]   As another example, severe pre-eclampsia with hypertension "can quickly progress to eclampsia" and is "nearly certain to deteriorate, and can lead to coma, kidney failure, stroke, or cardiac arrest," but "a physician cannot know with reasonable certainty when that progression to life-threatening seizures will occur in all cases."[38]

To an emergency physician, the District Court's distinction between conditions that are "likely to become emergent" and ones that are "presently" emergent is manifestly and dangerously unworkable.   At what point does the condition of a pregnant patient with a uterine hemorrhage deteriorate from "likely to become emergent" to presently life-threatening?  How many units of blood does she have to have lose?  One?  Two?  Five?  How fast does she have to be bleeding? Soaking through two pads an hour?  Three?  How low does her blood pressure need to be?  90 mm HG over 60 mm HG?  80 over 50?  And at what point in time does the condition of a pregnant person with sepsis from a uterine infection deteriorate from health threatening to life threatening?  If the standard treatment of IV fluids

---

[37]   Dr. Carpenter Declaration, *supra* note 12, at 6–7; *see also* ACOG Practice Bulletin No. 217, *Prelabor Rupture of Membranes* (Mar. 2020).

[38] Dr. Carpenter Declaration, *supra* note 12, at 8–9.

does not stop her blood pressure from dropping, is her condition now life threatening? Does it become life threatening when she is unconscious and any further treatment has become more complex and fraught with complications?

It is the physicians in the room with their patients, not lawmakers or courts, that are uniquely equipped to make these decisions, and they must make them in the moment and based on the facts in front of them. In some cases, delayed care may be a death sentence. The best that physicians can do—what physicians treating emergency conditions *must* do—is identify situations where that may be the case and, as EMTALA requires, provide "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result."[39] The District Court recognized that "a pregnant patient's health and life exist on a continuum,"[40] but it misunderstood the significance of this fact. There is simply no medically appropriate way to apply a "life-threatening" line-drawing test in emergency medicine. Any attempt to impose one will lead to delayed care, increased morbidity, and preventable deaths.

---

[39]   42 U.S.C. § 1395dd(e)(3)(A).

[40]   Mem. at 27 (citing Br. of *Amici Curiae* Medical & Public Health Societies, No. 5:22-CV-185-H, Aug. 17, 2022, ECF No. 54).

2.    <u>EMTALA Requires the Exercise of Sound Medical Judgment—
Not a Specific Treatment</u>

The District Court also incorrectly credited Plaintiffs' concern that the Guidance's interpretation of EMTALA "'purports to require AAPLOG's members to perform, assist in, or refer for elective abortions.'"[41] This misunderstands the role of the treating physician under EMTALA.  If the individual physician treating a patient does not believe that abortion is necessary stabilizing treatment in a given case, they do not have to provide an abortion.  Neither EMTALA nor the Guidance purports to dictate clinical standards of care or prescribe particular treatment regimens.  They leave that to the physician in the room with the patient.

The Guidance could not be clearer about this:  "The determination of an emergency medical condition is the responsibility of the examining physician or other qualified medical personnel."[42]  The Guidance does not say that any particular condition will always require abortion, or that a physician must perform an abortion in some situations even if they conclude that abortion is not the necessary stabilizing treatment.  Rather, it says only that "[e]mergency medical conditions involving pregnant patients *may* include, but are not limited to, ectopic pregnancy, complications of pregnancy loss, or emergent hypertensive disorders, such as

---

[41]   *Id.* at 16 (quoting Pls.' Br. at 21).

[42]   *Id.*, Ex. 1, at Appx. 002.

preeclampsia with severe features."[43]  It requires a physician to provide an abortion *only if* the physician "believes . . . that abortion is the stabilizing treatment necessary to resolve . . . an emergency medical condition.[44]

This statement entirely resolves AAPLOG and CDMA's asserted injuries. None of their members risk being forced to provide abortions in non-emergency situations.  EMTALA merely requires termination of a pregnancy if the treating physician determines that that is the clinically indicated stabilizing treatment required in a particular emergency situation.  Plaintiffs' arguments that the Guidance constrains their discretion as medical professionals and forces them to perform abortions they do not believe are necessary therefore mischaracterize the Guidance. Accordingly, they lack standing, and their arguments based on this supposed conflict fail on their merits.[45]

For similar reasons, the District Court's holding that the Guidance oversteps the Medicare Act's prohibition on federal "'supervision or control over the practice of medicine or the manner in which medical services are provided'"[46] is incorrect. The Guidance does not "'direct or prohibit any treatment or diagnosis[,]' 'favor one

---

[43]  *Id.*, Ex. 2, at Appx. 009 (emphasis added).

[44]  *Id.*

[45]  *See also* Appellants' Br. at 49–54.

[46]  Mem. at 52 (quoting 42 U.S.C. § 1395).

procedure over another[,]' or 'influence the judgment of medical professionals.'"[47]
Rather, it properly leaves treatments, diagnoses, and procedures entirely within the
judgment of medical professionals.  It simply says that *if* a physician determines, in
their medical judgment, that a particular treatment is required to stabilize a patient
experiencing an emergency medical condition, state law cannot prevent the
physician from providing that treatment.  This does not violate the Medicare Act.

3.    Incomplete Medication Abortion Is No Different from Any
       Other Condition That *May* Require Emergency Intervention

The District Court blatantly misconstrued the Guidance's statements about
incomplete abortions and would effectively discriminate against emergency patients
based on the source of their condition.  The Guidance's reference to incomplete
medication abortion is nothing more than an example of appropriate deference to the
judgment of medical professionals.  It recognizes that incomplete medication
abortion may be one *potential* source of an emergency medical condition; it does not
suggest that EMTALA *automatically requires* the physician to complete the
termination of pregnancy.[48]  As always, decisions about the medically indicated

---

[47]    *Id.* at 53 (quoting *Goodman v. Sullivan*, 891 F.2d 449, 451 (2d Cir. 1989)).

[48]    Incomplete medication abortions are typically treated by the prescribing
clinician with a second dose of misoprostol.  *Recommended Medication
Regimen for Treatment of Incomplete and Missed Abortion for Less than 13
Weeks Uterine Size*, IPAS, Feb. 14, 2021, available at
https://www.ipas.org/clinical-update/english/postabortion-care/recommended-
medication-regimen-for-treatment-of-incomplete-and-missed-abortion-for-less-

course of action are left to the treating physician.  The District Court therefore erred when it accepted Plaintiffs' assertion to the contrary.[49]

More importantly, if an emergency medical condition *does* exist, the circumstances that led to that emergency are irrelevant—both to EMTALA and medical ethics.  When treating a gunshot wound, a physician does not ask what the patient was doing at the time of the wound; when treating a car crash victim, they do not ask whether the patient was speeding.  In an emergency room, it would be dangerously dilatory for a physician to investigate whether a patient had attempted to induce an abortion and then refuse to provide necessary medical care if they suspect she had.  Medical ethics do not permit such dangerous practice, and EMTALA would preempt any state laws that would require it.

## III.    The Balance of the Equities and the Public Interest Weigh Against an Injunction

Even if the District Court had correctly found that Plaintiffs were likely to succeed on the merits, the Injunction would still be inappropriate.  An interpretation

---

than-13-weeks-uterine-size/.  Serious complications from incomplete medication abortions are infrequent.  Ashely Redinger and Hao Nguyen, *Incomplete Abortions*, NATIONAL INSTITUTE OF HEALTH, June 27, 2022, available at https://www.ncbi.nlm.nih.gov/books/NBK559071/ ("Patients with incomplete abortion normally have a good prognosis and can be managed expectantly with an 82% to 96% success rate with no future consequences on fertility.").

[49]    Mem. at 16–17.

of EMTALA that allowed states to override EMTALA would cause irremediable harm to patients and profoundly interfere with physicians' ability to practice consistent with professional obligations.

### A.    The Injunction Places Pregnant Patients at Risk

For all the reasons explained above, there are situations where abortion is a necessary stabilizing treatment for emergency medical conditions.  The Guidance challenged in this case does nothing more than recognize that abortion may be stabilizing treatment in some circumstances and must be provided where that is the case.  The District Court's conclusion that EMTALA does not require this treatment, and states have authority to prohibit hospitals and physicians from providing emergency treatment, jeopardizes the health and lives of pregnant patients.

Approximately four in five pregnancy-related deaths nationwide are preventable.[50]  In Texas, a staggering *ninety percent* of pregnancy-related deaths are preventable.[51]  "Standardized approaches to addressing obstetric emergencies" are

---

[50]  *See Four in 5 Pregnancy-related Deaths in the U.S. are Preventable*, CDC, Sept. 19, 2022, https://www.cdc.gov/media/releases/2022/p0919-pregnancy-related-deaths.html; *see also* Susanna Trost, et al., *Pregnancy-Related Deaths: Data from Maternal Mortality Review Committees in 36 US States, 2017–2019*, CDC, 2022, https://www.cdc.gov/reproductivehealth/maternal-mortality/erase-mm/data-mmrc.html.

[51]  *Texas Maternal Mortality and Morbidity Review Committee and Department of State Health Services Joint Biennial Report 2022*, at 8, Texas Dept. of Health and Human Servs., Dec. 2022,

critical to avoiding these unnecessary deaths.[52]  If states can prohibit the standard, clinically indicated treatments for pregnant patients experiencing emergency medical conditions, the rate of death among pregnant patients will increase. Nationwide, emergency departments receive more than 3.5 million visits by pregnant patients in a given year.[53]  While the vast majority of these visits do not require abortion care, prohibiting that care in the cases where it is necessary—or delaying that care by forcing physicians to wait until a patient's condition deteriorates—will cause countless women to experience preventable suffering, long-term impairment, or even death.

We are already seeing the terrible impacts of state laws that restrict physicians' judgment in the practice of emergency medicine.  The same day the District Court issued the Injunction in this case, for example, a Texas woman named Amanda Eid suffered PPROM, which resulted in her water breaking at just 18

---

https://www.dshs.texas.gov/sites/default/files/legislative/2022-Reports/Joint-Biennial-MMMRC-Report-2022.pdf.

[52]  Emily E. Peterson et al., *Vital Signs: Pregnancy-Related Deaths, United States, 2011–2015, and Strategies for Prevention, 13 States, 2013–2017*, 68 MORBIDITY & MORTALITY WKLY. REP. 423, 426 (May 10, 2019).

[53]  Healthcare Cost and Utilization Project, *Emergency Department and Inpatient Utilization and Cost for Pregnant Women: Variation by Expected Primary Payer and State of Residence*, at 8 (Dec. 14, 2021), https://www.hcup-us.ahrq.gov/reports/ataglance/HCUPanalysisHospUtilPregnancy.pdf.

weeks.[54]  Although her doctors already knew that the fetus could never survive and that Amanda would inevitably develop a dangerous infection, they believed—like the District Court here—that Texas's law prohibited them from terminating the doomed pregnancy until she was "sick enough that [her] life was at risk."[55]  Three days later, "she went downhill very, very fast," her fever spiking "in a matter of maybe five minutes."[56]  By this time, her bacterial infection was severe enough that antibiotics and a blood transfusion were unable to stop it—she went into septic shock, requiring invasive treatment and leaving it unclear whether she would survive.[57]  Emergency physicians were ultimately able to save her life, but only just.[58]  Among other consequences, the infection caused uterine scarring that may leave Amanda unable to have another child.[59]  None of this would have occurred had the patient received timely and medically indicated emergency treatment.

---

[54]  Elizabeth Cohen & John Bonifield, *Texas Woman Almost Dies Because She Couldn't Get an Abortion*, CNN, Nov. 16, 2022, https://www.cnn.com/2022/11/16/health/abortion-texas-sepsis/index.html.

[55]  *Id.*

[56]  *Id.*

[57]  *Id.*

[58]  *Id.*

[59]  *Id.*

Similar delays are occurring around the country—many of them resulting in near-death misses, and many leaving life-long impairments. [60] Although this relatively recent situation means that peer-reviewed studies have not yet been published, one early analysis found that "maternal morbidity nearly double[d]" in cases of PPROM, pre-eclampsia with severe features, and/or vaginal bleeding in two Texas hospitals after the passage of Senate Bill 8 (which banned abortion in Texas

---

[60] *See*, *e.g.*, Alicia Naspretto, *'My Heart Broke Into a Million Pieces': The Stories Behind the Texas Abortion Ban Lawsuit*, KXXV 25 ABC, Mar. 8, 2023, https://www.kxxv.com/news/in-depth/my-heart-broke-into-a-million-pieces-the-stories-behind-the-texas-abortion-ban-lawsuit; Laura Ungar & Heather Hollingsworth, *Despite Dangerous Pregnancy Complications, Abortions Denied*, ASSOCIATED PRESS, Nov. 20, 2022, https://apnews.com/article/abortion-science-health-business-ap-top-news-890e813d855b57cf8e92ff799580e7e8; Stephanie Emma Pfeffer, *Texas Woman Nearly Loses Her Life After Doctors Can't Legally Perform an Abortion: 'Their Hands Were Tied'*, PEOPLE MAGAZINE, Oct. 18, 2022, https://people.com/health/texas-woman-nearly-loses-her-life-after-doctors-cannot-legally-perform-abortion/; Elizabeth Cohen et al., *'Heartbreaking' Stories Go Untold, Doctors Say, As Employers 'Muzzle' Them in Wake of Abortion Ruling*, CNN, Oct. 12, 2022, https://www.cnn.com/2022/10/12/health/abortion-doctors-talking/index.html; Courtney Carpenter, *League City Family in 'Nightmare' Situation Under Texas Abortion Law*, ABC 13, Sept. 29, 2022, https://abc13.com/texas-abortion-laws-heartbeat-act-senate-bill-8-pregnant-woman/12277047/; Emily Baumgaertner, *Doctors in abortion-ban states fear prosecution for treating patients with life-threatening pregnancies*, LA TIMES, July 29, 2022, https://www.latimes.com/world-nation/story/2022-07-29/fearful-of-prosecution-doctors-debate-how-to-treat-pregnant-patients.

after cardiac activity was identified) and Senate Bill 4 (which criminalized providing abortion medication after seven weeks, even in emergency situations).[61]

Even under the best of circumstances, pregnancy and childbirth impose significant physiological changes on a person's body that can exacerbate underlying preexisting conditions and can severely compromise health.[62] These risks can create emergency situations in which a pregnant person's health and life are in the balance, as illustrated by the nation's ongoing maternal health crisis.[63] Pregnant people—

---

[61] Anjali Nambiar & Shivani Patel, *Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less with Complications in 2 Texas Hospitals after Legislation on Abortion*, 227 AM. J. OBSTETRICS & GYNECOLOGY 648, 649 (2022).

[62] *See*, *e.g.*, ACOG Practice Bulletin No. 190, *Gestational Diabetes Mellitus* (Feb. 2018); ACOG Practice Bulletin No. 222, *Gestational Hypertension and Preeclampsia* (Dec. 2018); ACOG Practice Bulletin No. 183, *Postpartum Hemorrhage* (Oct. 2017); ACOG Obstetric Care Consensus, *Placenta Accreta Spectrum* (July 2012, reaff'd 2021); ACOG Practice Bulletin No. 198*, Prevention and Management of Obstetric Lacerations at Vaginal Delivery* (Sept. 2018, reaff'd 2022); ACOG Clinical Consensus No. 1, *Pharmacologic Stepwise Multimodal Approach for Postpartum Pain Management* (Sept. 2021).

[63] *See generally* Roosa Tikkanen et al., *Maternal Mortality and Maternity Care in the United States Compared to 10 Other Developed Countries*, COMMONWEALTH FUND (Nov. 18, 2020), https://www.commonwealthfund.org/publications/issue-briefs/2020/nov/maternal-mortality-maternity-care-us-compared-10-countries (noting that the United States "has the highest maternal mortality rate among

like all other persons in this country—are entitled to receive timely health- and life-saving medical care, just as EMTALA requires.

**B.     The Injunction Will Particularly Harm Patients in Rural Areas, Minoritized Patients, and Patients with Low Incomes**

The consequences described above will be especially devastating for underserved populations, including patients living in rural areas, minoritized communities, and pregnant patients with low incomes.  As a result of structural inequities and social determinants, these populations are "more likely to face barriers in accessing routine health care services," including prenatal care.[64]  ED use has been "consistently increasing," with use by low-income populations and people of color rising at the highest rates.[65]  This is exacerbated by the lack of access in many parts of the country to maternity healthcare.[66]  In light of the socioeconomic constraints

---

developed countries" and maternal deaths "have been increasing in the United States").

[64]    Lyndsey S. Benson et al., *Early Pregnancy Loss in the Emergency Department*, J. AM. C. OF EMERGENCY PHYSICIANS OPEN, 1, 1–2 (2021) ("Benson*, EPL*").

[65]    *Id.* at 2.

[66]    *See*, *e.g.*, March of Dimes, *Maternity Care Desert*, https://www.marchofdimes.org/peristats/data?top=23&lev=1&reg=99&slev=1 (last visited May 7, 2023) ("More than 2.2 million women of childbearing age live in maternity care deserts (1,119 counties) that have no hospital offering obstetric care, no birth center and no obstetric provider. . . . An additional 4.7 million women of child bearing age live in counties with limited access to maternity care.").

these populations already face in accessing healthcare services, EDs and "emergency physicians have been given a unique social role and responsibility to act as health care providers of last resort for many patients who have no other ready access to care."[67]

The 46 million U.S. residents living in rural areas would be particularly endangered if their states were allowed to override EMTALA's mandate.[68] "[R]ural Americans are more likely to be living in poverty, unhealthy, older, uninsured or underinsured, and medically underserved."[69] Rural hospitals and EDs are "the safety net" for rural Americans, including rural pregnant patients.[70] Rural women are "more likely to be poor, lack health insurance or rely substantially on Medicaid and Medicare" and "must travel longer distances to receive care."[71] Pregnant rural patients accordingly are less likely to seek prenatal care,[72] and the initiation of

---

[67] ACEP, *Code of Ethics*, at 4; *see also* Benson, *EPL*, at 7 (EDs play a "vital role" in "caring for those who are socioeconomically vulnerable").

[68] *See* Econ. Rsch. Serv., U.S. Dep't of Agric., *Rural America at a Glance* 2 (2021), https://www.ers.usda.gov/webdocs/publications/102576/eib-230.pdf.

[69] CMS, *Rural Health Strategy*, at 2 (2018), https://www.cms.gov/About-CMS/Agency-Information/OMH/Downloads/Rural-Strategy-2018.pdf.

[70] ACEP, *Delivery of Emergency Care in Rural Settings*, at 1 (2017).

[71] ACOG Committee Opinion No. 586, *Health Disparities in Rural Women*, (2014, reaff'd 2021).

[72] *Id.*

prenatal care in the first trimester is lower for rural pregnant women and girls compared with those in suburban areas.[73] Rural women "experience poorer maternal outcomes compared to their non-rural counterparts, including high pregnancy-related mortality."[74]

People of color and people with low incomes similarly will be disproportionately harmed if EMTALA cannot be followed when treating pregnant patients. People of color and people with low incomes generally have worse access to care and higher rates of ED visits.[75] Pregnant women of color are also less likely to receive prenatal care, resulting in an increased risk for complex health issues occurring in pregnancy.[76] Women of color experience higher rates of severe

---

[73]  *Id.*

[74]  CMS, *Advancing Rural Maternal Health Equity*, at 1 (May 2022), https://www.cms.gov/files/document/maternal-health-may-2022.pdf ("CMS, *Advancing Rural Maternal*").

[75]  Agency for Healthcare Rsch. & Quality, *2019 Nat'l Healthcare Quality and Disparities Report*, at A22 (2019), https://www.ahrq.gov/sites/default/files/wysiwyg/research/findings/nhqrdr/2019qdr-cx061021.pdf; Office of the Ass't Sec'y for Planning & Evaluation, HHS, *Trends in the Utilization of Emergency Dep't Servs., 2009–2018* 1, 22 (Mar. 2021), https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//199046/ED-report-to-Congress.pdf.

[76]  Benson, *EPL*, at 2; *see also* Juanita Chinn, et al., *Health Equity Among Black Women in the United States*, 30 J. WOMEN'S HEALTH 212, 215 (2021) ("Chinn,

maternal morbidity and are more likely to suffer pregnancy-related deaths. [77] Women of color are also more likely to experience early pregnancy loss (or miscarriage), the standard treatment for which can include abortion, and to visit an ED for miscarriage-related care.[78]

These populations are therefore more likely to experience emergency medical conditions when pregnant and thus more likely to need the critical care that EMTALA requires.

### C.     Forcing Physicians to Decide Between Obeying State Law and Obeying EMTALA Harms Physicians and the Public Interest

The Guidance's interpretation of EMTALA is also necessary to allow physicians to practice consistent with medical ethics and without the specter of government sanctions.   If physicians must choose between complying with EMTALA and complying with contrary state law, they will be placed in an untenable lose-lose situation:  compliance with one set of obligations necessitates the violation of another.

---

*Health Equity*") (explaining that "Black women are at a disadvantage regarding the protective factor of the early initiation of prenatal care").

[77]   CMS, *Advancing Rural Maternal Health Equity*, at 1 (May 2022); *see also* Chinn, *Health Equity*, at 215 (Black and Latina women "are at greater risk of poor pregnancy outcomes").

[78]   Benson, *EPL*, at 6–7.

If EMTALA does not preempt contrary state laws, clinicians will be in the untenable position of choosing between providing care consistent with their best medical judgment, scientific evidence, and the clinicians' ethical obligations, or risking legal retribution.   Will they violate their state's law and be subject to indictment, arrest, prosecution, and license suspension, jeopardizing not only their livelihoods but also their ability to render care to patients in the state?[79]  Or will they violate EMTALA and subject themselves and their hospital to termination of their Medicare provider agreement, fines, and civil damages, thereby depriving patients who rely on these facilities for care?[80]  This not only places physicians in an impossible bind, it will delay or prevent the provision of critical, stabilizing care to pregnant patients.

Limiting EMTALA in the manner the State proposes would jeopardize long-established and widely accepted principles of medical ethics by undermining the patient-physician relationship and pitting physicians' interests against their patients' interests.  Physicians are subject to ethical obligations that require them to put the patient first.  ACOG's Code of Professional Ethics states that "the welfare of the

---

[79]   *See*, *e.g.*, Idaho Code § 18-622(2)-(3).

[80]   *See* ACEP, *EMTALA Fact Sheet*, https://www.acep.org/life-as-a-physician/ethics--legal/emtala/emtala-fact-sheet/ (listing penalties for physicians).

patient must form the basis of all medical judgments" and that obstetrician-gynecologists should "exercise all reasonable means to ensure that the most appropriate care is provided to the patient." [81]    Similarly, ACEP's Code of Professional Ethics states that "[e]mergency physicians shall embrace patient welfare as their primary professional responsibility" and explains that it is unethical to deny or delay the provision of emergency care on the basis of "type of illness or injury."[82]    And the AMA Code of Medical Ethics places on physicians the "ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others."[83]    EMTALA's requirement that a physician must provide "stabilizing treatment [to] prevent material deterioration" of all patients and must "act prior to the patient's condition declining"[84] merely codified what was already paramount in physicians' professional obligations.

Physicians should not be forced to supplant their own medical judgment regarding what emergency treatment is in the patients' best interests with a state legislature's non-expert decision regarding whether and when physicians may

---

[81]    ACOG, *Code of Professional Ethics* 2 (Dec. 2018).

[82]    ACEP, *Code of Ethics*, at 3, 11.

[83]    AMA, *Code of Medical Ethics Opinions on Patient-Physician Relationships* § 1.1.1 (2016) ("AMA, *Code of Ethics*").

[84]    CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss,* 4 (July 11, 2022).

provide clinically indicated treatment.  Such laws also create inherent conflicts of interest and may delay needed emergency treatment.  Physicians need to be able to offer appropriate treatment options based on patients' individualized needs without regard for their own self-interest. [85]  But if providing that care could subject physicians to criminal prosecution under a state's laws, the looming threat of criminal liability would result in dangerous delay.  In the time that clinicians and hospital administrators would need to evaluate their legal exposure, a time-sensitive emergent situation could advance, and the patient could deteriorate in front of them.  Such laws obstruct physicians' ability to put their pregnant patients first and place them in the untenable position of choosing between the ethical practice of medicine and obeying the state law.

The obligation to promote the wellbeing of others (known as "beneficence") and to do no harm and cause no injury ("non-maleficence") have been the cornerstones of the medical profession since the Hippocratic traditions nearly 2,500 years ago.[86]  Both of these principles arise from the foundation of medical ethics, which requires that the welfare of the patient forms the basis of all medical decision

---

[85]  *See*, *e.g.*, AMA, *Code of Ethics*, at § 1.1.1 (stating that a physician has an "ethical responsibility to place patients' welfare above the physician's own self-interest").

[86]  ACEP, *Code of Ethics*, at 6; *see generally* AMA, *Principles of Medical Ethics* (2001).

making.   EMTALA recognizes these principles by prohibiting physicians from placing their own interests above their patients' interests.  If a physician concludes that an abortion is medically necessary, the principles of beneficence and non-maleficence require the physician to recommend, provide, and/or (if time permits and the patient is stable) refer the patient for that course of treatment.  Placing physicians in the ethical quandary of choosing between providing the best available medical care and risking substantial penalties under state law, or protecting themselves and their medical practice, challenges the very core of the Hippocratic Oath all physicians take.

## **<u>CONCLUSION</u>**

For the foregoing reasons and those in Appellants' brief, this Court should vacate the preliminary injunction.

Dated: May 15, 2023

Respectfully submitted,

/s/     Shannon Rose Selden
Shannon Rose Selden
Adam Aukland-Peck
DEBEVOISE & PLIMPTON LLP
66 Hudson Blvd.
New York, NY 10001
Tel.: (212) 909-6000
srselden@debevoise.com
aauklandpeck@debevoise.com


Jeffrey B. Dubner
Skye L. Perryman
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel.: (202) 448-9090
jdubner@democracyforward.org
sperryman@democracyforwrd.org


*Counsel for* Amici

## CERTIFICATE OF SERVICE

I certify that on May 15, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Shannon Rose Selden
Shannon Rose Selden

*Counsel to Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,287 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

/s/ Shannon Rose Selden
Shannon Rose Selden

*Counsel to Amici Curiae*