No. 23-10246

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; AMERICAN ASSOCIATION OF PRO-LIFE
OBSTETRICIANS & GYNECOLOGISTS; CHRISTIAN MEDICAL AND
DENTAL ASSOCIATIONS,

*Plaintiffs-Appellees,*

*v.*

XAVIER BECERRA; UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES; CENTERS FOR MEDICARE AND MEDICAID
SERVICES; KAREN L. TRITZ; DAVID R. WRIGHT,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Texas, Lubbock Division

## BRIEF FOR PLAINTIFFS-APPELLEES

JOHN SCOTT
Provisional Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

LANORA C. PETTIT
Principal Deputy Solicitor General

NATALIE D. THOMPSON
Assistant Solicitor General
Natalie.Thompson@oag.texas.gov

SARA B. BAUMGARDNER
Assistant Attorney General

Counsel for the State of Texas

*Additional Counsel Listed on Following Page*

Matthew S. Bowman
John J. Bursch
Ryan L. Bangert
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
mbowman@ADFlegal.org
rbangert@ADFlegal.org

Julie Marie Blake
Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655
jblake@ADFlegal.org

*Counsel for American Association
of Pro-Life Obstetricians &
Gynecologists and Christian Medical
and Dental Associations*

# Certificate of Interested Persons

No. 23-10246

## State of Texas; American Association of Pro-Life Obstetricians & Gynecologists; Christian Medical and Dental Associations,

*Plaintiffs-Appellees*,

*v.*

## Xavier Becerra; United States Department of Health and Human Services; Centers for Medicare and Medicaid Services; Karen L. Tritz; David R. Wright,

*Defendants-Appellants.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees:**
State of Texas
American Association of Pro-Life Obstetricians & Gynecologists (AAPLOG)
Christian Medical and Dental Associations (CMDA)
*(AAPLOG and CMDA have no parent corporation, and no publicly held corporation owns 10% or more of their stock.)*

**Defendants-Appellants:**
Xavier Becerra
United States Department of Health and Human Services
Centers for Medicare and Medicaid Services
Karen L. Tritz
David R. Wright

**Counsel for Plaintiffs-Appellees:**
John Scott
Brent Webster
Lanora C. Pettit
Natalie D. Thompson
Sara B. Baumgardner
Office of the Texas Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548

Matthew S. Bowman
John J. Bursch
Ryan L. Bangert
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001

Julie Marie Blake
Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176

**Counsel for Defendants-Appellants:**
Brian M. Boynton
Leigha Simonton
Michael S. Raab
McKaye L. Neumeister
Nicholas S. Crown
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

**Amici and Counsel:**

City and County of San Francisco,
  California
David Chiu
City Attorney
City Hall Room 234
One Dr. Carlton B. Goodlett Place
San Francisco, California 94102

City of Philadelphia, Pennsylvania
Diana P. Cortes
City Solicitor
1515 Arch Street, 17th Floor
Philadelphia, Pennsylvania 19102

City of Northampton, Massachusetts
Alan Seewald
Northampton City Solicitor
One Roundhouse Plaza, Suite 304
Northampton, Massachusetts 01060

City of Madison, Wisconsin
Michael Haas
City Attorney, City of Madison
210 Martin Luther King Jr. Blvd
Rm. 401
Madison, Wisconsin 53703

City of Austin, Texas
Anne L. Morgan
City of Austin Law Department
P.O. Box 1546
Austin, Texas 78767-1546

County of Los Angeles, California
Dawyn Harrison
County Counsel
Jon Scott Kuhn
Steven De Salvo
500 W. Temple Street
Los Angeles, California 90012

County of Monterey, California
Leslie J. Girard
County Counsel, County of Monterey
168 West Alisal Street, 3rd Floor
Salinas, California 93901

County of Marin, California
Brian E. Washington
County Counsel, County of Marin
3501 Civic Center Drive, Rm. 275
San Rafael, California 94903

County of Milwaukee, Wisconsin
Margaret C. Daun
Milwaukee County Office of
  Corporation Counsel
901 N 9th Street, Suite 303
Milwaukee, Wisconsin 53233

King County, Washington
Leesa Manion
King County Prosecuting Attorney's
  Office
516 3rd Avenue
Seattle, Washington 98104

Travis County, Texas
Delia Garza
County Attorney, Travis County
P. O. Box 1748
Austin, Texas 78767

County of Santa Clara, California
Rachel Neil
James R. Williams
Kavita Narayan
Meredith A. Johnson
Office of the County Counsel
East Wing, 9th Floor
70 W. Hedding Street
San Jose, California 95110

State of Arizona
Kristin K. Mayes
Attorney General
2005 N. Central Ave
Phoenix, Arizona 85004

State of California
Rob Bonta
Renu R. George
Karli Eisenberg
David Houska
Hayley Penan
Office of the Attorney General
Healthcare Rights and Access
California Department of Justice
1300 I Street
Sacramento, California 95814

State of Colorado
Philip J. Weiser
Attorney General
1300 Broadway
Denver, Colorado 80203

State of Connecticut
William Tong
Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106

State of Delaware
Kathleen Jennings
Attorney General
820 N. French Street
Wilmington, Delaware 19801

State of Hawai'i
Anne E. Lopez
Attorney General
425 Queen Street
Honolulu, Hawai'i 96813

State of Illinois
Kwame Raoul
Attorney General
State of Illinois
100 West Randolph Street
Chicago, Illinois 60601

State of Maine
Aaron M. Frey
Attorney General
6 State House Station
Augusta, Maine 04333

State of Maryland
Anthony Brown
Attorney General
State of Maryland
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202

Commonwealth of Massachusetts
Andrea Joy Campbell
Attorney General
Commonwealth of Massachusetts
One Ashburton Place
Boston, Massachusetts 02108

State of Michigan
Dana Nessel
Attorney General
State of Michigan
P.O. Box 30212
Lansing, Michigan 48909

State of Minnesota
Keith Ellison
Attorney General State of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
    Blvd.
St. Paul, Minnesota 55155

State of Nevada
Aaron D. Ford
Attorney General
100 North Carson Street
Carson City, Nevada 89701

State of New Jersey
Matthew J. Platkin
Attorney General
25 Market Street
Trenton, New Jersey 08625

State of New Mexico
Raúl Torrez
Attorney General
P.O. Drawer 1508
Santa Fe, New Mexico 87504

State of New York
Letitia James
Barbara D. Underwood
Ester Murdukhayeva
Galen Sherwin
Laura Etlinger
Office of the Attorney General
The Capitol
Albany, New York 12224

State of North Carolina
Joshua H. Stein
Attorney General
114 W. Edenton Street
Raleigh, North Carolina 27603

State of Oregon
Ellen F. Rosenblum
Attorney General
1162 Court Street NE
Salem, Oregon 97301

Commonwealth of Pennsylvania
Michelle A. Henry
Attorney General
Strawberry Square
Harrisburg, Pennsylvania 17120

State of Rhode Island
Peter F. Neronha
Attorney General
150 South Main Street
Providence, Rhode Island 02903

State of Washington
Robert W. Ferguson
Attorney General
P.O. Box 40100
Olympia, Washington 98504

American Academy of Pediatrics
American College of Emergency Physicians
American College of Obstetricians and Gynecologists
American Medical Association
American Public Health Association
Society for Maternal-Fetal Medicine

Shannon Rose Selden
Adam B. Aukland-Peck
Debevoise & Plimpton, L.L.P.
66 Hudson Boulevard
New York, New York 10001

Jeffrey B. Dubner
Skye Lynn Perryman
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

Washington, District of Columbia
Brian L. Schwalb
Attorney General
400 6th Street, NW, Suite 8100
Washington, D. 20001

/s/ Matthew S. Bowman
MATTHEW S. BOWMAN
*Counsel of Record for Plaintiffs-Appellees AAPLOG and CMDA*

/s/ Natalie D. Thompson
NATALIE D. THOMPSON
*Counsel of Record for the State of Texas*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees agree that oral argument would aid the Court in its consideration of the significant issues involved in this matter.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ................................................................... i

Statement Regarding Oral Argument ............................................................ ii

Table of Authorities ....................................................................................... v

Introduction .................................................................................................... 1

Statement of Jurisdiction ............................................................................... 2

Issues Presented ............................................................................................. 3

Statement of the Case .................................................................................... 4

    I.   Statutory Background ......................................................................... 4

        A.  EMTALA ................................................................................. 4

        B.  Texas's Laws Protecting Human Life ...................................... 7

    II.  The Memorandum .............................................................................. 9

    III. Procedural History .......................................................................... 14

        A.  The Lawsuit ............................................................................ 14

        B.  The Injunction ........................................................................ 15

        C.  Appeal .................................................................................... 21

Summary of the Argument ........................................................................... 22

Standard of Review ...................................................................................... 24

Argument ...................................................................................................... 25

    I.   The Memorandum Is Final Agency Action Subject to Judicial
        Review. ............................................................................................ 25

        A.  The Memorandum marks the consummation of HHS's
            decisionmaking process. ........................................................ 25

        B.  The Memorandum creates legal consequences...................... 26

    II.  The Memorandum Exceeds HHS's Statutory Authority......................... 30

        A.  The Memorandum goes further than the statute. ............................. 30

            1.   EMTALA does not preempt background law governing the
                 practice of medicine and medical ethics. ..................................... 30

            2.   HHS's counterarguments are unavailing. .................................... 34

B. HHS does not argue that the Memorandum is a proper gap-filler, and it is not: the Memorandum is not a permissible construction of the statutory text. ................................ 37

III. HHS Unlawfully Failed to Subject the Memorandum to Notice and Comment. ................................................................ 39

A. The Memorandum is at least a "statement of policy." ...................... 40

B. The Memorandum establishes or changes a substantive legal standard. ........................................................................ 41

IV. The District Court Properly Enjoined Enforcement of the Memorandum as to Plaintiffs. ................................................ 43

A. The injunction prevents enforcement of an illegal mandate not found in EMTALA. ...................................................... 44

B. The Memorandum's mandate of any abortions, legal or illegal, violates the APA and injures Plaintiffs. ........................... 45

1. The district court properly gave Texas relief against the entire illegal Memorandum. ............................................. 45

2. All the Memorandum's illegal abortion mandates injure the doctors. .................................................................. 46

C. The injunction properly remedies the Memorandum's procedural deficiencies. ....................................................... 49

Conclusion ............................................................................... 51

Certificate of Service ................................................................ 52

Certificate of Compliance .......................................................... 52

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) ................................................................. 46

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982) ...................................................................15

*Azar v. Allina Health Servs.,*
139 S. Ct. 1804 (2019) ....................................................39, 40, 41

*Barrick Goldstrike Mines Inc. v. Browner,*
215 F.3d 45 (D.C. Cir. 2000) ....................................................... 29

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................... 25, 26

*Braidwood Mgmt., Inc. v. EEOC,*
No. 22-10145, 2023 WL 4073826 (5th Cir. June 20, 2023) ............... 43

*Brooks v. Md. Gen. Hosp., Inc.,*
996 F.2d 708 (4th Cir. 1993) ...............................................4, 5, 31

*Burditt v. U.S. Dep't of Health & Human Servs.,*
934 F.2d 1362 (5th Cir. 1991) ...................................................... 4

*Cent. & S. W. Servs., Inc. v. U.S. E.P.A.,*
220 F.3d 683 (5th Cir. 2000) ...................................................49-50

*Cherukuri v. Shalala,*
175 F.3d 446 (6th Cir. 1999) ....................................................... 27

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ............................................20, 22, 30, 35, 38

*Ciba-Geigy Corp. v. EPA,*
801 F.2d 430 (D.C. Cir. 1986) ................................................ 26, 29

*Consumer Fin. Protection Bureau v. All Am. Check Cashing, Inc.,*
33 F.4th 218 (5th Cir. 2022) ...................................................... 42

*Contender Farms, LLP v. U.S. Dep't of Agric.,*
779 F.3d 258 (5th Cir. 2015) .......................................................16

*Crosby v. Nat'l Foreign Trade Council,*
530 U.S. 363 (2000) ................................................................... 33

*Dep't of Homeland Sec. v. Regents,*
140 S. Ct. 1891 (2020) ............................................................... 50

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022) ....................................... 1, 8, 9, 15, 22, 28, 42, 45

*Eberhardt v. City of Los Angeles*,
62 F.3d 1253 (9th Cir. 1995) ........................................................ 5, 31

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) ...................................................................... 42

*Gen. Elec. Co. v. EPA*,
290 F.3d 377 (D.C. Cir. 2002) .................................................. 26, 27

*Goodman v. Sullivan*,
891 F.2d 449 (2d Cir. 1989) ...................................................... 32, 33

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
968 F.3d 454 (5th Cir. 2020) ..................................................... 31, 35

*Hardy v. N.Y. City Health & Hosp. Corp.*,
164 F.3d 789 (2d Cir. 1999) ............................................................ 5

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) .................................................................... 31

*Little Sisters of the Poor v. Pennsylvania*,
140 S. Ct. 2367 (2020) ................................................................... 50

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ................................................................. 17, 47

*Maine v. Taylor*,
477 U.S. 131 (1986) ........................................................................ 16

*Marshall ex rel. Marshall v. E. Carroll Parish Hosp. Serv. Dist.*,
134 F.3d 319 (5th Cir. 1998) ........................................... 4, 5, 31, 33-34

*Maryland v. King*,
567 U.S. 1301 (2012) ...................................................................... 46

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ........................................................................ 31

*MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*,
622 F.3d 361 (5th Cir. 2010) ........................................................... 24

*Miller v. Med. Ctr. of Sw. La.*,
22 F.3d 626 (5th Cir. 1994) ............................................................ 1, 4

*Nat'l Ass'n of Home Builders v. Norton*,
415 F.3d 8 (D.C. Cir. 2005) ...................................................... 26, 27

*Nat'l Fed. of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*,
  142 S. Ct. 661 (2022) ................................................................. 42

*Nat'l Pork Producers Council v. EPA*,
  635 F.3d 738 (5th Cir. 2011) ...............................................25, 26, 29

*Qureshi v. Holder*,
  663 F.3d 778 (5th Cir. 2011) ...............................................................19

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947) ...............................................................................31

*Roe v. Wade*,
  410 U.S. 113 (1973) ......................................................................... 8, 28

*Sherbert v. Verner*,
  374 U.S. 398 (1963) ............................................................................. 47

*Syncor Int'l Corp. v. Shalala*,
  127 F.3d 90 (D.C. Cir. 1997) .............................................26, 40, 41

*Teemac v. Henderson*,
  298 F.3d 452 (5th Cir. 2002) ........................................................... 24

*Tex. Ass'n of Mfrs. v. U.S. CPSC*,
  989 F.3d 368 (5th Cir. 2021) ........................................................... 49

*Texas Med. Ass'n v. HHS*,
  587 F. Supp.3d. 528 (E.D. Tex. 2022) ........................................... 47

*Texas v. EEOC*,
  933 F.3d 433 (5th Cir. 2019) ...................................................*passim*

*Texas v. Rettig*,
  987 F.3d 518 (5th Cir. 2021) ........................................................... 29

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ...................................................*passim*

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016) ........................................................................... 25

*United States v. Idaho*,
  No. 1:22-cv-00329 (D. Idaho Aug. 2, 2022) .......................... 13, 14

*United States v. Johnson*,
  632 F.3d 912 (5th Cir. 2011) ...........................................................17

*United States v. Univ. Hosp., State Univ. of N.Y. at Stony Brook*,
  729 F.2d 144 (2d Cir. 1984) ........................................................... 32

*Williams v. Birkeness*,
  34 F.3d 695 (8th Cir. 1994) ........................................................... 5

**U.S. Constitutional Provisions, Statues and Regulations:**

U.S. Const. amend I ..................................................................... 18

5 U.S.C.:

  § 553 ................................................................................... 14

  § 553(b)(A) ............................................................................ 39

  § 702 ..................................................................................... 2

  § 703 ..................................................................................... 2

  § 704 ................................................................................... 25

  § 706(2)(C) ............................................................................ 30

28 U.S.C.:

  § 1291 .................................................................................... 2

  § 1331 .................................................................................... 2

  § 1346 .................................................................................... 2

  § 1361 .................................................................................... 2

42 U.S.C.:

  § 1395 ........................................................................ 1, 32, 38

  § 1395dd ............................................................................... 16

  § 1395dd(a) ....................................................................... 6, 11

  § 1395dd(b)(1) .................................................................... 6, 32

  § 1395dd(b)(2) ........................................................................ 37

  § 1395dd(b)(3) ........................................................................ 37

  § 1395dd(c)(1) .......................................................................... 6

  § 1395dd(c)(1)(A)(ii) ............................................................ 7, 36

  § 1395dd(c)(2)(A) ................................................................. 7, 36

  § 1395dd(d) .............................................................................. 7

  § 1395dd(d)(1)(A) ...................................................................... 7

  § 1395dd(d)(1)(B) ...................................................................... 7

  § 1395dd(d)(1)(B)-(C) ............................................................... 48

  § 1395dd(e)(1)(A) ...................................................................... 6

  § 1395dd(e)(1)(A)(i) ............................................................ 20, 36

  § 1395dd(e)(1)(B)(ii) ............................................................ 6, 36

  § 1395dd(e)(3)(A) ..................................................... 6, 33, 34, 36

  § 1395dd(e)(3)(B) ...................................................................... 7

§ 1395dd(f) ................................................................... 1, 5, 33, 38

§ 1395hh .................................................................................. 14, 16

§ 1395hh(a)(2) ............................................... 2, 39, 40, 41, 42, 43

Tex. Health & Safety Code:

§ 170A.001(1) ..................................................................................... 8

§ 170A.002(a) ................................................................................... 3, 7

§ 170A.002(b)(2) ............................................................................. 8, 9

§ 170A.003 ........................................................................................... 7

§ 170A.004 ........................................................................................... 7

§ 170A.005 ........................................................................................... 7

§ 170A.007 ........................................................................................... 8

§ 245.002 ............................................................................................. 8

§ 245.002(1) ........................................................................................ 8

Tex. Occ. Code:

§ 103.001 ....................................................................................... 9, 47

§ 164.001 ............................................................................................. 8

§ 164.052(a)(5) ................................................................................... 8

§ 164.053(a)(1) ................................................................................... 8

42 CFR:

§ 489.24(d)(2)(i) ................................................................................ 6

§ 1003.500 ..................................................................................... 12, 48

Tex. Rev. Civ. Stat.:

arts. 4512.1-.4, .6 ........................................................................... 3, 8

Tex. Penal Code §§ 12.32-.33 ....................................................... 7

Fed. R. Civ. P. 54(b) ................................................................... 2, 22

Pub. L. No. 99-272, § 9121, 100 Stat. 82 (Apr. 7, 1986) ........................................... 36

Pub. L. No. 101-239, § 6211(h), 103 Stat. 2106 (Dec. 19, 1989) ............................ 1, 36

**Other Authorities:**

"HHS Secretary Xavier Becerra Statement on EMTALA
Enforcement" (May 1, 2023),
https://www.hhs.gov/about/news/2023/05/01/hhs-secretary-
xavier-becerra-statement-on-emtala-enforcement.html .................................. 14

Order, *All. for Hippocratic Med. v. Food & Drug Admin.*,
No. 23-10362, 2023 WL 2913725 (5th Cir. Apr. 12, 2023) (per
curiam) .............................................................................................. 46, 48

Protecting Access to Reproductive Health Care Services, Exec. Order
    14,076, 87 Fed. Reg. 42053 (2022) ................................................................ 10

*Remarks by President Biden on the Supreme Court Decision to Overturn
    Roe v. Wade*, The White House (June 24, 2022), https://
    www.whitehouse.gov/briefing-room/speechesremarks/
    2022/06/24/remarks-by-president-biden-on-the-supreme-court-
    decision-to-overturn-roe-v-wade ........................................................................ 9

# Introduction

The district court correctly enjoined the federal government's attempt to undermine *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). In an admitted government-wide effort to prevent States from regulating abortion, Defendant-Appellant the Department of Health and Human Services ("HHS" or "the agency") used a "Memorandum" to transform a 37-year-old statute that says nothing about abortion into a nationwide mandate that every hospital and emergency-room physician perform abortions, including requiring medical providers to finish an "incomplete medical abortion."

As the district court explained, this mandate is both novel and unlawful. The Emergency Medical Treatment and Labor Act of 1986 ("EMTALA") does not require *any* specific procedure, much less abortion; rather, it is an anti-dumping statute that prevents hospitals from turning away patients who cannot pay. *Miller v. Med. Ctr. of Sw. La.*, 22 F.3d 626, 628 (5th Cir. 1994). The statute twice says that it does not preempt state law, which necessarily includes state laws setting the medical standard of care, restricting abortions, and protecting medical professionals' conscience right not to perform abortions. 42 U.S.C. §§ 1395, 1395dd(f). And if there were any question about whether EMTALA requires abortions, Congress amended the statute in 1989 to require protecting the health of "the unborn child" *four separate times*. Pub. L. No. 101-239, § 6211(h), 103 Stat. 2106, 2248 (1989). EMTALA's statutory text is incompatible with a mandate requiring abortions.

That mandate—a memorandum mandating "obligations" regarding the provision of abortions in hospitals with emergency rooms (the "Memorandum")—

undisputedly injures Plaintiffs, and the district court properly enjoined its enforcement as to Texas and the doctor Plaintiffs under the APA. The Memorandum imposes new and unauthorized "obligations": it "requires" hospitals and physicians to provide abortions. It threatens both hospitals and individual physicians with six-figure fines for noncompliance. And the federal-agency defendants are already enforcing it in States and against parties not covered by the district court's injunction.

The district court was correct that the Memorandum is a binding final agency action subject to judicial review; that the policy change it embodied required notice and comment under 42 U.S.C. section 1395hh(a)(2), which never happened; and that the Memorandum is inconsistent with EMTALA's plain text. This Court should affirm the district court's final order enjoining HHS from enforcing the Memorandum as to Texas and the doctors in this case.

## Statement of Jurisdiction

The district court had jurisdiction under 5 U.S.C. sections 702 and 703 and 28 U.S.C. sections 1331, 1346, and 1361. *See* ROA.182. The district court entered a preliminary injunction, ROA.889-955, then converted it to a partial final judgment and permanent injunction under Federal Rule of Civil Procedure 54(b), ROA.1101-02. The district court amended the partial final judgment on January 13, 2023. ROA.1112-13. Defendants-Appellants timely appealed on March 10, 2023. ROA.1117. This Court has jurisdiction under 28 U.S.C. section 1291.

# ISSUES PRESENTED

The issues presented are:

1. Whether the Memorandum, which reflects the consummation of HHS's decisionmaking process; requires hospitals and doctors to perform abortions in certain circumstances; and asserts that, as a matter of law, EMTALA preempts state abortion regulations and prohibitions, is final agency action subject to judicial review.

2. Whether the Memorandum exceeds HHS's statutory authority because, among other things, EMTALA does not require specific procedures; expressly states that an unborn child's health must be protected; and preempts only "directly conflict[ing]" state laws, which do not include state medical regulations, conscience protections, or standards of care concerning abortion.

3. Whether HHS unlawfully failed to submit the Memorandum for public notice and comment as required by the Medicare Act.

4. Whether the district court correctly enjoined HHS from enforcing—as to Texas and the doctor Plaintiffs—the Memorandum's interpretation that abortion is mandated by EMTALA and that EMTALA preempts state regulations and prohibitions of abortion.

## Statement of the Case

## I. Statutory Background

This case involves a federal agency attempting to preempt state law and thwart a Supreme Court ruling. HHS invoked EMTALA, a provision of the Social Security Act, 42 U.S.C. § 1395dd, to issue the Memorandum, which mandates abortions in hospitals with emergency rooms in certain circumstances. The Memorandum purports to preempt state law regulating the performance of abortions, including Texas's Human Life Protection Act ("HLPA") and other criminal prohibitions on abortions unless necessary to save the life or health of the mother. *See* Tex. Health & Safety Code § 170A.002(a); Tex. Rev. Civ. Stat. arts. 4512.1-.4, .6.

### A. EMTALA

EMTALA ensures that Medicare-participating hospitals stabilize patients who have emergency medical conditions, irrespective of the patient's ability to pay. *See* 42 U.S.C. § 1395dd. Congress enacted EMTALA "in response to a growing concern that hospitals were dumping patients who could not pay by either turning them away from their emergency rooms or transferring them before their emergency conditions were stabilized." *Miller*, 22 F.3d at 628; *accord Brooks v. Md. Gen. Hosp., Inc.*, 996 F.2d 708, 710 (4th Cir. 1993); *see also Marshall ex rel. Marshall v. E. Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998) (noting that Congress enacted EMTALA in response to "the practice of refusing to treat patients who are unable to pay"); *Burditt v. U.S. Dep't of Health & Human Servs.*, 934 F.2d 1362, 1376 (5th Cir. 1991) (noting "the anti-dumping principles that Congress enshrined in EMTALA"). With EMTALA, Congress "fill[ed] a lacuna in traditional state tort

law by imposing on hospitals a legal duty (that the common law did not recognize) to provide emergency care to all." *Hardy v. N.Y. City Health & Hosp. Corp.*, 164 F.3d 789, 792-93 (2d Cir. 1999).

Importantly, the statute includes a presumption *against* preemption: "[t]he provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). EMTALA does not impose "a national standard of care" and is not meant to "improve the overall standard of medical care." *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995); *accord Brooks*, 996 F.2d at 710. Nor did Congress "intend[] [EMTALA] to be used as a federal malpractice statute." *Marshall*, 134 F.3d at 322. Thus, as this Court has explained, a physician or hospital does not violate EMTALA by declining to provide a certain type of treatment. A hospital violates EMTALA only if it does not stabilize indigent patients with the same care it affords to other patients. *See id.* at 323-24 (holding that a hospital violates EMTALA if it "treat[s] [one patient] differently from other patients"); *id.* at 323 ("[A] treating physician's failure to . . . order a[] [certain type of] procedure[] may constitute negligence or malpractice[] but cannot support an EMTALA claim."); *Williams v. Birkeness*, 34 F.3d 695, 697 (8th Cir. 1994) (explaining that EMTALA plaintiffs must show that the hospital treated the plaintiff "differently from other patients").

EMTALA requires hospitals with emergency departments to "provide" "any individual" who asks for examination or treatment with "an appropriate medical screening examination within the capability of the hospital's emergency

department . . . to determine whether" the individual has an "emergency medical condition." 42 U.S.C. § 1395dd(a). The statute defines "emergency medical condition" as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—"

> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy;
>
> (ii) serious impairment to bodily functions, or
>
> (iii) serious dysfunction of any bodily organ or part[.]

*Id.* § 1395dd(e)(1)(A). In the case of a pregnant woman having contractions, an "emergency medical condition" also includes situations in which a transfer of the pregnant woman "may pose a threat to the health or safety of the woman or the unborn child." *Id.* § 1395dd(e)(1)(B)(ii).

If a hospital determines that a patient has an emergency medical condition, the hospital must either provide for "such further medical examination and such treatment as may be required to stabilize the medical condition" or "for transfer of the individual to another medical facility." *Id.* § 1395dd(b)(1); *see id.* § 1395dd(c)(1) (providing restrictions on when a hospital may transfer an individual with an emergency medical condition, to prevent dumping patients); 42 C.F.R. § 489.24(d)(2)(i). To "stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A); *see id.*

§ 1395dd(e)(3)(B) (defining "stabilized" similarly). Transfers cannot occur without a physician certifying expected benefits of the transfer to "the individual and, in the case of labor, to the unborn child," and transfers are not "appropriate" unless they "minimize[] the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child." *Id.* § 1395dd(c)(1)(A)(ii), (c)(2)(A).

The law compels compliance via statutory penalties and loss of federal funding. *Id.* § 1395dd(d). A Medicare-participating hospital or physician "that negligently violates" EMTALA "is subject to a civil money penalty of" up to $50,000 per violation. *Id.* § 1395dd(d)(1)(A), (B). If a doctor violates EMTALA in a way that is more than "negligent[]," he or she "is subject to . . . exclusion from participation in [Medicare] and State health care programs." *Id.* § 1395dd(d)(1)(B).

## B.  Texas's Laws Protecting Human Life

Texas law protects human life both before and after birth. The HLPA generally forbids any "person" from "knowingly perform[ing], induc[ing], or attempt[ing] an abortion." Tex. Health & Safety Code § 170A.002(a). A person who does so commits a felony, *id.* § 170A.004, with a penalty of two years to life in prison, Tex. Penal Code §§ 12.32-.33, and may be subject to "a civil penalty of not less than $100,000 for each violation," Tex. Health & Safety Code § 170A.005; *cf. id.* § 170A.003 ("This chapter may not be construed to authorize the imposition of criminal, civil, or administrative liability or penalties on a pregnant female on whom an abortion is performed, induced, or attempted.").

But Texas law also provides exceptions when the mother's life is at risk. For example, the HLPA contains an exception that applies when, among other things,

the mother "has a life-threatening physical condition aggravated by, caused by, or arising from a pregnancy that places [her] at risk of death or poses a serious risk of substantial impairment of a major bodily function unless the abortion is performed or induced." *Id.* § 170A.002(b)(2). Moreover, under Texas law, the removal of an ectopic pregnancy or a dead, unborn child is not an abortion. *Id.* § 245.002(1) ("An act is not an abortion if the act is done with the intent to: (A) save the life or preserve the health of an unborn child; (B) remove a dead, unborn child whose death was caused by spontaneous abortion; or (C) remove an ectopic pregnancy."); *see id.* § 170A.001(1) ("In this chapter . . . '[a]bortion' has the meaning assigned by Section 245.002.").

In addition to the HLPA, Texas has criminal laws penalizing abortion that predate *Roe v. Wade*, 410 U.S. 113 (1973), *overruled by Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). *See* Tex. Rev. Civ. Stat. arts. 4512.1-.4, .6. Under those statutes, any person who causes an abortion is guilty of an offense and "shall be confined in the penitentiary." *Id.* art. 4512.1. Moreover, an individual who knowingly "furnish[es] the means for procuring" or attempting an abortion is "guilty as an accomplice." *Id.* arts. 4512.2-.3. But "an abortion procured or attempted by medical advice for the purpose of saving the life of the mother" is not an offense. *Id.* art. 4512.6.

In Texas, if a physician "commits an act" that "violates any state or federal law" and is "connected with the physician's practice of medicine," Tex. Occ. Code § 164.053(a)(1), the Texas Medical Board may revoke or suspend the physician's license, *id.* §§ 164.001, 164.052(a)(5); *see also* Tex. Health & Safety Code § 170A.007

(stating that doctors or "other health care professional[s] who perform[], induce[], or attempt[] an abortion" may have their licenses revoked). Accordingly, if Texas physicians violate state law by performing abortions when the mother's life is not in danger or the mother is not at "serious risk of substantial impairment of a major bodily function," Tex. Health & Safety Code § 170A.002(b)(2), they risk losing their licenses.

Texas law also protects the conscience rights of physicians to object to performing or participating in abortions, even if lawful. Tex. Occ. Code § 103.001.

## II.  The Memorandum

In *Dobbs*, the Supreme Court returned the issue of abortion to the States. *See* 142 S. Ct. at 2279, 2284. The Court held that the Constitution provides no federal right to abortion. *Id.* at 2279. Accordingly, Texas law governs the regulation of abortion in Texas. *See id.* at 2284.

The very day *Dobbs* issued, President Biden announced his intent to undermine the Court's decision and the right of States like Texas to protect unborn life.[1] In keeping with that intention, on July 8, 2022—a scant two weeks after the *Dobbs* decision—the President issued an Executive Order requiring the Secretary of HHS to submit a report "identifying steps to ensure that all patients—including pregnant women and those experiencing pregnancy loss, such as miscarriages and ectopic

---

[1] *See Remarks by President Biden on the Supreme Court Decision to Overturn Roe v. Wade*, The White House (June 24, 2022), https://www.whitehouse.gov/briefing-room/speechesremarks/2022/06/24/remarks-by-president-biden-on-the-supreme-court-decision-to-overturn-roe-v-wade.

pregnancies—receive the full protections for emergency medical care afforded under the law, including by considering updates to current guidance on obligations specific to emergency conditions and stabilizing care under [EMTALA]." Protecting Access to Reproductive Health Care Services, Exec. Order 14,076, 87 Fed. Reg. 42053, 42054 (2022).

Three days later, the President announced HHS's new mandate purporting to override individual States' abortion laws under EMTALA, and the Centers for Medicare and Medicaid Services ("CMS") at HHS issued the Memorandum, titled "Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss," to all state directors. ROA.214-19. The Secretary also issued a letter to medical providers describing the Memorandum (the "Letter"). ROA.221-22.

The Memorandum says that its "purpose" is to set forth hospitals' and physicians' "obligations under the Emergency Medical Treatment and Labor Act (EMTALA), in light of new state laws prohibiting or restricting access to abortion." ROA.215. The Memorandum insists that if "a pregnant patient presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA, and . . . abortion is the stabilizing treatment necessary to resolve that condition, the physician must provide that treatment." ROA.214 (emphasis omitted). "Emergency medical conditions involving pregnant patients may include, but are not limited to, ectopic pregnancy, complications of pregnancy loss, or emergent hypertensive disorders, such as preeclampsia with severe features." ROA.214 (emphasis omitted), 217. The Memorandum further elaborates that a

"patient with an incomplete medical abortion" would require an abortion ROA.219. It then states that EMTALA requires the hospital to "provide stabilizing treatment within its capability and capacity." ROA.217. *Compare* 42 U.S.C. § 1395dd(a), *with* ROA.217.

While the Memorandum claims that it merely "remind[s] hospitals of their existing obligation to comply with EMTALA and does not contain new policy," ROA.214, it does not merely recapitulate previously recognized duties. In the 37 years since the statute was enacted, neither the statute nor previous EMTALA guidance ever stated "obligations" that "required" that hospitals and physicians "must" provide "abortion." The Memorandum veers away from the statute, including its explicit language protecting "the unborn child," by indicating that the stabilizing treatment EMTALA requires includes abortion. ROA.217. It requires physicians and hospitals to provide abortions even if the State where the abortion would be performed prohibits them. ROA.218.

The Memorandum exceeds EMTALA in other ways, too. It asserts that "[a] physician's professional and legal duty to provide stabilizing medical treatment to a patient who presents under EMTALA to the emergency department and is found to have an emergency medical condition preempts any directly conflicting state law or mandate that might otherwise prohibit or prevent such treatment." ROA.214 (emphasis omitted). Likewise, the Letter insists that EMTALA preempts state prohibitions on abortion, declaring that "[a]ny state laws or mandates that employ a more restrictive definition of an emergency medical condition are preempted by the EMTALA statute." ROA.221. The Memorandum explains that "individual

11

physicians" could "enforce[]" EMTALA's "preemption of state law . . . in a variety of ways, potentially including as a defense to a state enforcement action, in a federal suit seeking to enjoin threatened enforcement, or, when a physician has been disciplined for refusing to transfer an individual who had not received the stabilizing care the physician determined was appropriate, under the statute's retaliation provision." ROA.218.

The Memorandum threatens crippling HHS penalties against doctors and hospitals. HHS says it may fine noncompliant hospitals $119,942 or $59,973 per violation (depending on the number of beds) and noncompliant physicians $119,942 per violation. ROA.218 (citing 42 CFR § 1003.500). In addition, "HHS, through its Office of the Inspector General (OIG)," may exclude physicians from participation in Medicare and other federally funded health-care programs, and CMS may penalize a hospital by terminating its provider agreement. ROA.218. The Memorandum also purports to authorize private lawsuits. ROA.218. And it asserts that "[a]ny state actions against a physician who provides an abortion in order to stabilize an emergency medical condition in a pregnant individual presenting to the hospital would be preempted." ROA.218.

Excluding hospitals from federally funded health-care programs represents a significant amount of funding. Texas hospitals receive approximately $15.98 billion per year from the federal government in the form of reimbursements for services under Medicaid and approximately $29.42 billion per year to fund Texas's Medicaid program. ROA.311-12. In Fiscal Year 2020, emergency departments at 487 Texas hospitals received "approximately $18.22 billion in Medicaid payments." ROA.312.

One example is the Texas Tech University System, which operates Texas Tech University Health Science Center and Texas Tech University Health Science Center El Paso. ROA.336. Those institutions received almost $149 million in Medicare and Medicaid funding from September 1, 2021, through August 2, 2022, over $7.5 million of which was for emergency-room medical services. ROA.337. Under the Memorandum, hospitals must risk these funds and potential exclusion from the Medicare program unless they violate state law and risk infringing the religious and conscience rights of physicians and other medical providers. *See* ROA.214-19.

HHS treats the Memorandum as binding and enforces it. Last year, the federal government sued the State of Idaho, alleging that Idaho's criminal abortion law is unconstitutional as preempted by EMTALA. Complaint, *United States v. Idaho*, No. 1:22-cv-00329 (D. Idaho Aug. 2, 2022). Its lawsuit is founded on the policy enshrined in the Memorandum. *Id.* The agency argues that "[i]n some circumstances, medical care that a state may characterize as an 'abortion' is necessary emergency stabilizing care that hospitals are required to provide under EMTALA." *Id.* at 2. And the government even cites the Memorandum to support that notion, asserting that in "some pregnancy-related emergency medical conditions . . . for which a physician could determine that the necessary stabilizing treatment" is "an 'abortion' under Idaho law," EMTALA "requires the hospital to provide" an abortion. *Id.* at 7.

And less than two months ago, HHS announced investigations against hospitals and doctors in Missouri for violating the Memorandum, stating, "[W]e will use the

full extent of our legal authority, consistent with orders from the courts, to enforce protections for individuals who seek emergency care—including when that care is an abortion," and including "requir[ing] that healthcare professionals offer treatment, including abortion care."[2] HHS noted, however, that it would not apply such enforcement to hospitals and doctors protected by the injunction here. *Id.*

## III. Procedural History

### A.  The Lawsuit

The State of Texas, the American Association of Pro-Life Obstetricians and Gynecologists ("AAPLOG"), and the Christian Medical and Dental Associations ("CMDA") (collectively, "Plaintiffs") sued HHS, the Secretary, CMS, the Director of the Survey and Operations Group for CMS, and the Director of the Quality Safety and Oversight Group for CMS (collectively, "the agency" or "HHS"). ROA.180-210 (amended complaint). Among other things, Plaintiffs alleged that the Memorandum exceeds statutory authority and that the agency failed to conduct notice and comment under the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, and the Medicare Act, 42 U.S.C. § 1395hh. ROA.201-04. CMDA also alleged that the Memorandum violated its members' rights under the Free Exercise Clause and the Religious Freedom Restoration Act. ROA.208-09. Plaintiffs requested a declaration that the Memorandum is "unlawful, unconstitutional, and

---

[2]  HHS, "HHS Secretary Xavier Becerra Statement on EMTALA Enforcement" (May 1, 2023), https://www.hhs.gov/about/news/2023/05/01/hhs-secretary-xavier-becerra-statement-on-emtala-enforcement.html.

unenforceable." ROA.209. They also asked the court to "[h]old unlawful and set aside" the Memorandum and enjoin HHS from enforcing it. ROA.209-10.

## B.  The Injunction

Plaintiffs moved for a temporary restraining order and a preliminary injunction, ROA.258-64 (motion), 265-337 (brief in support). After a hearing, *see* ROA.24, the district court granted a preliminary injunction and simultaneously denied the agency's motion to dismiss, ROA.889-955.

**1.**  As an initial matter, the district court concluded that Plaintiffs have Article III standing to raise their claims. ROA.900-19. The court recognized that Texas has two basic types of injuries here: an injury to its sovereign interests and a procedural injury. ROA.906-11.

States have an interest in "the exercise of sovereign power over individuals and entities within [their] relevant jurisdiction[s]," including "the power to create and enforce a legal code." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). The district court concluded that the Memorandum injures this sovereign interest in three main ways. *See Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) (per curiam). *First*, in the Memorandum, HHS asserts "authority to regulate matters," *see id.*, that the States rightfully control: the "authority to regulate abortion," which belongs solely "to the people and their elected representatives," *Dobbs*, 142 S. Ct. at 2279. *Second*, the Memorandum interprets a federal statute to preempt Texas law. ROA.908; *see Texas v. EEOC*, 933 F.3d 433, 437-40, 446-47 (5th Cir. 2019); *Texas*, 809 F.3d at 153. And *third*, the agency is using the Memorandum to "interfere[] with

the enforcement of state law," *Texas*, 809 F.3d at 153; *see Maine v. Taylor*, 477 U.S. 131, 137 (1986), by "encourag[ing] its hospitals and doctors to violate Texas abortion laws under threat of EMTALA liability," ROA.908; *see* ROA.217-18. As a result, Texas will bear an "increased regulatory burden" to prosecute more violations of its laws. *Contender Farms, LLP v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) ("An increased regulatory burden typically satisfies the injury in fact requirement.").

All this, of course, is in addition to the procedural injury that Texas sustained when HHS did not engage in notice and comment before promulgating the Memorandum. *See EEOC*, 933 F.3d at 447 ("A violation of . . . notice-and-comment requirements" is "one example of a deprivation of a procedural right."); ROA.910 (explaining that a violation of "Medicare-specific notice-and-comment provisions" in 42 U.S.C. section 1395hh also constitutes a procedural injury). Moreover, the State would be injured by loss to its medical providers of Medicare or Medicaid funds or by the enforcement of civil penalties against those providers. ROA.910; *see* ROA.218 (threatening loss of funds as a penalty for a hospital's noncompliance with the Memorandum), 311-12 (same), 337 (same).

These injuries are traceable to the Memorandum, not to EMTALA itself. Because the Memorandum binds HHS's enforcement staff, *see infra* Argument.I.B, the threat of punishing doctors and hospitals for complying with and requiring them to violate state law is traceable to the Memorandum, ROA.917-18. Moreover, because EMTALA, on its face, does not require a doctor to perform an abortion, *see generally* 42 U.S.C. § 1395dd, the abortion mandate is traceable to the Memorandum,

not the statute. *United States v. Johnson*, 632 F.3d 912, 921 (5th Cir. 2011); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). And the Plaintiffs' procedural injury—the promulgation of the Memorandum without notice and comment—is obviously traceable to the fact that HHS promulgated the Memorandum without notice and comment. ROA.917.

The district court explained that Texas's injuries would be redressed by a favorable ruling. ROA.918. "An injunction forbidding [HHS] from enforcing the [Memorandum] would safeguard Texas's sovereign interests." *EEOC*, 933 F.3d at 449. A favorable ruling would also redress the State's procedural injury because "some possibility exists that [HHS] would reconsider issuing the Memorandum as written" if it followed notice and comment. ROA.918; *see EEOC*, 933 F.3d at 447 ("The redressability requirement is lighter when the plaintiff asserts deprivation of a procedural right. 'When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.'" (quoting *Texas*, 809 F.3d at 150-51)).

The district court likewise held that AAPLOG and CMDA, the two groups of medical professionals opposed to elective abortions on medical, ethical, and religious grounds, had standing to challenge the Memorandum because it coerces physicians into providing abortions in contravention of their constitutional and statutory rights. ROA.897-98, 909-19. AAPLOG is an organization of 6,000 pro-life physicians, with 300 members in Texas. ROA.898. CMDA is a nonprofit organization of Christian physicians, dentists, and allied health-care professionals, with over 12,000 members

nationwide and 1,237 members in Texas, of whom 607 are practicing or retired physicians and 35 are OB/GYNs. ROA.898. These doctors seek to remain free of any government mandate to perform abortions. ROA.316-18, 323-24, 328, 331, 334. They believe that "in the case of a pregnant woman, doctors are 'treating two patients, the mother and the baby,' and that 'every reasonable attempt to save the baby's life' would be a necessary part of treating such patients." ROA.912 (quoting ROA.318-19). Thus, on behalf of their individual emergency-room doctor–members who treat pregnant patients, both AAPLOG and CMDA object to any abortion mandate, especially a mandate to perform abortions "to end the life of a human being in the womb for no medical reason." ROA.914.

But, wielding the threat of severe, career-ending punishments, the Memorandum requires these doctors to perform abortions "even when the mother's life is not at stake, causing [AAPLOG and CMDA's] members to violate their religious or moral beliefs and medical judgments." ROA.904-05, 912, 948. For example, HHS requires performing an abortion "where women present to an emergency room, after having taken chemical abortion drugs, but where the unborn child is still living and may still be preserved, even if the mother's life is not at stake. ROA.904 (quoting ROA.317, 319). The district court thus held that HHS's mandate ignores and undercuts doctors' interests in avoiding having to perform any abortions and in practicing consistent with their rights under federal and state abortion conscience laws, federal religious-liberty laws, and the First Amendment. ROA.897-98, 909-19; *see* ROA.195.

The district court further determined that these doctors, like the State, "suffered a procedural injury when HHS promulgated the Memorandum without soliciting the public's feedback." ROA.909. HHS prevented these physician members from "voic[ing] their medical, ethical, and religious objections to the abortions required under the Memorandum's interpretation of EMTALA," which inhibited them from protecting their concrete interest in freedom from any abortion mandate. ROA.911. The district court also held that AAPLOG and CMDA have associational standing to represent the interests of their doctor–members because the individual members have standing, the groups represent their physicians' pro-life and religious-liberty interests, and the individual members' participation as litigants is not necessary. ROA.911-17.

**2.** The district court determined that the Memorandum constitutes final agency action. ROA.919-27. The Memorandum is neither subject to further agency review nor a mere "intermediate step in a multi-stage administrative process." ROA.919-20 (quoting *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011)). Moreover, it binds HHS and its staff to a particular legal position, ROA.920-27, because it "speaks in mandatory terms regarding a doctor's obligation to perform abortions notwithstanding" state law and "binds HHS enforcement staff to its interpretation of EMTALA," ROA.921-22 (emphasis omitted). What is more, the Idaho lawsuit "demonstrates that the Guidance contains HHS's official interpretation of EMTALA," ROA.925, and the "Guidance provides hospitals and physicians with a 'safe harbor' from state law," ROA.925 (emphasis omitted).

**3.**  On the merits, the district court concluded that Plaintiffs were entitled to preliminary injunctive relief on their claims that the Memorandum exceeds statutory authority and that HHS was required to promulgate the Memorandum through notice and comment. ROA.927. Applying the two-step inquiry from *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the district court first explained that "Congress has not" "directly addressed whether physicians must perform abortions when they believe that it would resolve a pregnant woman's emergency medical condition, *irrespective* of the unborn child's health and state law." ROA.928-29. EMTALA requires no particular stabilization procedure and "provides no roadmap for doctors when their duty to a pregnant woman and her unborn child may conflict." ROA.929. So the district court rejected the agency's contention that the Memorandum merely reiterated the statute.

Turning to *Chevron*'s second step, the district court also concluded that the Memorandum is not a permissible construction of EMTALA. ROA.929. "EMTALA imposes obligations with respect to both the pregnant woman and her unborn child" by defining "emergency medical condition" to include "conditions that 'plac[e] the health of the individual (or, with respect to a pregnant woman, the health of the woman *or her unborn child*) in serious jeopardy.'" ROA.930 (quoting 42 U.S.C. § 1395dd(e)(1)(A)(i) (emphasis added)). Those "equal obligations" create a potential conflict in duties, and EMTALA does not resolve that conflict. ROA.930. Because it does not, "[s]tate law fills this void," ROA.933, and EMTALA "does not preempt state laws addressing that circumstance," ROA.932 (emphasis omitted). The district court also concluded that the Memorandum went beyond EMTALA by

purporting "to require abortions when physicians believe an abortion will stabilize a pregnant woman's emergency medical condition *irrespective* of the unborn child's health and state law." ROA.937 (emphasis omitted). The district court also determined that Plaintiffs were likely to succeed on their procedural challenge to the Memorandum's issuance because HHS did not "follow the Medicare Act's mandatory procedures before imposing a" policy statement establishing "a substantive legal standard." ROA.943 (emphasis omitted).

4.    Having found that Plaintiffs had a likelihood of success on the merits, the district court concluded that the other preliminary-injunction factors were satisfied and Plaintiffs were entitled to a preliminary injunction. ROA.947-51, 954. The court enjoined HHS from "enforc[ing] the [Memorandum] and Letter's interpretation that Texas abortion laws are preempted by EMTALA" and "enforc[ing] the [Memorandum] and Letter's interpretation of EMTALA—both as to when an abortion is required and EMTALA's effect on state laws governing abortion—within the State of Texas or against AAPLOG's members and CMDA's members." ROA.954.

## C.  Appeal

HHS moved to clarify the district court's injunction, ROA.1002-06, but before the district court acted on that motion, it also filed a notice of appeal in this Court, ROA.1056, which was docketed as No. 22-11037, *see* ROA.1103. After briefing on whether the district court had jurisdiction to "resolve" the motion to clarify given the agency's then-pending appeal, ROA.1057-75, the district court determined that it did have jurisdiction and denied the agency's motion, ROA.1078-82.

On the parties' joint request, ROA.1095, the district court entered partial final judgment under Federal Rule of Civil Procedure 54(b) on the two claims it had addressed when it granted the preliminary injunction. ROA.1112. The court determined that "there is no just reason for delay," stayed Plaintiffs' remaining claims "pending resolution of any appeal from this judgment," and administratively closed the case. ROA.1113. On the agency's motion, this Court stayed cause No. 22-1137 "pending district court proceedings," ROA.1103, and later, dismissed that appeal, ROA.1114-15. HHS noticed this appeal of the district court's final judgment. ROA.1117.

## Summary of the Argument

The Memorandum is subject to judicial review under the APA. It marks the consummation of HHS's decision regarding EMTALA's application to state abortion regulations after *Dobbs*. And it imposes binding obligations on regulated parties. That means it is final agency action subject to judicial review.

And the Memorandum is substantively unlawful. At *Chevron*'s first step, the district court was correct to conclude that EMTALA does not mandate abortions; instead, it is silent on the question. Courts presume that Congress does not supersede the traditional police powers of the States, such as their authority to regulate the practice of medicine and medical ethics. Two statutory provisions foreclose a contrary conclusion here. The Medicaid Act as a whole cannot be construed to interfere with the practice of medicine, and EMTALA adds that it does *not* preempt state law unless there is a "direct[] conflict." There is no such conflict. There is no inconsistency between EMTALA's requirements and state laws

governing the propriety of particular medical procedures. Instead, EMTALA operates against the backdrop of other law that does govern medical practice and ethics. The one specific stabilizing treatment that is mentioned—delivery of the unborn child if a woman is in labor—illustrates that other specific treatments are not mandated. The statutory silence forecloses the agency's contention that the Memorandum merely repeats the statute.

The agency's insistence that the Memorandum simply reiterates the statute does not hold up to analysis. That EMTALA is silent about abortion means abortion is *not* mandated—just like every other medical procedure is not mandated (with the exception of delivery when a woman is in labor). That EMTALA repeatedly protects the life and health of the "unborn child" reinforces the conclusion that EMTALA does not contain an abortion mandate. And that EMTALA recognizes patients' rights to refuse medical treatment does not transform it into an abortion mandate because that says nothing about what medical treatments are to be offered to the patient. Like the rest of EMTALA, the statute's informed-consent provision leaves background law in place, and background law includes state laws regulating the medical profession and medical ethics.

HHS does not defend the Memorandum as a permissible gap-filling measure. But even if it did, the agency's is not a permissible construction of the statute. The Memorandum disregards EMTALA's limited preemption provision and the Medicare Act's separate limitation on regulating the practice of medicine. And Congress amended the statute 34 years ago to explicitly say, four times, that

EMTALA protects the "unborn child" as a patient. A statute that protects an unborn child's life and health cannot be read to mandate abortion.

The Memorandum is also procedurally unlawful because HHS failed to subject it to notice and comment. Under the Medicare Act, rules and policy statements that impose new legal standards must undergo notice and comment. The Memorandum imposes a new legal standard and explicitly binds regulated parties by threatening them with penalties if they do not comply.

Finally, the district court rightly enjoined enforcement of the Memorandum as to Texas and the doctors here. Its narrow injunction is necessary to remedy Texas's sovereign injury to its ability to enforce its laws, the doctors' conscientious objections to performing the abortions the Memorandum purports to require, and all the Plaintiffs' procedural injury stemming from HHS's complete failure to conduct notice-and-comment rulemaking.

## Standard of Review

The Court reviews the grant of a permanent injunction under the abuse-of-discretion standard. *MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*, 622 F.3d 361, 370 (5th Cir. 2010); *accord Texas*, 809 F.3d at 150. Legal determinations are reviewed de novo. *EEOC*, 933 F.3d at 450; *Teemac v. Henderson*, 298 F.3d 452, 456 (5th Cir. 2002).

# ARGUMENT

## I.    The Memorandum Is Final Agency Action Subject to Judicial Review.

The APA provides a right to judicial review of all "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. "[W]hether an agency action is final is a jurisdictional issue, not a merits question." *EEOC*, 933 F.3d at 440 n.8. The Supreme Court has said that for an agency action to be "final," it (1) "must mark the consummation of the agency's decisionmaking process" and (2) "must be [an action] by which rights or obligations have been determined, *or* from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted) (emphasis added). The Supreme Court has adopted a "pragmatic approach" to finality, viewing the APA's finality requirement as flexible. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016).

### A.    The Memorandum marks the consummation of HHS's decisionmaking process.

The first finality requirement is not contested here; HHS does not argue that the Memorandum is "merely tentative or interlocutory [in] nature." *Bennett*, 520 U.S. at 178. Agency letters often "serve to confirm a definitive position that has a direct and immediate impact" or constitute a "statement of the agency's position" that cannot be "appealed to a higher level of [the agency's] hierarchy." *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 755 (5th Cir. 2011) (quotation marks omitted). Here, the Memorandum states that it is "[e]ffective . . . [i]mmediately" and "should be communicated to all . . . staff and managers immediately."

ROA.219. And the Secretary endorsed the Memorandum in a signed letter. ROA.221-22.

## B.   The Memorandum creates legal consequences.

The Memorandum is also an action "by which rights or obligations have been determined, or from which legal consequences will flow," *Bennett*, 520 U.S. at 178 (citation omitted), because it "made a substantive change" to HHS's position or has the "practical effect of . . . change in the legal obligations of a party," *Nat'l Pork Producers*, 635 F.3d at 756; *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005). Whether an agency action has made such a "substantive [change] . . . turns on whether [the] agency intends to bind itself to a particular legal position." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997); *accord EEOC*, 933 F.3d at 441. An action is final once the agency makes clear that it "expects regulated entities to alter their primary conduct to conform to [the agency's] position." *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986).

1.   This Court has explained that "'the mandatory language of a document alone can be sufficient to render it binding.'" *EEOC*, 933 F.3d at 441-42 (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002)). The Memorandum is rife with such language. The title itself imposes "obligations." ROA.214. It says hospitals and physicians "must" provide an abortion as stabilizing treatment "irrespective of any state laws or mandates." ROA.218. It "requires" the specified procedures. ROA.218. It threatens six-figure fines and loss of federal funding for noncompliance. ROA.218. On its face, the Memorandum makes clear that HHS intends to bind both itself and regulated parties to the Memorandum's standard.

The Memorandum is also final and binding "as a practical matter." *Gen. Elec.*, 290 F.3d at 383. It has the "practical effect of" effecting "change in the legal obligations of a party." *Norton*, 415 F.3d at 15. On its face, "private parties can rely on it as a norm or safe harbor by which to shape their actions." *Gen. Elec.*, 290 F.3d at 383. Regulated hospitals and physicians must take at face value its language of "obligations," "require[ments]," and edicts that they "must" perform abortions or face punishment. Moreover, "private parties" *desiring* to perform abortions will rely on the Memorandum as a "safe harbor." *Id.* Specifically, the Memorandum allows physicians and hospitals to perform abortions in violation of state laws and then use the Memorandum itself "as a defense to a state enforcement action, in a federal suit seeking to enjoin threatened enforcement, or[] when a physician has been disciplined" for violating state law. ROA.218-19.

**2.** Here, HHS chiefly contends (at 18) not that the Memorandum's standard is not binding, but that it is not "new." That is factually incorrect and legally unsupported. The agency agrees (at, *e.g.*, 30) that EMTALA does not mention abortion. It admitted in the district court that HHS "hasn't issued a guidance document specific like this one" regarding abortion and EMTALA. ROA.1242. And it acknowledges that the statutory "definition of 'stabilization' is 'not given a fixed or intrinsic meaning,' but instead 'is purely contextual or situational.'" Appellants' Br. 20 (quoting *Cherukuri v. Shalala*, 175 F.3d 446, 449-50 (6th Cir. 1999)). But the Memorandum purports to give a fixed meaning to the statute's stabilization requirement: that abortions, including elective abortions, are required, even if in

violation of state law. As the district court concluded, there has never been anything like the Memorandum's abortion mandate in the 37-year history of EMTALA.

Moreover, on its face, the Memorandum represents HHS's legal position in the new, post-*Dobbs* world: it was issued "in light of new state laws prohibiting or restricting access to abortion." ROA.215. The agency issued it in response to the President's instruction that HHS take action to increase abortion access and undermine pro-life state laws after the Supreme Court's decision in *Dobbs* returned the issue to the States. *See supra* 9-10. EMTALA, which was enacted in the 1980s, had never operated outside of *Roe v. Wade*'s *ancien régime*. *See Dobbs*, 142 S. Ct. at 2271-75. It would come as a surprise to the *Dobbs* Court to hear that a secret abortion mandate has been hiding in federal law for almost 40 years. *Dobbs* was, as the district court put it, a "sea-change" in the law, ROA.889, and the Memorandum set out HHS's legal position—for the first time—regarding how EMTALA would operate after *Dobbs*. The Memorandum is a "new policy" and thus subject to judicial review under the APA.

HHS claims (at 19) that a pair of September 2021 guidance documents supports its argument that the Memorandum is not "new." But neither of these documents imposes anything like the Memorandum's post-*Dobbs* abortion mandate. Neither one even *mentions* abortion, much less says that EMTALA preempts state law to the point of requiring abortions that would be unlawful in a given State. Nor do these documents create a safe harbor from state laws prohibiting abortions. But even if the September 2021 documents foreshadowed the Memorandum, an agency's series of gradual steps culminating in the agency head stating its final position in an

authoritative way can constitute final agency action when the relevant actions fall within the statute of limitations. *See Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 49-50 (D.C. Cir. 2000) (holding that "a preamble plus a guidance plus an enforcement letter," all issued within the statute of limitations, together constituted a final agency action); *Ciba-Geigy*, 801 F.2d at 436 n.8 (holding that a series of letters from the EPA, together, constituted a final agency action). "Fairly read," Plaintiffs' challenge would encompass the earlier guidance letters, too, if they mandated abortion (though they do not). *Barrick Goldstrike*, 215 F.3d at 49-50.

The authorities the agency cites (at 18) do not support it. *National Pork Producers Council* and *Texas v. Rettig* are about an irrelevant issue: the APA's statute of limitations. The plaintiffs in both cases challenged regulations but did so too late; to get around this, they tried to target subsequent documents that the agency had issued within limitations. *See Texas v. Rettig*, 987 F.3d 518, 530 (5th Cir. 2021); *Nat'l Pork Producers*, 635 F.3d at 754-56. *Rettig* discussed whether the agency triggered the reopener doctrine merely by applying requirements already found in a 13-year-old regulation. 987 F.3d at 529-30. *National Pork Producers* held that Plaintiffs could not independently challenge guidance letters that were sent out "following the issuance of complex regulations" because the formal regulations, not the guidance letters, imposed the challenged requirements. 635 F.3d at 747. Here, no prior regulations or documents of any kind require abortions under EMTALA. And Plaintiffs are not challenging any such instruments, much less trying to back into the statute of limitations to challenge a time-barred regulation. There is no abortion rule under EMTALA, *see infra* Argument.II—except the Memorandum.

## II.  The Memorandum Exceeds HHS's Statutory Authority.

When an administrative agency acts "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," courts must "hold [that action] unlawful and set [it] aside." 5 U.S.C. § 706(2)(C). The district court properly did so here. The Memorandum exceeds HHS's statutory authority under EMTALA in two respects. First, EMTALA does not require physicians or hospitals to perform abortions. Second, EMTALA does not preempt state regulations of abortion.

### A.  The Memorandum goes further than the statute.

In assessing agency action like the Memorandum, the Court begins by determining "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. HHS insists (at 27-28) that the Memorandum goes no further than the statute, so Congress actually has spoken to the "precise question at issue." That is wrong. The question here, as the district court put it, is "EMTALA's requirements as they pertain to abortion," ROA.928, or, put another way, whether EMTALA supersedes background law governing the practice of medicine and medical ethnics. EMTALA is silent as to abortion, just as it is silent as to other medical procedures or treatments, and Congress's silence provides the answer to the question at issue here. HHS's efforts to force a federal abortion policy into EMTALA are unsupported by the text Congress enacted.

### 1.  EMTALA does not preempt background law governing the practice of medicine and medical ethics.

To determine whether Congress has spoken to the precise question, the court must "exhaust all the 'traditional tools' of construction," including "'text,

structure, history, and purpose.'" *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)). The district court correctly interpreted EMTALA to leave the question of *which* appropriate stabilizing treatment is needed in situations of pregnancy complications up to the hospital's and doctor's judgment in accordance with background law. And Congress's failure to require particular medical treatments does not authorize HHS to do so. *Cf. Texas*, 809 F.3d at 186. Statutory silence *is* Congress's answer to the question whether EMTALA supersedes background law—and that answer is "no." The traditional tools of statutory construction do not support HHS's argument.

One traditional tool is "the [starting] assumption that the historic police powers of the States were not to be superseded by [a federal statute] unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). No such purpose is manifest here. Indeed, the opposite is true. EMTALA does not impose "a national standard of care." *Eberhardt*, 62 F.3d at 1258; *accord Brooks*, 996 F.2d at 710. That is why courts have long held that a medical provider does not violate EMTALA by declining to provide a certain type of treatment. *See Marshall*, 134 F.3d at 322. Put another way, EMTALA does not have substantive content with regard to medical care.

Statutory construction requires consideration of the statute as a whole, and the Medicare Act—of which EMTALA is a part—"shall [not] be construed" to interfere with "the practice of medicine or the manner in which medical services are

provided." 42 U.S.C. § 1395. Section 1395 underscores the "congressional policy against the involvement of federal personnel in medical treatment decisions." *United States v. Univ. Hosp., State Univ. of N.Y. at Stony Brook*, 729 F.2d 144, 160 (2d Cir. 1984). That is why Congress has prohibited HHS from "direct[ing] or prohibit[ing] any [particular] kind of treatment or diagnosis" in its administration of the Medicare program. *Goodman v. Sullivan*, 891 F.2d 449, 451 (2d Cir. 1989) (per curiam).

This provision further limits EMTALA to requiring some stabilizing care generally, without dictating what medical services will be provided. In keeping with this congressional policy, EMTALA says nothing about the myriad background legal rules that govern the practice of medicine. Any time a medical provider determines that a patient is experiencing an "emergency medical condition" triggering EMTALA, 42 U.S.C. § 1395dd(b)(1), she necessarily refers to background law to determine what treatment options are permissible. For example, if the law limits a particular procedure to physicians—to the exclusion of nurse practitioners, for example—potential stabilizing treatments would not include a nurse practitioner administering that procedure. A medical provider could not transplant an organ in violation of legal requirements governing donor consent, even if that transplant is necessary to stabilize a donee patient's emergency medical condition. So too, if federal or state law exempts physicians (or hospitals) that conscientiously object to performing a particular *legal* abortion, EMTALA's stabilization requirements would not force them to perform one.

By instructing physicians to disregard the life of the unborn child, the Memorandum attempts to "influence the judgment of medical professionals"

regarding appropriate stabilizing treatment options. *Sullivan*, 891 F.2d at 451. But EMTALA (and the Medicare Act as a whole) cannot properly be interpreted to do that. Instructing physicians to violate their state-law obligations regarding the lawful practice of medicine impermissibly inserts a federal agency into the States' traditional regulation of the medical profession.

The text of EMTALA further limits its own preemptive effect to state law that "directly conflicts" with its requirements. 42 U.S.C. § 1395dd(f). A state statute "directly conflicts" with federal law where (a) it is impossible for a regulated party to comply with both the state law and the federal or (b) the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000). Neither type of conflict exists here.

As to impossibility, a medical provider can comply with both EMTALA and state law by offering stabilizing treatment in accordance with state law. HHS recognizes (at 25) that "EMTALA mandates a specific form of stabilizing treatment in only one circumstance: where a pregnant woman is in labor." And in that case, the requirement is delivery, not abortion. 42 U.S.C. § 1395dd(e)(3)(A). Otherwise, EMTALA does not tell hospitals or physicians how to practice medicine. So it is far from impossible to comply with both EMTALA and state law concerning abortion.

Neither does compliance with state law stand as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373. EMTALA "was enacted to prevent 'patient dumping', which is the practice of refusing to treat patients who are unable to pay." *Marshall*,

134 F.3d at 322 (collecting cases). Respecting the States' traditional authority to regulate the practice of medicine does not interfere with that purpose.

Another traditional tool of statutory construction is canons of construction, such as the *expressio unius* canon. And EMTALA does include one notable requirement: if a woman is already in labor, to "stabilize" means "to deliver (including the placenta)." 42 U.S.C. § 1395dd(e)(3)(A). The inclusion of one stabilizing treatment indicates that others are *not* mandated. *See Texas*, 809 F.3d at 182 (explaining that the *expressio unius* maxim can be helpful for addressing "questions of statutory interpretation by agencies"). Abortion, which the Memorandum mandates, includes procedures well beyond "delivery," such as those that target the unborn child's life (for example, dismemberment). And the Memorandum's abortion mandate is not limited to *delivery* or to women *in labor*—it covers "pregnant patients" generally, as well as situations not involving labor, such as an "incomplete medical abortion." ROA.214, 219.

Plaintiffs do not, and need not, contend that EMTALA *prohibits* abortions, and HHS's apparent suggestion to the contrary (at 36-37) is wrong. This case presents only the issue of whether EMTALA *mandates* abortions. The district court correctly resolved that narrow question: EMTALA does no such thing. EMTALA leaves the matter of abortion to be determined based on background law, which includes state laws regulating abortion and medical ethics.

## 2. HHS's counterarguments are unavailing.

HHS *first* argues (at 29-31) that EMTALA's failure to mention abortion means that abortion is "the same as all other potential treatments for emergency medical

conditions." This does not save the Memorandum. As discussed above, EMTALA does not mandate other specific medical treatments, either. So treating abortion like all other treatments means EMTALA does *not* mandate abortions. The district court drew the natural conclusion from EMTALA's complete silence about abortion: the statute does not support an abortion mandate. Indeed, "silence" is not "an invitation" to regulate; this Court's "precedent says the opposite: Congress does not delegate authority merely by not withholding it." *Gulf Fishermens Ass'n*, 968 F.3d at 456; *accord Texas*, 809 F.3d at 186. Yet the Memorandum gives abortion special treatment as a specific procedure EMTALA *does* mandate, even in the face of prohibitory state law, even though EMTALA does *not* mandate specific procedures, especially over state law. EMTALA's silence as to abortion shows what the district court rightly concluded: Congress did not hide the elephant of an abortion mandate in a mousehole in EMTALA.

*Second*, HHS contends (at 32-41) that the district court was wrong to rely on EMTALA's multiple references to protecting the health and life of the "unborn child." As an initial matter, the district court did not use this language to resolve the clarity of the statute (*Chevron* step 1), but to determine whether HHS can issue an abortion mandate as a permissible gap-filler (*Chevron* step 2), ROA.929-32—a possible alternative defense of the Memorandum that the agency has chosen not to pursue in this Court. So HHS's criticism of the district court's reasoning is misplaced.

But in any event, the district court's analysis tracked the statute's plain protections for "the unborn child." In 1989, Congress added "unborn child" to the

statute, including to the definition of "emergency medical condition," specifying that it includes a condition that jeopardizes the health of either "the woman or her unborn child." 42 U.S.C. § 1395dd(e)(1)(A)(i); *see* Pub. L. No. 101-239, § 6211(h), 103 Stat. 2106, 2248 (Dec. 19, 1989). Notably, the previous version of the statute merely referred to the "individual" or the "patient." *See* Pub. L. No. 99-272, § 9121, 100 Stat 82 (Apr. 7, 1986). Because EMTALA's stabilization clause, 42 U.S.C. § 1395dd(e)(3)(A), requires stabilizing an emergency medical condition, EMTALA requires stabilizing the unborn child. Congress also required that transfers minimize risks to the unborn child, *id.* § 1395dd(c)(2)(A); that transfers not threaten the health or safety of the unborn child, *id.* § 1395dd(e)(1)(B)(ii); and that all transfers assess the medical benefits to the unborn child, *id.* § 1395dd(c)(1)(A)(ii). The statute's regard for the unborn child's life and health precludes interpreting EMTALA to mandate killing that child.

HHS resorts to a lengthy exegesis (at 32-41) to distinguish between the "individual" and the "unborn child" in the statute, but this cannot avoid the clear implication of the statutory text. An unborn child may, as HHS admits (at 36), independently experience an emergency medical condition. Whether a creative lawyer would refer to stabilizing that condition as fulfilling a duty to the child herself, to her mother, or to both does not change the nature of the statutory duty: to safeguard the health of unborn children, even independent of their mothers' health. There is no way to view Congress' four-fold addition of language to protect the unborn child as consistent with the Memorandum's mandate to kill an unborn child.

However a medical provider's duty is phrased, EMTALA does not mandate the performance of abortions. That is enough to resolve this case.

*Third*, HHS argues (at 41-44) that EMTALA requires abortions through its "informed-consent framework." This is another elephant HHS never discovered hiding in EMTALA during the statute's first 36 years of existence. EMTALA's recognition that a patient might exercise her right to refuse medical treatment, 42 U.S.C. § 1395dd(b)(2), (3), cannot transform the statute into an abortion mandate. That provision says nothing about abortion and does not negate the statute's explicit text protecting the unborn child. It also says nothing about what medical treatment a hospital or physician offers in the first place. The district court's reference to a doctor's duty to balance the interests of a pregnant woman and her unborn child, ROA.942, rightly emphasizes that physicians must comply with background law in determining what medical treatments can be offered.

## B.  HHS does not argue that the Memorandum is a proper gap-filler, and it is not: the Memorandum is not a permissible construction of the statutory text.

HHS does not defend the Memorandum as a gap-filling construction of EMTALA; rather, it insists (at, *e.g.*, 27) that the Memorandum is simply "a straightforward reading of EMTALA's text." *See also* Appellants' Br. at 28 (insisting that the district court "read ambiguity" into the statute), 29 (arguing that the court "manufactured ambiguity" and rejecting the idea that the Memorandum is a gap-filler), 46 ("There is thus no gap in the statute to be filled by state laws

governing abortion."). That is wrong—as discussed above, EMTALA does not speak to the precise question at issue—so the Court need go no further to affirm.

But should the Court proceed to *Chevron*'s second step, the Memorandum could stand only if it were a "permissible construction of the statute." *Chevron*, 467 U.S. at 843. It is not. First, although Congress specified that EMTALA's preemptive effect is limited, the Memorandum makes it expansive. Second, the Memorandum ignores the statute's regard for unborn children by instructing practitioners that they *must* perform abortions without regard to the health and life of the unborn child.

1.   EMTALA cannot be interpreted to preempt state laws regulating abortion because such laws do not "directly conflict[]" with EMTALA's stabilization duty. EMTALA expressly limits its own preemptive effect to state law that "directly conflicts" with its requirements, 42 U.S.C. § 1395dd(f), and the Medicare Act does not "authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided," 42 U.S.C. § 1395. As discussed above, both of these limitations on EMTALA's preemptive effect stand in the way of the Memorandum's expansive claim to preemption.

2.   If that weren't enough, it is impermissible to interpret a statute repeatedly protecting an unborn child as a law that requires killing the same unborn child. As the district court put it, the Memorandum interprets EMTALA to "eliminate[] the duty of emergency care to an unborn child when it conflicts with the health of the mother." ROA.929. That is not a permissible construction. As HHS admits (at 36), in 1989 Congress added "unborn child" to the statute four times. *See supra* 35-37.

The statute's regard for the unborn child's life and health precludes interpreting EMTALA to mandate killing that child. At minimum, the statute leaves the issue whether to perform any particular abortion as a question for state law and medical practice and ethics. Added to EMTALA's anti-preemption language, Congress's explicit protections for the unborn child also preclude interpreting EMTALA to require abortions.

## III. HHS Unlawfully Failed to Subject the Memorandum to Notice and Comment.

HHS was required to subject the Memorandum to notice and comment. The Medicare Act requires an agency to conduct notice-and-comment rulemaking when promulgating any "rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing . . . payment for services" or "the eligibility of individuals, entities, or organizations to . . . receive services or benefits." 42 U.S.C. § 1395hh(a)(2); *see Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1808 (2019). Policy statements that establish or change a substantive legal standard are subject to notice and comment under the Medicare Act, even if similar policy statements subject only to the APA would not require such formalities. *See Azar*, 139 S. Ct. at 1811-14; *compare* 5 U.S.C. § 553(b)(A), *with* 42 U.S.C. § 1395hh(a)(2).

No one disputes that the Memorandum "govern[s] . . . payment for services" or "the eligibility of individuals, entities, or organizations to furnish or receive services or benefits." 42 U.S.C. § 1395hh(a)(2); *see Azar*, 139 S. Ct. at 1810. After all, if hospitals or doctors do not comply with the Memorandum, they risk their Medicare

funding and face the "threat of exclusion from Medicare and state healthcare programs, as well as civil monetary penalties." ROA.945; *see* ROA.218. The Memorandum is therefore subject to notice and comment if it constitutes a statement of policy and "establishes or changes a substantive legal standard." 42 U.S.C. § 1395hh(a)(2). It is and it does.

## A.  The Memorandum is at least a "statement of policy."

The Memorandum is, at minimum, a "statement of policy" subject to notice and comment under the Medicare Act. *Id.* Statements of policy include any statement by which the agency "lets the public know its current enforcement or adjudicatory approach." *Syncor*, 127 F.3d at 94; *accord Azar*, 139 S. Ct. at 1810 (quoting *Syncor*, 127 F.3d at 94). The Memorandum certainly does that. It makes abundantly clear that HHS, through its OIG, will penalize doctors and hospitals if they do not provide abortions in various circumstances. ROA.218-19. OIG may exclude physicians from participation in Medicare and any federally funded health-care program or "penalize a hospital by terminating its provider agreement" if the physician or hospital does not provide an abortion when the Memorandum would require it. ROA.218. The Memorandum likewise anoints HHS with the power to "impose a civil monetary penalty on a hospital . . . or physician"—up to $119,942 per violation—"for refusing to provide" an abortion that the Memorandum would require. ROA.218. The Memorandum therefore "conditions federal Medicare and Medicaid funding on the provision of abortions." ROA.311. And the Memorandum also provides safe-harbor provisions for "individual physicians" wanting to perform abortions, who, it says, could "enforce[]" the Memorandum "in a variety of ways":

by using it as a "defense" against a State's attempt to vindicate its own laws, as a method to "enjoin threatened enforcement" in a federal suit, or as a defense in a disciplinary action. ROA.218.

HHS insists (at 48-49) that the Memorandum is not even a "statement of policy" for Medicare Act purposes because it does not "set an adjudicatory approach affecting the substance of a physician's determination whether an individual is experiencing an emergency medical condition" or "dictate how a physician would conclude that abortion is the necessary stabilizing treatment." This ignores the Supreme Court's definition of a "statement of policy" as a statement apprising the public of *the agency's* current enforcement or adjudicatory approach. *Azar*, 139 S. Ct. at 1810. Whether the policy sets an "adjudicatory" approach for the regulated persons or entities to follow is irrelevant to that definition. *See id.* The Memorandum informs physicians and hospitals that they could be subject to monetary penalties or at risk of losing their Medicare agreements or funding altogether if they do not perform abortions in situations the Memorandum requires them. ROA.217-18. HHS's own OIG can enforce these penalties. ROA.218. If that does not inform the public of HHS's current enforcement or adjudicatory approach, it is unclear what would. *See Azar*, 139 S. Ct. at 1810; *Syncor*, 127 F.3d at 94.

## B. The Memorandum establishes or changes a substantive legal standard.

The Memorandum also "establishes or changes a substantive legal standard." 42 U.S.C. § 1395hh(a)(2). HHS argues (at 46-48) that notice and comment was not required because the Memorandum is consistent with "EMTALA's generally

applicable mandate to provide stabilizing treatment for emergency medical conditions." But as discussed above, *see supra* Argument.II, the Memorandum goes miles beyond EMTALA by reading into its statutory silence a notion that abortion is required and that state laws regulating or prohibiting abortion are preempted. ROA.218. The statute sets out a general standard against preemption—the "directly conflicts" standard—but the Memorandum goes further by extending that preemption to state laws restricting abortion. *See* ROA.218. That "establishes or changes a substantive legal standard." 42 U.S.C. § 1395hh(a)(2).

As the district court correctly observed, "EMTALA has never been construed to preempt state abortion laws." ROA.946. That "lack of historical precedent" casts further doubt on the agency's insistence that the Memorandum does nothing but restate the statute. *Cf. Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010); *accord Nat'l Fed. of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 142 S. Ct. 661, 666 (2022) (per curiam); *Consumer Fin. Protection Bureau v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 235 (5th Cir. 2022) (Jones, J., concurring). *Dobbs* makes even clearer that the Memorandum "establishes a new substantive legal standard." ROA.946; *see* 42 U.S.C. § 1395hh(a)(2). The Memorandum purports to control state regulation of abortion even after the Supreme Court emphasized that *Dobbs* "return[ed] th[e] authority" to "regulat[e] or prohibit[] abortion" to the States in rejection of the federal government's "arrogat[ion]" of that authority. 142 S. Ct. at 2284; *accord id.* at 2243, 2259, 2277, 2279.

Moreover, for the reasons explained above, the Memorandum does much more than restate EMTALA's "generally applicable mandate"—it adds to EMTALA's requirements by requiring abortion in certain circumstances and stating that medical providers must comply at the risk of fines and of losing federal funds. *See supra* Argument.I.B. Even though the agency recognizes (at 25) that "EMTALA mandates a specific form of stabilizing treatment in only one circumstance"—where "a pregnant woman is in labor"—the Memorandum mandates abortion and does so outside of that circumstance. ROA.218.

The Memorandum changed the law, as no abortion mandate has ever been articulated under EMTALA before. It is full of mandatory language, obligations, and requirements. It threatens massive penalties. And as a practical matter, regulated entities must change their behavior in response. HHS has publicly enforced the Memorandum to penalize the decision not to perform an abortion where this injunction does not apply. *See supra* 13-14; *cf. Braidwood Mgmt., Inc. v. EEOC*, No. 22-10145, 2023 WL 4073826 at *8-*9 (5th Cir. June 20, 2023) (affirming an injunction based on agency enforcement of guidance). HHS was therefore required to subject the Memorandum to notice and comment under 42 U.S.C. section 1395hh(a)(2). It did not do so, and the district court was correct to enjoin the Memorandum. ROA.943.

## IV. The District Court Properly Enjoined Enforcement of the Memorandum as to Plaintiffs.

The district court's injunction is tailored to the Plaintiffs and within the court's discretion. It leaves EMTALA itself in place, encompassing only the

Memorandum's novel mandate. It protects Texas and the doctors but leaves the Memorandum in place elsewhere. No lesser relief could have remedied Texas's sovereign injury, protected the doctors from threats to their rights of conscience in caring for their patients, or cured Plaintiffs' procedural injuries.

## A. The injunction prevents enforcement of an illegal mandate not found in EMTALA.

HHS's complaints about the scope of the injunction are based on its misapprehension of what the injunction does. Contrary to HHS's characterization (at 52), the district court did not "enjoin[] EMTALA's requirements." Rather, it held unlawful and set aside, as to Plaintiffs, HHS's unlawful imposition of requirements *found nowhere in EMTALA*. The court enjoined enforcement because (for the first time in the statute's history) this Memorandum interpreted EMTALA to mandate abortions, even in violation of state law or conscience protections and therefore gravely threatened both the State's hospitals and the State's and the medical organizations' member physicians.

To be specific, the injunction reads: "The defendants may not enforce the [Memorandum] and Letter's interpretation that Texas abortion laws are preempted by EMTALA; and . . . may not enforce the [Memorandum] and Letter's interpretation of EMTALA—both as to when an abortion is required and EMTALA's effect on state laws governing abortion—within the State of Texas or against AAPLOG's members and CMDA's members." ROA.1113; *see also* ROA.1081. The gravamen of the district court's ruling is that the Memorandum adds

to EMTALA, and it is the delta between EMTALA and the Memorandum that HHS is enjoined from enforcing.

That does not prevent HHS from enforcing EMTALA itself, such as to prevent patient dumping, just as it had done for decades before it issued the Memorandum in the wake of *Dobbs*. If the Memorandum's impermissible interpretations are not at issue in a particular proposed enforcement action, the injunction has no application. Where HHS was able to take enforcement action based on a medical provider's failure to provide stabilizing treatment without relying on the Memorandum's novel view, the injunction does not apply. But an abortion *mandate* and corresponding state-law preemption in the Memorandum have no basis in EMTALA itself, so HHS cannot act against Plaintiffs on that ground.

## B.  The Memorandum's mandate of any abortions, legal or illegal, violates the APA and injures Plaintiffs.

HHS asks this Court to narrow the injunction to abortions that violate state law, arguing (at 51) that this would give the Plaintiffs "complete relief." The district court properly rejected this theory. HHS has an unduly restrictive view of the parties' injuries and the corresponding scope of relief needed.

### 1.  The district court properly gave Texas relief against the entire illegal Memorandum.

As to the State of Texas, the Memorandum instructs medical providers that state law is no defense in an EMTALA enforcement action and, conversely, that they cannot be held in violation of Texas law if they act pursuant to EMTALA. ROA.218-19. That kind of interference with Texas's traditional authority to regulate

the practice of medicine and protect health and safety is an irreparable injury of its own. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *Maryland v. King*, 567 U.S. 1301, 1303 (2012); *see* ROA.948. Texas suffers a sovereign injury from the Memorandum's improper claim that Texas law is preempted, even if in some cases medical providers complying with the Memorandum would happen to comply with Texas law anyway.

### 2. All the Memorandum's illegal abortion mandates injure the doctors.

The Memorandum illegally coerces AAPLOG and CMDA's members into providing abortions. ROA.897-98, 909-19. HHS does not dispute, *see* Appellants' Br. at 13-15, that the doctor groups can challenge the Memorandum when it "coerces physicians into providing elective abortions" in violation of state law and the doctors' conscientious objections. ROA.897-98, 909-19. Just so. In those circumstances, the doctors "face an injury from the irreconcilable choice between performing their jobs and abiding by their consciences." Order, *All. for Hippocratic Med. v. Food & Drug Admin.*, No. 23-10362, 2023 WL 2913725, at *8 (5th Cir. Apr. 12, 2023) (per curiam). The Memorandum includes such cases; for instance, it requires doctors to complete an "incomplete medical abortion." ROA.219.

But HHS is wrong to claim (at 15-17, 49-54) that the injunction must be narrowed to exclude instances of legal abortions or those in which the doctors would not have a conscientious objection. This argument is incorrect for three reasons.

*First*, HHS cannot constrain the doctors' objection to being regulated illegally. The doctors sought relief from loss of their right to comment on the entire abortion

mandate, not just parts of it. ROA.203-04. And the doctors sought, and were entitled to, injunctive relief from any illegal mandate imposed on them without statutory authority. *See* ROA.201-03, 209-10; *Lujan*, 504 U.S. at 561-62 (noting that there is "little question" that an object of an agency action can challenge it); *EEOC*, 933 F.3d at 446 (explaining that regulated entities "ordinarily" suffer a concrete injury from unlawful imposition of legal requirements).

*Second*, HHS has no right to define what kinds of pressure the doctors oppose. Serious cases are extremely complicated, those potentially involving abortion inherently implicate ethics and religion, and the correct judgment in rapidly developing circumstances is difficult to ascertain. For decades, the absence of *any* federal abortion mandate, in conjunction with broad state and federal rights *not* to perform abortions, has given doctors the needed breathing room to care for patients in complex cases. The Memorandum runs roughshod over that legal landscape by empowering HHS to second-guess doctors' judgments with the threat of massive fines and purporting to trump all conscience laws.[3] *Any pressure* to violate religious and medical judgment is a cognizable injury because it puts a thumb on the scale towards performing abortions. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (explaining that "[g]overnmental imposition" of mere "pressure" to violate one's beliefs is a substantial burden on religious exercise); *EEOC*, 933 F.3d at 449 ("[P]ressure . . . to change" behavior is itself injury.); *cf. Texas Med. Ass'n v. HHS*,

---

[3] The Memorandum purports to preempt state laws, which includes doctors' conscience rights. *See, e.g.*, Tex. Occ. Code § 103.001. And HHS insisted below that EMTALA also overrides the doctors' federal conscience rights. *See* ROA.484.

587 F. Supp.3d. 528, 537 (E.D. Tex. 2022) (enjoining rule because HHS imposed "pressure" when exceeding its statutory authority); ROA.197 (explaining that the Memorandum imposes pressure against the pro-life practice of medicine). Because the Mandate requires abortions and denies conscience rights, the doctors can escape its illegal pressure only through an injunction protecting them from any application of the Memorandum.

*Third*, HHS does not get to define the doctors' consciences. The doctors believe "in 'protecting the life of the mother and her unborn child." ROA.912 (quoting ROA.324). In tragic cases, they are willing to undertake procedures resulting in separations. ROA.316-34. But they see a "fundamental difference" between those separations and abortions. ROA.316-17. As an "abortion" mandate, the Memorandum inherently infringes on this distinction.

*Finally*, HHS's counsel recently suggested to this Court that individual doctors are not bound by EMTALA or the Memorandum, but that is incorrect.[4] The Memorandum insists that "the physician *must* provide that [abortion]" and threatens penalties on a "physician ($119,942/violation)" for noncompliance. ROA.214 (emphasis added), 219. EMTALA, its regulations, and its penalties likewise cover physicians. 42 U.S.C. § 1395dd(d)(1)(B)-(C); 42 CFR § 1003.500. The Memorandum illegally leverages EMTALA's authority over physicians, and

---

[4] *See* Oral Argument at 6:21, *Alliance for Hippocratic Medicine v. Food & Drug Admin.*, No. 23-10362 (5th Cir. May 17, 2023) ("The obligations of EMTALA run to the hospital that accepts federal funds, but it doesn't require any particular individual . . . doctor, to perform any particular procedures that he or she has a religious objection to.")

the district court acted within its discretion to protect the doctors from a novel and intolerable abortion mandate.

### C. The injunction properly remedies the Memorandum's procedural deficiencies.

HHS is also incorrect to argue (at 53-54) that the injunction is broader than necessary to redress Plaintiffs' procedural injuries. It is not.

The agency suggests (at 53) that it could promulgate an equivalent rule following notice and comment, so the only remedy needed for this procedural failure is remand, without an injunction on enforcing the Memorandum against the Plaintiffs. This theory assumes that the Memorandum is consistent with EMTALA itself, which is wrong for all the reasons explained above. HHS would lack authority to issue a new, equivalent regulation even if it complied with notice and comment. *See supra* Argument.II; ROA.952-53. That means the district court was correct to issue an injunction and not merely remand to give the agency the opportunity to conduct notice and comment. *See EEOC*, 933 F.3d at 451.

But even if not, HHS's proposed "remedy" would leave the agency free to enforce the Memorandum against Plaintiffs immediately, without engaging in any notice-and-comment procedures whatsoever. That is far afield from the cases HHS cites in support of its remand-without-vacatur proposal, which involved formally promulgated regulations that violated the APA because notice-and-comment rulemaking was conducted incorrectly or was not complete, not where notice-and-comment was never conducted at all. *See Tex. Ass'n of Mfrs. v. U.S. CPSC*, 989 F.3d 368, 383 (5th Cir. 2021); *Cent. & S. W. Servs., Inc. v. U.S. E.P.A.*, 220 F.3d 683, 692

(5th Cir. 2000). It is one thing for an agency to undergo the process of promulgating a final rule yet fail to "properly respond" to some comments or "explain one aspect of its decision." Appellants' Br. at 53 (citing *Cent. & S. W. Servs.*, 220 F.3d at 702). It is quite another for an agency to ignore notice and comment altogether and insist on imposing its rule in the meantime. And here, the court did not impose universal vacatur, so cases preferring remand without vacatur in other circumstances are inapposite. The district court already tailored its relief to the Plaintiffs and left the Memorandum in place elsewhere.

Because there are many reasons why any new regulation like the Memorandum would not reach the same result, the district court was well within its discretion to reject HHS's proposal. Again, it is doubtful that HHS *could* promulgate such a rule based on the Memorandum's incompatibility with EMTALA. *See supra* Argument.II. Rulemaking would also present other perspectives that HHS must meaningfully consider, respond to, and, if rejected, explain. *See, e.g.*, *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2384 (2020) (concluding that failure to discuss religious-freedom laws subjects the agency to APA "arbitrary and capricious" claims); *Dep't of Homeland Sec. v. Regents,* 140 S. Ct. 1891, 1913 (2020) (stating that an agency must discuss and weigh reliance interests). HHS gives no justification why the district court was required to believe later rulemaking would reach the same outcome.

## Conclusion

The Court should affirm the judgment of the district court.

Respectfully submitted.

/s/ Matthew S. Bowman

MATTHEW S. BOWMAN
JOHN J. BURSCH
RYAN L. BANGERT
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
mbowman@ADFlegal.org
rbangert@ADFlegal.org

JULIE MARIE BLAKE
Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655
jblake@ADFlegal.org

Counsel for American Association
of Pro-Life Obstetricians &
Gynecologists & Christian Medical
and Dental Associations

JOHN SCOTT
Provisional Attorney General of
    Texas

BRENT WEBSTER
First Assistant Attorney General

LANORA C. PETTIT
Principal Deputy Solicitor General

/s/ Natalie D. Thompson

NATALIE D. THOMPSON
Assistant Solicitor General
Natalie.Thompson@oag.texas.gov

SARA B. BAUMGARDNER
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for the State of Texas

## CERTIFICATE OF SERVICE

On July 6, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Natalie D. Thompson
NATALIE D. THOMPSON

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,762 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Natalie D. Thompson
NATALIE D. THOMPSON