No. 23-10246

# In the United States Court of Appeals
## for the Fifth Circuit

State of Texas; American Association of Pro-Life Obstetricians & Gynecologists; Christian Medical & Dental Associations,

Plaintiffs - Appellees,

v.

Xavier Becerra; United States Department of Health and Human Services; Centers for Medicare and Medicaid Services; Karen L. Tritz; David R. Wright,

Defendants - Appellants.

---

On Appeal from the United States District Court for the
Northern District of Texas, Lubbock
Case No. 5:22-CV-185
Honorable James Wesley Hendrix, U.S. District Judge

---

**Brief of *Amicus Curiae* Institute for Faith and Family
in Support of Plaintiffs-Appellees and Affirmance**

---

Deborah J. Dewart, Attorney at Law
111 Magnolia Lane
Hubert, NC  28539
lawyerdeborah@outlook.com
(910) 326-4554 (phone)

*Attorney for Amicus Curiae*
Institute for Faith and Family

**SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS**
**No. 11037**
**FIFTH CIRCUIT RULE 29.2**

The undersigned counsel certifies that the following persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Deborah J. Dewart, Counsel for *Amicus Curiae*

Institute for Faith and Family, *Amicus Curiae*

The undersigned counsel also certifies that the sole *Amicus Curiae*, Institute for Faith and Family, is a nonprofit corporation that has no parent corporation, is not a publicly held corporation, and does not issue stock.

DATED: July 7, 2023

/s/Deborah J. Dewart
Deborah J. Dewart
Counsel for *Amicus Curiae*
*Institute for Faith and Family*

i

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS ........................ i

TABLE OF AUTHORITIES .................................................................. iv

IDENTITY AND INTEREST OF *AMICUS CURIAE* ............................................ 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................. 1

ARGUMENT ........................................................................................ 4

I.   THE GUIDANCE IS "ARBITRARY AND CAPRICIOUS" BECAUSE HHS FAILED TO CONSIDER IMPORTANT ASPECTS OF THE PROBLEM. ...................................................... 4

II.  THE GUIDANCE IS ARBITRARY AND CAPRICIOUS BECAUSE HHS FAILED TO CONSIDER THIS NATION'S LONG HISTORY OF RESPECT FOR CONSCIENCE. ............................................. 5

    A.   Respect for individual conscience is deeply rooted in American history. ................................................................ 6

    B.   Federal law has long respected the conscience rights of both patients and health care professionals. .................................. 6

    C.   States provide broad constitutional and statutory protection for liberty of conscience. ................................................... 9

    D.   Like many successful Free Exercise cases, this case involves *conscientious objectors*—not civil disobedience. ........................... 12

III. THE GUIDANCE IS ARBITRARY AND CAPRICIOUS BECAUSE HHS FAILED TO CONSIDER OUR *FIRST* LIBERTY: RELIGIOUS FREEDOM. ........................................................ 14

    A.   Abortion is a highly controversial, divisive issue. ............................ 15

    B.   Religious freedom should not be dismantled to compel individual doctors to perform abortions. .......................................... 16

C.      Accommodation of a medical professional's conscience does not threaten any person's fundamental rights. ......................................... 17

IV.    THE GUIDANCE AND RELATED MANDATE DEMONSTRATE HOSTILITY TO RELIGIOUS LIBERTY AND CONSCIENCE. ............. 18

V.    THE ADMINISTRATION CANNOT SATISFY THE DEMANDING "COMPELLING INTEREST" OR "LEAST RESTRICTIVE MEANS" PRONGS OF RFRA. ................................................................... 20

A.      HHS cannot satisfy the compelling interest prong ........................... 22

B.      HHS cannot satisfy the least restrictive means prong ....................... 23

CONCLUSION ................................................................ 24

CERTIFICATE OF SERVICE ............................................... 25

CERTIFICATE OF COMPLIANCE ....................................... 26

ECF CERTIFICATIONS ..................................................... 27

# TABLE OF AUTHORITIES

## CASES

*Ariz. Christian Sch. Tuition Org. v. Winn*,
    131 S. Ct. 1436 (2011) ........................................................................ 8

*Attorney Gen. v. Desilets*,
    636 N.E.2d 233 (Mass. 1994) .......................................................... 20

*Baird v. State Bar of Arizona*,
    401 U.S. 1 (1971) ............................................................................. 18

*Bowen v. Kendrick*,
    487 U.S. 589 (1988) ......................................................................... 18

*Braunfeld v. Brown*,
    366 U.S. 599 (1961) ................................................................... 19, 20

*Brown v. Entertainment Merchants Association*,
    131 S. Ct. 2729 (2011) ..................................................................... 23

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) ................................................... 4, 21, 23, 24

*Catholic Charities of Sacramento, Inc. v. Superior Court*,
    85 P.3d 67 (Cal. 2004) ..................................................................... 20

*Coulee Catholic Sch. v. Labor & Indus. Review Comm'n*,
    768 N.W.2d 868 (Wis. 2009) ............................................................ 12

*Dobbs v. Jackson Women's Health Organization*,
    142 S. Ct. 2228 (2022) .......................................................... 2, 15, 17

*Doe v. Bolton*,
    410 U.S. 179 (1973) ......................................................................... 14

*E. Tex. Baptist Univ. v. Burwell*,
    807 F.3d 630 (5th Cir. 2015) ......................................................... 5, 9

*Eisenstadt v. Baird*,
   405 U.S. 438 (1972) ..................................................................... 14

*Emp't Div., Ore. Dep't of Human Res. v. Smith*,
   494 U.S. 872 (1990) ..................................................................... 13

*Everson v. Bd. of Educ. of Ewing*,
   330 U.S. 1 (1947) ......................................................................... 18

*First Covenant Church v. City of Seattle*,
   840 P.2d 174 (Wash. 1992) .......................................................... 11

*Flast v. Cohen*,
   392 U.S. 83 (1968) ...................................................................... 8, 9

*Frank v. State*,
   604 P.2d 1068 (Alaska 1979) ....................................................... 11

*Girouard v. United States*,
   328 U.S. 61 (1946) ........................................................ 5, 13, 16, 17

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006) ................................................................ 22, 23

*Griswold v. Connecticut*,
   381 U.S. 479 (1965) ..................................................................... 14

*Guaranteed Auto Fin., Inc. v. Dir., ESD*,
   92 Ark. App. 295 (2005) .......................................................... 11, 12

*Harden v. State*,
   216 S.W.2d 708 (Tenn. 1948) ...................................................... 11

*Harris v. McRae*,
   448 U.S. 297 (1980) ..................................................................... 18

*Humphrey v. Lane*,
   728 N.E.2d 1039 (Ohio 2000) ...................................................... 11

*Hurley v. Irish-American Gay, Lesbian, & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995) ............................................................................ 16

*In re Williams*,
    152 S.E.2d 317 (N.C. 1967) ............................................................. 11

*Keyishian v. Bd. of Regents,*
    385 U.S. 589 (1967) ........................................................................... 18

*Lee v. Weisman*,
    505 U.S. 577 (1992) .............................................................. 5, 18, 20

*Little Sisters of the Poor v. Pennsylvania*,
    140 S. Ct. 2367 (2020) ................................................. 4, 20, 21, 22

*Lynch v. Donnelly*,
    465 U.S. 668 (1984) ........................................................................... 19

*Motor Vehicle Mfrs. Assn. of United States, Inc. v.*
    *State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983) ................. 4

*Priests for Life v. United States HHS*,
    808 F.3d 1 (D.C. Cir. 2015) ............................................................. 8

*Prince v. Massachusetts*,
    321 U.S. 158 (1944) ........................................................................... 13

*Rasmussen v. Glass*,
    498 N.W.2d 508 (Minn. Ct. App. 1993) ............................ 11, 19, 20

*Roe v. Wade*,
    410 U.S. 113 (1973) .......................................................... 7, 14, 15, 17

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ........................................................................... 18

*Schelske v. Austin*,
    2022 U.S. Dist. LEXIS 229432 (N.D. Tex. 2022) ............................ 5

*Sherbert v. Verner*,
374 U.S. 398 (1963) ........................................................ 13, 19, 20, 22

*State ex rel. McClure v. Sports & Health Club, Inc.*,
370 N.W.2d 844 (Minn. 1985) ................................................... 19, 20

*Swanner v. Anchorage Equal Rights Comm'n*,
874 P.2d 274 (Alaska 1994) ............................................................ 20

*Texas v. Becerra*,
2022 U.S. Dist. LEXIS 151142 (N.D. Tex. 2022) ......................... 3, 8

*Thomas v. Collins*,
323 U.S. 516 (1945) ..................................................................... 22

*Thomas v. Review Bd. of Indiana Employment Security Div.*,
450 U.S. 707 (1981) ..................................................................... 21

*Tony and Susan Alamo Found. v. Sec'y of Labor*,
471 U.S. 290 (1985) ............................................................... 19, 20

*United States v. Lee*,
455 U.S. 252 (1982) ............................................................... 19, 20

*United States v. Seeger*,
380 U.S. 163 (1965) ....................................................................... 6

*Washington v. Glucksberg*,
521 U.S. 701 (1997) ..................................................................... 17

*Webster v. Reprod. Health Servs.*,
492 U.S. 490 (1989) ..................................................................... 18

*West Virginia State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ............................................................... 13, 16

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ..................................................................... 13

*Wooley v. Maynard*,
  430 U.S. 705 (1977)...................................................................... 16

*Zorach v. Clauson,*
  343 U.S. 306 (1952).............................................................. 18, 19

## STATUTES

5 U.S.C. §706(2)(A)....................................................................... 4

5 U.S.C. § 1395hh(a)(2).................................................................. 4

42 U.S.C. § 238n (the "Coats-Snowe Amendment") ................................ 3

42 U.S.C. § 300a-7(c), (d) (the "Church Amendment").......................... 3, 7

42 U.S.C. § 300gg-13(a)(4) ............................................................ 3

42 U.S.C.S. § 1395dd (Emergency Medical Treatment & Labor Act) .................. 2

42 U.S.C. § 18001 *et seq.* ("Patient Protection and Affordable Care Act")............. 3

42 U.S.C. § 2000bb *et seq.* (Religious Freedom Restoration Act of 1993)
  ("RFRA") ........................................................ 3, 4, 17, 20, 21, 22, 23

Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, §§ 506, 507, 136
  Stat. 496, 496 (2022) (Hyde and Weldon Amendments) ................................... 3

Ga. Crim. Code § 26-1202(e) ......................................................... 14

## CONSTITUTIONAL PROVISIONS

Alabama Const. Art. I, Sec. 4 ......................................................... 10

A.R.S. Const. Art. II, § 12 ............................................................ 10

Alaska Const. Art. I, § 4 .............................................................. 10

Ark. Const. Art. 2, § 24............................................................... 10

Cal. Const. art. I, § 4 ............................................................... 10

Colo. Const. Art. II, Section 4 ................................................ 10

Conn. Const. Art. I., Sec. 3 ...................................................... 10

Del. Const. art I, § 1 ................................................................ 10

Fla. Const. Art. I, § 3 .............................................................. 10

Ga. Const. Art. I, § I, Para. III-IV ......................................... 10

HRS Const. Art. I, § 4 ............................................................. 10

Idaho Const. Art. I, § 4 .......................................................... 10

Illinois Const., Art. I, § 3 ........................................................ 10

Ind. Const. Art. 1, §§ 2, 3 ....................................................... 10

Iowa Const. Art. I, § 3 ............................................................ 10

Kan. Const. B. of R. § 7 ........................................................... 10

Ky. Const. § 1 .......................................................................... 10

La. Const. Art. I, § 8 ............................................................... 10

ALM Constitution Appx. Pt. 1, Art. II ................................... 10

Me. Const. Art. I, § 3 .............................................................. 10

Md. Dec. of R. art. 36 ............................................................. 10

MCLS Const. Art. I, § 4 .......................................................... 10

Minn. Const. art. 1, § 16 ......................................................... 10

Miss. Const. Ann. Art. 3, § 18 ................................................ 10

Mo. Const. Art. I, § 5 ................................................................... 10

Mont. Const., Art. II § 5 .............................................................. 10

Ne. Const. Art. I, § 4 ................................................................... 10

Nev. Const. Art. 1, § 4 ................................................................ 10

N.H. Const. Pt. FIRST, Art. 4 and Art. 5 .................................. 10

N.J. Const., Art. I, Para. 3 .......................................................... 10

N.M. Const. Art. II, § 11 ............................................................ 10

NY CLS Const Art I, § 3 ............................................................ 10

N.C. Const. art. I, § 13 ............................................................... 10

N.D. Const. Art. I, § 3 ................................................................ 10

Oh. Const. art. I, § 7 .................................................................. 10

Okl. Const. Art. I, § 2 ................................................................ 11

Ore. Const. Art. I, §§ 2, 3 .......................................................... 10

Pa. Const. Art. I, § 3 .................................................................. 10

R.I. Const. Art. I, § 3 ................................................................. 10

S.C. Const. Ann. Art. I, § 2 ................................................. 10, 11

S.D. Const. Article VI, § 3 ......................................................... 10

Tenn. Const. Art. I, § 3 .............................................................. 10

Tex. Const. Art. I, § 6 ................................................................ 10

Utah Const. Art. I, § 4 ............................................................... 10

Vt. Const. Ch. I, Art. 3 .................................................................. 10

Va. Const. Art. I, § 16 ................................................................... 10

Wash. Const. art. 1, § 11 .............................................................. 10

W. Va. Const. Art. III, § 15 ........................................................... 10

Wis. Const. Art. I, § 18 ................................................................. 10

Wyo. Const. Art. 1, § 18 ............................................................... 10

## OTHER AUTHORITIES

119 Cong. Rec. 9595 (1973) ............................................................ 7

Sen. Rep.  No. 103-111, 1st Sess., p. 4 (1993), reprinted in 1993 U.S. Code
   Cong. & Admin. News ............................................................... 16

Helen Alvaré, *No Compelling Interest:*
*The "Birth Control" Mandate and Religious Freedom*
58 Vill. L. Rev. 379 (2013) .......................................................... 23

J. David Bleich, *The Physician as a Conscientious Objector*, 30 Fordham
   Urb. L. J. 245 (2002) ................................................................... 7

Noah Feldman, *Intellectual Origins of the Establishment Clause,*
   77 N. Y. U. L. Rev. 346 (2002) .................................................... 8

Letter from George Washington to Colonel Benedict Arnold
   (Sept. 14, 1775), *in* THE PAPERS OF GEORGE WASHINGTON,
   1 REVOLUTIONARY WAR SERIES 455-56 (1985) ............................... 5

James Madison, *Memorial and Remonstrance Against Religious Assessments*,
   reprinted in 2 WRITINGS OF JAMES MADISON 183 (G. Hunt ed. 1901) ............... 9

Michael W. McConnell, *"God is Dead and We have Killed Him!" Freedom
   of Religion in the Post-Modern Age*, 1993 BYU L. Rev. 163 (1993) ......... 16, 19

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) ........................................ 8

Courtney Miller, Note:  *Reflections on Protecting Conscience for Health Care Providers: A Call for More Inclusive Statutory Protection in Light of Constitutional Considerations*, 15 S. Cal. Rev. L. & Social Justice 327 (2006) ........................................ 7, 9, 10

Nora O'Callaghan, *Lessons From Pharaoh and the Hebrew Midwives: Conscientious Objection to State Mandates as a Free Exercise Right*, 39 Creighton L. Rev. 561 (2006) ...................................................... 7, 13, 15, 19

Harlan Fiske Stone, *The Conscientious Objector*, 21 Col. Univ. Q. 253 (1919) ................................................................... 6

https://www.consciencelaws.org/law/laws/usa.aspx#state ..................................... 10

Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss, Centers for Medicare & Medicaid Services (July 11, 2022), https://www.cms.gov/files/document/qso-22-22-hospitals.pdf ["Guidance"] ...... 2

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Institute for Faith and Family, as *amicus curiae*, respectfully submits that the District Court ruling should be affirmed.

The Institute for Faith and Family ("IFF") is a North Carolina nonprofit corporation established to preserve and promote faith, family, and freedom by working in various arenas of public policy to protect constitutional liberties, including the right to life. See https://iffnc.com.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The First Amendment has never been confined within the walls of a church, as if it were a wild animal needing to be caged. On the contrary, the Constitution broadly guarantees liberty of religion and conscience. Liberty extends beyond individuals to associations like the American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG) and the Christian Medical and Dental Associations (CMDA), co-plaintiffs in this case with the State of Texas. These associations consist of medical professionals who wish to conduct business with integrity, consistent with conscience, ethics, and religious faith. Not everyone shares those values but cutting conscience out of the medical profession is a frightening prospect

---

[1] The parties have consented to the filing of this brief. *Amicus curiae* certifies that no counsel for a party authored this brief in whole or in part and no person or entity, other than *amicus*, its members, or its counsel, has made a monetary contribution to its preparation or submission.

for patients, doctors, and other medical personnel. This is particularly true following the Supreme Court's decision returning abortion regulation to the states. *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2243 (2022).

Now, in a brazen end-run around *Dobbs*, the Department of Health and Human Services ("HHS") has issued Guidance under the Emergency Medical Treatment & Labor Act (EMTALA), 42 U.S.C.S. § 1395dd, demanding that providers perform abortions regardless of state law and directly contrary to EMTALA's statutory requirement to consider the welfare of an unborn child when stabilizing a pregnant woman (the "Abortion Mandate"). Specifically: "If a physician believes that a pregnant woman presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA, and that abortion is the stabilizing treatment necessary to resolve that condition, the physician *must* provide that treatment." Guidance at 1.[2]

This "broad and undifferentiating" Guidance "provides no exceptions for healthcare providers with genuinely held religious objections to abortions, which may be required under federal appropriations laws or the Religious Freedom

---

[2] Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss, Centers for Medicare & Medicaid Services (July 11, 2022), https://www.cms.gov/files/document/qso-22-22-hospitals.pdf ["Guidance"]. The Guidance was revised on August 25, 2022 to comply with the District Court's preliminary injunction (last visited 12/29/22).

2

Restoration Act [RFRA]."[3] *Texas v. Becerra*, 2022 U.S. Dist. LEXIS 151142, *83-84 (N.D. Tex. 2022). This failure to consider religious liberty subjects the Guidance to claims that it is "arbitrary and capricious."

The Abortion Mandate, much like the Contraception Mandate[4] that preceded it, attacks liberties Americans have treasured for over 200 years—liberties no one can be required to sacrifice as a condition for participating in the public square. The Mandate is as great an assault on conscience as the constitutional evil of compelling citizens to support religious beliefs they do not hold. It is anathema to the basic First Amendment principle that the government may not coerce its citizens to endorse or support a cause. The injury here is particularly insidious, forcing conscientious objectors to personally perform a morally objectionable procedure—abortion.

---

[3] *See* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, §§ 506, 507, 136 Stat. 496, 496 (2022) (Hyde and Weldon Amendments); 42 U.S.C. § 238n (Coats-Snowe Amendment); 42 U.S.C. § 300a-7(c), (d) (Church Amendment); 42 U.S.C. §§ 2000bb—2000bb-4 (RFRA).

[4] Following the enactment and implementation of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 *et seq.*, the Contraceptive Mandate imposed crippling financial penalties upon employers that failed to comply with a legal directive that guaranteed *free access* to contraceptive drugs and related services through their employee health insurance plans—in direct conflict with the religious faith that motivates their lives and missions. 42 U.S.C. § 300gg-13(a)(4).

# ARGUMENT

## I. THE GUIDANCE IS "ARBITRARY AND CAPRICIOUS" BECAUSE HHS FAILED TO CONSIDER IMPORTANT ASPECTS OF THE PROBLEM.

In formulating the Guidance, HHS failed to consider the inevitable conscientious and religious objections of many medical professionals. This critical omission demonstrates that not only did the government fail to conduct the required notice and comment (5 U.S.C. § 1395hh(a)(2)) but also "entirely failed to consider an important aspect of the problem." *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2383-2384 (2020), quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). That "important aspect" encompasses not only RFRA, but the law's traditional respect for rights of conscience. The Guidance is clearly irreconcilable with *Burwell v. Hobby Lobby*, 573 U.S. 682 (2014) in abandoning RFRA, and since RFRA protects a *corporation* like Hobby Lobby from having to *pay for* religiously objectionable drugs, then surely it protects a *natural person* (a doctor) from having to *personally perform* an objectionable procedure (abortion). The Guidance imposes a burden that is even more personally intrusive and substantial than the Contraception Mandate. HHS's failure to consider RFRA and other "important aspects of the problem" renders the Guidance susceptible to the charge that it is "arbitrary and capricious." 5 U.S.C. §706(2)(A).

4

## II.     THE GUIDANCE IS ARBITRARY AND CAPRICIOUS BECAUSE HHS FAILED TO CONSIDER THIS NATION'S LONG HISTORY OF RESPECT FOR CONSCIENCE.

The free exercise of religion is inescapably intertwined with conscience. The victory for freedom of thought recorded in the Bill of Rights recognizes that in the domain of conscience there is a moral power higher than the State. *Girouard v. United States,* 328 U.S. 61, 68 (1946). Courts have an affirmative "duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people." *Lee v. Weisman*, 505 U.S. 577, 592 (1992).

"Conscience is the essence of a moral person's identity. . . . Liberty of conscience was the foundation for Madison's and Jefferson's and other Framers' views underlying the First Amendment's religion clauses." *E. Tex. Baptist Univ. v. Burwell*, 807 F.3d 630, 635 (5th Cir. 2015) (Jones, J., dissenting from denial of Petition for Rehearing En Banc.) Our first commander in chief cautioned that "[w]hile we are Contending for our own Liberty, we should be very cautious of violating the Rights of Conscience in others." Letter from George Washington to Colonel Benedict Arnold (Sept. 14, 1775), *in* THE PAPERS OF GEORGE WASHINGTON, 1 REVOLUTIONARY WAR SERIES 455-56 (1985). *Schelske v. Austin*, 2022 U.S. Dist. LEXIS 229432, *91 (N.D. Tex. 2022).

**A.    Respect for individual conscience is deeply rooted in American history.**

America's traditional respect for conscience is illustrated by exemptions granting relief from the moral dilemma created by mandatory military service. The Supreme Court, acknowledging man's "duty to a moral power higher than the State," once quoted the profound statement of Harlan Fiske Stone (later Chief Justice) that "both morals and sound policy require that the state should not violate the conscience of the individual." *United States v. Seeger*, 380 U.S. 163, 170 (1965), quoting Harlan Fiske Stone, *The Conscientious Objector*, 21 Col. Univ. Q. 253, 269 (1919). Indeed, "nothing short of the self-preservation of the state should warrant its violation," and even then it is questionable "whether the state which preserves its life by a settled policy of violation of the conscience of the individual will not in fact ultimately lose it by the process." *Id*. It is hazardous for any government to crush the conscience of its citizens. But the Mandate threatens to breed a nation of persons who lack *conscience*, forcing religious citizens and organizations to set aside conscience or face ruinous fines. The tsunami of lawsuits challenging the Contraception Mandate testifies to the gravity of the matter, and the same floodgates are opening again.

**B.    Federal law has long respected the conscience rights of both patients and health care professionals.**

There is a long history of respect for the conscience and moral autonomy of both patients and health care professionals. Regardless of the rights of women,

demanding that a physician act in a "morally unpalatable manner . . . compromises the physician's ethical integrity" and likely has "a corrosive effect upon [his or her] dedication and zeal" in treating patients. J. David Bleich, *The Physician as a Conscientious Objector*, 30 Fordham Urb. L. J. 245 (2002).

After abortion was constitutionalized[5] in *Roe v. Wade*, 410 U.S. 113 (1973), Congress acted swiftly to preserve the conscience rights of professionals who objected to participating in the procedure. When Senator Church introduced the "Church Amendment" (42 U.S.C. § 300a-7(c)) for that purpose, he explained that: "Nothing is more fundamental to our national birthright than freedom of religion." 119 Cong. Rec. 9595 (1973). Soon thereafter, Congress passed the Hyde Amendment, prohibiting the use of federal funds to perform abortions except in cases of incest, rape, or danger to the mother's life. Nora O'Callaghan, *Lessons From Pharaoh and the Hebrew Midwives: Conscientious Objection to State Mandates as a Free Exercise Right*, 39 Creighton L. Rev. 561, 627-628 (2006). Almost every state has also enacted conscience clause legislation. Courtney Miller, Note: *Reflections on Protecting Conscience for Health Care Providers: A Call for More Inclusive Statutory Protection in Light of Constitutional Considerations*, 15 S. Cal. Rev. L. & Social Justice 327, 331 (2006).

---

[5] Since abortion was a matter for each state to decide individually, and it was already legal in some states, it is more accurate to say that it was *constitutionalized* rather than *legalized*.

Freedom of conscience is even broader than the "free exercise of religion" the First Amendment explicitly protects. Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1491 (1990). Liberty of conscience underlies the Establishment Clause and the unique taxpayer standing rules developed in *Flast v. Cohen*, 392 U.S. 83 (1968): "[T]he Framers' generation worried that conscience would be violated if citizens were required to pay taxes to support religious institutions with whose beliefs they disagreed." *Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1446-1447 (2011), quoting Noah Feldman, *Intellectual Origins of the Establishment Clause*, 77 N. Y. U. L. Rev. 346, 351 (2002). An equivalent principle is true here. The Mandate requires medical professionals to violate their core faith by facilitating or even personally performing a procedure they believe is immoral, contrary to our nation's history. "AAPLOG and CMDA members who object to abortions on medical, ethical, and religious grounds face the threat of monetary penalties and exclusion from federal healthcare programs unless they perform abortions that violate their beliefs." *Texas v. Becerra*, 2022 U.S. Dist. LEXIS 151142, *83-84. The Founders' then-recent experience with religious persecution produced "a fierce commitment to each individual's natural and inalienable right to believe according to his conviction and conscience and to exercise his religion as these may dictate." *Priests for Life v. United States HHS*, 808 F.3d 1, 5 (D.C. Cir. 2015) (Brown, J.,

dissenting from denial of Petition for Rehearing En Banc), citing James Madison, *Memorial and Remonstrance Against Religious Assessments*, reprinted in 2 WRITINGS OF JAMES MADISON 183, 184 (G. Hunt ed. 1901) (internal quotation marks omitted).

The Mandate is as much a frontal assault on conscience as the Establishment Clause evil of compelling citizens to support religious beliefs they do not hold. Even seemingly modest intrusions are constitutionally forbidden: "Thomas More went to the scaffold rather than sign a little paper for the King." *E. Tex. Baptist Univ. v. Burwell*, 807 F.3d at 635 (Jones, J., dissenting from denial of Petition for Rehearing En Banc). Quoting James Madison, "the leading architect of the religion clauses of the First Amendment," the Supreme Court once cautioned that "the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever." *Flast v. Cohen*, 392 U.S. at 103, quoting 2 WRITINGS OF JAMES MADISON 183, 186 (Hunt ed., 1901).

**C.  States provide broad constitutional and statutory protection for liberty of conscience.**

All states protect liberty of conscience through their constitutions and/or statutes. Miller: *Reflections on Protecting Conscience for Health Care Providers*,

9

15 S. Cal. Rev. L. & Social Justice at 331.[6] The vast majority of state constitutions expressly define religious liberty in terms of conscience.[7] A few states, while not using the term "conscience," provide similar rights by protecting their citizens against state compulsion. Alabama Const. Art. I, Sec. 4; Iowa Const. Art. I, § 3; Md. Dec. of R. art. 36; W. Va. Const. Art. III, § 15. Some state constitutions contain a broad description of religious liberty, limited only by licentiousness or acts that would threaten public morals, peace and/or safety. Conn. Const. Art. I., Sec. 3; Fla. Const. Art. I, § 3; Md. Dec. of R. art. 36; Miss. Const. Ann. Art. 3, § 18. Several states essentially duplicate the language of the U.S. Constitution. Alaska Const. Art. I, § 4; HRS Const. Art. I, § 4; La. Const. Art. I, § 8; Mont. Const., Art. II § 5; S.C.

---

[6] When this article was published, forty-nine states had some form of conscience clause legislation, with variations as to which providers, institutions, procedures and payors were covered. Current detailed state-by-state information can be found at: https://www.consciencelaws.org/law/laws/usa.aspx#state (last visited 12/29/2022).

[7] *See* A.R.S. Const. Art. II, § 12; Ark. Const. Art. 2, § 24; Cal. Const. art. I, § 4; Colo. Const. Art. II, Section 4; Del. Const. art I, § 1; Ga. Const. Art. I, § I, Para. III-IV; Idaho Const. Art. I, § 4; Illinois Const., Art. I, § 3; Ind. Const. Art. 1, §§ 2, 3; Kan. Const. B. of R. § 7; Ky. Const. § 1; ALM Constitution Appx. Pt. 1, Art. II; Me. Const. Art. I, § 3; MCLS Const. Art. I, § 4; Minn. Const. art. 1, § 16; Mo. Const. Art. I, § 5; Ne. Const. Art. I, § 4; Nev. Const. Art. 1, § 4; N.H. Const. Pt. FIRST, Art. 4 and Art. 5; N.J. Const., Art. I, Para. 3; N.M. Const. Art. II, § 11; NY CLS Const Art I, § 3; N.C. Const. art. I, § 13; N.D. Const. Art. I, § 3; Oh. Const. art. I, § 7; Ore. Const. Art. I, §§ 2, 3; Pa. Const. Art. I, § 3; R.I. Const. Art. I, § 3; S.D. Const. Article VI, § 3; Tenn. Const. Art. I, § 3; Tex. Const. Art. I, § 6; Utah Const. Art. I, § 4; Vt. Const. Ch. I, Art. 3; Va. Const. Art. I, § 16; Wash. Const. art. 1, § 11; Wis. Const. Art. I, § 18; Wyo. Const. Art. 1, § 18.

Const. Ann. Art. I, § 2. Oklahoma's unique language provides for "perfect toleration of religious sentiment" and mode of worship and prohibits any religious test for the exercise of civil rights. Okl. Const. Art. I, § 2.

State courts also acknowledge rights of conscience, but typically weigh those rights against compelling state interests. Conscience has been defined as "that moral sense which dictates . . . right and wrong." *Harden v. State*, 216 S.W.2d 708, 711 (Tenn. 1948) (handling of poisonous snakes could be regulated to protect public health and safety). "Freedom of conscience" is a "fundamental right of every citizen . . . [d]eeply rooted in the constitutional law of Minnesota." *Rasmussen v. Glass*, 498 N.W.2d 508, 515 (Minn. Ct. App. 1993) (ruling in favor of deli owner who refused delivery to abortion clinic). *See also In re Williams*, 152 S.E.2d 317, 326 (N.C. 1967) (free exercise includes protection against government compulsion to do what one's religious beliefs forbid, but it is not absolute); *Frank v. State*, 604 P.2d 1068, 1070 (Alaska 1979) (religiously compelled actions can be forbidden only where they substantially threaten public safety, peace or order); *First Covenant Church v. City of Seattle*, 840 P.2d 174, 187 (Wash. 1992) (city's interest in preservation of aesthetic and historic structures was not compelling enough to burden church's rights to religion and free speech); *Humphrey v. Lane*, 728 N.E.2d 1039, 1043 (Ohio 2000) (ruling in favor of corrections officer whose Native American religion required him to maintain long hair); *Guaranteed Auto Fin., Inc. v. Dir., ESD*, 92

11

Ark. App. 295, 299-300 (2005) (conditioning availability of unemployment benefits upon willingness to violate "cardinal principles" of religious faith effectively penalized free exercise); *Coulee Catholic Sch. v. Labor & Indus. Review Comm'n*, 768 N.W.2d 868, 886 (Wis. 2009) (first grade teacher's employment discrimination claim against Catholic school employer failed because her position was closely linked to the school's religious mission—noting the "extremely strong language" of the state constitution, "providing expansive protections for religious liberty")

**D.     Like many successful Free Exercise cases, this case involves *conscientious objectors*—not civil disobedience.**

"Actions speak louder than words" is a common idiom reflected in First Amendment precedent about expressive *conduct*. But does precedent against compelled *speech* apply to compelled *conduct*? Not necessarily. But mandating an act that violates conscience, where abstention would ordinarily *not* be illegal, is in some respects analogous to compelled speech. This is particularly true where the mandatory act associates the person with a specific viewpoint he does not hold. It is ordinarily not illegal to refrain from performing abortions. Compliance with the Mandate affirmatively associates a doctor with a pro-abortion viewpoint he or she does not hold. Much like compelled speech, the Mandate thus darkens the "fixed star in our constitutional constellation" that forbids any government official, "high or petty," from prescribing "what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word *or act* their faith

12

therein." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis added) (Pledge of Alliance combines speech and action).

Many winning cases decided prior to *Emp't Div., Ore. Dep't of Human Res. v. Smith*, 494 U.S. 872 (1990) involved conscientious objectors seeking freedom from state compulsion to commit an act against conscience. *See, e.g., Girouard v. United States,* 328 U.S. 61; *Sherbert v. Verner*, 374 U.S. 398 (1963) (Sabbath work); *Barnette,* 319 U.S. 624 (1943) (flag salute); *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (high school education). Losing plaintiffs, including *Smith*, are often "civil disobedience" claimants seeking to actively engage in illegal conduct, e.g., *Prince v. Massachusetts*, 321 U.S. 158 (1944) (child labor). *Lessons From Pharaoh*, 39 Creighton L. Rev. at 564. *Smith* repeatedly emphasized the *criminal* conduct at issue. *Smith,* 494 U.S. at 874, 878, 887, 891-892, 897-899, 901-906, 909, 911-912, 916, 921.

Conscientious objector claims are "very close to the core of religious liberty." *Lessons From Pharaoh*, 39 Creighton L. Rev. at 565, 611, 615-616. Individual medical professionals should never have to choose between allegiance to the state and faithfulness to God when their beliefs can be accommodated without sacrificing public peace or safety.

This Court's decision has broad ramifications for the myriad of other situations where legal mandates invade conscience and an exemption does not

threaten public peace or safety. In light of the high value courts, legislatures, and constitutions have historically assigned to conscience, it is imperative to protect medical professionals who decline to perform morally objectionable acts such as abortion.

### III.   THE GUIDANCE IS ARBITRARY AND CAPRICIOUS BECAUSE HHS FAILED TO CONSIDER OUR *FIRST* LIBERTY: RELIGIOUS FREEDOM.

The laws governing reproductive freedom have changed dramatically over the years. At one time the states were free to outlaw contraception or limit it to married couples. That changed in two key Supreme Court decisions preceding *Roe v. Wade*. *See Griswold v. Connecticut*, 381 U.S. 479, 485 (1965) (recognizing right of married couples to use contraception due to the "zone of privacy" in that relationship); *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) (extending the right to single persons). But none of these rulings created corollary rights to draft unwilling accomplices. In the companion case to *Roe v. Wade*, the Supreme Court left intact Georgia's statutory protections for health care workers who object to participating in abortions. *Doe v. Bolton*, 410 U.S. 179, 205 (1973); Ga. Crim. Code § 26-1202(e) (1968). But the Mandate now threatens to compel an individual doctor to become a de facto accomplice to a morally objectionable procedure. The mandate grates against the Constitution, threatening crippling penalties and essentially banning people of faith from full participation in society. This is tantamount to a statement that "no religious

believers who refuse to [perform abortion] may be included in this part of our social life." *Lessons From Pharaoh*, 39 Creighton L. Rev. at 573.

### A.    Abortion is a highly controversial, divisive issue.

Many deeply religious people view abortion as a grave moral wrong. Concerned citizens across the country have enacted regulations, including informed consent, parental notice, waiting periods, and laws regulating medical personnel and facilities. The ensuing legal challenges are legion. But the very enactment of such restrictions is evidence that Americans are profoundly troubled and deeply divided. Even with the issue returned to the states, deep division remains.

Whatever "reproductive rights" exist under federal or state law, such rights do not trump the inalienable First Amendment rights of those who cannot in good conscience support—let alone facilitate—those rights. Between *Roe* and *Dobbs*, such rights were plucked out of obscure corners of the Constitution. There was deep disagreement over their continued viability, and the debate continues. Americans on both sides of the debate are entitled to express their respective positions. The government itself may adopt a position, but it violates the Constitution to compel individuals to facilitate or perform morally objectionable services contrary to conscience. This severe intrusion on liberty of conscience cannot be justified.

15

**B.    Religious freedom should not be dismantled to compel individual doctors to perform abortions.**

The First Amendment protects against government coercion to endorse or subsidize a cause. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *Barnette*, 319 U.S. 624. The government has no power to force a *speaker* to support or oppose a particular viewpoint. *Hurley v. Irish-American Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 575 (1995). Here, the Mandate goes even further by demanding that medical professionals perform a morally objectionable procedure that associates them with a viewpoint their abhor. Religious liberty collapses under the weight of secular ideologies that employ the strong arm of the state to advance their causes, promoting tolerance and respect for some while ruthlessly suppressing others. Michael W. McConnell, *"God is Dead and We have Killed Him!" Freedom of Religion in the Post-Modern Age*, 1993 BYU L. Rev. 163, 186-188 (1993).

America was founded by people who risked their lives to escape religious tyranny and observe their faith free from government intrusion. Congress has ranked religious freedom "among the most treasured birthrights of every American." Sen. Rep. No. 103-111, 1st Sess., p. 4 (1993), reprinted in 1993 U.S. Code Cong. & Admin. News, at pp. 1893-1894. As the Supreme Court observed, "[t]he struggle for religious liberty has through the centuries been an effort to accommodate the demands of the State to the conscience of the individual." *Girouard v. United States*, 328 U.S. at 68. "[T]he product of that struggle" was the First Amendment's

protection for religious liberty. *Id*. We dare not sacrifice priceless American freedoms through misguided—or even well-intentioned—efforts to broaden access to abortion. Religious citizens and organizations have not forfeited their right to live and pursue their missions in a manner consistent with their faith and conscience.

### C.    Accommodation of a medical professional's conscience does not threaten any person's fundamental rights.

Abortion is no longer considered a fundamental right. It is not mentioned in the Constitution, nor is it "implicitly protected by any constitutional provision." *Dobbs*, 142 S. Ct. at 2242. No such right is "deeply rooted in this Nation's history and tradition" or "implicit in the concept of ordered liberty." *Id*., quoting *Washington v. Glucksberg*, 521 U.S. 701, 721 (1997). Accommodation of conscientious objections to abortion cannot threaten a right that does not exist.

The Abortion Mandate was created by an executive agency (HHS) and seemingly grants a "right" to abortion under defined circumstances. But this "right" pales in comparison to the religious liberty explicitly protected by the First Amendment as well as RFRA, and it would render objecting medical professionals complicit in a procedure they believe is tantamount to infanticide.

Even if abortion were given the status of a legal right, no private party is obligated to facilitate it for another person. Nor is the government obligated to finance abortion or ensure the most convenient access. Even while *Roe* remained on the books, the state could prefer childbirth and allocate resources accordingly.

17

*Harris v. McRae,* 448 U.S. 297, 315 (1980); *Rust v. Sullivan*, 500 U.S. 173, 201 (1991). The government has "no affirmative duty to 'commit any resources to facilitating abortions.'" *Id.*, quoting *Webster v. Reprod. Health Servs.,* 492 U.S. 490, 511 (1989); *see Bowen v. Kendrick,* 487 U.S. 589, 596-597 (1988) (upholding Adolescent Family Life Act's restriction of funding to "programs or projects which do not provide abortions or abortion counseling or referral").

## IV.    THE GUIDANCE AND RELATED MANDATE DEMONSTRATE HOSTILITY TO RELIGIOUS LIBERTY AND CONSCIENCE.

Courts have a "duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people." *Lee v. Weisman*, 505 U.S. at 592. The Guidance attacks conscience, penalizing medical professionals who cannot in good conscience perform abortions. But "[n]o person can be punished for entertaining or professing religious beliefs or disbeliefs . . . ." *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15-16 (1947). A citizen may not be excluded from a profession, such as medicine, by unconstitutional criteria. *Baird v. State Bar of Arizona*, 401 U.S. 1, 6-7 (1971) (attorney); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 607 (1967) (professor).

The First Amendment demands government neutrality so that each religious creed may "flourish according to the zeal of its adherents and the appeal of its dogma." *Zorach v. Clauson*, 343 U.S. 306, 313 (1952). The Mandate guts the First Amendment, brazenly exhibiting the "callous indifference" to religion never

intended by the Establishment Clause. *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984), citing *Zorach,* 343 U.S. at 314. The Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Id*.

Even in the commercial sphere, believers do not forfeit their constitutional rights. The Mandate is hostile to people of faith, effectively squeezing them out of full participation in civic life. *Lessons From Pharaoh*, 39 Creighton L. Rev. at 561-563. Religion does not end where daily life begins. When religion is shoved to the private fringes of life, constitutional guarantees ring hollow. McConnell, *"God is Dead and We have Killed Him!"*, 1993 BYU L. Rev. at 176. Morality necessarily intersects the public realm. All individuals and businesses should be free to operate with a high level of honesty and integrity in dealing with the persons they serve.

Conflicts between religion and regulation typically occur in settings beyond the walls of a church. These conflicts may involve either religious citizens who own a business or non-church organizations established for religious purposes:

- *Braunfeld v. Brown,* 366 U.S. 599 (1961) (Sunday closing)
- *Sherbert v. Verner,* 374 U.S. 398 (unemployment benefits)
- *United States v. Lee*, 455 U.S. 252 (1982) (Amish business)
- *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290 (1985) (employment laws)
- *State ex rel. McClure v. Sports & Health Club, Inc.,* 370 N.W.2d 844, 853 (Minn. 1985) (hiring)
- *Rasmussen v. Glass,* 498 N.W.2d 508 (food delivery)

- *Swanner v. Anchorage Equal Rights Comm'n,* 874 P.2d 274 (Alaska 1994) (housing)
- *Attorney Gen. v. Desilets*, 636 N.E.2d 233 (Mass. 1994) (same)
- *Catholic Charities of Sacramento, Inc. v. Superior Court*, 85 P.3d 67, 93 (Cal. 2004) (charitable work).

Some claimants succeeded (*Sherbert, Rasmussen, Desilets*), while others did not (*Braunfeld, Lee, Alamo Found., McClure, Swanner, Catholic Charities*). The "commercial" factor did not dictate the outcome.

United States v. Lee is often cited to oppose religious exemptions in the commercial sphere. *See, e.g., Catholic Charities of Sacramento,* 85 P.3d at 93. But *Lee* does not hold that believers forfeit their constitutional rights when they step beyond the borders of a church. The frequently cited language, in context, states that "*every* person cannot be shielded from *all* the burdens incident to exercising *every* aspect of the right to practice religious beliefs." *United States v. Lee*, 455 U.S. at 261 (emphasis added). Religious freedom is not abrogated in the public square—and where religious professionals serve the community, they are surely entitled to provide services in a manner consistent with their faith.

## V.    THE ADMINISTRATION CANNOT SATISFY THE DEMANDING "COMPELLING INTEREST" OR "LEAST RESTRICTIVE MEANS" PRONGS OF RFRA.

"RFRA broadly prohibits the Federal Government from violating religious liberty. See 42 U.S.C. §2000bb-1(a)." *Little Sisters*, 140 S. Ct. at 2389 (Alito, J., concurring). Protection for religious liberty covers every "branch, department,

agency, [and] instrumentality" of the Federal Government, including any "person acting under the color of" federal law. §2000bb-2(1). It also extends to the "implementation" of the law. §2000bb-3(a).

In some cases, there is a "difficult moral question" about "where to draw the line in a chain of causation that leads to objectionable conduct," and courts "cannot override the sincere religious beliefs of an objecting party on that question." *Little Sisters*, 140 S. Ct. at 2391 (Alito, J., concurring); see *Hobby Lobby*, 573 U.S. 15 723-726; *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 715-716 (1981). Here, there are no such difficulties. The doctor does not merely participate in a "chain of causation." The Guidance demands personal participation—a doctor "must provide" an abortion in response to a specifically defined emergency medical condition.

There is also no difficulty in ascertaining the weight of the burden. The Guidance imposes monetary penalties and exclusion from federal funding that are indisputably "substantial" burdens. Accordingly, the government must "demonstrate[] that application of the burden to *the [doctor]*—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§2000bb-1(a), (b) (emphasis added); *Hobby Lobby*, 573 U.S. at 705. Following *Hobby Lobby*, the Supreme Court's "decisions all but instructed the Departments [of Health and

Human Services, Labor, and the Treasury] to consider RFRA going forward." *Little Sisters*, 140 S. Ct. at 2383. In this case, as in *Little Sisters*, "[i]t is hard to see how the Departments could promulgate rules consistent with these decisions if they did not overtly consider these entities' rights under RFRA." *Id*.

## A.    HHS cannot satisfy the compelling interest prong.

The government "must clear a high bar" to establish a compelling state interest. *Little Sisters*, 140 S. Ct. at 2392 (Alito, J., concurring). Drawing from *Sherbert v. Verner*, the decision codified in RFRA, "'only the gravest abuses, endangering paramount interests'" justifies the limitation of free exercise. *Id*. at 406, quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945). To establish that it has a "compelling interest" in forcing unwilling doctors to perform abortions, the Government would have to show that it would commit one of "the gravest abuses" of its responsibilities if it did not exercise such coercion over objecting doctors. That is totalitarian nonsense—it is the coerced performance of abortion that would constitute one of "the gravest abuses" of government power this country has ever seen.

The Supreme Court has carefully explained that a heavy burden falls on the *government* to show a compelling interest in applying the challenged law to "the *particular claimant* whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S.

418, 430-431 (2006) (quoting §2000bb-1(b)) (emphasis added). That means the government must "scrutinize[] the asserted harm of granting *specific* exemptions to *particular* religious claimants" (*id*. at 431, emphasis added)—here, the religious medical professionals who object to performing abortions. There is no indication that the government could possibly meet jump such a high hurdle.

### B.    HHS cannot satisfy the least restrictive means prong.

In the *Hobby Lobby* briefing, the administration asserted a "compelling" interest in "gender equality." *Hobby Lobby*, 573 U.S. at 726. The Court found that interest was too broadly formulated. *Id*. Instead, the government must "specifically identify an 'actual problem' in need of solving" and show that the burden on the particular claimant's rights is "actually necessary" for the solution. "Predictive judgment[s]" and "ambiguous proof" are insufficient. Helen Alvaré, *No Compelling Interest: The "Birth Control" Mandate and Religious Freedom*, 58 Vill. L. Rev. 379, 432 (2013), quoting *Brown v. Entertainment Merchants Association*, 131 S. Ct. 2729, 2738-2739 (2011). Nevertheless, the Supreme Court assumed—*solely for the sake of argument*—that the government had a compelling interest and then tackled the least restrictive means analysis. *Hobby Lobby*, 573 U.S. at 728. The Mandate could not meet the challenge. "The least-restrictive-means standard is exceptionally demanding . . . and it is not satisfied here. HHS has not shown that it lacks other

23

means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties in these cases." *Id.*

## CONCLUSION

This Court should affirm the District Court's holding.

DATED:  July 7, 2023                          /s/Deborah J. Dewart
                                              Deborah J. Dewart, Attorney at Law
                                              111 Magnolia Lane
                                              Hubert, NC  28539
                                              lawyerdeborah@outlook.com
                                              (910) 326-4554 (phone)
                                              Counsel for *Amicus Curiae*
                                              *Institute for Faith and Family*

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2023, an electronic copy of the foregoing brief was filed with the Clerk of this Court using the CM/ECF system, which will serve all counsel of record.

/s/Deborah J. Dewart
Deborah J. Dewart

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,572 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman 14-point font in text and Times New Roman 14-point font in footnotes produced by Microsoft Word software.

/s/Deborah J. Dewart
Deborah J. Dewart

## ECF CERTIFICATIONS

I certify that the required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13, the electronic submission is an exact copy of the paper submission, and the document has been scanned for viruses and is free of viruses.


/s/Deborah J. Dewart
Deborah J. Dewart