No. 23-10246

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS &
GYNECOLOGISTS; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS,
*Plaintiffs-Appellees*,

v.

XAVIER BECERRA; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES; CENTERS FOR MEDICARE AND MEDICAID SERVICES; KAREN L. TRITZ;
DAVID R. WRIGHT,
*Defendants-Appellants*.

**On Appeal from the United States District Court for the
Northern District of Texas, Lubbock Division, No. 5:22-CV-185-H**

**BRIEF OF AMICI CURIAE ADVANCING AMERICAN FREEDOM; 40 DAYS FOR
LIFE; AMERICAN VALUES; ANGLICANS FOR LIFE; CENTER FOR POLITICAL
RENEWAL; CENTER FOR URBAN RENEWAL AND EDUCATION; CHARLIE
GEROW; CHRISTIANS ENGAGED; GLOBAL LIBERTY ALLIANCE;
INTERNATIONAL CONFERENCE OF EVANGELICAL CHAPLAIN ENDORSERS;
JAMES DOBSON FAMILY INSTITUTE; MINNESOTA FAMILY COUNCIL; MISSOURI
CENTER-RIGHT COALITION; MONTANA FAMILY FOUNDATION; MY FAITH
VOTES; NATIONAL CENTER FOR PUBLIC POLICY RESEARCH; NEW JERSEY
FAMILY POLICY CENTER; FRONTLINE POLICY COUNCIL; PROJECT 21 BLACK
LEADERSHIP NETWORK; SAMARITAN'S PURSE; STUDENTS FOR LIFE OF
AMERICA; THE CHRISTIAN LAW ASSOCIATION; THE CORNWALL ALLIANCE
FOR THE STEWARDSHIP OF CREATION; THE FAMILY FOUNDATION; THE
JUSTICE FOUNDATION; AND YOUNG AMERICA'S FOUNDATION SUPPORTING
PLAINTIFFS-APPELLEES AND AFFIRMANCE**

J. MARC WHEAT
  *Counsel of Record*
ADVANCING AMERICAN FREEDOM, INC.
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 780-4848
MWheat@advancingamericanfreedom.com

*Counsel for Amici Curiae*

July 7, 2023

## SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS
## FIFTH CIRCUIT RULE 29.2

The undersigned counsel certifies that the following persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

J. Marc Wheat, General Counsel for Advancing American Freedom, Amicus Curiae. The undersigned counsel also certifies that Amici Curiae, Advancing American Freedom, 40 Days For Life; American Values; Anglicans For Life; Center For Political Renewal; Center For Urban Renewal And Education; Charlie Gerow; Christians Engaged; Global Liberty Alliance; International Conference Of Evangelical Chaplain Endorsers; James Dobson Family Institute; Minnesota Family Council;  Missouri Center-Right Coalition; Montana Family Foundation; My Faith Votes; National Center For Public Policy Research; New Jersey Family Policy Center; Frontline Policy Council; Project 21 Black Leadership Network; Samaritan's Purse; Students For Life Of America; The Christian Law Association; The Cornwall Alliance For The Stewardship Of Creation; The Family Foundation; The Justice Foundation; And Young America's Foundation are nonprofit corporations that have no parent corporations, are not publicly held corporations, and do not issue stock.

DATED: July 7, 2023        /s/ J. Marc Wheat
                           J. Marc Wheat
                           General Counsel for Advancing American Freedom

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS ........................ i

TABLE OF AUTHORITIES ................................................................... iv

IDENTITY AND INTEREST OF AMICI CURIAE ............................................ 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................ 2

ARGUMENT .................................................................................... 6

I.    The CMS's Interpretation of EMTALA is Not Entitled to Deference
      Because *Chevron* Violates Basic Constitutional Principles and Statutory
      Requirements and Thus Ought to be Overturned ......................... 6

II.   The Guidance is Not Entitled to Deference Because it Does Not Meet
      the Requirements of the Current *Chevron* Doctrine ...................... 9

      A.    HHS's interpretation in this case should be struck down because it
            was promulgated in a manner inconsistent with the APA and was not
            the product of significant agency consideration ...................... 9

      B.    CMS's Guidance is not entitled to deference because it is designed to
            settle a major question of great political and social significance
            without clear congressional authorization to do so ............... 14

            1.    The Department of Health and Human Services' Interpretation
                  of EMTALA is not entitled to deference because it seeks to
                  settle an issue of great political significance and because it
                  seeks to intrude into a specific domain of state law ...................... 15

            2.    The Relevant Language of EMTALA Upon Which HHS Relies
                  is Neither a Clear Statement of Authority to Regulate the
                  Politically Contentious Abortion Issue nor is it a Clear
                  Statement of Authority to Preempt State Law ............... 20

III.  The Guidance Should be Set Aside Under *Skidmore* Deference Because it
      is a Blatant Misreading of EMTALA's Language ......................... 24

IV.  The CMS Guidance is Arbitrary and Capricious Because the Guidance
     Entirely Failed to Consider an Important Aspect of the Problem and Thus
     Must Be Set Aside ........................................................................................ 25

CONCLUSION ................................................................................................. 27

CERTIFICATE OF COMPLIANCE ..................................................................... 28

ECF CERTIFICATIONS ...................................................................................... 29

CERTIFICATE OF SERVICE .............................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*Alabama Association of Realtors v. HHS*,
   141 S. Ct. 2485 (2021) ....................................................................15

*Barnhart v. Walton*,
   535 U.S. 212 (2002) ......................................................... 10, 11, 12, 13

*Biden v. Nebraska*,
   600 U.S. _____ (2023) .........................................................................4

*Brown v. U.S. Dep't of Educ.*,
   2022 WL 16858525 (N.D. Tex. Nov. 10, 2022), cert. granted before judgment
   sub nom. *Dep't of Educ. v. Brown*, 143 S. Ct. 541 (2022). ...............................4, 5

*Buffington v. McDonough*,
   143 S. Ct. 14 (2022) ...........................................................................8

*Chevron U.S.A. Inc v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984) ............................................. 1, 5, 6, 7, 8, 9, 10, 24

*Crosby v. National Foreign Trade Council*,
   530 U.S. 363 (2000) .........................................................................20

*Cruzan by Cruzan v. Dir., Missouri Dep't of Health*,
   497 U.S. 261 (1990) .........................................................................26

*Dep't of Educ. v. Brown*,
   143 S. Ct. 541 (2022) ..........................................................................5

*Dobbs v. Jackson Women's Health*,
   142 S. Ct. 2228 (2022) ...................................................... 2, 16, 17, 18, 26

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) .................................................................. 5, 8, 10

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ............................................................................6

*FTC v. Bunte Brothers, Inc.*,
  312 U.S. 349 (1941)....................................................................23

*Goodman v. Sullivan*,
  891 F.2d 449 (2d Cir. 1989) ................................................ 12, 22

*Gonzales v. Carhart*,
  550 U.S. 124 (2007).................................................................26

*Gonzales v. Oregon*,
  546 U.S. 243 (2006).................................................................15

*Hardy v. New York City Health & Hospitality Corp.*,
  164 F.3d 789 (2d Cir. 1999) ...................................................19

*Harry v. Marchant*,
  291 F.3d 767 (11th Cir. 2002) ................................................20

*Heller v. Doe*,
  509 U.S. 312 (1993).................................................................18

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019).............................................................7

*Marbury v. Madison*,
  5 U.S. 137 (1803).....................................................................7

*Marshall ex rel. Marshall v. E. Carroll Par. Hosp. Serv. Dist.*,
  134 F.3d 319 (5th Cir. 1998) ..................................................21

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*,
  463 U.S. 29 (1983)...................................................................25

*NFIB v. OSHA*,
  142 S. Ct. 661 (2022).................................................. 4, 14, 15, 16

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015).....................................................................7

*Planned Parenthood of Southeastern Pennsylvania v. Casey*,
   505 U.S. 833 (1992) ............................................................................. 17

*Rodriguez v. Laredo Reg'l Med. Ctr., L.P.*,
   No. 5:21-CV-43, 2021 WL 7906834 (S.D. Tex. July 12, 2021) ......................... 19

*Roe v. Wade*,
   410 U.S. 113 (1973) .................................................................. 2, 14, 16

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ............................................................................ 24

*Texas v. Becerra*,
   No. 5:22-CV-185-H, 2022 WL 3639525 (N.D. Tex. Aug. 23, 2022) .... 11, 12, 14,
   19, 20, 21, 22, 23, 25

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) .............................................................. 5, 8, 10, 24

*Utility Air Regulatory Group v. EPA*,
   573 U.S. 302 (2014) ............................................................................ 23

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) .................................... 2, 6, 14, 15, 16, 17, 20, 21, 22, 23

*Whitman v. American Trucking Associations*,
   531 U.S. 457 (2001) ............................................................................ 21

## Constitution and Statutes

5 U.S.C. § 553 ......................................................................... 5, 8, 12

5 U.S.C. § 553(b)-(c) ...................................................................... 10

5 U.S.C. § 706 ................................................................................ 8

5 U.S.C. § 706(2)(a) ........................................................................ 25

42 U.S.C. § 1393hh(a)(2) ................................................................. 5, 10

42 U.S.C. § 1395dd ............................................................................26

42 U.S.C. § 1395dd(a) ..........................................................................3

42 U.S.C. § 1395dd(b)(1) ......................................................................3

42 U.S.C. § 1395dd(b)(1)(A)-(1)(B) ....................................................18

42 U.S.C. § 1395dd(c)(1)(ii) ................................................................18

42 U.S.C. § 1395dd(c)(1)(A)(ii) ................................................. 3, 4, 11

42 U.S.C. § 1395dd(c)(1)(A)(iii) ...........................................................3

42 U.S.C. § 1395dd(f) ..........................................................................18

42 U.S.C. § 1395hh(a)(2) ......................................................................24

42 U.S.C. § 1395hh(b) ..........................................................................24

Mass. Const. pt. 1, art. XXX ..................................................................6

Tex. Health & Safety Code Ann. § 170A.002 (West) ...........................26

Tex. Health & Safety Code Ann. § 170A.002(b) (West) .......................19

U.S. Const. Art. II § 1 cl. 1 ....................................................................5

U.S. Const. Art. II § 3 .............................................................................5

**Regulations**

Actions - H.R.3128 - 99th Congress (1985-1986): Consolidated Omnibus Budget
  Reconciliation Act of 1985, H.R.3128, 99th Cong. (1986),
  https://www.congress.gov/bill/99th-congress/house-bill/3128/actions ...............23

Executive Order 14,076. 87 Fed. Reg. 42,053 (July 8, 2022) .............................2, 16

**Other Authorities**

E. Gellhorn & P. Verkuil, *Controlling Chevron-Based Delegations*, 20 Cardozo L. Rev. 989 (1999) ..................................................................................................2

Letter to Health Care Providers, SECRETARY OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-providers.pdf.........................................................................2

*Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, CENTERS FOR MEDICARE & MEDICAID SERVICES (July 11, 2022), https://www.cms.gov/files/document/qso-22-22-hospitals.pdf.............................................................................................................3

**IDENTITY AND INTEREST OF AMICI CURIAE**[*]

Amici Advancing American Freedom; 40 Days For Life; American Values; Anglicans For Life; Center For Political Renewal; Center For Urban Renewal And Education; Charlie Gerow; Christians Engaged; Global Liberty Alliance; International Conference Of Evangelical Chaplain Endorsers; James Dobson Family Institute; Minnesota Family Council;  Missouri Center-Right Coalition; Montana Family Foundation; My Faith Votes; National Center For Public Policy Research; New Jersey Family Policy Center; Frontline Policy Council; Project 21 Black Leadership Network; Samaritan's Purse; Students For Life Of America; The Christian Law Association; The Cornwall Alliance For The Stewardship Of Creation; The Family Foundation; The Justice Foundation; and Young America's Foundation educate the public on the wisdom of America's Constitutional order and believe this case permits the Court to clearly articulate that the Defendants-Appellants do not merit judicial deference under *Chevron v. NRDC*, 467 U.S. 837 (1984).

---

[*] All parties received timely notice and have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part. No person other than Amicus Curiae and its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

**INTRODUCTION AND SUMMARY OF THE ARGUMENT**

The genius of the Constitution is its structure, dividing power against itself into three coequal branches to protect the liberties of its citizens from government overreach. Administrative agencies may only act within the confines of the power granted to them by Congress. "'Enabling legislation' is generally not an 'open book to which the agency may add pages and change the plot line.'" *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (quoting E. Gellhorn & P. Verkuil, *Controlling Chevron-Based Delegations*, 20 Cardozo L. Rev. 989, 1011 (1999)).

On June 24, 2022, the Supreme Court issued its opinion in *Dobbs v. Jackson Women's Health*, 142 S. Ct. 2228 (2022), overturning *Roe v. Wade*, 410 U.S. 113 (1973). In response to the *Dobbs* decision, President Biden issued Executive Order 14,076. 87 Fed. Reg. 42,053 (July 8, 2022). Only three days later, on July 11, the Secretary of Health and Human services (HHS) issued a letter asserting to health care providers that federal law "protects [their] clinical judgment and the action that [they] take to provide stabilizing medical treatment to [their] pregnant patients, regardless of the restrictions in the state where [they] practice."[1] The Centers for Medicare and Medicaid Services (CMS) issued Guidance in conjunction with the Secretary's letter, instructing participating doctors and hospitals that, under the

---

[1] Letter to Health Care Providers, SECRETARY OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-providers.pdf (last visited March 24, 2023).

Emergency Medical Treatment and Labor Act (EMTALA), they are required to provide abortions as a "stabilizing treatment" or transfer the woman to another medical facility that can do so, if they determine that doing so is necessary to protect the life of the mother, even if providing the abortion would be contrary to state law.[2] The Guidance threatens noncompliant doctors and hospitals with hefty penalties. Guidance at 5. If given effect, this interpretation would expand the meaning of the 1986 statute to include abortions as a form of treatment and would illegally overwrite legitimate state laws designed to protect women and the unborn.

EMTALA imposes three basic requirements on physicians and hospitals when a patient enters an emergency department seeking care. First, they must screen the patient "to determine whether an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a). Then they must either provide necessary stabilizing treatment for the person or transfer the individual to another medical facility. 42 U.S.C. § 1395dd(b)(1). Among other requirements, a transfer under section (b) may not occur unless the doctor certifies that the medical benefits of transferring the patient outweigh the increased risks of doing so. 42 U.S.C. § 1395dd(c)(1)(A)(iii). Further, if the emergent situation is labor, the doctor must also consider the risk of the transfer "to the unborn child." 42 U.S.C.

---

[2] *Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, CENTERS FOR MEDICARE & MEDICAID SERVICES (July 11, 2022), https://www.cms.gov/files/document/qso-22-22-hospitals.pdf (last visited March 24, 2023).

§ 1395dd(c)(1)(A)(ii). The Guidance issued by CMS tells doctors and hospitals that, when treating pregnant women with emergency conditions, EMTALA requires them to perform abortion as a "stabilizing medical treatment," if it is deemed necessary, and that any state law to the contrary is preempted. Guidance at 1. However, nothing in the language of EMTALA requires that doctors and hospitals provide abortion as a form of "treatment."

This Guidance is part of a pattern of Biden Administration behavior to expand the power of the executive branch through dubious claims. Where Congress is unwilling to act on one of the President's policy priorities, the administrative state is there to fill the gap. Two notorious examples of this overreach have been struck down by the Supreme Court in the last two years. The first is the Occupational Safety and Health Administration's (OSHA) workplace vaccine mandate, which the Supreme Court struck down in 2022 because it exceeded the agency's statutory authority. *NFIB v. OSHA*, 142 S. Ct. 661 (2022). The second, the Administration's effort to unilaterally cancel student loan debt, was struck down in 2023 for exceeding the Department of Education's statutory authority. *Joseph R. Biden, President of the United States, et al. v. Nebraska, et al.* 600 U.S. ___ (2023). Here, the Biden Administration seeks to preempt constitutional laws enacted by states as an exercise of their legitimate interests in unborn life and maternal health.

The executive power is clear in the Constitution. It is granted to the President, not lower executive branch officials, U.S. Const. Art. II § 1 cl. 1, and it is the President's responsibility to "take Care that the Laws be Faithfully executed." U.S. Const. Art. II § 3. To do so requires executing the laws as passed by Congress. When a presidential administration acts beyond the law as established by Congress, the courts have a duty to hold it to account.

Under the Administrative Procedure Act (APA) and the Social Security Act (SSA), HHS generally must comply with the notice and comment requirements in their promulgation of new regulations. *See* 5 U.S.C. § 553; 42 U.S.C. § 1393hh(a)(2). When they fail to do so, the rules they seek to impose are generally not entitled to judicial acquiescence, known as *Chevron* deference. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220 (2016) (*United States v. Mead Corp.*, 533 U.S. 218, 227 (2001)). *Chevron* deference is the doctrine under which courts defer to agency interpretations of ambiguous statutory law. *See Chevron U.S.A. Inc v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Chevron* deference should not apply in this case for several reasons. First, *Chevron* itself should be overturned because it violates the constitutional separation of powers. Second, *Chevron* deference does not apply when agencies fail to comply with notice and comment requirements. Finally, it does not apply in extraordinary cases where an agency asserts new and expanded power over an issue of great

economic or political significance. *See West Virginia*, 142 S. Ct. at 2608. In such cases, there is "'reason to hesitate before concluding that Congress' meant to confer such authority." *Id*. at 2608 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). There is reason to hesitate here. Finally, this Court should set aside the Guidance as arbitrary and capricious because the agency failed to consider the bodily integrity of the unborn child; an interest for which EMTALA expresses a clear concern.

## ARGUMENT

### I.   The CMS's Interpretation of EMTALA is Not Entitled to Deference Because *Chevron* Violates Basic Constitutional Principles and Statutory Requirements and Thus Ought to be Overturned.

The 1780 Massachusetts state constitution prohibited each of its government's three branches from exercising the powers of the other two so that, "it may be a government of laws and not of men." Mass. Const. pt. 1, art. XXX. When Congress delegates its authority to executive agencies, the risk increases that we will have a government of men (bureaucrats), and not of laws. This case demonstrates the danger posed by delegation which creates an opportunity for agency officials to pursue their political goals in flagrant disregard of the rule of law.

When the courts defer to agency interpretations of law, they abandon their constitutional responsibility. As Chief Justice John Marshall recognized, "It is

emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Similarly, Justice Thomas has noted, "Those who ratified the Constitution knew that legal texts would often contain ambiguities. . .The judicial power was understood to include the power to resolve these ambiguities over time. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 119 (2015) (Thomas, J. concurring) (citations omitted). When executive agencies' interpretations of statutes or regulations are granted deference, they are exercising the judicial power of final interpretation. Thus, *Chevron*, in effect, allows agencies to supersede the powers of both Congress and the federal courts, and thus the constitutional separation of powers.

The APA is a statute enacted by Congress to govern administrative agencies. As Justice Gorsuch notes, "some have even described [the APA] as a kind of constitution for our 'administrative state.'" *Kisor v. Wilkie*, 139 S. Ct. 2400, 2432 (2019) (Gorsuch, J. concurring). It requires that in most cases, for an agency to promulgate a new regulation, it must issue public notice of its intent to regulate and must allow for, and respond to, public comments on the proposed regulation. 5 U.S.C. § 553. If an agency fails to do so outside of limited statutory exceptions, courts must strike down the regulation on review. *Encino Motorcars*, 579 U.S. at 220 (*Mead Corp.*, 533 U.S. at 227). The APA itself echoes Chief Justice Marshall's sentiment above, requiring "reviewing courts to 'decide all relevant

questions of law' and 'set aside agency action . . . found to be . . . not in accordance with law.'" *Id*. at 2432 (Gorsuch, J. concurring) (quoting 5 U.S.C. § 706). Thus, both agencies and reviewing courts are bound by the requirements of the APA. When courts defer to agency interpretation, they supply executive agencies with greater authority than intended by Congress and allowed by the Constitution.

The type of harm caused by *Chevron* is well illustrated by *Buffington v. McDonough*, 143 S. Ct. 14 (2022) (Gorsuch, J. dissenting), in which the Court denied the certiorari petition of a veteran who had certain retroactive disability benefits payments withheld because of a Department of Veterans Affairs statutory interpretation. The lower "courts invoked '*Chevron* deference,' bypassed any independent review of the relevant statutes, and allowed the agency to continue to employ its rules to the detriment of veterans." *Id*. Although not every case that invokes *Chevron* deference is so dramatic, every time a court defers to agency interpretation, it violates both the APA and Article III, as well as the constitutional principle of separation of powers.

Deferring to CMS in this case would signal to agencies that their powers are not limited by statutory language but only by the bottomless bureaucratic imagination. The Biden Administration's attempts to use the administrative state to advance its political goals over and against the intent of Congress, the legitimate

interests of states, and the limits imposed by the constitution illustrate plainly the need for courts to abandon *Chevron* and reclaim their role under the APA and the Constitution as a check on the Executive branch of the national government.

## II.   The Guidance is Not Entitled to Deference Because it Does Not Meet the Requirements of the Current *Chevron* Doctrine.

Even if the Court's current *Chevron* precedent were applied, HHS's interpretation of EMTALA is not entitled to deference because it was promulgated without notice and comment, is contrary to the statutory scheme it interprets, is not the product of the agency's careful consideration, and addresses a major political question without clear authority from Congress.

### A.   HHS's interpretation in this case should be struck down because it was promulgated in a manner inconsistent with the APA and was not the product of significant agency consideration.

"*Chevron* deference is not warranted where the regulation is 'procedurally defective'—that is, where the agency errs by failing to follow the correct procedures in issuing the regulation." *Encino Motorcars*, 579 U.S. at 220 (*Mead Corp.*, 533 U.S. at 227). In this case, HHS failed to comply with the APA and the SSA's notice and comment requirement. When an agency attempts to issue a new regulation, it must publish a notice of proposed rulemaking in the Federal Register and must allow time and ability for interested persons to comment. 5 U.S.C. § 553(b)-(c). The SSA, applicable in this case, requires that "[n]o rule, requirement, or other statement of policy . . . that establishes or changes a

9

substantive legal standard governing the scope of benefits . . . shall take effect unless it is promulgated by the Secretary." 42 U.S.C. § 1393hh(a)(2). The Guidance, contrary to these statutory requirements, was issued without notice and comment despite substantially changing the obligations of doctors and hospitals in relation to state law and federal benefit and thus is not entitled to *Chevron* deference.

Furthermore, even though in some cases the Court has deferred to agency interpretations not promulgated through notice and comment rulemaking, the Court should not do so here. The Supreme Court in *Barnhart v. Walton* suggested that it would have deferred to that agency's interpretation even if it had not been issued through the notice and comment process. 535 U.S. 212, 222 (2002). *Barnhart* arose from a dispute over the statutory meaning of "inability," and the Social Security Administration's application of the term to limit certain benefits unless the person claiming them could show an inability to work for the relevant period of time. *Id*. at 214-15. There, the Court upheld the agency's interpretation based on "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time." *Id*. at 221-22. The Court's analysis in *Barnhart*

demonstrates the legal inadequacy of HHS's interpretation of EMTALA in this case.

The Court in *Barnhart* begins its analysis by noting that although the statutory language does not explicitly impose the interpretation adopted by the agency in that case, the agency's interpretation was "a fair inference from the statutory language." *Id*. at 219. On the other hand, in this case, the agency's interpretation is contrary to the implications of the statutory language. Under EMTALA, as noted above, the doctor is required to consider the health of the unborn child in considering whether to transfer a woman in labor to a different healthcare facility. 42 U.S.C. § 1395dd(c)(1)(A)(ii). As the district court notes, "EMTALA leaves that balancing to doctors, who must comply with state law." *Texas v. Becerra*, No. 5:22-CV-185-H, 2022 WL 3639525, at *26 (N.D. Tex. Aug. 23, 2022). That concern is expressed in the context of making the determination whether a woman in labor should be transferred to another medical facility, but the natural inference is that that concern would extend earlier in the life of the unborn and not, as the Guidance in this case would require, that that concern is absent before labor begins. In fact, the Guidance does not even make an exception to its own rule for emergent situations that involve a woman in labor.[3] Where in

---

[3] *See* Guidance at 3-4. The Guidance quotes the statutory language requiring doctors to consider the benefits and risks of transfer to both the mother and the

*Barnhart* the agency's interpretation of the statutory language was a reasonable inference from the text, here the interpretation runs counter to the natural inference that the life and wellbeing of the unborn deserves consideration in a doctor's analysis of the emergent situation experienced by the mother.

Second, in its analysis in *Barnhart*, the Court said that the agency's interpretation was permissible and "makes considerable sense in terms of the statute's basic objectives." *Id.* at 219. The Court noted that "the statute demands some duration requirement." *Id.* Here, far from demanding further interpretation, the statutory language is clear. The hospital and doctor must provide stabilizing treatment or transfer in emergency situations and, when that situation is labor, must consider the wellbeing of the child. 5 U.S.C. § 553 Further, the determination of what treatment is appropriate is left up to doctors, not the agency. *Texas v. Becerra*, 2022 WL 3639525, at *25 (quoting *Goodman v. Sullivan*, 891 F.2d 449, 451 (2d Cir. 1989)). Here, as described above, the agency's interpretation seeks to impose abortion as a treatment on doctors. If a doctor chooses not to provide an abortion in an emergency situation, either because of state law or because of his own professional judgment about what is best for the wellbeing of the mother and the child, and the Government, in hindsight, decides that abortion was the appropriate "treatment" in that situation, the doctor and hospital could be subject to

---

child, but in the rest of the document, directs hospitals' and doctors' treatment without regard to that language.

significant penalties. See Guidance at 5. This disregards two of the statute's "basic objectives:" to protect the wellbeing of the unborn and the discretion of doctors to choose treatment for their patients. Congress does not pass laws that expressly protect a particular interest with the expectation that administrative agencies may undermine those interests, especially through the issuance of a six-page Guidance document with no opportunity for public feedback or agency response to that feedback. Thus, because it directly conflicts with the interests protected by the statute, CMS's Guidance and its interpretation cannot be important to the administration of the statute.

Finally, unlike the Social Security Administration's interpretation in *Barnhart*, CMS's interpretation here is novel. In *Barnhart*, the Court found that "the Agency's interpretation is one of longstanding," because the agency had adopted the interpretation as far back as 1957, forty years before the question arose in that case. *Barnhart*, 535 U.S. at 220-21. In this case, though, the interpretation promulgated by CMS in its guidance is novel and is not the product of careful agency consideration. As the district court in this case notes, "EMTALA has never been construed to preempt state abortion laws." *Texas v. Becerra*, 2022 WL 3639525, at *28. This, "'lack of historical precedent' is another marker that the Guidance establishes a new substantive legal standard." *Id*. at *26 (quoting *NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022)). Rather than the continuation of a long-

established interpretation, CMS's Guidance is clearly a result of a policy disagreement with states' legitimate efforts to protect the lives of the unborn in the wake of the overruling of *Roe v. Wade*, 410 U.S. 113 (1973).

The agency's interpretation of EMTALA in its Guidance violates the requirements of the APA and SSA, is inconsistent with the statutory language and scheme, and is entirely novel. Thus, even though the Court has not always required compliance with notice and comment before granting deference to agency interpretation, it should not defer here.

**B.    CMS's Guidance is not entitled to deference because it is designed to settle a major question of great political and social significance without clear congressional authorization to do so.**

If an agency's interpretation of a statute it administers triggers what has been called the major questions doctrine, the agency will need to show a clear statement of authority from Congress for that interpretation before the reviewing court may defer to the agency's interpretation. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2621 (2022) (Gorsuch, J. concurring).

1.    The Department of Health and Human Services' Interpretation of EMTALA is not entitled to deference because it seeks to settle an issue of great political significance and because it seeks to intrude into a specific domain of state law.

In *West Virginia v. EPA*, the Court's most recent case addressing the major questions doctrine, Justice Gorsuch in his concurrence found three situations in which an agency interpretation triggers the major questions doctrine, two of which

14

are relevant here. *Id*. at 2620-21. First, there must be a clear statement "when an agency claims the power to resolve a matter of great 'political significance,' or end an "earnest and profound debate across the country,'" *West Virginia v. EPA*, 142 S. Ct. 2587, 2620 (2022) (Gorsuch, J. concurring) (quoting *NFIB v. OSHA*, 142 S. Ct. at 665; *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006)). Second, agencies may also need a clear statement from Congress "when an agency seeks to 'intrude into an area that is the particular domain of state law.'" *Id*. (quoting *Alabama Association of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021)). CMS's interpretation of EMTALA in this case is clearly both related to an issue of great political significance and is intended to intrude into a particular domain of state law.

First, the CMS Guidance was created to address an issue of great political significance in the United States. The "Court has indicated that the [major questions] doctrine applies when an agency claims the power to resolve a matter of great 'political significance' or end an 'earnest and profound debate across the country.'" *West Virginia v. EPA*, 142 S. Ct. at 2620 (Gorsuch, J., concurring) (quoting *NFIB v. OSHA*, 142 S. Ct. at 665 (internal quotation marks omitted). This is precisely what CMS seeks to do with its Guidance. After the Supreme Court overturned *Roe v. Wade*, 410 U.S. 113 (1973) in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), President Joe Biden issued an executive order requiring the Secretary of HHS to find ways to expand abortion

access in the United States. 87 Fed. Reg. 42,053 (July 8, 2022). In its decision in *Dobbs*, the Supreme Court returned the issue of abortion regulation to the states after almost fifty years. The clear purpose of the Executive Order and the ensuing Guidance was to claw back some of that democratic power from the people and states, and to protect certain abortions from state regulation.

Abortion is a matter of significant political controversy in the United States, as it was in 1986 when EMTALA was passed. As Justice Alito noted at the beginning of his opinion for the majority in *Dobbs*, "Abortion presents a profound moral issue on which Americans hold sharply conflicting views." 142 S. Ct. at 2240. As noted above, the CMS through its Guidance, seeks to settle that controversy, at least in certain cases, by fiat.

Even if given effect, the Guidance would not prevent states from regulating most abortion within their jurisdictions, but that fact is not dispositive in this analysis. In *NFIB v. OSHA*, 142 S. Ct. 661 (2022), one of the cases identified by Justice Gorsuch as an example of agency action that sought to resolve a significant political matter, OSHA tried to coerce employers into acting as enforcers of an illegitimate vaccine mandate. *See West Virginia v. EPA*, 142 S. Ct. 2587. In that case, the sheer number of Americans affected would likely have been more than those that would be affected by the CMS Guidance in this case. However, the OSHA mandate would not have reached all Americans just as the CMS guidance

here would not reach all abortions. Nonetheless, given the significance of the issue of abortion, its life-and-death nature, and the extent to which this federal action invades the regulatory interests of the states, HHS's attempt to insert itself into this important and contentious issue should trigger the major questions doctrine, and thus undermine judicial deference.

Second, the guidance intrudes into an area that is the particular domain of state law by telling doctors and hospitals that state law is preempted by EMTALA. States have a legitimate interest in the safety of women and their preborn children. This interest is recognized by the Court today and has been for at least three decades. *See Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2284 (2022) ("[States'] legitimate interests include respect for and preservation of prenatal life at all stages of development [and] the protection of maternal health and safety.") (citation omitted); *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 846 (1992). In *Dobbs* the Court held that rational basis scrutiny applies to state law restricting abortion. *Dobbs*, 142 S. Ct. at 2283. It recognized that, "A law regulating abortion, like other health and welfare laws, is entitled to a 'strong presumption of validity.'" *Dobbs*, 142 S. Ct. at 2284 (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)). Because abortion law falls within the category of health and welfare regulation, it is within the domain of state regulation.

Because the health of the mother and the unborn child are legitimate state interests, CMS attempt to intrude on that interest should not be deferred to absent a clear statement of authority from Congress. CMS's interpretation of EMTALA regarding preemption in this case is wrong. EMTALA is explicit that it will only preempt state law, "to the extent that the [state] requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). Thus, the question is whether there is a direct conflict between state law and EMTALA.  Under EMTALA, if a patient arrives in a hospital emergency room with an emergency medical condition or in labor, the hospital must either provide required stabilizing treatment or transfer the patient to another medical facility that can provide stabilizing treatment. 42 U.S.C. § 1395dd(b)(1)(A)-(1)(B). In the case of a woman in labor, if she has not been stabilized, the doctor may only authorize her transfer to another facility if the benefits of doing so would outweigh the risks to both the woman and the "unborn child." 42 U.S.C. § 1395dd(c)(1)(ii).

There is no direct conflict between EMTALA and the relevant state law in this case. Texas's Human Life Protection Act (HLPA) bans abortion unless (1) the person performing the abortion is a doctor, (2) the pregnant woman "has a life-threatening physical condition aggravated by, caused by, or arising from a pregnancy that places the female at risk of death or poses a serious risk of substantial impairment of a major bodily function unless the abortion is performed

or induced," and (3) the abortion is performed in a manner that is most likely to allow the child to survive. Tex. Health & Safety Code Ann. § 170A.002(b) (West). However, the requirement that the abortion be performed in a manner most likely to allow the unborn child to survive does not apply in cases where the method would increase the risk to the mother of death or would cause "a serious risk of substantial impairment of a major bodily function of the pregnant female." *Id.*

As the district court in this case noted, "The Second Circuit and other district courts have uniformly construed this savings clause as an ordinary conflicts-preemption provision." *Texas v. Becerra*, 2022 WL 3639525, at *21 (citing *Hardy v. New York City Health & Hospitality Corp.*, 164 F.3d 789, 795 (2d Cir. 1999); *Rodriguez v. Laredo Reg'l Med. Ctr., L.P.*, No. 5:21-CV-43, 2021 WL 7906834, at *2 (S.D. Tex. July 12, 2021)). In cases of conflict-preemption, state and federal law directly conflict "where (1) it is impossible for a person to comply with both the state law and EMTALA; or (2) where the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372–73 (2000)). Finding that it is not impossible for doctors and hospitals to comply with both Texas law and EMTALA in this case, the district court wrote, "EMTALA provides no instructions on what a physician is to do when there is a conflict between the health of the mother and the unborn child" and that "[s]tate law fills

this void." *Id*. As the district court also found, Texas law does not prevent the goals of EMTALA from being accomplished. *See Id*. at 22. EMTALA's primary purpose is to ensure that patients who are unable to pay still receive essential emergency medical treatment. *Id*. The Texas law does not compel the "rejection of patients." *Id*. (quoting *Harry v. Marchant*, 291 F.3d 767, 774 (11th Cir. 2002)). Thus, because there is no conflict between Texas law and EMTALA, EMTALA does not preempt Texas law in this case. By attempting to force doctors and hospitals to violate state law in an area recognized by the Court as one of legitimate state interest, the Guidance intrudes into a particular domain of state law and thus is not entitled to deference.

> 2. The Relevant Language of EMTALA Upon Which HHS Relies is Neither a Clear Statement of Authority to Regulate the Politically Contentious Abortion Issue nor is it a Clear Statement of Authority to Preempt State Law.

When the major questions doctrine applies, agencies must provide more than "a colorable textual basis" for their claims to expanded power. *See West Virginia v. EPA*, 142 S. Ct. at 2609. "Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle devices.'" *Id*. (quoting *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001)). Justice Gorsuch, concurring in *West Virginia v. EPA*, found that the Court has considered four factors, three of which are relevant here, when determining

whether the legislative authority upon which an agency bases its interpretation constitutes a clear statement.

"*First*, courts must look to the legislative provisions on which the agency seeks to rely 'with a view of their place in the overall statutory scheme.'" *West Virginia v. EPA*, 142 S. Ct. at 2622 (Gorsuch, J. concurring) (emphasis in original). CMS's Guidance runs counter to both the purpose of EMTALA and the requirements of the SSA, generally. As the district court noted, "The primary purpose of EMTALA is 'to prevent patient dumping, which is the practice of refusing to treat patients who are unable to pay.'" *Texas v. Becerra*, 2022 WL 3639525, at *22 (quoting *Marshall ex rel. Marshall v. E. Carroll Par. Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998)). The Guidance does not advance this goal. Rather, it is intended to force doctors and hospitals to either provide an abortion or to transfer the woman to another medical facility where an abortion can be performed. Guidance at 4.

Relatedly, the Guidance directly violates the plain language of the SSA. "EMTALA is subject to the Medicare Act's prohibition that 'nothing in this subchapter,' which includes EMTALA, 'shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided.'" *Texas v. Becerra*, 2022 WL 3639525, at *25 (quoting 42 U.S.C. § 1395). The district court

goes on to note that, "Courts across the country uniformly hold that this section prohibits Medicare regulations that 'direct or prohibit any kind of treatment or diagnosis'; 'favor one procedure over another'; or 'influence the judgment of medical professionals.'" *Id.* (quoting *Goodman*, 891 F.2d at 451). Here, CMS has attempted to direct the medical care of pregnant women without regard to the wellbeing of the unborn child and contrary to the overarching requirements of the statutory scheme.

Second, Justice Gorsuch suggests that reviewing courts "look to the age and focus of the statute the agency invokes in relation to the problem the agency seeks to address." *West Virginia v. EPA*, 142 S. Ct. at 2623 (Gorsuch, J. concurring). Further, "an agency's attempt to deploy an old statute focused on one problem to solve a new and different problem may also be a warning sign that it is acting without clear congressional authority." *Id*. EMTALA was passed in 1986 by a split Congress and signed by President Reagan.[4] It is doubtful that such legislation, directed as it was at providing emergency care for patients unable to afford treatment and enacted by a bipartisan group of senators and representatives, signed by President Reagan, and with language designed to protect the interests of unborn children, was really a trojan horse for mandatory abortion.

---

[4] *See* Actions - H.R.3128 - 99th Congress (1985-1986): Consolidated Omnibus Budget Reconciliation Act of 1985, H.R.3128, 99th Cong. (1986), https://www.congress.gov/bill/99th-congress/house-bill/3128/actions.

Third, "just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *West Virginia v. EPA*, 142 S. Ct. at 2610 (quoting *FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941) (internal quotation marks omitted)). Thus, it is telling that "EMTALA has never been construed to preempt state abortion laws." *Texas v. Becerra*, 2022 WL 3639525, at *28. This effort to expand the meaning of the statute to reach a hot political issue of the day is exactly the sort of overreach that should be identified by the clear statement requirement. As Justice Gorsuch notes, "When an agency claims to have found a previously 'unheralded power,' its assertion generally warrants 'a measure of skepticism.'" *West Virginia v. EPA*, 142 S. Ct. at 2623 (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324, (2014)).

Therefore, because the CMS Guidance challenged in this case triggers the major questions doctrine, and because it is based not on a clear statement from Congress, but rather on a misreading of the law contrary to the language of the statute and its context, CMS's Guidance is not entitled to *Chevron* deference.

### III.  The Guidance Should be Set Aside Under *Skidmore* Deference Because it is a Blatant Misreading of EMTALA's Language.

When an agency's interpretation of a statute it administers is not entitled to *Chevron* deference, the Court may apply *Skidmore* deference. *See Mead*, 533 U.S. at 234-35. Under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), the reviewing court may take the agency's interpretation as persuasive authority. The interpretation's persuasiveness depends on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.*

The agency's interpretation of EMTALA in this case is of no persuasive value. Federal agencies do not have free rein; they are at least limited to Congressional delegations of authority. Relevant here, only the Secretary of HHS may issue regulations under EMTALA. *See* 42 U.S.C. § 1395hh(a)(2), (b). The Guidance issued by CMS in this case cannot have the force of law because it was not issued as a regulation through one of the limited processes established by the APA, nor was it issued by the Secretary of HHS. Despite its noncompliance with those statutory requirements for rulemaking, the Guidance threatens hospitals and doctors with significant civil penalties for failing to comply with its interpretation of the statute. Guidance at 5. It was issued to advance the policy interests of the Biden administration without an opportunity for public feedback or for the agency

to respond to that feedback. It interprets EMTALA to preempt state abortion laws in a way that has never been done before. *Texas v. Becerra*, 2022 WL 3639525, at *28. Thus, it is a novel interpretation of a statute that disregards that statute's concern for unborn life, issued with no opportunity for criticism or correction, and explicitly to advance a policy goal of the President. In short, it is a blatant power grab, and thus should not be treated even as persuasive authority.

## IV. The CMS Guidance is Arbitrary and Capricious Because the Guidance Entirely Failed to Consider an Important Aspect of the Problem and Thus Must Be Set Aside.

Upon review, courts must strike down agency action which they find to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(a). As the Court noted in *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, "Normally, an agency rule would be arbitrary and capricious if the agency. . .entirely failed to consider an important aspect of the problem." 463 U.S. 29, 43 (1983). Thus, if CMS failed to consider an important aspect of the problem in promulgating its Guidance in this case, this Court must set it aside for being arbitrary and capricious.

Our legal system has recognized the significant interest people have in bodily integrity by acknowledging the importance of informed consent. *See Cruzan by Cruzan v. Dir., Missouri Dep't of Health,* 497 U.S. 261, 269 (1990). That the unborn is not yet an adult does not mean that he or she has no right to bodily

integrity. Parents may provide consent for medical treatment on behalf of the child but that consent clearly does not include the right to consent to the termination of the child's life. The Court has recognized the legitimate state interest in "[respecting and preserving] prenatal life at all stages of development." *Dobbs*, 142 S. Ct. at 2284 (citing *Gonzales v. Carhart*, 550 U.S. 124, 157-58 (2007)). Texas seeks to advance the same goal as did Congress in EMTALA when it required doctors to consider the health and wellbeing, the bodily integrity, of the unborn child when making decisions about the health of the woman. *See* 42 U.S.C. § 1395dd; Tex. Health & Safety Code Ann. § 170A.002 (West). The CMS Guidance, on the other hand, contrary to both EMTALA's requirements and those of the Texas law, disregards the bodily integrity of the unborn child.

The purpose of the Guidance was to ensure availability of abortion. *See* Guidance at 1. In every single instance of abortion, the question of the health of the unborn child is a factor, whether considered by the doctors or not. By failing to take this issue into account in its Guidance, especially given Congress's clear concern for the wellbeing of the unborn child in the relevant section of EMTALA, the agency acted arbitrarily and capriciously in issuing this guidance. As such, this Court should find the Guidance to be an invalid exercise of administrative power and set it aside.

**CONCLUSION**

For the foregoing reasons, this Court should uphold the district court's injunction prohibiting enforcement of the Guidance issued by CMS.

/s/ J. Marc Wheat

J. MARC WHEAT

   *Counsel of Record*

ADVANCING AMERICAN FREEDOM, INC.

801 Pennsylvania Avenue, N.W.

Washington, D.C. 20004

(202) 780-4848

MWheat@advancingamericanfreedom.com

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,405 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman 14-point font in text and Times New Roman 14-point font in footnotes produced by Microsoft Word software.

/s/ J. Marc Wheat
J. Marc Wheat

## ECF CERTIFICATIONS

I certify that the required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13, the electronic submission is an exact copy of the paper submission, and the document has been scanned for viruses and is free of viruses.

/s/ J. Marc Wheat<br>J. Marc Wheat

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2023, an electronic copy of the foregoing brief was filed with the Clerk of this Court using the CM/ECF system, which will serve all counsel of record.

/s/ J. Marc Wheat
J. Marc Wheat