No. 23-10246

# United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS;
AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS;
CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS,

*Plaintiffs-Appellees,*

v.

XAVIER BECERRA; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES; CENTERS FOR MEDICARE AND MEDICAID SERVICES;
KAREN L. TRITZ; DAVID R. WRIGHT,

*Defendants-Appellants,*

On Appeal from the United States District Court for the
Northern District of Texas, Lubbock Division
No. 5:22-cv-00185-H, Hon. James Wesley Hendrix

**BRIEF FOR *AMICUS CURIAE* CHARLOTTE LOZIER INSTITUTE
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

Gene C. Schaerr
 *Counsel of Record*
Cristina Martinez Squiers
Joshua J. Prince
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for* Amicus Curiae

JULY 7, 2023

# SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

No. 23-10246
*State of Texas, et al. v. Xavier Becerra, et al.*

Pursuant to 5th Cir. R. 29.2, the undersigned counsel of record hereby certifies that, in addition to the persons and entities listed in the Appellees' Certificate of Interested Persons, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Counsel for Plaintiff-Appellee State of Texas:
Amy Snow Hilton, Assistant Attorney General
Christopher D. Hilton, Assistant Attorney General

Counsel for Defendants-Appellants:
Christopher R. Healy, U.S. Department of Justice

*Amicus Curiae*:
Charlotte Lozier Institute

Counsel for *Amicus Curiae*:
Gene C. Schaerr
Cristina Martinez Squiers
Joshua J. Prince
SCHAERR | JAFFE LLP

In accordance with Federal Rule of Appellate Procedure 26.1, *amicus curiae* Charlotte Lozier Institute states that it is not publicly

traded and has no parent corporations.  No publicly traded corporation owns 10% or more of *amicus*.  The legal name of *amicus* Charlotte Lozier Institute is the Susan B. Anthony List Inc. Education Fund, a 501(c)(3) charitable nonprofit that is separate from the Susan B. Anthony List Inc., a 501(c)(4) social-welfare entity.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

*Counsel of Record for* Amicus Curiae
*Charlotte Lozier Institute*

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS............i

TABLE OF AUTHORITIES..................................................................iv

INTEREST OF *AMICUS CURIAE* AND SUMMARY OF
ARGUMENT.............................................................................. 1

ARGUMENT ....................................................................................3

    I.    HHS's Guidance Disregards EMTALA's Plain Text,
    Which Requires Physicians to Protect the Life of Unborn
    Children ...................................................................................3

        A.    EMTALA's repeated references to the "unborn
        child" reflect a statutory command to recognize
        both the pregnant woman and her unborn child as
        patients protected by the statute. .....................................3

        B.    Contrary to the statute's text, HHS urges a novel
        and incoherent interpretation of EMTALA. ......................5

    II.    The Threat of Enforcement of the HHS Memorandum
    Effectively Mandates Abortions When They Are Not
    Necessary Emergency Care...........................................................9

CONCLUSION .......................................................................... 22

CERTIFICATE OF SERVICE................................................... 23

CERTIFICATE OF COMPLIANCE.......................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992) ......................3

*Hibbs v. Winn*, 542 U.S. 88 (2004) ...........................................................6

*Martinez v. Mukasey*, 519 F.3d 532 (5th Cir. 2008) ...............................3

*Rotkiske v. Klemm*, 140 S. Ct. 355 (2019) ...............................................3

*Texas v. Becerra,* 623 F. Supp. 3d 696 (N.D. Tex. 2022)..........................9

*United States v. Idaho*, 623 F. Supp. 3d 1096 (D. Idaho, 2022),
   *recons. denied*, 2023 WL 3284977 (D. Idaho May 4, 2023),
   *appeal docketed*, No. 23-35440 (9th Cir. June 28, 2023) .....................19

**Statutes**

42 U.S.C. § 1395dd ...........................................................................3, 4, 7

Tex. Health & Safety Code § 170A.002....................................................12

Tex. Health & Safety Code § 245.002 ........................................................9

**Treatise**

2A Norman J. Singer, Statutes and Statutory Construction § 46.06
(rev. 6th ed. 2000)......................................................................................6

**Rule**

Fed. R. App. P. 29........................................................................................1

**Other Authorities**

AAPLOG,
   *Practice Guideline No. 10, Concluding Pregnancy Ethically*
   (2022) ......................................................................................................11

ACOG,
   *Practice Bulletin No. 135, Second-Trimester Abortion*,
   121 Obstetrics & Gyn. 1394 (2013)......................................................18

ACOG,
  *Practice Bulletin No. 203, Chronic Hypertension in Pregnancy*,
  133 Obstetrics & Gyn. e26 (2019) ................................................... 10, 16

ACOG,
  *Practice Bulletin No. 217, Prelabor Rupture of Membranes*,
  135 Obstetrics & Gyn. e80 (2020) ................................................... 10, 15

ACOG,
  *Practice Bulletin No. 222, Gestational Hypertension and
  Preeclampsia*, 135 Obstetrics & Gyn. e237 (2020) ....................... 10, 16

ACOG,
  *Practice Bulletin No. 225, Medical Management Up to
  70 Days Gestation,* 136 Obstetrics & Gyn. e31 (2020) ......................... 18

Press Release, Am. Med. Ass'n,
  AMA Announces New Adopted Policies Related to
  Reproductive Health Care (Nov. 16, 2022) ......................................... 21

Kathi Aultman et al.,
  *Deaths and Severe Adverse Events After the Use of
  Mifepristone as an Abortifacient from September 2000
  to February 2019*, 36 Issues L. Med. 3 (2021) ..................................... 14

Fritz Baumgartner & Gabriel Flores,
  *Contemporary Medical Students' Perceptions of the
  Hippocratic Oath*, 85 Linacre Q. 63 (2018) ......................................... 18

Christina Camilleri & Stephen Sammut,
  *Progesterone-Mediated Reversal of Mifepristone-Induced
  Pregnancy Termination in a Rat Model: An Exploratory
  Investigation*, 13 Sci. Reps. 1 (2023) ................................................... 13

Helene M. Cole, *Legal Interventions During Pregnancy:
  Court-Ordered Medical Treatments and Legal Penalties
  for Potentially Harmful Behavior by Pregnant Women*,
  264 J. Am. Med. Ass'n 2663 (1990) ....................................................... 5

Colloquium,
   *Medical Intervention in Cases of Maternal-Fetal Vital
   Conflicts, A Statement of Consensus*,
   14 Nat'l Cath. Bioethics Q. 477 (2014) ................................................ 11

George Delgado & Mary L. Davenport,
   *Progesterone Use to Reverse the Effects of Mifepristone*,
   46 Annals of Pharmacotherapy e36 (2012) ......................................... 13

George Delgado et al.,
   *A Case Series Detailing the Successful Reversal of the
   Effects of Mifepristone Using Progesterone*,
   33 Issues L. & Med. 21 (2018) ...................................................... 12, 13

Sheila Desai et al.,
   *Estimating Abortion Provision and Abortion Referrals Among
   United States Obstetricians-Gynecologists in Private Practice*,
   97 Contraception 297 (2018) ................................................................. 10

Food & Drug Admin.,
   Ref. ID: 3909592, Mifeprex Medication Guide (rev. 2016) ................. 12

Margaret M. Gary & Donna J. Harrison,
   *Analysis of Severe Adverse Events Related
   to the Use of Mifepristone as an Abortifacient*,
   40 Annals Pharmacotherapy 191 (2006) ............................................. 14

Hippocrates,
   The Oath (Francis Adams trans. 1849) (400 B.C.E.) .......................... 18

Shelly Kaller et al.,
   *Pharmacists' Knowledge, Perspectives, and Experiences
   with Mifepristone Dispensing for Medication Abortion*,
   61 J. Am. Pharmacists Ass'n 785 (2021) ............................................ 18

Ning Liu & Joel G. Ray,
   *Short-Term Adverse Outcomes After Mifepristone–
   Misoprostol Versus Procedural Induced Abortion*,
   176 Annals Internal Med. 145 (2023) .................................................. 13

Harris Meyer,
  *Hospital Investigated for Allegedly Denying an Emergency
  Abortion After Patient's Water Broke*, KFF Health News
  (Nov. 1, 2022) ...................................................................................... 20

Yukiko Motojima et al.,
  *Management and Outcomes of Periviable Neonates Born at
  22 Weeks of Gestation: A Single-Center Experience in Japan*,
  J. Perinatology (2023) ......................................................................... 11

James Studnicki et al.,
  *Doctors Who Perform Abortions: Their Characteristics
  and Patterns of Holding and Using Hospital Privileges*,
  6 Health Servs. Rsch. Managerial Epidemiology 1 (2019) .................. 13

Debra B. Stulberg et al.,
  *Abortion Provision Among Practicing Obstetrician-
  Gynecologists*, 118 Obstetrics & Gyn. 609 (2011) .............................. 10

U.S. Nat'l Libr. of Med.,
  *NCT03320057, Medication Abortion Via Pharmacy
  Dispensing*, ClinicalTrials.gov ........................................................... 18

## INTEREST OF *AMICUS CURIAE*[1] AND
## SUMMARY OF ARGUMENT

This case and the proper interpretation of the Emergency Medical Treatment and Labor Act (EMTALA) are of enormous importance to *Amicus* Charlotte Lozier Institute (CLI), a nonprofit research and education organization committed to bringing modern science to bear in life-related policy and legal decision-making.  CLI believes that laws governing abortion should be informed by the most current medical and scientific knowledge on human development and not by attempts to promote a political or ideological agenda.

While CLI agrees with the many points persuasively made by the Appellees in their brief, it writes separately to expand on two of them.

*First*, as Appellees explain (at 35–36), EMTALA requires physicians to do everything in their power to preserve the life of both the mother and her unborn child.  Yet the Department of Health and Human

---

[1] *Amicus* is authorized to file this brief by Fed. R. App. P. 29(a)(2) because all parties have consented to its filing.  No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of the brief; and no person other than *amicus* or its counsel contributed money that was intended to fund the preparation or submission of the brief.  Fed. R. App. P. 29(a)(4)(E).

Services (HHS) memorandum at issue in this case drastically departs from a faithful reading of the statute by ignoring the unborn child and elevating the provision of abortion above all else.

*Second*, Appellees are correct that the new guidance will, in some instances, require or coerce physicians to participate in abortions even in cases where the life of the mother is not endangered. Appellants ignore this risk by citing rare examples where pregnancy complications *may* require abortion. But the new HHS guidance severely limits a physician's judgment as to what constitutes a true medical emergency that requires abortion.

Thus, the district court was correct in holding that (1) HHS's new interpretation of EMTALA, which eliminates protections for the unborn child, is contrary to the statute's plain text; and (2) Appellees have shown that HHS "imposes conditions 'broader' than EMTALA to 'include elective abortions where the woman's life is not at stake but which may constitute 'stabilizing care' under the' Guidance." ROA.914, 934–35, 939, RE.63, 83–84, 88 [ECF No. 33]. This Court should affirm those holdings.

## ARGUMENT

### I.    HHS's Guidance Disregards EMTALA's Plain Text, Which Requires Physicians to Protect the Life of Unborn Children

As the Supreme Court has recognized "time and again," "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992); *accord Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019). As this Court has recognized, the "plain statutory language is the most instructive and reliable indicator of Congressional intent." *Martinez v. Mukasey*, 519 F.3d 532, 543 (5th Cir. 2008). HHS's new guidance violates these basic principles, and thus contravenes the statutory text by ignoring the statute's express protections for unborn life and instead mandating the termination of such life.

### A.    EMTALA's repeated references to the "unborn child" reflect a statutory command to recognize both the pregnant woman and her unborn child as patients protected by the statute.

EMTALA requires hospitals to determine whether someone presenting at the hospital has an "emergency medical condition." 42 U.S.C. § 1395dd(a). It then defines "emergency medical condition" to include medical conditions from which "the absence of immediate medical attention" could reasonably be expected to place "the health of the woman

*or her unborn child*" in "serious jeopardy," *id.* § 1395dd(e)(1)(A) (emphasis added), and conditions where transferring a pregnant woman would threaten her "or the unborn child," *id.* § 1395dd(e)(1)(B)(ii).[2]

If a patient has such a condition, hospitals must either provide "further medical examination" of the woman and her unborn child, provide "such treatment as may be required to stabilize the[ir] medical condition," or "transfer" them "to another medical facility" that can provide the care that the woman and her unborn child needs. *Id.* § 1395dd(b)(1), (c)(1).

EMTALA then defines "stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(A).

The text of the statute just described demonstrates Congress's commitment to what bioethicists and physicians call a "two-patient paradigm." Under that view, "a physician's ethical duty toward the

---

[2] Indeed, before a transfer to another facility may occur, a physician must certify that the transfer would benefit both the woman and her unborn child. 42 U.S.C. § 1395dd(c)(1)(A)(ii), (c)(2)(A).

pregnant woman clearly requires the physician to act in the interest of the fetus as well as the woman."[3]  And by defining "emergency medical conditions" to include conditions threatening the health of the unborn child, EMTALA ensures that it never departs from that paradigm.  At all relevant points, physicians and hospitals subject to EMTALA's requirements are required to follow the two-patient paradigm to protect both the mother and her unborn child.

### B.    Contrary to the statute's text, HHS urges a novel and incoherent interpretation of EMTALA.

Despite EMTALA's clear text, HHS's new memorandum employs a one-patient paradigm, under which the mother's health and preference are the only considerations.  For example, HHS argues that EMTALA's repeated mention of the unborn child in the statute's 1989 amendments "did not alter the identity of the party to whom the statute's obligations run[]"—the mother—but instead merely showed Congress's recognition that "perceived serious threats to the health of the fetus … pos[ed] a threat to the pregnant woman herself."  Appellants' Br. 35.  This Court

---

[3] Helene M. Cole, *Legal Interventions During Pregnancy: Court-Ordered Medical Treatments and Legal Penalties for Potentially Harmful Behavior by Pregnant Women*, 264 J. Am. Med. Ass'n 2663, 2664 (1990).

should reject that sophistry because it elides the statutory text in at least three ways.

*First*, HHS's new interpretation violates several canons of statutory construction. If all Congress did in the 1989 amendments was recognize that an unborn child's health *could* become an emergency medical condition for her mother, then the amendments would have been unnecessary. A pregnant woman at risk due to her pregnancy was already an "individual" or a "patient" under the prior version of EMTALA. The rule against surplusage forbids a reading of the statute that makes the 1989 amendments unnecessary. *See* 2A Norman J. Singer, *Statutes and Statutory Construction* § 46.06, pp. 181–86 (rev. 6th ed. 2000) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" (cleaned up)).

Indeed, applying that rule here makes sense, as it "complements the principle that courts are to interpret the words of a statute in context." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004). EMTALA's context— the multiple protections it affords the "unborn child"—stands in stark

contrast to HHS's attempt to diminish the "unborn child" to nothing more than just a means to the end of protecting her mother.

*Second*, as noted above, EMTALA, but not the memorandum, recognizes that both the mother and fetus are patients in need of stabilization, treatment, and potential transfer. When a pregnant woman presents at an EMTALA-regulated entity, EMTALA requires the entity to check for an "emergency medical condition," by expressly evaluating both the "woman" and "her unborn child." 42 U.S.C. § 1395dd(e)(1). Because the HHS memorandum—and HHS's defense of it in litigation—disregards the requirement to consider the welfare of an unborn child when determining how to stabilize a woman, it cannot be squared with EMTALA's text.

*Third*, HHS's argument reads into the text a limitation on fetal care just to fit its policy preference regarding abortion. Far from merely "clarif[ying] the scope of medical conditions that can trigger the statute's obligations" towards only pregnant women, Appellants' Br. 35, the EMTALA amendments *expanded* the scope of protection to include the mother and unborn child alike. Despite this expansion, the HHS memorandum limits and eliminates fetal care in its insistence that

abortion is likely to be necessary to protect a mother in various circumstances.

HHS is not alone in asserting this erroneous and atextual understanding of EMTALA. One of appellants' *amici*, the American College of Obstetricians and Gynecologists (ACOG), argues that "EMTALA … prohibit[s] physicians from placing their own interests above their patients' interests" by—at times—requiring physicians to perform abortions. ACOG Br. 39 [ECF No. 51]. But, in making that argument, ACOG flatly ignores the two-person paradigm imposed by the statutory text. Nowhere in its brief is there any recognition of the statutory protections offered to the unborn child. Instead, ACOG rests upon its ideological conclusion that abortion is the answer—even if, as explained next, other treatments that could preserve the health of both the mother and her unborn child are available.

This Court should reject HHS's and ACOG's misinterpretation of EMTALA and affirm the decision below. As Appellees correctly conclude (at 36), "[t]here is no way to view Congress' four-fold addition of language to protect the unborn child as consistent with the Memorandum's mandate to kill an unborn child."

8

## II.    The Threat of Enforcement of the HHS Memorandum Effectively Mandates Abortions When They Are Not Necessary Emergency Care

As shown above, EMTALA's plain text forbids regulated entities from even considering abortion in all but the most serious circumstances.[4]   Despite that, the HHS memorandum departs from EMTALA's text by treating abortion as a necessary stabilizing treatment even "in circumstances which do not require separation of the mother and her unborn child to save the mother's life."  Decl. of Donna Harrison, M.D. ¶ 25, *Texas v. Becerra,* 623 F. Supp. 3d 696 (N.D. Tex. 2022) (No. 5:22-cv-00185-H), ECF No. 23-1 ("Dist. Ct.").  And the threat of fines and the loss of federal funding will inevitably lead some physicians to perform abortions even when presented with other options.

Abortion is rarely medically necessary to stabilize a pregnant woman, and—critical in any EMTALA analysis—an abortion will *never* stabilize an unborn child.[5]  To be sure, as the district court recognized, there may be situations where EMTALA's dual obligations to the mother

---

[4] CLI agrees that the memorandum is invalid even without a showing that EMTALA *prohibits* abortions because EMTALA cannot be read to *require* abortions.  Appellees' Br. 34.

[5] Situations like the removal of an ectopic pregnancy, while medically necessary, are not an abortion.  Tex. Health & Safety Code § 245.002.

and her unborn child conflict and the preservation of either will result in the death of the other. ROA.931; RE.80. However, such situations are not just tragic, but rare—as are serious complications during pregnancy.

In early pregnancy, complications are often treated with expectant management, where the woman and her unborn child are closely monitored to allow the pregnancy to advance.[6] Consistent with EMTALA's two-patient paradigm, a doctor, in her own reasonable medical judgment, makes decisions along with the pregnant woman— even if the most likely ultimate outcome is that an emergency medical condition as defined by EMTALA will develop.[7]

---

[6] ACOG, *Practice Bulletin No. 217, Prelabor Rupture of Membranes*, 135 Obstetrics & Gyn. e80 (2020); ACOG, *Practice Bulletin No. 222, Gestational Hypertension and Preeclampsia*, 135 Obstetrics & Gyn. e237 (2020); ACOG, *Practice Bulletin No. 203, Chronic Hypertension in Pregnancy*, 133 Obstetrics & Gyn. e26 (2019).

[7] Indeed, the majority of OB-GYNs follow a two-patient paradigm irrespective of EMTALA. The reality, despite ACOG's promotion of abortion as "necessary" healthcare, ACOG Br. 7, is that only 7-14% of obstetricians will perform an elective abortion when requested by a patient. Sheila Desai et al., *Estimating Abortion Provision and Abortion Referrals Among United States Obstetricians-Gynecologists in Private Practice*, 97 Contraception 297, 301 (2018); Debra B. Stulberg et al., *Abortion Provision Among Practicing Obstetrician-Gynecologists*, 118 Obstetrics & Gyn. 609, 611 (2011).

Many life-threatening complications in pregnancy occur *after* fetal viability (around 22 weeks' gestation), when an unborn child can survive separate from her mother.[8]  At that stage of pregnancy, if a medically indicated separation is required, it can often be done in such a way that the neonate can continue to live.[9]  In such circumstances, far from *requiring* an abortion, EMTALA requires the unborn child to be stabilized—whether by birth through standard obstetric interventions of labor induction or by cesarean section.[10]

Nothing in Texas law conflicts with EMTALA's requirements. Texas ensures that any abortions performed under a health exception are performed "in a manner that, in the exercise of reasonable medical judgment, provides the best opportunity for the unborn child to survive"—while also preserving the life and health of the mother.  Tex.

---

[8] Yukiko Motojima et al., *Management and Outcomes of Periviable Neonates Born at 22 Weeks of Gestation: A Single-Center Experience in Japan*, J. Perinatology (2023), https://doi.org/10.1038/s41372-023-01706-4 (24 of 29 infants born at 22 weeks gestation at one clinic survived).

[9] *See generally* AAPLOG, *Practice Guideline No. 10, Concluding Pregnancy Ethically* (2022), https://tinyurl.com/4eccu22c.

[10] Colloquium, *Medical Intervention in Cases of Maternal-Fetal Vital Conflicts, A Statement of Consensus*, 14 Nat'l Cath. Bioethics Q. 477, 485 (2014), doi: 10.5840/ncbq20141439.

Health & Safety Code § 170A.002(b)(3). But the goal under Texas law, like the goal under EMTALA, is always the same—all reasonable attempts to preserve the life of *both* patients are required, recognizing that an abortion may merely be one possible stabilizing option among many. Thus, contrary to the HHS memorandum, actions that abandon EMTALA's protections for the unborn child should be the exception, not the rule.

Further, while many of the specific conditions cited by HHS's physician-declarants could be treated by abortion, other stabilizing treatments are often available. One such complication is a failed medication abortion. In 1-3% of women, an attempted medication abortion will fail to kill the unborn child.[11] If a clinically stable woman with a still-living embryo or fetus presents to an emergency room requesting an action to reverse the abortion, progesterone supplementation is medically supported and should be offered.[12] And,

[11] Food & Drug Admin., Ref. ID: 3909592, Mifeprex Medication Guide at 13 (rev. 2016), https://tinyurl.com/3r72h3wf.

[12] George Delgado et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 Issues L. & Med. 21, 22–23 (2018) (Delgado, *Case Series*). Although Dr. Haider disparages this practice, her support for this position is only one ACOG article. *See* Decl. of Sadia Haider, MD ¶ 18, Dist. Ct. ECF No. 41 ("Haider Decl.").

even where the pregnant woman does not wish to reverse the abortion, treatment of a stable woman with retained fetal tissue following a medical abortion is not typically required in the emergency room unless the woman is bleeding severely or has an infection.[13]

---

Yet reversal of the effects of abortion drugs by progesterone supplementation frequently succeeds. A retrospective study demonstrated that the most effective protocols for progesterone supplementation after exposure to abortion drugs increased the chances for an unborn child's survival from 25% to 68%. George Delgado & Mary L. Davenport, *Progesterone Use to Reverse the Effects of Mifepristone*, 46 Annals of Pharmacotherapy e36 (2012), DOI: 10.1345/aph.1R252; Delgado, *Case Series*, 33 Issues L. & Med. 21. There was no increase in the rate of birth defects in the children born after reversal. Delgado, *Case Series*, 33 Issues L. & Med. at 26. A newly published pre-clinical study, moreover, supports the results seen in the clinical case study series. It shows a clear progesterone-mediated reversal of an initiated mifepristone-induced pregnancy termination in a rat model. *See* Christina Camilleri & Stephen Sammut, *Progesterone-Mediated Reversal of Mifepristone-Induced Pregnancy Termination in a Rat Model: An Exploratory Investigation*, 13 Sci. Reps. 1, 6 (2023), https://doi.org/10.1038/s41598-023-38025-9.

[13] Ning Liu & Joel G. Ray, *Short-Term Adverse Outcomes After Mifepristone–Misoprostol Versus Procedural Induced Abortion*, 176 Annals Internal Med. 145, 147 (2023). While many of these women do not require emergency care, the tragic reality is that they do not have anywhere else to turn other than the emergency room. These women may have been given abortion pills out of state, through the mail from the internet or telemedicine providers, or by abortion doctors who are unwilling or unable to manage their complications, as many abortion providers do not maintain hospital admitting privileges. James Studnicki et al., *Doctors Who Perform Abortions: Their Characteristics and Patterns of Holding and Using Hospital Privileges*, 6 Health Servs. Rsch. Managerial Epidemiology 1 (2019). In fact, the FDA's complication

Nevertheless, when the child survives an attempted medication abortion, EMTALA's textual requirement to consider both the woman and the unborn child prohibit ending the life of the living child. Yet, in those same circumstances, the HHS memorandum would require abortion. *See* Appellees' Br. 18 ("For example, HHS requires performing an abortion where women present to an emergency room, after having taken chemical abortion drugs, but where the unborn child is still living and may still be preserved, even if the mother's life is not at stake." (citation and internal quotation marks omitted)).

Other HHS physicians expressed concerns about preterm, premature rupture of membranes (PPROM). Dr. Robert Carpenter, for example, explained that PPROM made it difficult to know "with reasonable certainty if or when the sepsis will result in organ failure or

---

data records that less than 40% of surgeries required for failed chemical abortions were performed by abortion providers. Kathi Aultman et al., *Deaths and Severe Adverse Events After the Use of Mifepristone as an Abortifacient from September 2000 to February 2019*, 36 Issues L. Med. 3, 4 (2021); Margaret M. Gary & Donna J. Harrison, *Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient*, 40 Annals Pharmacotherapy 191 (2006). While many caring practitioners intervene surgically in the emergency room to remove the retained tissue of these women who have nowhere else to go, it is ethically problematic to be forced to care for these non-emergency complications resulting from the choice to end human life.

death without immediate treatment." Decl. of Dr. Robert James Carpenter ¶ 10, Dist. Ct. ECF No. 41 ("Carpenter Decl."). But with PPROM, abortion is not the only option. ACOG advises that "[w]omen presenting with [P]PROM before neonatal viability should be counseled regarding the risks and benefits of expectant management versus immediate delivery" and provided with "a realistic appraisal of neonatal outcomes."[14] Thus even ACOG recognizes that, in the appropriate case, watchful waiting—not abortion—may be the best course. Additionally, if the physician and patient desired intervention at the time of diagnosis, the ACOG recommendations—and all state laws allow—immediate delivery by induced labor or cesarean section, without intentional destruction of the unborn child which would occur with a dilation and evacuation abortion.

The same is true with preeclampsia, another condition advanced by HHS experts as requiring abortion. *See*, *e.g.*, Carpenter Decl. ¶¶ 12–13. In the event of a life-threatening hypertensive emergency, ACOG explains that "delivery is recommended … at or beyond 34 0/7 weeks of gestation" and recognizes that, "before 34 0/7 weeks of gestation,"

---

[14] ACOG, *Practice Bulletin No. 217*, *supra* note 6, at e88.

expectant management may be appropriate "based on strict selection criteria of those appropriate candidates and is best accomplished in a setting with resources appropriate for maternal and neonatal care."[15]  As dangerous as preeclampsia is, ACOG makes clear that expectant management or delivery—both options that allow the unborn child to survive—are possible courses of treatment.

Although not an exhaustive list of the possible complications that a woman may experience during pregnancy, the complications discussed above—together with possible treatments other than abortion—illustrate that the insistence of HHS's experts that abortion is medically required when these conditions are present is often incorrect.[16]

It is in this ambiguity—when medical conditions have various treatment options other than abortion—that the HHS memorandum presents the clearest harm.  Though the memorandum purports to apply only when abortion "is the stabilizing treatment necessary to resolve" an

---

[15] ACOG, *Practice Bulletin No. 222*, *supra* note 6, at e245; ACOG, *Practice Bulletin No. 203*, *supra* note 6, at e42.

[16] And in fact, many of these physicians recognize that determining whether abortion is, in fact, medically necessary during emergency treatment varies greatly from case to case.  *See* Haider Decl. ¶ 17; Decl. of Alan Peaceman, M.D. ¶ 11, Dist. Ct. ECF No. 41.

emergency medical condition, ROA.214, it gives HHS significant authority to "enforce" EMTALA even in cases where other options are available or where there is not a true medical emergency. *See* ROA.219. Indeed, the guidance defines medical emergency as a situation that "*could place* the health of a person (including pregnant patients) in serious jeopardy," whereas the statute defines medical emergency as a situation that "could reasonably be expected to" place the health of a mother or her unborn child in serious jeopardy. ROA.939, RE.88 (emphasis added). Thus, the HHS guidance broadens the scope of what constitutes emergent care in favor of greater abortion access.

Further highlighting the ambiguity that HHS could exploit in enforcing its broad EMTALA guidance is ACOG's argument here that when a physician decides an abortion is "medically necessary," EMTALA recognizes that "the principles of beneficence and nonmaleficence require the physician to recommend, provide, and/or (if time permits and the patient is stable) refer the patient for that course of treatment." ACOG Br. 39.[17]  But ACOG, as stated earlier, is ignoring that the principles of

---

[17] This statement cites the Hippocratic Oath but fails to mention that the original Hippocratic Oath specifically pledged not to provide herbs to induce an abortion.  Fritz Baumgartner & Gabriel Flores, *Contemporary*

beneficence and nonmaleficence also apply to the unborn child, as required by EMTALA's text. And if a patient is stable and there is time to refer the patient for an abortion elsewhere, then it is difficult to argue that situation presents a true medical emergency.[18]

*Medical Students' Perceptions of the Hippocratic Oath*, 85 Linacre Q. 63, 70 (2018) ("I will give no deadly medicine to anyone if asked, nor suggest any such counsel; and in like manner I will not give to a woman a pessary to produce abortion." (quoting Hippocrates, The Oath (Francis Adams trans. 1849) (400 B.C.E.)).

[18] While ACOG provides clinical practice guidelines for members that are developed through a peer-review process that generally ensures that the recommendations are based on science, ACOG has not abided by that scientific standard in its guidance about abortion. ACOG's publications on abortion are crafted by prominent abortion advocates, such as Mitchell Creinin (consultant for Danco, the manufacturer of the abortion drug, mifepristone) and Daniel Grossman (Director of ANSIRH, a vocal abortion advocacy organization), who collaborated on *Practice Bulletin No. 225, Medical Management Up to 70 Days Gestation*, and (in Grossman's case) who cowrote *Practice Bulletin No. 135, Second-Trimester Abortion*. Shelly Kaller et al., *Pharmacists' Knowledge, Perspectives, and Experiences with Mifepristone Dispensing for Medication Abortion*, 61 J. Am. Pharmacists Ass'n 785 (2021); ACOG, *Practice Bulletin No. 225, Medical Management Up to 70 Days Gestation*, 136 Obstetrics & Gyn. e31, e31 (2020); ACOG, *Practice Bulletin No. 135, Second-Trimester Abortion*, 121 Obstetrics & Gyn. 1394, 1394 (2013). Dr. Grossman is also the Principal Investigator of the clinical trials to test pharmacy dispensation of mifepristone for abortion. U.S. Nat'l Libr. of Med., *NCT03320057, Medication Abortion Via Pharmacy Dispensing*, ClinicalTrials.gov, https://classic.clinicaltrials.gov/ct2/show/NCT033200 57 (accessed July 6, 2023).

It is thus no answer for HHS or ACOG to argue that the ultimate decision as to what stabilizing treatment to provide is "left to the professional judgment of the relevant medical personnel." Appellants' Br. 45. HHS's memorandum erases the ability of many physicians to exercise their professional judgment against abortion.

Under the HHS memorandum, even if a physician decides with her patient that another stabilizing treatment besides abortion would be the best course forward, the physician does so at great personal risk, as HHS might ultimately disagree. Faced with the possibility of six-figure fines and the loss of federal funding, ROA.218, many physicians may choose to provide abortions even if their conscience forbids it.

This fear of HHS enforcement is not theoretical. As the district court pointed out, the Department of Justice has already sued Idaho, asserting that EMTALA requires the state's hospitals to provide abortion when the mother's "health"—but not her life—is at risk. ROA.916–17, RE.65–66 (citing Compl., *United States v. Idaho*, 623 F. Supp. 3d 1096 (D. Idaho, 2022) (No. 1:22-CV-00329-BLW), Dkt. No. 1, *recons. denied*, 2023 WL 3284977 (D. Idaho May 4, 2023), *appeal docketed*, No. 23-35440 (9th Cir. June 28, 2023)). And the federal government has opened an

investigation of an alleged denial of an emergency abortion at a Missouri hospital even though "the doctors and hospital lawyers allegedly determined that her case did not qualify" as a medical emergency.[19]  The woman ultimately received an abortion four days later at a different facility.[20]  This lawsuit and investigation demonstrate that HHS intends to use its broad guidance to ensure the expansion of abortion care in emergency rooms.

Finally, the confusion that HHS's guidance has now created, because the guidance conflicts with EMTALA and curtails medical judgment regarding abortion, exacerbates the difficulties physicians already faced regarding compliance with abortion laws.  Leading medical organizations, such as ACOG and the American Medical Association (AMA), blatantly support abortion as essential healthcare.  And they view any restrictions on abortion as "reckless government interference in

---

[19] Harris Meyer, *Hospital Investigated for Allegedly Denying an Emergency Abortion After Patient's Water Broke*, KFF Health News (Nov. 1, 2022), https://kffhealthnews.org/news/article/emtala-missouri-hospital -investigated-emergency-abortion/.

[20] *Id.*

the practice of medicine that is dangerous to the health of our patients."[21] The AMA president has further stated: "Under extraordinary circumstances, the ethical guidelines of the profession support physician conduct that sides with their patient's safety and health, acknowledging that this may conflict with legal constraints that limit access to abortion or reproductive care."[22]

By releasing guidance that blatantly contradicts EMTALA's protections for unborn life and mandates, or, at a minimum, strongly suggests that abortion care is needed in non-emergent situations, the federal government has now reiterated the message that the provision of abortion-related care must come before all else, including the plain text of laws, physicians' ethical obligations to the two-patient paradigm, and physicians' individual medical judgment. Applying EMTALA's plain text, the district court was correct to reject that message.

---

[21] Press Release, Am. Med. Ass'n, AMA Announces New Adopted Policies Related to Reproductive Health Care (Nov. 16, 2022), https://tinyurl.com/4w7cbzzp.

[22] *Id.*

## CONCLUSION

EMTALA protects unborn life. Yet the HHS memorandum promotes, and even requires, the destruction of the unborn child even when it is *unnecessary* to preserve the life of the mother. Because the HHS memorandum will—in some instances—require physicians to participate in non-emergency abortion care, the district court's injunction should be affirmed.

July 7, 2023                    Respectfully submitted,

                    */s/ Gene C. Schaerr*
                    Gene C. Schaerr
                       *Counsel of Record*
                    Cristina Martinez Squiers
                    Joshua J. Prince
                    SCHAERR | JAFFE LLP
                    1717 K Street NW, Suite 900
                    Washington, DC 20006
                    Telephone: (202) 787-1060
                    Facsimile: (202) 776-0136

                    *Counsel for* Amicus Curiae
                    *Charlotte Lozier Institute*

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. App. P. 25(d) and 5th Cir. R. 25.2.5, I hereby certify that on July 7, 2023, I filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the Court's CM/ECF system; service on counsel for all parties was accomplished by electronic mail or by service through the Court's electronic filing system.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

## CERTIFICATE OF COMPLIANCE

The foregoing brief contains 4,459 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and complies with the type volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Office 365 in 14-point Century Schoolbook font.

Additionally, I certify that (1) any required redactions have been made in compliance with 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of Microsoft Defender virus detector and is free of viruses.

July 7, 2023                    */s/ Gene C. Schaerr*
                               Gene C. Schaerr