No. 23-10246

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

STATE OF TEXAS, *et al*.,

*Plaintiffs-Appellees*,

v.

XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, *et al*.,

*Defendants-Appellants*,

Appeal from the United States District Court
for the Northern District of Texas, Lubbock Division, Case No. 5:22-CV-185
The Honorable James Wesley Hendrix, Judge Presiding

**BRIEF *AMICUS CURIAE* OF AMERICANS UNITED FOR LIFE
SUPPORTING PLAINTIFFS-APPELLEES AND AFFIRMANCE**

STEVEN H. ADEN
  *Counsel of Record*
CAROLYN MCDONNELL
DANIELLE PIMENTEL
AMERICANS UNITED FOR LIFE
1150 Connecticut Ave., N.W.
Suite 500
Washington, DC 22036
Steven.Aden@aul.org
Telephone: 202-741-2917

*Counsel for* Amicus Curiae

## SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS
## FIFTH CIRCUIT COURT RULE 29.2

The undersigned counsel of record certifies that the following listed persons

and entities have an interest in the outcome of the case. These representations are

made in order that the judges of this Court may evaluate possible disqualification or

recusal. In addition to the persons or entities listed by the parties and other amici:

***Amicus Curiae***

Americans United for Life

**Counsel for *Amicus Curiae***

Steven H. Aden
Carolyn McDonnell
Danielle Pimentel
Americans United for Life
1150 Connecticut Ave., N.W.
Suite 500
Washington, DC 20036

The undersigned counsel of record also certifies that the sole *Amicus Curiae,*

Americans United for Life, is a nonprofit corporation that has no parent corporation,

is not a publicly held corporation, and does not issue stock.

Respectfully submitted,

/s/ Steven H. Aden
STEVEN H. ADEN
  *Counsel of Record*
AMERICANS UNITED FOR LIFE
1150 Connecticut Ave., N.W.
Suite 500
Washington, DC 20036

i

Steven.Aden@aul.org
Telephone: (202) 741-4917

*Counsel for* Amicus Curiae

July 7, 2023

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS ........................ i

TABLE OF CONTENTS.......................................................................... iii

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF INTEREST OF *AMICUS CURIAE*.......................................... viii

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................1

ARGUMENT ......................................................................................3

    I.    The Abortion Mandate Violates the Major Questions Doctrine By Undermining Congress' Intent to Protect Unborn Life Through EMTALA.............................................................................3

    II.    The Abortion Mandate Subverts Congress' Pro-life Policy Stance ..........................................................................................7

          A.    There is No Federal Right or Interest in Abortion Following *Dobbs*......................................................................8

          B.    HHS's Reinterpretation of EMTALA Undermines Congress's Pro-life Policy Stance.............................................10

    III.    The Abortion Mandate Contravenes the Medical Understanding of the Unborn Child as a Second Patient .............................................13

    IV.    The Abortion Mandate Unlawfully Usurps State Medical Licensing and Devises an Ambiguous Standard of Care....................16

CONCLUSION.....................................................................................22

CERTIFICATE OF COMPLIANCE........................................................23

CERTIFICATE OF SERVICE ...............................................................24

# TABLE OF AUTHORITIES

## Cases

*Barsky v. Bd. of Regents of the Univ. of the State of New York*,
  347 U.S. 442 (1954)....................................................................17

*Biden v. Nebraska*,
  600 U.S. ___ (2023)......................................................................4

*City of Akron v. Akron Ctr. for Reprod. Health*,
  462 U.S. 416 (1983)....................................................................19

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022)......................................................... passim

*June Med. Servs., LLC v. Russo*,
  140 S. Ct. 2103 (2020)................................................................19

*Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psych.*,
  228 F.3d 1043 (9th Cir. 2000) .....................................................17

*Planned Parenthood of Cent. Mo. v. Danforth*,
  428 U.S. 52 (1976)......................................................................18

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833, 871 (1992) .........................................................8, 19

*Roe v. Wade*,
  410 U.S. 113 (1973)......................................................................8

*Webster v. Reprod. Health Servs.*,
  492 U.S. 490 (1989)....................................................................18

*West Virginia v. Env't Prot. Agency*,
  142 S. Ct. 2587 (2022)..................................................................4

*Whole Woman's Health v. Hellerstedt*,
  136 S. Ct. 2292 (2016)................................................................18

## Statutes

1 U.S.C. § 8 .................................................................................10

18 U.S.C. § 1461 .........................................................................11

18 U.S.C. § 1462 .........................................................................11

18 U.S.C. § 1531 .........................................................................10

18 U.S.C. § 248 ...........................................................................11

20 U.S.C. § 1688 .........................................................................11

22 U.S.C. § 2151b(f)(3) ..............................................................12

42 U.S.C. § 1395 .........................................................................18

42 U.S.C. § 1395dd ............................................................. passim

42 U.S.C. § 1395w-22(j)(3)(B) ...................................................11

42 U.S.C. § 1396u-2(b)(3)(B) .....................................................11

42 U.S.C. § 18023(b)(4) ..............................................................11

42 U.S.C. § 238n ..........................................................................11

42 U.S.C. § 300a-6 .......................................................................12

42 U.S.C. § 300a-7 .......................................................................11

Ariz. Rev. Stat. Ann. § 13-3603.02(A) (2021) ...........................21

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, ___ Stat. ___
   (2022)................................................................................... 11, 12

Iowa Code § 146A.1 (2023) ........................................................21

N.C. Gen. Stat. § 90-21.7 (1995) ................................................21

Neb. Rev. Stat. §§ 71-5001 to 71-5004 (2017)...........................21

Pub. L. 108-105, 117 Stat. 1201 (2003)....................................................10

Pub. L. No. 103-259, 108 Stat. 694 (1994)...............................................11

Pub. L. No. 94-439, 90 Stat. 1418 (1976)..................................................12

Tex. Health & Safety Code § 170A.002 (2022) .......................................16

Tex. Health & Safety Code § 170A.007 (2022) .......................................17

**Legislation and Legislative History**

*[Written] Testimony of Monique C. Wubbenhorst, M.D., M.P.H., F.A.C.O.G., F.A.H.A, in Examining the Harm to Patients from Abortion Restrictions and the Threat of a National Abortion Ban before the H. Comm. on Oversight & Reform*, 117th Cong. (2022) .....................................................14

Women's Health Protect Act of 2019, H.R. 2975, 116th Cong. (2019)..................12

Women's Health Protection Act of 2021, H.R. 3755, 117th Cong. (2021) ...........12

**Other Authorities**

Am. Ass'n of Pro-Life Obstetricians & Gynecologists, *Fetal Intervention and Selective Reduction Policymakers*, Prac. Guideline No. 12 (Dec. 2021)......15

Am. Ass'n of Pro-Life Obstetricians & Gynecologists, *Fetal Pain*, Prac. Guideline No. 2 (2021)...................................................................15

Am. Ass'n of Pro-Life Obstetricians & Gynecologists, *State Restrictions on Abortion: Evidence-Based Guidance for Policymakers*, Comm. Op. No. 10 (Sept. 2022)..........................................................17

Clarke D. Forsythe & Rachel N. Morrison, *Stare Decisis, Workability, and* Roe v. Wade*: An Introduction*, 18 Ave Maria L. Rev. 48 (2020)................19

Clarke D. Forsythe, *A Draft Opinion Overruling* Roe v. Wade, 16 Geo. J. L & Pub. Pol'y 445 (2018)........................................................ 18, 19

Clarke D. Forsythe, Abuse of Discretion: The Inside Story of *Roe v. Wade* 127 (2012)................................................................... viii

Debnath Chatterjee et al., *Anesthesia for Maternal-Fetal Interventions: A Consensus Statement From the American Society of Anesthesiologists Committees on Obstetric and Pediatric Anesthesiology and the North American Fetal Therapy Network*, 132 Anesthesia & Analgesia 1164 (2021) ..........................................................................................................16

Fred de Miranda & Patricia Lee June, *When Human Life Begins*, Am. Coll. of Pediatricians 1 https://acpeds.org/assets/imported/3.21.17-When-Human-Life-Begins.pdf (Mar. 2017) ............................................................13

Letter from Xavier Becerra, Sec'y, U.S. Dep't Health & Hum. Servs. to Health Care Providers (July 11, 2022), https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-providers.pdf....................................................................2

*Pro-Life Model Legislation and Guides*, Ams. United for Life, https://aul.org/law-and-policy/ (last visited July 5, 2023).......................... viii

Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss, Ctrs. for Medicare & Medicaid Servs. (Aug. 25, 2022), https://www.cms.gov/files/document/qso-22-22-hospitals.pdf.............. 1, 2, 7

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

Americans United for Life (AUL) is the original national pro-life legal advocacy organization. Founded in 1971, AUL has committed over fifty years to protecting human life from conception to natural death. Supreme Court opinions have cited briefs and scholarship authored by AUL. *See, e.g., Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2266 (2022) (citing Clarke D. Forsythe, Abuse of Discretion: The Inside Story of *Roe v. Wade* 127, 141 (2012)). AUL attorneys regularly evaluate and testify on various bioethics bills and amendments across the country. AUL has created comprehensive model legislation and works extensively with state legislators to enact constitutional pro-life laws, including legislation preventing public funds from subsidizing abortion and protecting healthcare providers' freedom of conscience. *See Pro-Life Model Legislation and Guides*, Ams. United for Life, https://aul.org/law-and-policy/ (last visited July 5, 2023).

---

[1] No party's counsel authored any part of this brief. No person other than *Amicus Curiae* and its counsel contributed any money intended to fund the preparation or submission of this brief. Plaintiffs-Appellees and Defendants-Appellants have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Emergency Medical Treatment and Labor Act (EMTALA) does not mention abortion once. *See* 42 U.S.C. § 1395dd. The statute requires hospitals with an emergency department to determine whether an individual who requests service has an emergency medical condition. *Id*. at § 1395dd(a). If an individual has an emergency medical condition, the statute requires the hospital to provide stabilizing care or transfer the individual. *Id*. at § 1395dd(b)(1). An emergency medical condition is defined as:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.

*Id.* at § 1395dd(e)(1)(A). The purpose of this statute is to prevent the practice of patient dumping. Yet, the U.S. Department of Health and Human Services (HHS) exceeded the text's bounds by including an abortion mandate in its Guidance interpreting this statute. *See* Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss, Ctrs. for Medicare & Medicaid Servs. (Aug. 25, 2022), https://www.cms.gov/files/document/qso-22-22-hospitals.pdf. The Guidance states that the physician's duty to provide stabilizing treatment under EMTALA requires the physician to perform an abortion if "abortion

1

is the stabilizing treatment necessary to resolve that condition" preempting any contrary state law. *Id*. at 1. When HHS issued the Guidance, HHS Secretary Xavier Becerra simultaneously sent a Letter to health care providers to reinforce the Guidance's abortion mandate.[2] *Amicus* supports Appellees and urges this Court to affirm the permanent injunction that prevents the Guidance and Letter's radical interpretation of EMTALA from being enforced.

We write separately to highlight that HHS' interpretation of EMTALA cannot be found in the statutory text or in the policy purposes behind the passing of the statute. Congress has consistently expressed a policy of prioritizing and protecting human life from abortion violence, which HHS is bound to acknowledge and implement since there is no federal right or interest in abortion following *Dobbs v. Jackson Women's Health Organization*. *See* 142 S. Ct. 2228. By mandating that physicians perform elective abortions in some instances, HHS both undermined Congress' legislative intent to protect unborn children in EMTALA, and subverted federal pro-life policy. HHS further contravened the medical understanding that the unborn child is a second patient. By unlawfully interfering with state medical licensing, HHS is creating an ambiguous standard of care that will hurt women

---

[2] Letter from Xavier Becerra, Sec'y, U.S. Dep't Health & Hum. Servs. to Health Care Providers (July 11, 2022), https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-providers.pdf.

seeking abortion. Accordingly, we ask the Court to affirm the permanent injunction against the enforcement of this unlawful abortion mandate.

## ARGUMENT

I.    THE ABORTION MANDATE VIOLATES THE MAJOR QUESTIONS DOCTRINE BY UNDERMINING CONGRESS' INTENT TO PROTECT UNBORN LIFE THROUGH EMTALA.

The EMTALA abortion mandate has no legal basis and violates the major questions doctrine. EMTALA requires "[n]ecessary stabilizing treatment for emergency medical conditions and labor." 42 U.S.C. § 1395dd(b). Under the statute, "to stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to [a woman in labor], to deliver (including the placenta)." *Id*. § 1395dd(e)(3)(A). Nothing in EMTALA's text discusses abortion, let alone requires states to permit the practice. *Id*. § 1395dd.

In *Dobbs v. Jackson Women's Health Organization*, the Supreme Court held there is no federal constitutional right to abortion and returned the abortion issue to the democratic process. 142 S. Ct. at 2242–2243. Under the major questions doctrine, this means that HHS must have explicit authority from Congress to regulate abortion because *Dobbs* restored the legislatures' authority to create abortion policy. The doctrine "refers to an identifiable body of law that has developed over a series

of significant cases all addressing a particular and recurring problem: agencies asserting highly consequential power beyond what congress could reasonably be understood to have granted." *West Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2609 (2022). As the Court recognized, "there are 'extraordinary cases' that call for a different approach—cases in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *Id*. at 2608 (citation omitted) (alteration in original).

In *Biden v. Nebraska*, the Supreme Court recently rejected the "Government's reading of the HEROES Act, [under which] the Secretary [of Education] would enjoy virtually unlimited power to rewrite the Education Act," including the cancellation of $430 billion in student loans. 600 U.S. ___, slip op. at 20–21(2023). Likewise, HHS cannot rewrite EMTALA to manufacture an abortion mandate. And just as the Court "f[oun]d it 'highly unlikely that Congress would leave' to 'agency discretion' the decision of how much coal-based generation there should be over the coming decades" in *West Virginia v. Environmental Protection Agency*, 142 S. Ct. at 2613, it is equally unlikely that EMTALA authorizes HHS to set a national abortion policy. Abortion is a heated political topic. As *Dobbs* notes, there has not been "a national settlement of the abortion issue," but, rather, abortion has been a contentious issue over the past half-century after "*Roe* and *Casey* [] enflamed debate

4

and deepened division." *Dobbs*, 142 S. Ct. at 2243. Yet, HHS tries to institute a national abortion policy by protecting abortion under the guise of stabilizing medical care even though EMTALA does not mention abortion. Since the abortion issue has returned to the democratic process, Congress holds the federal power to legislate on the abortion issue. HHS must show that Congress has delegated that authority to HHS, but it cannot.

EMTALA's text, moreover, considers the unborn child a second patient, and abortion conflicts with this understanding. EMTALA explicitly protects an "unborn child" at four separate points in the statute. 42 U.S.C. § 1395dd. In transferring a woman in labor, medical professionals must certify that "the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks . . . to the *unborn child* from effecting the transfer." *Id*. § 1395dd(c)(1)(A)(ii) (emphasis added). EMTALA defines "appropriate transfer" as "a transfer . . . in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to . . . the health of the *unborn child*." *Id*. § 1395dd(c)(2)(A) (emphasis added). Under the statute, an "emergency medical condition" is "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in . . . placing . . . with respect to a pregnant woman, the health of the woman or her

5

*unborn child* [] in serious jeopardy." *Id.* § 1395dd(e)(1)(A) (emphasis added). Regarding pregnant women having contractions, an "emergency medical condition" includes a situation in which "transfer [of the patients] may pose a threat to the health or safety of the woman or the *unborn child*." *Id.* § 1395dd(e)(1)(B)(ii) (emphasis added). EMTALA's consideration of the unborn child as a second patient is consistent with modern medicine, discussed *infra* Section III.

By writing an abortion mandate into EMTALA's text, HHS would undermine Congress' intent to protect the unborn child from harm. As the Supreme Court directs in *Dobbs*, "States [and Congress] may regulate abortion for legitimate reasons, and when such regulations are challenged under the Constitution, courts cannot 'substitute their social and economic beliefs for the judgment of legislative bodies.'" 142 S. Ct. at 2283–2284. The Court recognizes that:

> These legitimate interests include respect for and preservation of prenatal life at all stages of development . . . the protection of maternal health and safety; the elimination of particularly gruesome or barbaric medical procedures; the preservation of the integrity of the medical profession; the mitigation of fetal pain; and the prevention of discrimination on the basis of race, sex, or disability.

*Id.* at 2284. Furthermore, "[a] law regulating abortion, like other health and welfare laws, is entitled to a 'strong presumption of validity.'" *Id.* (citation omitted).

Even though EMTALA's plain language protects unborn children, which indicates Congress has balanced its interests in favor of protecting unborn human life, at no point does the HHS Guidance consider the government's interest in

protecting unborn children. *See* Reinforcement of EMTALA Obligations, *supra*. Moreover, the HHS Guidance does not have the authority to rebalance Congress' interests. Congress has already weighed the appropriate considerations and decided to protect them in the manner EMTALA lays out. Throughout the statute, Congress took measures to protect patients—including unborn children—in the way and by the means it decided to be appropriate. HHS lacks the authority to attempt to change how Congress has weighed the interests at stake in pregnancy by diminishing protections for unborn children. Accordingly, the EMTALA abortion mandate is unlawful under the major questions doctrine and has undermined the statute's text and intent.

II.    THE ABORTION MANDATE SUBVERTS CONGRESS' PRO-LIFE POLICY STANCE.

Congress has demonstrated a consistent commitment to protecting human life in federal policy, particularly the lives of unborn children. Following *Dobbs*, federal law provides no right or interest in elective abortion. *See infra* Section II.A. Without any such right or interest, HHS must look to the actions and intentions of democratically elected lawmakers in Congress to determine the policy objectives it ought to incorporate into its rulemaking processes. Congress has manifested a policy of protecting human life through pro-life statutes, and HHS cannot interpolate abortion mandates into EMTALA's text because the agency lacks any authority to act against federal policy.

A.    There is No Federal Right or Interest in Abortion Following *Dobbs*.

There is no federal right or interest in abortion, and none existed before *Roe v. Wade* concocted it. *See* 410 U.S. 113 (1973), *overruled by Dobbs*, 142 S. Ct. 2228. Accordingly, HHS has no authority to protect abortion within EMTALA's text. *Roe* was a consequence of abortionists turning to judicial activism to create an abortion "right." The Supreme Court in *Roe* held the "right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action . . . or . . . in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id*. at 153. As Justice Alito wrote in *Dobbs*,

> *Roe* . . . was remarkably loose in its treatment of the constitutional text. It held that the abortion right, which is not mentioned in the Constitution, is part of a right to privacy, which is also not mentioned . . . And that privacy right, *Roe* observed, had been found to spring from no fewer than five different constitutional provisions—the First, Fourth, Fifth, Ninth, and Fourteenth Amendments.

*Dobbs*, 142 S. Ct. at 2245. The *Roe* Court then concocted an arbitrary trimester test for determining the constitutionality of abortion regulations.

*Planned Parenthood of Southeastern Pennsylvania v. Casey* subsequently clarified that abortion was a substantive due process right, not a privacy right, and reaffirmed the right to a pre-viability abortion "is the most central principle of *Roe v. Wade*." 505 U.S. 833, 871 (1992), *overruled by Dobbs*, 142 S. Ct. 2228. Justice Alito noted in *Dobbs* that "[t]he *Casey* Court did not defend [*Roe*'s] unfocused

analysis and instead grounded its decision solely on the theory that the right to obtain an abortion is part of the 'liberty' protected by the Fourteenth Amendment's Due Process Clause." *Dobbs*, 142 S. Ct. at 2245.

*Dobbs* refuted *Roe* and *Casey*'s faulty foundations by holding there is no constitutional right to abortion. The Due Process Clause protects rights guaranteed by the first eight Amendments and, at issue in *Dobbs*, unenumerated fundamental rights. However, for unenumerated fundamental rights, the Court must "ask[] whether the right is 'deeply rooted in [our] history and tradition' and whether it is essential to our Nation's 'scheme of ordered liberty.'" *Id*. at 2246 (citation omitted) (second alteration in original). After analyzing abortion under this test, the Court held "[t]he inescapable conclusion is that a right to abortion is not deeply rooted in the Nation's history and traditions." *Id*. at 2253.

Further, there is no federal statute protecting a right to abortion. HHS must have a statutory basis for implementing a federal abortion policy, given there is no constitutional provision. HHS cannot point to such a statute since none exists. To include abortion as a right within a proper interpretation of EMTALA, HHS *must* explicitly point to a provision providing authority to create a national abortion policy. *See supra* Section I. HHS cannot do so due to *Dobbs*' ruling that there is no constitutional right to abortion, and the issue has properly returned to the authority of the democratic process.

B.    HHS's Reinterpretation of EMTALA Undermines Congress's Pro-life
       Policy Stance.

Federal policy is overwhelmingly pro-life. Following *Dobbs*, there is no
federal right or interest in promoting, providing, or paying for elective abortion.
Rather, there is a plethora of statutes protecting women, unborn children, families,
and medical professionals from the harms of abortion violence. Congress maintains
a pro-life policy stance, and HHS cannot act contrary to that policy by manufacturing
abortion protections within EMTALA.

Many federal statutes highlight the emphasis Congress has placed on
protecting women and unborn life from the harms of abortion violence. The Born-
Alive Infants Protection Act recognizes that children born alive after attempted
abortion are legal persons under federal law and cannot be left to die without medical
care. 1 U.S.C. § 8. The Partial-Birth Abortion Ban Act prohibits the horrific abortion
method that induces labor just to kill the child when she is partially born. 18 U.S.C.
§ 1531. In the findings of the Partial-Birth Abortion Ban Act, Congress described
the unborn child as "living" and partial-birth abortion as a "gruesome and inhumane
procedure." Pub. L. 108-105, § 2(1), 117 Stat. 1201, 1201 (2003). The committee
even noted that part of its motivation for banning the procedure stemmed from the
belief that the procedure cultivates a "complete disregard for infant human life." *Id.*
at § 2(14)(L), 117 Stat. at 1206. Federal law also bars the use of the United States
Postal Service or common carriers from mailing abortion-inducing drugs, including

the chemical abortion regimen of mifepristone and misoprostol. 18 U.S.C. §§ 1461; 1462. As expressions of public policy, these statutes overwhelmingly manifest Congress's intention to protect human life from abortion.[3]

Over the past half-century, Congress has enacted numerous statutes protecting medical professionals that conscientiously object to taking a human life through abortion, including the Church Amendments, 42 U.S.C. § 300a-7, Coats-Snowe Amendment, 42 U.S.C. § 238n, and Weldon Amendment, *see*, *e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. H, tit. V, § 507(d), ___ Stat. ___, ___ (2022). There are conscience protections throughout federal law, such as in the Danforth Amendment to Title IX's definition of sex discrimination, 20 U.S.C. § 1688, amendments regulating managed-care providers in the Medicare and Medicaid programs, 42 U.S.C. §§ 1395w-22(j)(3)(B), 1396u-2(b)(3)(B), and Affordable Care Act provisions regarding insurance, 42 U.S.C. § 18023(b)(4).

Congress regularly restricts public funding of elective abortion. The Hyde Amendment has been a cornerstone of every federal health and welfare appropriations bill since Congressman Henry Hyde first proposed it in 1976. *See*

---

[3] Objectors may point to the Freedom of Access to Clinic Entrances Act ("FACE Act") as evidence to the contrary. The law prohibits using force or threatening somebody to impede them from obtaining reproductive health services. *See* 18 U.S.C. § 248. The statute's coverage includes harassment against pro-life pregnancy resource centers and separately covers "place[s] of religious worship." *Id.* This law does not authorize violence against unborn life, but rather evenhandedly "protect[s] the public safety and health and activities affecting interstate commerce" in reproductive healthcare and religious activities. Pub. L. No. 103-259, § 2, 108 Stat. 694, 694 (1994).

Pub. L. No. 94-439 tit. II, § 209, 90 Stat. 1418, 1434 (1976). The present version of the Hyde Amendment restricts abortion funding except for medical emergencies and cases of rape or incest. Consolidated Appropriations Act, 2023, div. H., tit. V, §§ 506–507. Congress also restricts abortion in other areas. The Dornan Amendment prohibits the District of Columbia from expending public funds for abortion except if the mother's life is at risk or in cases of rape or incest. Consolidated Appropriations Act, 2023, div. E, tit. VIII, § 810. Federal programs often include explicit abortion funding prohibitions, such as Title X, which restricts recipients from using public funds "in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Congress has enacted restrictions on federal assistance if those funds promote abortion. For instance, Congress enacted the Biden Amendment—named after President Joe Biden when he was a Senator—to prevent federal funds from supporting biomedical research relating to abortion. 22 U.S.C. § 2151b(f)(3).

These statutes show that federal policy opposes abortion violence. Moreover, Congress has repeatedly rebuffed anti-life bills that would concoct legal protections for abortion. *See*, *e.g.*, Women's Health Protection Act of 2021, H.R. 3755, 117th Cong. (2021); Women's Health Protect Act of 2019, H.R. 2975, 116th Cong. (2019). Again, there is no federal right or interest in elective abortion following the *Dobbs* decision. Rather, federal abortion policy protects infants born-alive after a botched

12

abortion, prohibits gruesome partial-birth abortions, bans the mailing of abortion-inducing drugs, safeguards conscientious objections towards abortion, and restricts the public funding of abortion. Accordingly, federal policy is pro-life. Injecting abortion into EMTALA would directly conflict with federal pro-life policy. HHS has not shown it has the authority to disregard and act contrary to Congress' pro-life policy stance. As a result, HHS lacks the authority to promulgate an abortion mandate, and this Court should affirm the permanent injunction against the lawless Guidance.

III.   THE ABORTION MANDATE CONTRAVENES THE MEDICAL UNDERSTANDING OF THE UNBORN CHILD AS A SECOND PATIENT.

The abortion mandate not only conflicts with EMTALA's intent to protect unborn children and federal pro-life policy, but also is in tension with the medical profession's treatment of the unborn child as a second patient. The unborn child is a genetically distinct living member of the human species. Fred de Miranda & Patricia Lee June, *When Human Life Begins*, Am. Coll. of Pediatricians 1, 1–2 https://acpeds.org/assets/imported/3.21.17-When-Human-Life-Begins.pdf    (Mar. 2017). Accordingly, she is a patient in her own right. As Dr. Monique C. Wubbenhorst testified before the U.S. House Committee on Oversight and Reform, "[c]linicians caring for pregnant women have two patients: the mother and her unborn child." *[Written] Testimony of Monique C. Wubbenhorst, M.D., M.P.H., F.A.C.O.G., F.A.H.A, in Examining the Harm to Patients from Abortion Restrictions*

*and the Threat of a National Abortion Ban before the H. Comm. on Oversight & Reform*, 117th Cong. 3 (2022). Recognition of the fetus as an unborn child has progressed due to technology because modern technology has provided evidence of the "human form" of the child to make him or her a patient on their own. *Id.* ("Sophisticated imaging, genetics, and the exploding field of fetal therapy have increased our knowledge of fetal life. Mainstream medicine now treats the fetus as a patient, capable of being treated and worthy of care." (citation omitted)). It is only in the context of abortion that the fetus is not considered a second patient. *Id.* at 4. Advancements in technology have developed the medical profession's recognition of the unborn child as a person worthy of care and dignity and have also allowed the profession to develop procedures to treat the child while in the womb. *Id.* at 3–4. Accordingly, "at minimum, the same ethical principles governing the medical treatment of the fetus should govern elective abortion of the fetus. This includes restrictions on abortions performed past the second trimester, and recognition of the fact that the fetus experiences pain at earlier gestational ages than previously thought." *Id.* at 4.

Fetal surgery is even recognized as a specialized field of medicine now. Physicians treat fetuses as patients and can provide several options for fetuses suffering from a list of conditions. Am. Ass'n of Pro-Life Obstetricians & Gynecologists, *Fetal Intervention and Selective Reduction Policymakers*, Prac.

Guideline No. 12, at 1 (Dec. 2021). These conditions include twin-twin transfusion syndrome, congenital diaphragmatic hernia, and open neural tube defects. *Id*. at 1–3. Fetal intervention, for instance, has developed to reduce suffering in "non-lethal fetal conditions." *Id*. at 1. Guidelines have been established for physicians to treat these fetal conditions while also protecting the health and life of the mother. *Id*. at 3–6.

In this field, medicine shows that fetuses can feel pain. Am. Ass'n of Pro-Life Obstetricians & Gynecologists, *Fetal Pain*, Prac. Guideline No. 2, at 3 (2021). Pain has been defined in biology as "aversive behavioral and physiological reactions and . . . suspension of normal behavior in response to noxious stimuli," and there is "significant evidence that fetuses can perceive noxious stimuli and demonstrate physiological and behavioral reactions to them—fetuses are not numb to invasive or harmful interaction." *Id*. at 1. The evidence shows that fetuses certainly experience pain by 22 weeks gestational age and even "respond to touch as early as 7 to 8 weeks." *Id*. at 3. Accordingly, "it is best to administer adequate fetal anesthesia in all invasive maternal–fetal procedures to inhibit the humoral stress response, decrease fetal movement, and blunt any perception of pain, as has been standard practice since the start of maternal–fetal surgery in the early 1980s." Debnath Chatterjee et al., *Anesthesia for Maternal-Fetal Interventions: A Consensus Statement From the American Society of Anesthesiologists Committees on Obstetric*

*and Pediatric Anesthesiology and the North American Fetal Therapy Network*, 132 Anesthesia & Analgesia 1164, 1167 (2021). In sum, the medical profession has recognized the importance of protecting unborn life in its practice and treats the unborn child as a patient in her own right. Yet, the HHS Guidance contravenes this medical understanding.

IV.    THE ABORTION MANDATE UNLAWFULLY USURPS STATE MEDICAL LICENSING AND DEVISES AN AMBIGUOUS STANDARD OF CARE.

Abortion is not appropriate medical care under state abortion prohibition statutes unless the licensed medical professional follows carefully delineated statutory guidelines. In Texas, "[a] person may not knowingly perform, induce, or attempt an abortion" unless the "pregnancy [] places the female at risk of death or poses a serious risk of substantial impairment of a major bodily function unless the abortion is performed or induced." Tex. Health & Safety Code § 170A.002(a) to (b) (2022). However, the licensed physician must "perform[], induce[], or attempt[] the abortion in a manner that, in the exercise of reasonable medical judgment, provides the best opportunity for the unborn child to survive" unless that procedure would create "a greater risk of the pregnant female's death" or "a serious risk of substantial impairment of a major bodily function of the pregnant female." *Id*. § 170A.002(b)(3).

State police powers broadly include the power to regulate health and safety within a state's borders and thus to regulate the medical profession:

It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state's police power. The state's discretion in that field extends naturally to the regulation of all professions concerned with health. [For example, i]n Title VIII of its Education Law, the State of New York regulates many fields of professional practice, including medicine . . . . It has established detailed procedures for investigations, hearings and reviews with ample opportunity for the accused practitioner to have his case thoroughly considered and reviewed.

*Barsky v. Bd. of Regents of the Univ. of the State of New York*, 347 U.S. 442, 449 (1954). Further, the state's police power especially extends to licensing professions when public health is at stake. *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1054 (9th Cir. 2000) (citation omitted). Following *Dobbs*, and without contrary direction from Congress, this power allows states to regulate the medical profession's practice of abortion through its licensing boards.

Doctors must thus follow the scope of their state medical licensing boards. If a Texas doctor does not follow the statutory guidelines in the Texas abortion abolition statute, she acts outside the scope of her medical license and is subject to professional disciplinary action.[4] Tex. Health & Safety Code § 170A.007 (2022). The EMTALA abortion mandate would rewrite state abortion health and safety laws

---

[4] Texas' laws only proscribe elective induced abortions. Elective induced abortions are "procedures done with the primary intent to produce dead offspring" and are distinct from "medically-indicated separation procedures necessary to save the life of a woman." The laws prohibiting elective induced abortions would not affect the procedures done to save the life of the mother. *See* Am. Ass'n of Pro-Life Obstetricians & Gynecologists, *State Restrictions on Abortion: Evidence-Based Guidance for Policymakers*, Comm. Op. No. 10, at 1 (Sept. 2022).

and medical licensing statutes to permit doctors to engage in the unlicensed practice of medicine in pro-life states such as Texas. Yet the Medicare Act, which includes EMTALA, directs that "[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395. Accordingly, HHS has no authority to alter state medical licensing statutes, nor health and safety laws that abolish abortion.

Moreover, HHS has not shown how it has the authority to become the "*ex officio* medical board*" in setting a national abortion policy. As Justice White noted in *Planned Parenthood of Central Missouri v. Danforth*, the Supreme Court's contrived constitutional right to abortion allowed the Court to become the nation's "*ex officio* medical board with powers to approve or disapprove medical and operative practices and standards [on abortion] throughout the United States." *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 99 (1976) (White, J., concurring in part and dissenting in part); *see* Clarke D. Forsythe, *A Draft Opinion Overruling* Roe v. Wade, 16 Geo. J. L & Pub. Pol'y 445, 473, 476, (2018). Supreme Court Justices regularly employed this language to express concern about the Court's involvement in abortion laws. *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2326 (2016) (Thomas, J., dissenting); *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 519 (1989) (Rehnquist, J.) (plurality opinion) (citation omitted); *City*

*of Akron v. Akron Ctr. for Reprod. Health*, 462 U.S. 416, 456 (1983) (O'Connor, J., dissenting) (citation omitted)); *see* Forsythe, *A Draft Opinion Overruling* Roe v. Wade, *supra* at 473 n. 218. "The unprecedented role of the Court, coupled with the broad license to abortion [in *Roe*], mean[t] that the Court occupie[d] and control[ed] the entire field of elective abortion—a procedure allowed for any reason, at any time of pregnancy, and in every state." Clarke D. Forsythe & Rachel N. Morrison, *Stare Decisis, Workability, and* Roe v. Wade*: An Introduction*, 18 Ave Maria L. Rev. 48, 75 (2020).

This approach was unworkable, and "[t]he Court [wa]s unable to effectively implement the expansive role it fashioned for itself" as the abortion *ex officio* medical board. *Id.*; *see* Forsythe, *A Draft Opinion Overruling* Roe v. Wade, *supra* at 476. The Court cannot appropriately weigh the "imponderable values" involved in the practice of abortion. *June Med. Servs., LLC v. Russo*, 140 S. Ct. 2103, 2136 (2020) (Roberts, C.J., concurring in the judgment). That difficult task belongs to the "legislators, not judges." *Id.* "[F]oreclosing all democratic outlet for the deep passions this issue arouses, [and] banishing the issue from the political forum" only inflamed the divisive debate on abortion policy. *Casey*, 505 U.S. at 1002 (Scalia, J., concurring in the judgment in part and dissenting in part). Further, no federal licensure board for the practice of abortion exists. Post-*Dobbs*, the legislatures have the authority to govern abortion, and administrative agencies may not act as a

commanding medical board without authorization. Abortion policy, as we have learned through the *Roe* era, is best left to elected representatives chosen by the people.

HHS cannot assert that the EMTALA abortion mandate preempts state medical licensing laws. EMTALA provides a section on preemption, directing, "[t]he provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). Again, EMTALA requires stabilizing treatment but says nothing about abortion as a form of stabilizing treatment. In this regard, there is no direct conflict between state abortion abolition statutes and EMTALA. Consequently, per the statutory text, there is no preemption issue. Rather, Congress directs HHS to respect the authority of pro-life state limits on medical licenses, which only permit abortion in narrowly defined circumstances.

If HHS's abortion mandate became enforceable, it would create an array of issues, given the conflict between federal law and state laws prohibiting abortion. The standard of care for doctors would be unclear since they would no longer be within the scope of the state medical licensure in states that have abolished abortion. The standard of care for many pro-life state laws would be questioned, including whether the doctor must adhere to state informed consent and health and safety protections for women seeking abortion. These provisions include:

- reflection periods, *see*, *e.g.*, Iowa Code § 146A.1(1) (2023);

- ultrasound requirements, *see*, *e.g.*, *id.*;

- informational disclosures on procedural risks, *see*, *e.g.*, *id.* § 146A.1(1)(d);

- notice of the availability of perinatal hospice resources, *see*, *e.g.*, Neb. Rev. Stat. §§ 71-5001 to 71-5004 (2017);

- prenatal nondiscrimination laws, such as prohibitions on sex-, race-, or disability-selective abortions, *see*, *e.g.*, Ariz. Rev. Stat. Ann. § 13-3603.02(A) (2021);

- parental involvement laws such as requirements for parental consent or notification when an unemancipated pregnant minor is seeking an abortion, *see*, *e.g.*, N.C. Gen. Stat. § 90-21.7 (1995).

Additionally, if a woman suffers from an incomplete abortion and would like to commence a lawsuit, it is unclear what the standard of care would be in a subsequent lawsuit. If the performed abortion is illegal under state law, then the doctor performed the abortion outside the legal standards set by the state licensing board on the one hand. On the other hand, no federal licensing board exists to provide guidelines for the doctor's scope of lawful conduct. This leaves the doctor unclear about his obligations and potentially leaves the woman and her family without legal recourse. Such a situation would create an untenable regulatory framework. Congress has not given HHS the authority to create a national abortion policy, let alone the power to interfere with state medical licensing to this degree.

## CONCLUSION

The United States has a strong history of protecting women and unborn children from abortion violence, and HHS' abortion mandate contradicts this policy position. Accordingly, *Amicus Curiae* respectfully asks this court to affirm the lower court's permanent injunction.

Respectfully submitted,

STEVEN H. ADEN
  *Counsel of Record*
CAROLYN MCDONNELL
DANIELLE PIMENTEL
AMERICANS UNITED FOR LIFE
1150 Connecticut Ave., N.W.
Suite 500
Washington, DC 22036
Steven.Aden@aul.org
Telephone: 202-741-4917

*Counsel for* Amicus Curiae

July 7, 2023

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

A. I hereby certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this brief complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because it contains 5,395 words, excluding the parts exempted by Fed. R. App. P. 32(f).

B. I also certify that this brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Times New Roman.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

STEVEN H. ADEN
  *Counsel of Record*
AMERICANS UNITED FOR LIFE
1150 Connecticut Ave., N.W.
Suite 500
Washington, DC 22036
Steven.Aden@aul.org
Telephone: 202-741-4917

*Counsel for* Amicus Curiae

July 7, 2023

# CERTIFICATE OF SERVICE

I certify that on July 7, 2023, I electronically filed the foregoing brief with the Clerk of Court throughout the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

/s/ Steven H. Aden
STEVEN H. ADEN
  *Counsel of Record*
AMERICANS UNITED FOR LIFE
1150 Connecticut Ave., N.W.
Suite 500
Washington, DC 22036
Steven.Aden@aul.org
Telephone: 202-741-4917

*Counsel for* Amicus Curiae