No. 23-10246

In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS,

Plaintiffs – Appellees,

*v.*

XAVIER BECERRA; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CENTERS FOR MEDICARE AND MEDICAID SERVICES; KAREN L. TRITZ; DAVID R. WRIGHT,

Defendants – Appellants.

_____

On Appeal from the United States District Court
For the Northern District of Texas at Lubbock (Hendrix, J.)
Civil Action No. 5:22-CV-00185

_____

**BRIEF OF THE CATHOLIC HEALTH CARE LEADERSHIP ALLIANCE, CATHOLIC MEDICAL ASSOCIATION, CATHOLIC BENEFITS ASSOCIATION, CATHOLIC BAR ASSOCIATION, THE NATIONAL CATHOLIC BIOETHICS CENTER, CHRIST MEDICUS FOUNDATION, NATIONAL ASSOCIATION OF CATHOLIC NURSES-U.S.A., AND THE TEXAS CATHOLIC CONFERENCE OF BISHOPS AS *AMICI CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE**

_____

Thomas Brejcha
B. Tyler Brooks
THOMAS MORE SOCIETY
309 W. Washington St., Suite 1250
Chicago, IL 60606
Telephone: (336) 707-8855
*Counsel for Amici Curiae*

## STATEMENT OF INTERESTED PERSONS

Undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case pursuant to Rule 28.2.1 and 5th Cir. R. 29.2. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### Plaintiffs-Appellees

STATE OF TEXAS
AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS ("AAPLOG")
CHRISTIAN MEDICAL AND DENTAL ASSOCIATION ("CMDA")
(Neither AAPLOG nor CMDA have parent corporations nor are either owned by a publicly held corporation holding more than 10% of stock.)

### Defendants-Appellants

XAVIER BECERRA
UNITED STATES DEPT. OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES
KAREN L. TRITZ
DAVID R. WRIGHT

### Counsel for Plaintiffs-Appellees

*Office of the Texas Attorney General*
 John Scott
 Brent Webster
 Lanora C. Pettit
 Natalie D. Thompson
 Sara B. Baumgardner
 Amy Snow Hilton
 Christopher D. Hilton

*Alliance Defending Freedom*
    Matthew S. Bowman
    Julie Marie Blake
    John J. Bursch
    Ryan L. Bangert

## **Counsel for Defendants-Appellants**

*United States Department of Justice*
    Brian M. Boynton
    Leigha Simonton
    Michael S. Raab
    McKaye L. Neumeister
    Nicholas S. Crown
    Christopher R. Healy

## ***Amici* and Counsel for Defendants-Appellants**

AMERICAN ACADEMY OF PEDIATRICS
AMERICAN COLLEGE OF EMERGENCY PHYSICIANS
AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS
AMERICAN MEDICAL ASSOCIATION
AMERICAN PUBLIC HEALTH ASSOCIATION
SOCIETY FOR MATERNAL-FETAL MEDICINE
*Debevoise & Plimpton*
    Shannon Rose Selden
    Adam Aukland-Peck
*Democracy Forward Foundation*
    Jeffrey B. Dubner
    Skye L. Perryman

CITY & COUNTY OF SAN FRANCISCO
    David Chiu

COUNTY OF LOS ANGELES
    Dawyn Harrison

CITY OF PHILADELPHIA
    Diana P. Cortes

COUNTY OF MONTEREY
  Leslie J. Girard

CITY OF NORTHAMPTON
  Alan Seewald

COUNTY OF MARIN
  Brian E. Washington

CITY OF MADISON
  Michael Haas

COUNTY OF MILWAUKEE
  Margaret C. Daun

CITY OF AUSTIN
  Anne L. Morgan

KING COUNTY
  Leesa Manion

TRAVIS COUNTY, TX
  Delia Garza

COUNTY OF SANTA CLARA, CA
  Rachel Neil
  James R. Williams
  Kavita Narayan
  Meredith A. Johnson

STATE OF CONNECTICUT
  William Tong

STATE OF DELAWARE
  Kathleen Jennings

STATE OF MAINE
  Aaron M. Frey

STATE OF ARIZONA
    Kristin K. Mayes

STATE OF HAWAII
    Anne E. Lopez

STATE OF CALIFORNIA
    Rob Bonta
    Renu R. George
    Karli Eisenberg
    David Houska
    Hayley Penan

STATE OF NEW YORK
    Letitia James
    Barbara D. Underwood
    Ester Murdukhayeva
    Galen Sherwin
    Laura Etlinger

STATE OF COLORADO
    Philip J. Weiser

STATE OF MARYLAND
    Anthony Brown

COMMONWEALTH OF MASSACHUSETTS
    Andrea Joy Campbell

STATE OF NEW MEXICO
    Raul Torrez

STATE OF MICHIGAN
    Dana Nessel

STATE OF WASHINGTON
    Robert W. Ferguson

STATE OF MINNESOTA
  Keith Ellison

STATE OF NORTH CAROLINA
  Joshua H. Stein

STATE OF NEVADA
  Aaron D. Ford

STATE OF OREGON
  Ellen F. Rosenblum

STATE OF NEW JERSEY
  Matthew J. Platkin

COMMONWEALTH OF PENNSYLVANIA
  Michelle A. Henry

STATE OF RHODE ISLAND
  Peter F. Neronha

DISTRICT OF COLUMBIA
  Brian L. Schwalb

### _Amici_ and Counsel for Plaintiffs-Appellees

LIFE LEGAL DEFENSE FOUNDATION
  Catherine W. Short
_Messall Law Firm, LLC_
  Rebecca R. Messall
(Life Legal Defense Foundation does not have a parent corporation, nor does a publicly held corporation hold any stock in it.)

CHARLOTTE LOZIER INSTITUTE
_Schaerr Jaffee LLP_
  Gene C. Schaerr
  Cristina Martinez Squiers
  Joshua J. Prince

(The Charlotte Lozier Institute does not have a parent corporation, nor does a publicly held corporation hold any stock in it.)

AMERICANS UNITED FOR LIFE
    Steven H. Aden
    Carolyn McDonnell
    Danielle Pimentel
(Americans United for Life does not have a parent corporation, nor does a publicly held corporation hold any stock in it.)

ADVANCING AMERICAN FREEDOM
40 DAYS FOR LIFE
AMERICAN VALUES
ANGLICANS FOR LIFE
CENTER FOR POLITICAL RENEWAL
CENTER FOR URBAN RENEWAL AND EDUCATION
CHARLIE GEROW
CHRISTIANS ENGAGED
GLOBAL LIBERTY ALLIANCE
INTERNATIONAL CONFERENCE OF EVANGELICAL CHAPLAIN ENDORSERS
JAMES DOBSON FAMILY INSTITUTE
MINNESOTA FAMILY COUNCIL
MISSOURI CENTER-RIGHT COALITION
MONTANA FAMILY FOUNDATION
MY FAITH VOTES
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH
NEW JERSEY FAMILY POLICY CENTER
FRONTLINE POLICY COUNCIL
PROJECT 21 BLACK LEADERSHIP NETWORK
SAMARITAN'S PURSE
STUDENTS FOR LIFE OF AMERICA
THE CHRISTIAN LAW ASSOCIATION
THE CORNWALL ALLIANCE FOR THE STEWARDSHIP OF CREATION
THE FAMILY FOUNDATION
THE JUSTICE FOUNDATION
YOUNG AMERICA'S FOUNDATION
    J. Marc Wheat

(None of these *amici* has a parent corporation, nor does a publicly held corporation hold any stock in any of them.)

INSTITUTE FOR FAITH AND FAMILY
    Deborah J. Dewart
(The Institute for Faith and Family does not have a parent corporation, nor does a publicly held corporation hold any stock in it.)

CATHOLIC HEALTH CARE LEADERSHIP ALLIANCE
CHRIST MEDICUS FOUNDATION
NATIONAL CATHOLIC BIOETHICS CENTER
CATHOLIC BAR ASSOCIATION
CATHOLIC MEDICAL ASSOCIATION
NATIONAL ASSOCIATION OF CATHOLIC NURSES-U.S.A.
CATHOLIC BENEFITS ASSOCIATION
TEXAS CATHOLIC CONFERENCE OF BISHOPS
*Thomas More Society*
    Thomas Brejcha
    B. Tyler Brooks

In accordance with Federal Rule of Appellate Procedure 26.1, *amici curiae* CATHOLIC HEALTH CARE LEADERSHIP ALLIANCE; CHRIST MEDICUS FOUNDATION; NATIONAL CATHOLIC BIOETHICS CENTER; CATHOLIC BAR ASSOCIATION; CATHOLIC MEDICAL ASSOCIATION; NATIONAL ASSOCIATION OF CATHOLIC NURSES-U.S.A.; CATHOLIC BENEFITS ASSOCIATION; and the TEXAS CATHOLIC CONFERENCE OF BISHOPS state that none of them is publicly traded and they have no parent corporations. No publicly traded corporation owns 10% or more of these *amici*.

Date: July 7, 2023                    /s/B. Tyler Brooks

## <u>TABLE OF CONTENTS</u>

STATEMENT OF INTERESTED PERSONS ........................................... i

TABLE OF AUTHORITIES .................................................... x

INTEREST OF *AMICI CURIAE* ............................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 6

ARGUMENT ........................................................... 10

   I.   AN UNBORN CHILD IS PROTECTED UNDER EMTALA,
WHICH PRECLUDES INTENTIONAL ABORTION AS A
TREATMENT, AND APPELLANTS' UPDATED GUIDANCE
DIRECTLY CONTRADICTS FEDERAL LAWS PROTECTING
CONSCIENCE RIGHTS ......................................................10

      A. EMTALA Requires that Unborn Children be Protected, a
Duty Appellants' Updated Guidance Fails to Acknowledge
...............................................................................10

      B. Defendants' Updated Guidance Violates Federal Conscience
Laws Specific to Health Care ......................................16

  II.  REQUIRING ABORTIONS UNDER EMTALA HARMS
CATHOLIC HEALTH CARE PROVIDERS, WHO HAVE LONG
TREATED PREGNANCY EMERGENCIES WITHOUT
INTENTIONALLY TERMINATING THE LIVES OF UNBORN
CHILDREN .......................................................…..18

 III.  CONTRARY TO APPELLANTS' CONTENTIONS, THE
ABORTION MANDATE IMPOSES NEW REQUIREMENTS ON
HEALTH CARE PROVIDERS, MAKING IT A NEW RULE,
RATHER THAN A MERE RESTATEMENT OF EXISTING LAW,
THAT ATTEMPTS TO ESTABLISH ABORTION AS A NATIONAL
STANDARD OF CARE .......................................................22

IV.   THE ABORTION MANDATE VIOLATES THE RELIGIOUS
      FREEDOM RESTORATION ACT ...........…...................... 26

CONCLUSION ............................................................... 32

CERTIFICATE OF COMPLIANCE ..............................…... 34

CERTIFICATE OF SERVICE ....................................... 35

# TABLE OF AUTHORITIES

## *Case Law*

*Asadi v. G.E. Energy United States, L.L.C.,* 720 F.3d 620 (5th Cir. 2013) ..................................................................................................15

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ...............27-28

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ................................................................26

*Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266 (6th Cir. 1990) ..................................................................................................11

*Davila v. Gladden*, 777 F.3d 1198 (11th Cir. 2015) .........................28, 30

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ..................................................................................................15

*Ek Hong Djie v. Garland*, 39 F.4th 280 (5th Cir. 2022) .........................15

*Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) ………..........................................................26

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) .................... 28, 32

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ......................................................................... 30

*Harris v. McRae*, 448 U.S. 297 (1980) ………..........................................17

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) …………...........................................................................27-29, 32

*Holt v. Hobbs*, 574 U.S. 352 (2015) ....................................................... 28

*Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008) ........................ 29

*Little Sisters of the Poor Saints Peter & Paul Home v. Penn.*, 140 S. Ct. 2367 (2020) ........................................................................21, 30

*Mohammad Abubakar Khalid v. Holder*, 655 F.3d 363 (5th Cir. 2011) ........................................................................................15

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) ................................................................................................ 26

*Sherbert v. Verner*, 374 U.S. 398 (1963) ................................. 27, 31

*Singh v. McHugh*, 109 F. Supp. 3d 72 (D.D.C. 2016) ............................. 28

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021).......................................26, 32

*Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707 (1981) ................................................................................................ 27

*U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336 (5th Cir. 2022) .......... 28, 31

## Constitutions and Statutes

42 U.S.C. § 238n .......................................................................17

42 U.S.C. § 300a-7................................................................. *passim*

42 U.S.C. § 1395dd ............................................................... *passim*

42 U.S.C. § 2000bb ...............................................................22, 26-28

Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Div. H., Tit. V, §§ 506-07.......................................................................17

HUMAN LIFE PROTECTION ACT, CH. 800, § 2 ................................ 25

TEX. HEALTH & SAFETY CODE § 170A.002 ...................................... 25

Weldon Amendment, Consolidated Appropriations Act, 2009, Pub. L. No. 111-117, 123 Stat. 3034 ............................................................................17

## *Other Authorities*

John A. Di Camillo & Jozef D. Zalot, *Medical Interventions During Pregnancy in Light of* Dobbs, 47 Ethics & Medics (Aug. 2022) ...................................................................................................................... 20

157 Cong. Rec. 6877-78 (2011).................................................................. 20

Letter from Xavier Becerra, Secretary, U.S. Dep't of Health & Human Servs., to Health Care Providers (July 11, 2022) ........................... *passim*

Edward C. Liu & Wen W. Shen, Congressional Research Service, *The Hyde Amendment: An Overview* (July 20, 2022) ...............................16-17

Exec. Order No. 14,076, 87 Fed. Reg. 42,053 (July 8, 2022) ......... *passim*

Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss, (QSO-21-22-Hospitals-UPDATED JULY 2022), July 11, 2022 .......................................... *passim*

United States Conference of Catholic Bishops, Ethical and Religious Directives for Catholic Health Care Services (6th ed. 2018) ..........................................................................................................5, 19

## INTERESTS OF THE *AMICI CURIAE*[1]

*Amicus Curiae* **Catholic Health Care Leadership Alliance** (CHCLA) is an alliance of Catholic organizations whose mission is to support the rights of patients and professionals to receive and provide health care in accordance with the moral, ethical, and social teachings of Jesus Christ and His Church through ongoing evangelization, education, advocacy, and mutual support.   CHCLA's allied members include professionals involved in all areas of health care, including physicians and nurses, as well as practice groups and hospitals.  CHCLA members are engaged in the active practice of health care on a daily basis, working in both secular and religious environments, and adhere to Catholic doctrine as their sincerely held religious beliefs.  Its members collectively provide medical care to hundreds of thousands of patients across the country.   CHCLA believes that the position taken by Appellants will significantly impact: (1) the duty of health care providers in general to protect the life of an unborn child under EMTALA; (2) the ability of

---

[1] All parties have consented to the filing of this *amicus* brief. No party's counsel authored the brief in whole or part; no party or party's counsel contributed money intended to fund the brief; and no person other than these *amici*, their members, or their counsel contributed money intended to fund the brief.

CHCLA members to practice medicine without being required or forced to perform intentional abortions as a treatment option under EMTALA, which is a violation of CHCLA members' conscience rights as practitioners of the Catholic faith; and (3) health care access for the underserved patients for whom CHCLA members provide care.

*Amicus Curiae* **Christ Medicus Foundation** (CMF) was established in 1997 to defend religious freedom by educating religious and lay leaders on the intersection of health care, the exercise of faith and religious freedom, and the right to life. For decades, it has led coalitions, campaigns, and conferences to educate and inform Christ-centered health care decisions. As part of this mission, CMF helps defend the rights, health, and wellbeing of patients and families through the Health Care Civil Rights Taskforce and builds momentum around this movement through the Religious Freedom Campaign.

*Amicus Curiae* **National Catholic Bioethics Center** (NCBC) is a nonprofit research and educational institute committed to applying the principles of natural moral law, consistent with many traditions including the teachings of the Catholic Church, to ethical issues arising in health care and providing health care in accordance with the moral,

ethical, and social teachings of Jesus Christ and His Church through ongoing evangelization, education, advocacy, and mutual support.

*Amicus Curiae* **Catholic Bar Association** (CBar) is a community of legal professionals that educates, organizes, and inspires its members to faithfully uphold and bear witness to the Catholic faith in the study and practice of law. The CBar's mission and purpose include upholding the principles of the Catholic faith in the practice of law and assisting the Church in the work of communicating Catholic legal principles to the legal profession and society at large. This includes the principles of religious liberty and rights of conscience with respect to religious beliefs.

*Amicus Curiae* **Catholic Medical Association** (CMA) has over 2,000 physicians and hundreds of allied health members nationwide. CMA members seek to uphold the principles of the Catholic faith in the science and practice of medicine—including the belief that every person's conscience and religious freedoms should be protected. The CMA's mission includes defending its members' right to follow their consciences and Catholic teachings in their professional work.

*Amicus Curiae* **National Association of Catholic Nurses-U.S.A.** (NACN-USA) is the national professional organization for Catholic

nurses in the United States. A nonprofit group of hundreds of nurses of different backgrounds, the NACN-USA focuses on promoting moral principles of patient advocacy, human dignity, and professional and spiritual development in the integration of faith and health within the Catholic context in nursing.

*Amicus Curiae* **Catholic Benefits Association** ("CBA") is an Oklahoma non-profit limited cooperative association committed to assisting its Catholic employer members in providing health coverage to their employees consistent with Catholic values. The CBA provides such assistance through its website, training webinars, legal and practical advice for member employers, and litigation services protecting members' legal and conscience rights. The CBA's member employers include 78 Catholic dioceses, over 7000 parishes, over 1300 schools and colleges, as well as social services agencies, hospitals, senior housing, and closely held for-profit employers. One of the conditions of membership is that the member affirm that its health care coverage complies with Catholic values.

*Amicus Curiae* **Texas Catholic Conference of Bishops** (The Bishops) is an unincorporated association consisting of the bishops of the

fifteen Catholic Dioceses in Texas and the Ordinariate of the Chair of St. Peter. Through this association, the various bishops speak with one voice on issues facing the Catholic Church in Texas. The Roman Catholic Church in Texas has a long history of ministering to the needs of pregnant women and their unborn children through various healthcare and social service ministries. The Bishops regularly advocate for both conscience protection of healthcare providers and the protection of the life and health of mothers and their unborn children before the Texas Legislature as well as state and federal agencies. The broader Catholic community includes thousands of Texans who provide healthcare in both secular and religious hospitals in Texas. The Texas Catholic Bishops have the responsibility of ensuring that all Catholic Hospitals in their diocesan territories deliver services consistent with the United States Conference of Catholic Bishops' *Ethical and Religious Directives (ERDs)*, which constitute authoritative guidance on the provision of Catholic healthcare services.[2] Among other things, the *Directives* guide Catholic

---

[2] *Ethical and Religious Directives (ERDs),* available at http://www.usccb.org/about/doctrine/ethical-and-religious-directives/upload/ethical-religious-directives-catholic-health-service-sixth-edition-2016-06.pdf (last visited July 7, 2023).

healthcare providers and staff working in Catholic healthcare settings to honor the sanctity of each human life. The Catholic Church teaches that all human life is a gift from God, and therefore all human life is innately sacred. This respect for life is lifelong and applies to all human beings—from conception to natural death. The Bishops have consistently supported the truth that decisions regarding treatment should be made through this lens of the inherent sanctity of all human life in accordance with the ERDs as interpreted by the diocesan bishop. Catholic hospitals in Texas and throughout the country have been providing compassionate care for women and babies (born and unborn) for centuries without providing abortions or abortive procedures. The new abortion definitions in Texas have not restricted their ability to continue to provide consistent care for these families in accordance with the ERDs and the CMS guidance for the abortion mandate is a direct threat to the continued provision of this consistent care.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici Curiae* submit this brief in support of the District Court's granting of an injunction against Appellants. *Amici* argue that Appellants' position entirely disregards the duties and responsibilities

owed by health care providers to an unborn child under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd. To assert that abortion—which is the intentional termination of an unborn child's life—is permitted, or even required, under EMTALA is contrary to the unambiguous text and intent of the statute. Appellants' position that intentional abortion is required for emergency situations during pregnancy unnecessarily violates Catholic health care providers' conscience rights, in as much as the Catholic Church's ethical guidelines for treatment of pregnancy complications (including the complications cited by Appellants' and their *amici*) can be safely and ethically treated without intentionally terminating the life of an unborn child. Therefore, these *Amici* offer this brief to help explain the significant impact of requiring intentional abortions to both the unborn child in violation of EMTALA and to Catholic health care providers, who can provide safe and ethical treatment of all pregnancy complications without performing intentional abortions.

This case only arises because the U.S. Department of Health and Human Services (HHS), following an executive order from President Biden, directed the Centers for Medicare & Medicaid Services (CMS) to

issue guidance regarding the provision of intentional abortions as a treatment option under EMTALA. The guidance memorandum issued by CMS, along with an email letter from HHS Secretary Xavier Becerra to all health care providers, stated that, in certain circumstances, intentional abortion is *required* in response to an emergent complication that arises during pregnancy. Appellants' communications about the responsibilities under EMTALA fail to mention, at all, the concurrent responsibilities to the unborn child and that permitting an intentional abortion under EMTALA is contrary to the intent and unambiguous language of the statute to protect the health of the unborn child from serious jeopardy.

There is absolutely zero Congressional authorization under EMTALA for HHS to require emergency departments to perform abortions. To the contrary, there are clear Congressional enactments protecting the medical conscience and religious freedom rights of medical professionals and health care entities to decline to participate in abortions. The Congressional authorization applicable to the Defendants' June 2022 guidance shows that Appellants not only exceeded their authority, but also violated the clear intent of Congress.

Furthermore, Appellants' position requires health care providers to perform intentional abortions, a position that is directly contrary to the teachings of the Catholic faith, and Appellants' have taken this position despite there being substantial evidence that all of the medical emergencies Appellants' have identified as reasons to purportedly justify intentional abortion under EMTALA can be safely and ethically treated without the intentional termination of an unborn child's life.

Further, the federal government's guidance from CMS is clearly intended to control how health care is administered and, it follows, to control the health care providers and require the health care providers to act in accordance with the guidance. Many of those providers, both individuals and entities, believe that human life begins at the moment of conception or fertilization. Even though federal statutory law protects religious beliefs, Appellants are attempting to improperly use EMTALA to override religious liberty protections so as to force health care providers to perform abortions and, if the provider fails to do so in certain circumstances, the provider could be punished under EMTALA, which could impact a provider's licensure and employment. This action on the part of the Appellants is in direct violation of federal statutory law and

the U.S. Constitution, and the District Court was right to grant a permanent injunction against Appellants' unconstitutional attempt to use EMTALA to fabricate an abortion mandate that will violate the rights of religious health care providers who desire to treat both the mother *and* the baby equally in compliance with the text and purpose of EMTALA.

Because Appellants' actions imperil the free exercise of health care providers' religious beliefs and because Appellants' arguments completely contradict the intent of EMTALA, *amici* respectfully request that the District Court's injunction be upheld.

## ARGUMENT

**I.  AN UNBORN CHILD IS PROTECTED UNDER EMTALA, WHICH PRECLUDES INTENTIONAL ABORTION AS A TREATMENT, AND APPELLANTS' UPDATED GUIDANCE DIRECTLY CONTRADICTS FEDERAL LAWS PROTECTING CONSCIENCE RIGHTS.**

### A. EMTALA Requires that Unborn Children be Protected, a Duty Appellants' Updated Guidance Fails to Acknowledge.

The Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, provides no authority for Appellants to coerce medical providers into performing abortions and *in fact requires*

*them to care for unborn children.* Specifically, EMTALA's plain language

states that it protects the health of the "unborn child," just as it does the

health of a pregnant woman, from being placed in "serious jeopardy."

This duty arises in the context of an "emergency medical condition,"

which EMTALA defines as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain, psychiatric disturbances and/or symptoms of substance abuse) such that the absence of immediate medical attention could reasonably be expected to result in – (i) placing the health of the individual (or, *with respect to a pregnant woman, the health of the woman or her unborn child*) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part; or (B) with respect to a pregnant woman who is having contractions – (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that *transfer may pose a threat to the health or safety of the woman or the unborn child.*

42 U.S.C. § 1395dd(e)(1)(A) (emphasis added).

Based on the very statutory definition of "emergency medical

condition" in EMTALA, unborn children are a protected class. *Cf.*

*Romine v. St. Joseph Health Sys.*, 541 F. App'x 614, 618 (6th Cir. 2014)

(citing *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268

(6th Cir. 1990)) ("EMTALA 'applies to any and all patients'"). Because

an abortion of that unborn child would mean intentionally terminating his or her life and thus placing the unborn child's health in "serious jeopardy," in accordance with the statutory language of EMTALA, intentional abortion is necessarily prohibited.

Appellants' position then is entirely contrary to EMTALA's text, which unambiguously protects the life and health of an unborn child. The July 8 executive order by President Biden, however, discussed only the pregnant mother when it ordered HHS to rely on EMTALA as a means of increasing access to abortion and makes no mention whatsoever of the responsibility under EMTALA to the "unborn child." In his executive order, the President directed HHS to

> (iii) identify[] steps to ensure that all patients—including pregnant women and those experiencing pregnancy loss, such as miscarriages and ectopic pregnancies—receive the full protections for emergency medical care afforded under the law, including by considering updates to current guidance on obligations specific to emergency conditions and stabilizing care under the Emergency Medical Treatment and Labor Act, 42 U.S.C. 1395dd, and providing data from the Department of Health and Human Services concerning implementation of these efforts.

Exec. Order No. 14,076, 87 Fed. Reg. 42,053 (July 8, 2022).

On July 11, U.S. Department of Health & Human Services (HHS) Secretary Xavier Becerra issued a letter to health care providers outlining their duties under EMTALA. The letter states that, when a pregnant woman presents to an emergency department with an emergency medical condition and "abortion is the stabilizing treatment necessary to resolve that condition, the physician must provide that treatment." Letter from Xavier Becerra, Secretary, U.S. Dep't of Health & Human Servs., to Health Care Providers (July 11, 2022), *available at* https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-providers.pdf (last visited July 7, 2023). Secretary Becerra, however, never mentions in his letter the responsibilities of health care providers under EMTALA to the unborn child.

In the guidance memorandum issued by the Centers for Medicare & Medicaid Services (CMS) along with the Secretary's letter, mention of the duties owed to the unborn child is likewise totally omitted. The guidance (technically an update to a prior guidance memorandum) explains what constitutes an "emergency medical condition" or "EMC":

> An EMC includes medical conditions with acute symptoms of sufficient severity that, in the absence of immediate medical attention, could place the health of a person (including pregnant

patients) in serious jeopardy, or result in a serious impairment or dysfunction of bodily functions or any bodily organ.  Further, an emergency medical condition exists if the patient may not have enough time for a safe transfer to another facility, or if the transfer might pose a threat to the safety of the person.

*Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, (QSO-21-22-Hospitals-UPDATED JULY 2022), July 11, 2022, *available at* https://www.cms.gov/medicareprovider-enrollment-and-certificationsurveycertificationgeninfopolicy-and-memos-states-and/reinforcement-emtala-obligations-specific-patients-who-are-pregnant-or-are-experiencing-pregnancy-0 (last visited July 8, 2023).  The updated memorandum goes into further detail about "stabilizing treatment" and again only discusses duties to the "pregnant patient."  As with the President and the Secretary, CMS makes no mention of the duties EMTALA imposes on providers to treat the "unborn child."

Taking these three documents together, a health care provider could read the materials, which purport to set forth the statutory duties and obligations under EMTALA when a pregnant woman presents for emergency treatment, and come away with no idea that EMTALA

requires providers to protect the life and health of the unborn child and the mother alike. This is not guidance. This is misdirection. Moreover, it is a clear example of cherry-picking certain words in a statute and ignoring others, which is impermissible. *See, e.g., Asadi v. G.E. Energy United States, L.L.C.*, 720 F.3d 620, 622 (5th Cir. 2013) ("In construing a statute, a court should give effect, if possible, to every word and every provision Congress used.") (citations omitted).

Regardless of how much Appellants disagree with the Supreme Court's decision in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), it does not allow them to rewrite EMTALA's unambiguous terms to justify causing harm to an unborn child. *See United States v. Haggar Apparel Co.*, 526 U.S. 380, 392 (1999) (if a "regulation is inconsistent with the statutory language . . . the regulation will not control"); *Ek Hong Djie v. Garland*, 39 F.4th 280, 284 (5th Cir. 2022) (citations omitted) ("To the extent a regulation attempts to carve out an exception from a clear statutory requirement, the regulation is invalid."); *Mohammad Abubakar Khalid v. Holder*, 655 F.3d 363, 366 (5th Cir. 2011) (citation omitted) (agency regulation that fails to give effect to clear intent of Congress is invalid). On these grounds alone, the permanent

injunction is justified since the plain language of EMTALA does not and cannot mandate performance of abortion.

### B. Defendants' Updated Guidance Violates Federal Conscience Laws Specific to Health Care.

Outside of EMTALA, the specific Congressional intent relevant to this appeal is expressed through federal laws that clearly and unequivocally protect the conscience and religious freedom rights of medical professionals, health care entities, and the public generally to decline to participate in or subsidize abortions.

The Church Amendments, 42 U.S.C. § 300a-7 *et seq.*, enacted in the 1970s, prohibit recipients of federal funds from discriminating against a health care provider who refuses to participate or assist in an abortion if doing so would be "contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(d) & (e); *see id.* at § 300a-7(c). Made a part of federal HHS appropriations laws enacted since 1976, the Hyde Amendment is a law that restricts federal funding of abortion. "The most recently enacted version of the Hyde Amendment (P.L. 117-103. Div. H, §§ 506-507), applicable for fiscal year (FY) 2022, prohibits covered funds [from being] expended for any abortion or to provide health benefits coverage that includes abortion" other than in cases of rape, incest, or life of the mother.

16

Edward C. Liu & Wen W. Shen, Congressional Research Service, *The Hyde Amendment: An Overview* (July 20, 2022), *available at* https://crsreports.congress.gov/product/pdf/IF/IF12167 (last visited July 7, 2023); *see* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Div. H., Tit. V, §§ 506-07; *cf. generally Harris v. McRae*, 448 U.S. 297 (1980) (upholding constitutionality of Hyde Amendment).  The Weldon Amendment, which has been a part of every HHS appropriations act passed since 2005, expressly forbids the federal government from discriminating against any health care provider, facility, or plan on the basis that it does not provide, perform, or cover abortion.  Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Div. H., Tit. V, §§ 506-07; *see* Weldon Amendment, Consolidated Appropriations Act, 2009, Pub. L. No. 111-117, 123 Stat. 3034; *see also* 42 U.S.C. § 238n (Coats-Snowe Amendment of 1996) (prohibiting abortion-related discrimination in governmental activities regarding training and licensing of physicians).  There is no conflict between EMTALA and the Weldon Amendment because the former does not require abortions, but if there were such a conflict, the Weldon amendment would govern because it is specific to abortion and enacted *after* EMTALA.

In repeatedly passing these federal conscience laws, Congress has acted *for decades* to protect the conscience and religious freedom rights of medical professionals and health care entities, to prohibit the federal government from subsidizing abortions, and to prohibit discrimination against medical professionals and health care entities on the basis of refusing to perform abortions.  By purporting to use EMTALA to require individuals and entities to provide abortions, Appellants have exceeded their statutory authority and have acted contrary to the express will of Congress under federal law.

## II. REQUIRING ABORTIONS UNDER EMTALA HARMS CATHOLIC HEALTH CARE PROVIDERS, WHO HAVE LONG TREATED PREGNANCY EMERGENCIES WITHOUT INTENTIONALLY TERMINATING THE LIVES OF UNBORN CHILDREN.

Catholic health care providers have an established record of providing safe and ethical treatment of pregnancy complications that does not involve or require abortions.  Unlike Appellants in their hastily issued guidance, the Catholic Church has taken great pains to define the term 'abortion' and set forth what is ethically acceptable medical treatment.  The United States Conference of Catholic Bishops' *Ethical and Religious Directives for Catholic Health Care Services* (ERDs)

specifically defines what constitutes an abortion. Directive 45 of the ERDs states:

> Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted. Every procedure whose sole immediate effect is the termination of pregnancy before viability is an abortion.

United States Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services*, 18 (6th ed. 2018), *available at* https://www.usccb.org/resources/ethical-religious-directives-catholic-health-service-sixth-edition-2016-06_0.pdf (last visited July 7, 2023).

The ERDs also specifically give direction for those situations where there is a risk to the life of the mother and treatment of the mother will unintentionally cause the death of the unborn child; this treatment is justified and acceptable. Directive 47 of the ERDs states:

> Operations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child.

*Id.* at 19. It is therefore entirely incorrect to assert or imply that Appellants' guidance, with its policy of requiring providers to participate

in voluntary abortions, is needed to ensure the lives of pregnant mothers are protected.  *See, e.g.,* 157 Cong. Rec. 6877-78 (2011) (letters of physicians entered into record in support of legislation to protect the right of health care workers to refuse to participate in abortions and opining that intentional abortion is never medically necessary); *id.* at 6878 (letter of John Thorp, M.D., of Univ. of N. Carolina School of Medicine, OB-GYN) ("I have not seen a situation where an emergent or even urgent abortion was needed to prevent a maternal death.").

A recent article in *Ethics & Medics*, published by the National Catholic Bioethics Center on Health Care and the Life Sciences (NCBC), discusses in detail issues concerning various pregnancy complications and how they can be properly treated without directly and intentionally terminating the life of the unborn child.  John A. Di Camillo & Jozef D. Zalot, *Medical Interventions During Pregnancy in Light of* Dobbs, 47 Ethics & Medics (Aug. 2022), *available at* https://static1.squarespace.com/static/5e3ada1a6a2e8d6a131d1dcd/t/62f d2714a7bfe76313e74b48/1660757780241/E%26M_August_22_publish.p df (last visited July 7, 2023).  The article specifically addresses the situations raised by Appellants related to the emergency medical

conditions under EMTALA involving pregnancy complications, including ectopic pregnancy, complications of pregnancy loss, and emergency hypertension disorders, all of which can be treated consistent with medical ethics and Catholic teachings without performing an intentional abortion. For example, as treatment for an ectopic pregnancy, the article identifies multiple options that are deemed by NCBC ethicists to be consistent with Catholic doctrine. *Id.* at 3. The article also dispels the myth that treating a miscarriage is somehow providing an abortion: "If an unborn child dies in utero, it is permissible to remove the remains through a surgical procedure . . . typically a dilation and curettage, [which] is the same one used on living children in the case of elective abortions—but it is not a direct abortion when the child has already died[.]" *Id.* at 4.

Nonetheless, by mandating abortion as a treatment under EMTALA, Appellants place Catholic health care providers in an unfortunately all too familiar position of being forced to fight against an abortion requirement that conflicts with their sincerely held religious beliefs. *E.g., Little Sisters of the Poor Saints Peter & Paul Home v. Penn.*, 140 S. Ct. 2367 (2020) (long running legal dispute between Catholic

women religious and states over exemption to contraception mandate). Appellants' have created unnecessary confusion given the fact that everyone agrees that medical treatments to save the life of the mother that unintentionally cause the death of the unborn child are permitted. The confusion arises in that, despite there being treatment options for all pregnancy complications that do not involve abortion, Appellants insist that all health care providers have a duty under EMTALA to perform an intentional abortion. Appellants' update to existing guidance is a violation of the rights of Catholic health care providers under federal conscience protection laws as well as the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb—statutes of which no analysis appears to have been performed by Appellants prior to requiring intentional abortion as a treatment option under EMTALA.

### III. CONTRARY TO APPELLANTS' CONTENTIONS, THE ABORTION MANDATE IMPOSES NEW REQUIREMENTS ON HEALTH CARE PROVIDERS, MAKING IT A NEW RULE, RATHER THAN A MERE RESTATEMENT OF EXISTING LAW, THAT ATTEMPTS TO ESTABLISH ABORTION AS A NATIONAL STANDARD OF CARE.

The directive from the President of the United States to the Department of Health and Human Services, of which CMS is a part, to use EMTALA as a justification for performing abortions was the

foundation for the mandate issued just days later by CMS.  Far from merely restating existing law or even reiterating prior guidance, the July 11, 2022 "guidance," seeks to make EMTALA a loophole in any State's abortion laws.

This shift in the law is apparent when looking at the differences between the July 11, 2022 abortion mandate and the prior CMS guidance of September 17, 2021.  While the two documents are similar in many respects, the differences are highly significant on the question of what procedures are to be purportedly required under EMTALA even though they may be illegal under state law.

One of the most striking such changes is the expanded definition of "Emergency Medical Condition" (EMC).  Under the new abortion mandate, an EMC can include circumstances far broader than simply the life of a pregnant woman or a serious threat to her health, thereby allowing a non-life-threatening situation and other less than serious threats to the woman's health to be used as the justification for an abortion.

The new mandate also contains a lengthy section defining "stabilizing treatment."  New language appears that is likely to be used

to require elective abortions for women presenting to emergency departments: "Emergency medical conditions involving pregnant patients may include, *but are not limited to*: ectopic pregnancy, complications of pregnancy loss, or emergent hypertensive disorders, such as preeclampsia with severe features," (emphasis added).

The guidance goes on at length to severely threaten physicians that they must follow EMTALA rather than state law due to EMTALA's preemption provisions. This abortion mandate also introduces the concept of requiring healthcare providers to complete chemical abortions that the mother began elsewhere.

The new guidance's clear partisanship in favor of abortion is ironic given that the statutory language of EMTALA itself creates a presumption in favor of preserving the life of *both* the mother and the unborn child in emergency medical situations, as previously mentioned. EMTALA expressly holds that providers are required to provide stabilizing care for an "emergency medical condition," which is "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain), such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health

of the individual (*or, with respect to a pregnant woman, the health of the woman or her unborn child*) in serious jeopardy . . . ." 42 U.S.C. § 1395dd(e)(1)(A) (emphasis added). The abortion mandate of the new guidance now turns this presumption on its head by excluding the unborn child from the scope of persons covered by EMTALA, despite its express language, and making EMTALA an abortion-on-demand statute.

Though Appellants argue now that the new guidance was nothing but a reminder of existing legal obligations, it really is far more. It purports to announce far expanded duties under EMTALA for healthcare providers to perform abortions, even when there is no "life threatening physical condition" arising from a pregnancy that places her "at risk of death or poses a serious risk of substantial impairment of a major bodily function unless the abortion is performed" (the conditions under which abortion is to be allowed under Texas law). Human Life Protection Act, Act of May 25, 2021, 87th Leg., R.S., ch. 800, § 2, 2021 Tex. Sess. Law Serv. 1887 (H.B. 1280) at § 2 (to be codified at Tex. Health & Safety Code § 170A.002(b)(2)).

The federal government's abortion mandate threatens to turn every hospital emergency department into an abortion clinic, even in states

(like Texas) with protections for the unborn, contrary to existing federal law.

## IV. THE ABORTION MANDATE VIOLATES THE RELIGIOUS FREEDOM RESTORATION ACT.

The Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb, was enacted to address the constraints on religious liberty jurisprudence created by *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), which requires a comparator analysis to determine whether a law or regulation that purports to be neutral and generally applicable does in fact—either textually or by operation—"treat any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (cleaned up) (emphasis in original) (citing *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, 141 S. Ct. 63, 67-68 (2020) (*per curiam*)); *see Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993) ("Apart from the text, the *effect* of a law in its real operation is strong evidence of its object.") (emphasis added).

RFRA is intended to restore the pre-*Smith* standard for determining religious liberty violations: that a law or regulation imposing a substantial burden on the practice of religion as a condition

to obtaining an important societal benefit must undergo strict scrutiny, which requires the government to demonstrate that (1) there is a compelling governmental interest justifying the burden and that (2) the challenged measure is narrowly tailored to achieve that interest. *Sherbert v. Verner*, 374 U.S. 398, 408 (1963); *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.,* 450 U.S. 707, 717-18 (1981).  In *Thomas v. Review Board of Indiana*, the Supreme Court announced what is now the core of RFRA:

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.  While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial . . .

> The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest . . . [O]nly those interests of the highest order  . . .  can overbalance legitimate claims to the free exercise of religion.

*Id.* (cleaned up)

Accordingly, as the Supreme Court has recently affirmed, RFRA provides "very broad protection[s] for religious liberty," *Burwell v. Hobby*

*Lobby Stores, Inc.*, 573 U.S. 682, 693-94 (2014), which means "*greater protection* for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 357 (2015) (emphasis added). "The question, then, is not whether [the government] has a compelling interest in enforcing its . . . policies generally, but whether it has such an interest in denying an exception to [the Plaintiff]." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021); *see U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 349 (5th Cir. 2022); *Davila v. Gladden*, 777 F.3d 1198, 1206 (11th Cir. 2015); *Singh v. McHugh*, 109 F. Supp. 3d 72, 87 (D.D.C. 2016) (elements of Army's grooming and uniform policies substantially burdened cadet's religious beliefs).

Under RFRA, the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless "it demonstrates that application of the burden to the person" furthers "a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b).

Moreover, RFRA protects "*any* exercise of religion, *whether or not compelled by, or central to*, a system of religious belief." 42 U.S.C. §§

2000cc-5(7)(A); 42 U.S.C. § 2000bb-2(4) (emphasis added). The "importance" of a religious belief is irrelevant. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1134, 1137 (10th Cir. 2013) ("substantial burden" relates to the degree of coercion applied by government, not the substantiality of the religious belief at issue, which would require an impermissible theological inquiry by the court). Courts must "focus not on the centrality of the particular activity to the adherent's religion but rather on whether the adherent's sincere religious exercise is substantially burdened." *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008). A "substantial burden" exists when government action rises above *de minimis* inconveniences and puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* (cleaned up).

There are indisputably pro-life individuals and entities in the healthcare field who are caught up in the sweep of the federal government's new mandator for abortion, but Appellants did not even consider those rights. As the facts of this case make clear, this abortion mandate flunks the compelling interest/narrow tailoring inquiries as a matter of law.

First, under RFRA, to establish a compelling interest sufficient to withstand strict scrutiny, defendants may not merely recite "broadly formulated interests," but rather must survive "scrutin[y] [of] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). That has not been, and cannot be, done here.

Second, as to the actual existence of a compelling government interest, "officials cannot simply utter the magic words . . . and as a result receive unlimited deference." *Davila*, 777 F.3d at 1206 (citing *O Centro*, 546 U.S. at 438). In *Davila*, the Court listed a multitude of *situation-specific* evidence that could have helped its evaluation of compelling interest, such as historical incidents that justify the interest asserted and evidence of the effectiveness of other measures serving the same interest. Here, again, Appellants did nothing to consider specific situations.

Third, RFRA's requirement that a compelling government interest must be established as to the *particular claimant* sets a "high bar." *Navy Seals*, 27 F.4th at 349 (quoting *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2392 (2020) (Alito, J., concurring)). In *Little Sisters*, Justice Alito described that "high bar"

thus: "In *Sherbert v. Verner* . . . the decision that provides the foundation for the rule codified in RFRA, we said that '[o]nly the gravest abuses, endangering paramount interest' could 'give occasion for [a] permissible limitation' on the free exercise of religion." *Id.* at 2392.

This Court's reasoning in *Navy Seals* ought to inform the result in this case. In denying a stay of the district court's injunction barring enforcement of the Navy's vaccine mandate as to the unvaccinated plaintiff SEALs, this Court observed that they had "successfully deployed overseas before and after the vaccine became available, and one even received a Joint Service Commendation Medal for 'safely navigating restricted movement and distancing requirements' while deployed in South Korea between January and June 2020. Plaintiffs also trained other SEALs preparing for deployments at various points during the pandemic *while remaining unvaccinated*." *Navy Seals*, 227 F.4th at 352 (emphasis added).

And, even if there were a compelling governmental interest at stake here, Appellants cannot establish that their abortion mandate is the "least restrictive means" they could have employed to serve it. The "least-restrictive-means standard is exceptionally demanding" in that it

requires the government to show "it lacks other means of achieving its desired goal." *Hobby Lobby*, 573 U.S. at 728. "[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881. Under this standard, Appellants must "show that measures less restrictive of the First Amendment activity could not address [the] interest" to be advanced. *Tandon*, 141 S. Ct. at 1296-1297. This, Appellants cannot do, namely because they cannot offer more than conclusory supposition.

Despite being fully cognizant of the fact that they were imposing an abortion mandate on a large group of providers, many of whose members hold religious objections to participating in or facilitating abortion, Appellants issued a "guidance" that uttered not one word about federally protected civil rights under RFRA. Appellants thus not only failed to *consider* how their abortion mandate would violate their RFRA rights prior to issuance, but they have also shown they would like to actively curtail those rights as well.

## CONCLUSION

For these reasons, these *amici curiae* respectfully ask the Court to affirm the decision of the District Court.

This the <u>7th</u> day of July, 2023.

Respectfully submitted,

<u>/s/B. Tyler Brooks</u>
Thomas Brejcha[†]
B. Tyler Brooks
THOMAS MORE SOCIETY
309 W. Washington St.
Suite 1250
Chicago, IL 60606
Telephone: (336) 707-8855
Facsimile: (312) 782-1887
tbrejcha@thomasmoresociety.org
tbrooks@thomasmoresociety.org

*Counsel for Amici Curiae*

[†] *pro hac vice* application forthcoming.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,198 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Microsoft Word 2022 in 14-point Century Schoolbook, a proportionally spaced typeface.

Dated: <u>July 7, 2023</u>

/s/B. Tyler Brooks
B. Tyler Brooks
THOMAS MORE SOCIETY
309 W. Washington St.
Suite 1250
Chicago, IL 60606
Telephone: (336) 707-8855
Fax: (336) 900-6535
tbrooks@thomasmoresociety.org

## STATEMENT UNDER FED. R. APP. 29(a)(4)(E)

No counsel for a party authored this brief in whole or in part; no party or a party's counsel contributed money that was intended to fund preparation or submission of the brief; and no person other than the amici curiae or their counsel contributed money that was intended to fund preparing or submitting the brief.

## **CERTIFICATE OF SERVICE**

I certify that on July 7, 2023, the foregoing document was filed with the Clerk of the Court using the CM/ECF system, causing it to be served on all counsel of record.

Dated: <u>July 7, 2023</u>

/s/B. Tyler Brooks
B. Tyler Brooks
THOMAS MORE SOCIETY
309 W. Washington St.
Suite 1250
Chicago, IL 60606
Telephone: (336) 707-8855
Fax: (336) 900-6535
tbrooks@thomasmoresociety.org

*Counsel for Amici Curiae*