No. 23-10246

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————————

STATE OF TEXAS; AMERICAN ASSOCIATION OF PRO-LIFE
OBSTETRICIANS & GYNECOLOGISTS; CHRISTIAN MEDICAL & DENTAL
ASSOCIATIONS,

Plaintiffs-Appellees,

v.

XAVIER BECERRA; UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES; CENTERS FOR MEDICARE AND MEDICAID
SERVICES; KAREN L. TRITZ; DAVID R. WRIGHT,

Defendants-Appellants.

————————

On Appeal from the United States District Court
for the Northern District of Texas

————————

## REPLY BRIEF FOR APPELLANTS

————————

> BRIAN M. BOYNTON
>   *Principal Deputy Assistant Attorney*
>   *General*
>
> LEIGHA SIMONTON
>   *United States Attorney*
>
> MICHAEL S. RAAB
> McKAYE L. NEUMEISTER
> NICHOLAS S. CROWN
>   *Attorneys, Appellate Staff*
>   *Civil Division, Room 7325*
>   *U.S. Department of Justice*
>   *950 Pennsylvania Avenue NW*
>   *Washington, DC 20530*
>   *(202) 305-1754*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .............................................................................. ii

INTRODUCTION AND SUMMARY ............................................................... 1

ARGUMENT .................................................................................................... 2

    I.     The Guidance Is Not Final Agency Action. ................................................. 2

    II.    The Guidance Is Consistent with EMTALA .............................................. 6

    III.   The Medicare Act Did Not Require Notice and Comment Here .......... 20

    IV.   The Injunction Is Overbroad ................................................................... 22

CONCLUSION ................................................................................................ 27

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Abbot v. Perez,*
   138 S. Ct. 2305 (2018) ................................................ 24

*Azar v. Allina Health Servs.,*
   139 S. Ct. 1804 (2019) ............................................. 2, 21

*Baby K, In re,*
   16 F.3d 590 (4th Cir. 1994) .................................. 17, 20, 22

*Battle ex rel. Battle v. Memorial Hosp. at Gulfport,*
   228 F.3d 544 (5th Cir. 2000) ...................................... 17

*Bennett v. Spear,*
   520 U.S. 154 (1997) ............................................. 2, 3, 4

*Biden v. Missouri,*
   142 S. Ct. 647 (2022) ............................................. 16

*Bostock v. Clayton County,*
   140 S. Ct. 1731 (2020) .......................................... 7, 25

*Bourgeois, In re,*
   902 F.3d 446 (5th Cir. 2018) ..................................... 14

*Brooks v. Maryland Gen. Hosp., Inc.,*
   996 F.2d 708 (4th Cir. 1993) ..................................... 17

*Burditt v. U.S. HHS,*
   934 F.2d 1362 (5th Cir. 1991) .................................... 17

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) .............................................. 24

*California v. United States,*
   No. C-05-00328-JSW, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008) ........ 22

*Campbell v. Universal City Dev. Partners, Ltd.,*
   72 F.4th 1245 (11th Cir. 2023) ................................... 18

*Central & S.W. Servs., Inc. v. U.S. EPA,*
   220 F.3d 683 (5th Cir. 2000) ..................................... 26

*Cherukuri v. Shalala*,
175 F.3d 446 (6th Cir. 1999) ............................................................ 6, 21

*City of Akron v. Akron Ctr. for Reprod. Health, Inc.*,
462 U.S. 416 (1983) .................................................................................. 18

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022) ............................................................................ 18

*Draper v. Chiapuzio*,
9 F.3d 1391 (9th Cir. 1993) .................................................................... 22

*Eberhardt v. City of Los Angeles*,
62 F.3d 1253 (9th Cir. 1995) .................................................................. 16

*Florida v. HHS*,
19 F.4th 1271 (11th Cir. 2021) ............................................................... 16

*Gill v. Whitford*,
138 S. Ct. 1916 (2018) ............................................................................. 23

*Hardy v. New York City Health & Hosp. Corp.*,
164 F.3d 789 (2d Cir. 1999) .................................................................... 22

*Luminant Generation Co. v. U.S. EPA*,
757 F.3d 439 (5th Cir. 2014) ............................................................... 3, 4

*Marinello v. United States*,
138 S. Ct. 1101 (2018) ............................................................................... 7

*Marshall ex rel. Marshall v. East Carroll Par. Hosp. Serv. Dist.*,
134 F.3d 319 (5th Cir. 1998) ............................................................ 16-17

*Morin v. Eastern Me. Med. Ctr.*,
780 F. Supp. 2d 84 (D. Me. 2010) ......................................................... 22

*Murphy v. National Collegiate Athletic Ass'n*,
138 S. Ct. 1461 (2018) ............................................................................. 13

*National Pork Producers Council v. U.S. EPA*,
635 F.3d 738 (5th Cir. 2011) .................................................................... 3

*New York v. U.S. HHS*,
414 F. Supp. 3d 475 (S.D.N.Y. 2019) .................................................... 22

*NLRB v. SW Gen., Inc.*,
   580 U.S. 288 (2017) ................................................................. 14

*ODonnell v. Harris County*,
   892 F.3d 147 (5th Cir. 2018) ................................................. 23

*Patel v. Garland*,
   142 S. Ct. 1614 (2022) ........................................................... 13

*Pennsylvania Dep't of Corr. v. Yeskey*,
   524 U.S. 206 (1998) ................................................................. 7

*Peoples Nat'l Bank v. Office of Comptroller of Currency of U.S.*,
   362 F.3d 333 (5th Cir. 2004) ................................................... 3

*Perez v. Mortgage Bankers Ass'n*,
   575 U.S. 92 (2015) ................................................................. 26

*Planned Parenthood of Se. Pa. v. Casey*,
   505 U.S. 833 (1992) ............................................................... 17

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ............................................................... 16

*Ritten v. Lapeer Reg'l Med. Ctr.*,
   611 F. Supp. 2d 696 (E.D. Mich. 2009) ................................. 22

*Roe v. Wade*,
   410 U.S. 113 (1973) ............................................................... 18

*Sackett v. EPA*,
   143 S. Ct. 1322 (2023) ............................................................. 9

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ............................................................... 25

*Thornburgh v. American Coll. of Obstetricians & Gynecologists*,
   476 U.S. 747 (1986) ............................................................... 18

*United States v. Harris Methodist Fort Worth*,
   970 F.2d 94 (5th Cir. 1992) ................................................... 15

*Waggoner v. Gonzales*,
   488 F.3d 632 (5th Cir. 2007) ................................................. 20

**Statutes:**

Emergency Medical Treatment and Labor Act (EMTALA):

    42 U.S.C. § 1395dd(a) ................................................................... 10

    42 U.S.C. § 1395dd(b) ................................................................ 1, 7

    42 U.S.C. § 1395dd(b)(1) ............................................................. 10

    42 U.S.C. § 1395dd(b)(1)(A) ........................................ 4, 10, 13, 14, 20

    42 U.S.C. § 1395dd(c) ................................................................... 10

    42 U.S.C. § 1395dd(c)(1) ............................................................. 10

    42 U.S.C. § 1395dd(c)(1)(A)(ii) .................................................. 9-10

    42 U.S.C. § 1395dd(c)(2)(A) ...................................................... 9-10

    42 U.S.C. § 1395dd(d)(2)(A)-(B) ................................................... 13

    42 U.S.C. § 1395dd(e)(1) ............................................................. 21

    42 U.S.C. § 1395dd(e)(1)(A)(i) ............................................... 10, 19

    42 U.S.C. § 1395dd(e)(1)(B)(ii) ................................................. 9-10

    42 U.S.C. § 1395dd(e)(3) ........................................................... 7, 21

    42 U.S.C. § 1395dd(e)(3)(A) ...................................... 4, 13, 14, 19, 20

    42 U.S.C. § 1395dd(f) ........................................ 1, 4, 10, 11, 12, 13, 22

42 U.S.C. § 1395 ............................................................................ 15, 16

42 U.S.C. § 1395hh(a)(2) ............................................................. 2, 20-21

**Legislative Material:**

HB-3058, 2023 Leg., 88 Reg. Sess. (Tx. 2023), https://perma.cc/73Z4-6FRH ........ 24

**Other Authorities:**

CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss* (Sept. 17, 2021), https://perma.cc/65CQ-YLUQ ................................................................ 5-6

OCR, *Guidance on Nondiscrimination Protections Under the Church Amendments for Health Care Personnel* (Sept. 17, 2021), https://perma.cc/FKH7-LZS2 ................. 5

## INTRODUCTION AND SUMMARY

Plaintiffs do not dispute that emergency medical conditions—such as sepsis, seizures, preeclampsia, preterm premature rupture of membranes, organ failure, and cardiac arrest—may arise during pregnancy. Opening Br. 27. They concede that terminating a pregnancy may be medically necessary treatment to stabilize such life-threatening emergencies. ROA.280, 1133-1136. And they cannot ignore the plain text of the Emergency Medical Treatment and Labor Act (EMTALA), which guarantees that individuals experiencing medical emergencies be offered "stabiliz[ing]" treatment deemed necessary by their healthcare providers—and preempts "any State or local law" that "directly conflicts" with that requirement. 42 U.S.C. § 1395dd(b), (f).

The district court erred in enjoining an agency Guidance document (ROA.214-219) that restates these straightforward points. Plaintiffs have no prerogative to bar medically necessary emergency care in federally funded hospitals, all at the expense of pregnant patients whose health and lives are in peril. The court's contrary conclusion falters at every turn.

The Guidance is not final agency action subject to judicial review. It repeats a well-settled understanding of EMTALA's requirements—which apply only if a qualified provider determines both that (1) the individual has an emergency medical condition as defined by EMTALA and (2) abortion is the treatment necessary to stabilize that condition. The Guidance has no independent legal force, and any legal consequences flow not from the Guidance, but from the statute.

The Guidance is fully consistent with EMTALA because it reiterates existing statutory obligations. Under EMTALA, pregnant individuals presenting to an emergency department with an emergency medical condition must be offered stabilizing treatment, as deemed necessary in the provider's professional judgment. Nothing in the statute supports plaintiffs' preferred carve-out for necessary pregnancy terminations; EMTALA protects pregnant and non-pregnant patients alike.

The Guidance also meets the Medicare Act's procedural requirements. Notice-and-comment rulemaking was not required because the Guidance is not a "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard." 42 U.S.C. § 1395hh(a)(2). Rather, the "statute itself" imposes any policy at issue and "supplies the controlling legal standard." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816-17 (2019) (emphasis omitted).

Finally, the injunction is overbroad. It forbids the enforcement of EMTALA's requirements against plaintiffs as applied to *all* emergency abortion care—even life-saving treatments to which no plaintiff objects. Plaintiffs, moreover, do not defend the district court's flawed equities analysis.

This Court should reverse.

## ARGUMENT

### I.    The Guidance Is Not Final Agency Action.

The Guidance is not reviewable because it is not final agency action. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (requiring that an action "mark the consummation of

the agency's decisionmaking process" and "be one by which rights or obligations have been determined, or from which legal consequences will flow" (quotation marks omitted)).

**A.**     The Guidance is "not reviewable" because it "merely reiterate[s] what has already been established" in EMTALA, *see National Pork Producers Council v. U.S. EPA*, 635 F.3d 738, 756 (5th Cir. 2011), and repeated in prior (unchallenged) guidance documents. Plaintiffs do not contest that courts and practitioners have long recognized—independent of the Guidance—that emergency abortions may constitute stabilizing treatment. Opening Br. 18-21.

Nor does the Guidance "commit the [agency] to any particular course of action." *Luminant Generation Co. v. U.S. EPA*, 757 F.3d 439, 442 (5th Cir. 2014). The Guidance does not dictate how providers exercise their professional judgment regarding the proper stabilizing care, and it does not dictate any particular result. Opening Br. 23-25.

The Guidance likewise does not determine plaintiffs' legal "rights or obligations." *Bennett*, 520 U.S. at 178 (quotation marks omitted). The document "merely expresses [an agency's] view of what the law requires of a party," *Luminant Generation*, 757 F.3d at 442 & n.7 (quotation marks omitted), and "only affects [plaintiffs'] rights adversely on the contingency of future administrative action," *Peoples Nat'l Bank v. Office of Comptroller of Currency of U.S.*, 362 F.3d 333, 337 (5th Cir. 2004) (quotation marks omitted); Opening Br. 21-25.

Plaintiffs do not address *Luminant Generation* or *Peoples National Bank*. For good reason: Even when the Department of Health and Human Services (HHS) believes that a provider has violated EMTALA, any "adverse legal consequences will flow only if" a statutory violation is found through a future enforcement proceeding, subject to judicial review. *Luminant Generation*, 757 F.3d at 442; Opening Br. 22.

**B.**    Plaintiffs misconstrue both EMTALA and the Guidance. Plaintiffs state that the Guidance "imposes obligations," "requirements," and "edicts" to "perform abortions," and provides a "safe harbor" against state laws. Pls. Br. 26-27 (alteration and quotation marks omitted). As explained (Opening Br. 22-25), these characterizations are unsound. Even under plaintiffs' incorrect framing, the Guidance is non-final because any legal consequences would "flow" from EMTALA itself. *See Bennett*, 520 U.S. at 178. The statute, not the Guidance, defines and requires "stabiliz[ing]" treatment, 42 U.S.C. § 1395dd(b)(1)(A), (e)(3)(A), and "preempt[s]" "any State or local law requirement"—including removing state-law defenses—"to the extent that the requirement directly conflicts with a requirement of this section," *id.* § 1395dd(f).[1]

Also mistaken is plaintiffs' contention that the Guidance "purports to give a fixed meaning to the statute's stabilization requirement." Pls. Br. 27; Pls. Br. 47 (arguing

---

[1] Like the district court, plaintiffs cite (Br. 13-14) *United States v. Idaho*, No. 1:22-cv-329 (D. Idaho). That suit was brought to enforce EMTALA itself, not the Guidance, and does not support a finality finding. Opening Br. 24. Plaintiffs' refrain (Br. 13-14, 40-41, 43) that HHS has "enforced" or "investigat[ed]" violations of the Guidance itself is likewise flawed. HHS enforces the statute; plaintiffs' assertion is unsupported by the document they cite (at 14 n.2).

the Guidance "empower[s] HHS to second-guess doctors' judgments"). The Guidance does no such thing: It states that EMTALA applies only *if the provider* concludes that the patient is "experiencing an emergency medical condition as defined by EMTALA" *and* "that abortion is the stabilizing treatment necessary to resolve that condition." ROA.214 (italics omitted). Both determinations, the Guidance repeats, are "under the purview" and "the responsibility of" an "examining physician or other qualified medical personnel." ROA.217; *see* Opening Br. 22-24.

Plaintiffs' remaining assertions similarly contradict the record. Plaintiffs insist that the Guidance reflects a "change" and "binding" "new policy" because HHS's prior guidance documents did not "*mention*[] abortion" or EMTALA's preemptive effect. Pls. Br. 27-28 (quotation marks omitted). That is incorrect: The earlier, pre-*Dobbs* guidance plaintiffs cite mentioned abortion 24 times—and reminded providers that "stabiliz[ing]" care under EMTALA could "include abortions." Opening Br. 19-20 (quoting OCR, *Guidance on Nondiscrimination Protections Under the Church Amendments for Health Care Personnel* 2 (Sept. 17, 2021), https://perma.cc/FKH7-LZS2). HHS likewise reminded hospitals in separate pre-*Dobbs* guidance that "[s]tabilizing treatment" for pregnancy-related emergency conditions "could include medical and/or surgical interventions (e.g., dilation and curettage (D&C)," and that EMTALA "preempts any directly conflicting state law or mandate that might otherwise prohibit such treatment." Opening Br. 19 (alteration in original) (quoting CMS, *Reinforcement of EMTALA Obligations Specific to*

5

*Patients Who Are Pregnant or Are Experiencing Pregnancy Loss* 4 (Sept. 17, 2021), https://perma.cc/65CQ-YLUQ).

## II.    The Guidance Is Consistent with EMTALA.

The Guidance reiterates providers' existing obligations under EMTALA and thus is fully consistent with the statute.

**A.**    The district court's contrary holding depends on an incorrect premise: that because EMTALA does not expressly discuss abortion, it does not "provide[ a] roadmap for doctors when their duty to a pregnant woman and her unborn child may conflict," and therefore Congress has not "spoken to the 'precise question at issue.'" ROA.928-929.  That is incorrect.  Opening Br. 28-46.

**1.**    Plaintiffs barely attempt to defend the court's analysis, and the arguments they make are unavailing.  Plaintiffs echo the district court by contending that, because EMTALA does not expressly reference abortion, the statute does not mandate the provision of such care when it constitutes the requisite stabilizing treatment.  Pls. Br. 22-23, 30-31, 34-35.  EMTALA, however, does not purport to list all acceptable medical treatments because the treatment path lies with the provider's expert judgment.  *See Cherukuri v. Shalala*, 175 F.3d 446, 449-50 (6th Cir. 1999) ("The definition [of 'stabilized'] depends on the risks associated with the transfer and requires the transferring physician, faced with an emergency, to make a fast on-the-spot risk analysis.").  And there is no "such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception."

*Bostock v. Clayton County*, 140 S. Ct. 1731, 1747 (2020). As the Supreme Court has reiterated, "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (quotation marks omitted); *see Marinello v. United States*, 138 S. Ct. 1101, 1116 (2018) (Thomas, J., dissenting) (recognizing that "breadth is not the same thing as ambiguity" and a statute can be "both 'very broad' and 'very clear'").

EMTALA's stabilization requirement is broad and clear. Given the range of potential emergency medical conditions that could arise, the statute speaks in general terms and permits any form of medical care to qualify as stabilizing treatment, if the relevant medical professionals determine that such care is necessary. 42 U.S.C. § 1395dd(e)(3). When those professionals conclude that a particular form of care constitutes the requisite stabilizing treatment, EMTALA mandates that they offer it to the individual (if that care is within the hospital's capacity) and provide it upon informed consent. *Id.* § 1395dd(b). This is equally true when the individual presenting with an emergency medical condition is pregnant, and the provider determines—in her expert medical judgment—that the stabilizing treatment requires terminating the pregnancy. Opening Br. 25-27. That EMTALA does not expressly name abortion—just as it omits mention of all manner of stabilizing treatments—is immaterial. Such care fits squarely within the broad scope of stabilizing treatments that EMTALA could require. Opening Br. 29-31.

7

**2.a.**   Beyond invoking supposed statutory silence, plaintiffs distance them-selves from the district court's reasoning.  They maintain (Br. 35) that the court did not rely on EMTALA's reference to a pregnant woman's "unborn child" in determining whether the statute resolved the precise question at issue.[2]  That too is incorrect.  The district court's erroneous view—that the statute creates equal and independent statutory duties to both a pregnant individual and her unborn child—undergirded all aspects of the court's analysis.  Opening Br. 32.  For example, the court concluded that Congress had not addressed "whether physicians must perform abortions when they believe that it would resolve a pregnant woman's emergency medical condition, irrespective of the unborn child's health and state law" because EMTALA "provides no roadmap for doc-tors when their duty to a pregnant woman and her unborn child may conflict." ROA.929 (emphasis omitted).  Based on this purported conflict, the district court per-ceived a statutory "gap" to be filled by state law.  *E.g.*, ROA.931-937.

---

[2] Plaintiffs invoke the *Chevron* framework (Br. 30, 35), but that doctrine has no bearing here and HHS has not relied on it.  Indeed, notwithstanding its purported ap-plication of *Chevron*'s second step, the district court indicated that HHS has no authority to adopt *any* permissible gap-filling construction of EMTALA concerning abortion.  *See* ROA.931 n.12 ("EMTALA does not mention abortion, nor does it purport to resolve conflicts between the health of the unborn child or the woman.  These were gaps in the statute that were left for the states, rather than HHS, to fill.").  And plaintiffs (Br. 31) seem to agree.  This suggests that the court viewed there to be only one permissible construction of the statute:  The status of abortion as available stabilizing treatment must be determined by reference to state law.  As explained, the district court's inter-pretation was incorrect.

That error ends the matter and warrants reversal. Because EMTALA—correctly construed—does not create equal and independent statutory duties to an unborn child, it contains no unresolved intra-statutory conflict; there is thus no basis for the district court's decision to treat abortion differently from any other form of emergency care that could constitute stabilizing treatment under EMTALA's broad definitions. Opening Br. 29-31, 41-43; *infra* pp. 10-12. In stating that abortion care can constitute stabilizing treatment—when a qualified provider so determines—the Guidance is fully consistent with the statute.

**b.**    Rather than defend the district court's central reasoning, plaintiffs deride the government's comprehensive statutory analysis as a "lengthy exegesis" (Br. 36) and then fail to engage with it.

Instead, plaintiffs observe that EMTALA references a pregnant woman's "unborn child" four times, state that this shows a "regard for … unborn child[ren]," and thus posit the existence of a "statutory duty[] to safeguard the health of unborn children, even independent of their mothers' health." Pls. Br. 36. But in devising this syllogism, plaintiffs do not cite the statutory text creating EMTALA's screening and stabilization requirements. Such "[t]extualist arguments that ignore the operative text cannot be taken seriously." *Sackett v. EPA*, 143 S. Ct. 1322, 1344 (2023).

Even when plaintiffs purport to paraphrase the statute's four references to the "unborn child," plaintiffs misconstrue the text. Three of those references consider the interests of an "unborn child" only when the pregnant woman is *already in labor*. 42

U.S.C. § 1395dd(c)(1)(A)(ii), (c)(2)(A), (e)(1)(B)(ii). Those provisions are irrelevant to the application of EMTALA's screening, stabilization, and transfer requirements when the pregnant individual experiencing an emergency medical condition is *not* in labor. Opening Br. 39-40. Plaintiffs likewise misunderstand the fourth reference, § 1395dd(e)(3)(A), in arguing that "EMTALA requires stabilizing the unborn child." Pls. Br. 36. The text is clear: what must be stabilized is the "medical condition," 42 U.S.C. § 1395dd(b)(1)(A), which belongs to the "individual," *id.* § 1395dd(b)(1), (c), (e)(1)(A)(i). This unborn-child reference serves only to expand the circumstances in which a pregnant individual can be considered to have an emergency medical condition necessitating stabilizing treatment. It does not change the identity of the subject to whom EMTALA's statutory duties run: the individual pregnant woman. Opening Br. 35-36.

Plaintiffs do not argue that a fetus constitutes an "individual" under EMTALA. Plaintiffs suggest (Br. 36-37) that this distinction does not matter, but it is dispositive because the statute's duties run only to the "individual" seeking care. 42 U.S.C. § 1395dd(a), (b)(1), (c)(1). Given the uncontested distinction between fetus and "individual," no coherent reading of the statutory text supports the district court's conclusion that EMTALA imposes equal and independent statutory duties, or that there is an intra-statutory conflict. *Cf.* ROA.930-931. And without this supposed conflict, there is no statutory gap to be filled by state abortion laws. Rather, any state law that would

prohibit the provision of abortion care when a provider deems it a necessary stabilizing treatment is "preempt[ed]." 42 U.S.C. § 1395dd(f).

    **c.**    Even if a statutory conflict existed, the text would resolve it through EM-TALA's informed-consent framework. Opening Br. 41-44. Rather than grapple with this textual argument, plaintiffs recycle points offered elsewhere in their brief and assert (at 37) that this function of the informed-consent provision was "never discovered … during the statute's first 36 years of existence." But during that period, neither HHS nor the States needed to discuss the role of the informed-consent framework in resolving any purported intra-statutory tension concerning abortion care, because the Supreme Court's pre-*Dobbs* decisions would not have permitted state-law abortion restrictions that would have required a different outcome from that under EMTALA. *See, e.g.*, *infra* pp. 16-18. On this alternative ground as well, EMTALA contains no statutory gap.

    **B.**    Plaintiffs do not dispute that abortion care falls within the stabilization provision's plain text. They have conceded that pregnancy termination can constitute stabilizing treatment under EMTALA. Opening Br. 31; *cf.* Pls. Br. 34 ("Plaintiffs do not[] … contend that EMTALA *prohibits* abortions[] …."). And they do not contest that when Congress intends to create special rules governing abortion, it does so expressly. Opening Br. 30-31. Indeed, plaintiffs agree that there is no reason to treat abortion differently from any other form of treatment that might be deemed necessary to treat an emergency medical condition under § 1395dd(e)(1)(A).

Plaintiffs depart from the district court's view that EMTALA does not speak to abortion specifically, instead declaring (at 23, 32-35) that EMTALA does not preempt state-law prohibitions on *any form* of stabilizing treatment (except for patients in labor). Here, plaintiffs attempt to reframe the question as broadly as possible, asking "whether EMTALA supersedes background law governing the practice of medicine and medical ethnics [sic]." Pls. Br. 30; *contra* ROA.928 (addressing "EMTALA's requirements as they pertain to abortion"). But this reframing is untethered from the text and fares no better in showing that the Guidance exceeds EMTALA's scope. Congress *did* intend EMTALA to supersede otherwise applicable state law, specifically when such law "directly conflicts" with EMTALA. 42 U.S.C. § 1395dd(f). A direct conflict exists when EMTALA would require a physician to offer pregnancy termination as stabilizing treatment, but state law would bar such care. Opening Br. 44-45.

Plaintiffs appear to argue that no direct conflict exists under this scenario because physicians must "necessarily refer[] to background law to determine what treatment options are permissible." Pls. Br. 32; *see* Pls. Br. 37. But EMTALA does not recognize a state-law veto over the permissible forms of treatment necessary to stabilize an emergency medical condition.

**1.a.**    The text does not support plaintiffs' effort (at 32-33) to limit EMTALA's preemptive scope to circumstances in which state-law requirements are merely procedural and their application would not determine the care provided. The preemption clause sweeps in "*any* State or local law requirement … to the extent that the

12

requirement directly conflicts with a requirement of [EMTALA]."[3]    42 U.S.C. § 1395dd(f) (emphasis added); *see Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022) ("[T]he word 'any' has an expansive meaning." (quotation marks omitted)).  Nor do the statutory definitions of "stabilized" and "to stabilize" suggest that they incorporate state law to identify available treatments.  42 U.S.C. § 1395dd(b)(1)(A) (requiring the provision of "such treatment as may be required to stabilize the medical condition"); *id.* § 1395dd(e)(3)(A) ("'[T]o stabilize' means[] … such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur ….").  When Congress meant to incorporate background state law, it said so expressly.  *Id.* § 1395dd(d)(2)(A)-(B).

    **b.**    Plaintiffs point to only one aspect of the text to support their reframed argument:  EMTALA's requirement that hospitals stabilize by delivering the child and placenta when a woman is in labor.  42 U.S.C. § 1395dd(e)(3)(A).  Citing the "*expressio unius* canon," plaintiffs argue that this "inclusion of one stabilizing treatment indicates

---

[3] An amicus suggests that state abortion restrictions like Texas's cannot fall within EMTALA's preemption provision because those statutes contain "prohibitions," not "requirements."  Life Legal Defense Foundation Br. 10-13.  But such a reading would nullify the preemption provision because virtually any affirmative command can be rephrased as a negative prohibition. *Cf. Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1478 (2018) (describing a posited "distinction" between affirmative commands and negative prohibitions as "empty").  It would be inimical to assume Congress intended to permit States to circumvent an express preemption provision through creative drafting.

that others are *not* mandated." Pls. Br. 34; Pls. Br. 23. But "[t]he *expressio unius* canon applies only when circumstances support a sensible inference that the term left out must have been meant to be excluded." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (alterations and quotation marks omitted); *see In re Bourgeois*, 902 F.3d 446, 447-48 (5th Cir. 2018) ("[T]he *expressio unius* canon is not meant to be mechanically applied.").

The canon does not support plaintiffs' preferred inference. EMTALA's plain text mandates the offering of whatever "medical treatment of the condition" the provider deems "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A); *see id.* § 1395dd(b)(1)(A). In identifying a particular treatment in one instance, Congress did not override the application of this general language across all other medical conditions. Regardless, EMTALA singles out "contractions" in subparagraph (e)(1)(B) because labor might not otherwise meet the definition of "emergency medical condition" in subparagraph (e)(1)(A). That the statute specifies a certain form of stabilizing treatment when a woman is in labor makes sense given the nature of the condition.

If any inference can be drawn from requiring delivery as stabilizing treatment for women in labor, it is that EMTALA meant to displace the statute's general deference to a provider's medical judgment under these circumstances only. For all other emergency medical conditions, EMTALA leaves the determination of the requisite stabilizing treatment to the expert judgment of the providers. *See* 42 U.S.C. § 1395dd(e)(3)(A).

14

And this *federal* statute's specificity regarding stabilizing treatment for labor in no way suggests that *state* law can bar other forms of treatment for other emergency medical conditions. Whether the individual is in labor or is experiencing any other emergency medical condition, EMTALA's preemption provision applies equally.

      **c.**      Lacking support in EMTALA itself for a state-law veto, plaintiffs cite (Br. 31-32) a general provision of the Medicare Act, 42 U.S.C. § 1395. But plaintiffs misunderstand that provision and its interaction with EMTALA.

      Section 1395 does not require complete deference to state-law regulation of medical practice when federal law imposes specific duties on providers—here, a duty to offer care that the provider herself has determined is necessary to stabilize an individual's emergency medical condition. Indeed, through § 1395's "admonition that regulation should not 'supervise or control' medical practice or hospital operations," Congress "endorsed medical self-governance" for providers. *United States v. Harris Methodist Fort Worth*, 970 F.2d 94, 101 (5th Cir. 1992). That is entirely consistent with EMTALA's requiring stabilizing medical treatment *when practitioners deem it necessary*. Nothing in § 1395 nullifies EMTALA's preemption provision—or gives States prerogative to interfere with the practice of emergency medicine and deny women stabilizing treatment. Opening Br. 46.

      Nor does EMTALA exercise impermissible "supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395. Again, EMTALA leaves the decision regarding the required stabilizing

treatment to the judgment of the relevant medical professionals. Opening Br. 25-27; American College of Emergency Physicians Br. 23-25. EMTALA imposes a condition on payment of Medicare funds and thus "simply regulat[es] a federal program." *Florida v. HHS*, 19 F.4th 1271, 1287 (11th Cir. 2021) (quotation marks omitted). Adopting a contrary "reading of section 1395 would mean that nearly every condition of participation the Secretary has long insisted upon is unlawful." *Biden v. Missouri*, 142 S. Ct. 647, 654 (2022) (per curiam). Moreover, this funding condition was enacted by Congress, not imposed by a "Federal officer or employee." 42 U.S.C. § 1395. And even if there were tension between EMTALA's stabilization requirement and § 1395's general provision, EMTALA—the subsequent and more "specific" statute—would control. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

**2.**    Looking beyond the text entirely, plaintiffs invoke (Br. 31) States' "'historic police powers'" to justify their statutory construction. But that concept is inapposite in light of EMTALA's text and historical context.

Section 1395dd(f) expressly provides that EMTALA preempts "any" state regulation—including one undertaken pursuant to police powers—when state and federal law directly conflict. *See supra* pp. 12-13; Opening Br. 26-27, 44-45. The cases plaintiffs cite (Br. 31) do not suggest otherwise. They pertain to EMTALA's *screening* requirement; they do not address the extent to which EMTALA's *stabilization* requirement—the one at issue here—preempts state law. *See Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258-59, 1259 n.3 (9th Cir. 1995); *Marshall ex rel. Marshall v. East Carroll Par. Hosp. Serv.*

*Dist.*, 134 F.3d 319, 322-25 (5th Cir. 1998); *Brooks v. Maryland Gen. Hosp., Inc.*, 996 F.2d 708, 713 (4th Cir. 1993).  Plaintiffs identify no case adopting their position that state-law treatment restrictions are silently baked into the federal definition of stabilizing treatment under EMTALA.  Nor do plaintiffs acknowledge *In re Baby K*, 16 F.3d 590, 597 (4th Cir. 1994), which held to the contrary.

This Court's decisions also do not support plaintiffs' atextual view.  When addressing the stabilization requirement, the Court has construed its application to turn on professional judgment of medical needs, without suggesting that state law may prohibit the exercise of such judgment.  *See Battle ex rel. Battle v. Memorial Hosp. at Gulfport*, 228 F.3d 544, 559 (5th Cir. 2000) ("The Fifth Circuit has defined 'to stabilize' as 'treatment that medical experts agree would prevent the threatening and severe consequence of' the patient's emergency medical condition while in transit." (alteration omitted)); *Burditt v. U.S. HHS*, 934 F.2d 1362, 1370 n.8 (5th Cir. 1991) (observing that hospitals violate their EMTALA obligations when "something other than the present or projected medical needs of its patients determined the treatment provided").

History likewise refutes plaintiffs' novel argument.  In requiring the provision of stabilizing treatment, Congress was legislating against a backdrop that limited a State's authority to ban abortion.  At EMTALA's enactment in 1986, no State could properly ban abortion pre-viability, or post-viability "where it [wa]s necessary, in appropriate medical judgment, for the preservation of the life or health of the mother."  *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879 (1992) (plurality opinion) (quotation

17

marks omitted) (reaffirming holdings of *Roe v. Wade*, 410 U.S. 113 (1973)); *see City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 428-31 (1983); *Thornburgh v. American Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 759 (1986). EMTALA did not "preserve" police powers that no State possessed when Congress enacted the statute.

The Supreme Court's decision in *Dobbs* does not alter this analysis. The Supreme Court "returned" "the authority to regulate abortion … to the people and their elected representatives," *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2279 (2022), which includes "their representatives in the democratic process in … Congress," *id.* at 2309 (Kavanaugh, J., concurring). Those elected representatives in Congress had already placed this question—the requisite stabilizing treatment for emergency medical conditions experienced by pregnant women—in the hands of medical professionals, to be determined according to their expert judgment. Opening Br. 25-31.

**3.** Plaintiffs' construction of EMTALA is not only inconsistent with the district court's (incorrect) reasoning and unsupported by the statutory text. It would also lead to absurd consequences. It is nonsensical to interpret a federal law with an express preemption provision—enacted because background state law and principles of medical ethics at the time failed to ensure the provision of necessary emergency care, *see* Opening Br. 4-5—as tolerating state laws that prohibit the provision of necessary emergency care. *See Campbell v. Universal City Dev. Partners, Ltd.*, 72 F.4th 1245, 1257-58 (11th Cir. 2023) (holding that state law cannot define what disability-discriminatory

requirements are "necessary" under the Americans with Disabilities Act, given the statute's preemption provision and consequences of interpreting the federal law to yield to state law).  Congress does not construct elephant holes to house mice.

Under plaintiffs' reading, EMTALA would *never* preempt state law regarding whether a particular stabilizing treatment could be offered, *i.e.*, when the difference between state and federal law would be outcome-determinative.  The upshot:  States could restrict life-saving treatment for non-medical reasons, contrary to the dictates of medical ethics, and still collect Medicare funding for their hospitals; and despite EMTALA's broad framework and express preemptive effect, emergency-department physicians would be powerless to provide the care that, in their expert judgment, would be necessary to stabilize the emergency medical condition.

For example, plaintiffs' view would permit States to mandate that hospitals can offer only palliative care, but no curative treatment, for any emergency condition resulting from an individual's own unlawful activities—*e.g.*, injuries caused by trespassing, a drug overdose, underage drinking, or reckless driving.  Under plaintiffs' logic, even if the medical condition placed an individual's health "in serious jeopardy," 42 U.S.C. § 1395dd(e)(1)(A)(i), an emergency-department physician in a federally funded hospital would be forbidden to offer the treatment that she judged necessary to prevent "material deterioration of the condition," *id.* § 1395dd(e)(3)(A), because that "treatment option[]" would not be "permissible" under state law, Pls. Br. 32.

19

Contrary to plaintiffs' suggestion (Br. 33), the result would not entail "offering stabilizing treatment in accordance with state law."  Stabilizing treatment is, by definition, deemed "necessary" by the provider.  42 U.S.C. § 1395dd(e)(3)(A).  Patients thus would receive lesser treatment that does not satisfy EMTALA's mandate of "such treatment as may be required to stabilize the medical condition."  *Id.* § 13955dd(b)(1)(A).  That outcome would flout EMTALA's purpose, plain requirements, and preemption provision.  *See Waggoner v. Gonzales*, 488 F.3d 632, 638 (5th Cir. 2007) ("[A] common mandate of statutory construction [is] to avoid absurd results.").

Unlike the district court's and plaintiffs' discordant theories, the government's reading (at 32-41) harmonizes EMTALA and state law.  When a physician can provide what she concludes is the requisite stabilizing treatment while complying with state-law requirements, she must do so.  But if state law directly conflicts with EMTALA—*e.g.*, by prohibiting the provision of treatment that, in her medical judgment, would be necessary to stabilize the condition—then that state law is preempted and must be disregarded under those circumstances.  *See Baby K*, 16 F.3d at 597.  The Guidance goes no further than EMTALA itself by reiterating this principle and reminding providers of their pre-existing statutory obligations.

## III.   The Medicare Act Did Not Require Notice and Comment Here.

The Medicare Act's notice-and-comment requirement does not govern here.  It applies to a "rule, requirement, or other statement of policy" that also "establishes or changes a substantive legal standard governing … the payment for services."  42 U.S.C.

§ 1395hh(a)(2).  The Guidance does not meet either condition.  Opening Br. 46-49.

Indeed, notice-and-comment rulemaking was not required because "the statute itself"

"supplies the controlling legal standard." *Allina*, 139 S. Ct. at 1816-17 (emphasis omit-

ted).

    **A.**    Plaintiffs contend (Br. 40-41) that the Guidance is a "statement of policy"

because it allegedly announces an "adjudicatory approach," but plaintiffs fail to articu-

late what that approach is.  *Cf. Allina*, 139 S. Ct. at 1810 (finding that a "spreadsheet

announcing the 2012 Medicare fractions" for payments constituted an adjudicatory ap-

proach).  Plaintiffs instead identify *statutory* features: that violations of EMTALA carry

risks of monetary penalties or loss of funding.  The Guidance, however, does not com-

pel a provider to determine that abortion care is necessary stabilizing treatment.  *See*

*supra* pp. 4-5.  Rather, the Guidance follows the settled understanding that EMTALA's

definition of "stabilize" "is purely contextual or situational," and thus "depends on the

risks associated with" a particular case and "requires the transferring physician, faced

with an emergency, to make a fast on-the-spot risk analysis." *Cherukuri*, 175 F.3d at

449-50.

    **B.**    The Guidance does not establish or change a substantive legal standard.

The Guidance underscores that the "statute" requires "stabilizing treatment" for an

"emergency medical condition," and that those determinations are "under the purview"

and "the responsibility of" the medical provider.  ROA.214, *see* ROA.217, 221-222; 42

U.S.C. § 1395dd(e)(1), (3).  And contrary to plaintiffs' suggestion (Br. 42-43), there is

nothing new in recognizing that EMTALA preempts directly conflicting state law. *See* 42 U.S.C. § 1395dd(f); *Baby K*, 16 F.3d at 597; *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999); *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993) (per curiam).

Nor is there anything novel in repeating that EMTALA's requirements may attach when medical providers conclude that abortion care is necessary stabilizing treatment. *See New York v. U.S. HHS*, 414 F. Supp. 3d 475, 537-39 (S.D.N.Y. 2019); *Morin v. Eastern Me. Med. Ctr.*, 780 F. Supp. 2d 84, 93-96 (D. Me. 2010); *Ritten v. Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d 696, 712-18 (E.D. Mich. 2009); *California v. United States*, No. C-05-00328-JSW, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008); *see also* ROA.576, 568-569, 583, 596-597 (physician declarations confirming similar understanding). Plaintiffs cannot reconcile their argument (Br. 43) that the Guidance "changed the law" with their concessions that EMTALA itself could include abortion care as stabilizing treatment. ROA.280, 1133-1134; ROA.1135, 1138.

## IV.   The Injunction Is Overbroad.

The district court improperly enjoined enforcement of EMTALA against plaintiffs as applied to all pregnancy-termination care, including life-saving treatments permissible under Texas law and to which no plaintiff objects. Opening Br. 49-53. Even under plaintiffs' statutory analysis—which requires physicians to reference Texas law "to determine what treatment options are permissible" (Br. 32)—the injunction is overbroad. At a minimum, this Court should limit any injunctive relief to the discrete

situations when applying the "Guidance and Letter's interpretation of EMTALA," ROA.1113, would actually contradict Texas law or a plaintiff-organization member's beliefs.

**A.1.**    The injunction is inconsistent with constitutional and equitable principles because it is not "tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *see ODonnell v. Harris County*, 892 F.3d 147, 155, 163 (5th Cir. 2018) (injunction "must be vacated" if it "is not narrowly tailored to remedy the specific action which gives rise to the order" (quotation marks omitted)).  Plaintiffs concede (Br. 43-44) that the injunction applies to *all* pregnancy-termination care that they could conceivably provide—even life-saving treatments that Texas law and the organizational members' beliefs would permit.  The injunction thus exceeds plaintiffs' asserted harms and the district court's findings:  Plaintiffs alleged (and the district court found) injury based on abortion care that would *violate* state law or members' beliefs. Opening Br. 50-51; *Gill*, 138 S. Ct. at 1934 ("standing is not dispensed in gross" (quotation marks omitted)).

Plaintiffs' theory confirms that the injunction should be narrowed.  By plaintiffs' lights, hospitals must offer stabilizing treatment consistent with state-law restrictions (Br. 32-33), and the district court enjoined the Guidance only insofar as it "adds to EMTALA" (Br. 44-45).  But under that view, HHS may properly enforce EMTALA to require pregnancy termination when that stabilizing treatment is consistent with Texas law.  To adopt plaintiffs' statutory argument is to concede the injunction's overbreadth.

**2.** There is no basis for Texas's suggestion (Br. 45-46) that it suffers "sovereign injury" when enforcing EMTALA would comport with Texas law. In those instances, there would be no "direct[] conflict" triggering preemption, 42 U.S.C. § 1395dd(f), and nothing would render Texas unable "to enforce its duly enacted plans," *Abbot v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018).

Texas's assertion of harm rings especially hollow after its Legislature enacted HB-3058,[4] which takes effect September 1, 2023. HB-3058 states that professionals providing healthcare that results in pregnancy termination have an affirmative defense to liability under Texas law if they "exercised reasonable medical judgment in providing medical treatment to a pregnant woman in response to: (1) an ectopic pregnancy at any location; or (2) a previable premature rupture of membranes." By enjoining applications of EMTALA even when Texas expressly permits termination of a pregnancy, however, the district court granted relief "more burdensome to the defendant than necessary." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

**3.** The organizational plaintiffs' arguments fare no better. They contend (Br. 47-48) that the Guidance "pressure[s]" members to violate their consciences, but their sworn declarations (and the district court's findings) identify objections only to so-called "elective" abortions. Opening Br. 50-51. Indeed, plaintiffs concede (Br. 48) that in some instances abortion is both medically necessary and permissible under their

---

[4] 2023 Leg., 88 Reg. Sess. (Tx. 2023), https://perma.cc/73Z4-6FRH.

convictions.  *See* ROA.912 (plaintiffs "do not object to abortions where it is necessary to save the mother's life").  An injunction preventing HHS from ensuring that pregnant patients do not die because of the denial of readily available, life-saving care sweeps far beyond plaintiffs' asserted harms.

4.    Contrary to plaintiffs' assertion (Br. 47-48, 47 n.3), HHS did not argue in the proceedings below that the Guidance or EMTALA "overrides the doctors' federal conscience rights."  The government explained that the conscience provisions in the Hyde, Coats-Snowe, and Church Amendments do not "override EMTALA, a separate statute," ROA.484 (quotation marks omitted), in response to incorrect arguments that those provisions operated to exclude abortion from EMTALA's definition of "stabilizing treatment," regardless of who was providing the care.  The government did not contend that EMTALA would compel individuals to perform abortions contrary to their sincerely held moral or religious beliefs; the government argued the exact opposite.  ROA.497 ("The Guidance does not purport to displace [the Religious Freedom Restoration Act (RFRA)] or to state that RFRA does not apply in this context.").  Plaintiffs also ignore that RFRA would inform EMTALA's application to individual providers.  *See Bostock*, 140 S. Ct. at 1754.

5.    Plaintiffs' alleged injury from "a lack of notice and comment," ROA.953, and their asserted right not to "be[] regulated illegally," Pls. Br. 46, likewise do not justify the sweeping injunction—particularly one that prohibits abortion care to which no plaintiff objects.  *Cf. Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[A]

25

procedural right *in vacuo*[ ]is insufficient to create Article III standing.").  Any procedural

deficiencies that the district court identified would be remedied by notice and comment,

and thus would warrant either remand without vacatur or (at most) a narrower injunc-

tion.  Opening Br. 53-54.  Plaintiffs do not meaningfully contest the point; instead, they

rely (Br. 49-50) on their *substantive* claims to buttress the injunction, which underscores

the court's error in relying on supposed *procedural* harms to justify such expansive relief.[5]

    **B.**    The injunction should be narrowed for an independent reason:  It is

acutely disruptive and unsupported by the court's equitable balancing.  Opening Br. 51-

53.  The harms to the government and public are severe.  The injunction interferes with

HHS's ability "to advise the public of [its] construction of the statutes and rules which

it administers."  *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quotation marks

omitted).  It imperils the lives and wellbeing of women experiencing emergency medical

conditions that can arise during pregnancy.  *See* ROA.563-570, 575-578, 583-586, 592-

596.  And it risks denying these individuals life-saving care that plaintiffs would other-

wise offer and that Texas law would allow.  Nothing in the district court's equities bal-

ancing supports this result.  Tellingly, plaintiffs venture no defense of that analysis.

---

[5] Plaintiffs suggest (Br. 50) that remand without vacatur would be inappropriate because they surmise "many reasons why" HHS might reach a different outcome.  That argument misstates the law and misses the point:  The standard for remand is whether there is a "serious possibility" that HHS would reach the same result.  *Central & S.W. Servs., Inc. v. U.S. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (quotation marks omitted).  (Indeed, there is, as HHS has maintained that the Guidance simply repeats the statute.)  Regardless, plaintiffs' speculation does not support an injunction covering healthcare that they admit is consistent with Texas law and their consciences.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

LEIGHA SIMONTON
  *United States Attorney*

MICHAEL S. RAAB
McKAYE L. NEUMEISTER

  *s/ Nicholas S. Crown*
NICHOLAS S. CROWN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7325*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

August 2023

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.


*s/ Nicholas S. Crown*
Nicholas S. Crown

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,478 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Nicholas S. Crown*
Nicholas S. Crown