# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 2, 2024

Lyle W. Cayce
Clerk

No. 23-10246

State of Texas; American Association of Pro-Life
Obstetricians & Gynecologists; Christian Medical &
Dental Associations,

*Plaintiffs—Appellees*,

*versus*

Xavier Becerra; United States Department of Health
and Human Services; Centers for Medicare and
Medicaid Services; Karen L. Tritz; David R. Wright,

*Defendants—Appellants.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 5:22-CV-185

Before Southwick, Engelhardt, and Wilson, *Circuit Judges*.

Kurt D. Engelhardt, *Circuit Judge*:

The Emergency Medical Treatment and Active Labor Act of 1986 ("EMTALA"), 42 U.S.C. § 1395dd, requires hospitals with emergency departments that receive Medicare reimbursement to provide a medical screening and, if an emergency medical condition exists, necessary stabilizing treatment or an appropriate transfer irrespective of the individual's ability to pay. EMTALA was enacted to combat "patient dumping," the practice of some

No. 23-10246

hospitals turning away or transferring indigent patients without evaluation or treatment.

The State of Texas, along with two medical associations with members located in Texas ("Texas plaintiffs"), sued the Department of Health and Human Services ("HHS"), HHS Secretary Xavier Becerra, the Centers for Medicare and Medicaid Services ("CMS"), the Director of the Survey and Operations Group for CMS, and the Director of the Quality Safety and Oversight Group for CMS (collectively "HHS"), challenging HHS's guidance on EMTALA's requirement that physicians must provide an abortion when that care is the necessary stabilizing treatment for an emergency medical condition. The Texas plaintiffs alleged that the guidance mandates providers to perform elective abortions in excess of HHS's authority and contrary to state law and sought to enjoin its enforcement. The district court enjoined the guidance's interpretation of EMTALA within Texas or against any member of a plaintiff organization. HHS appealed. For the following reasons, we AFFIRM.

## I.

### A.

In 1986, Congress enacted EMTALA to ensure public access to emergency services regardless of a patient's ability to pay. 42 U.S.C. § 1395dd(a). EMTALA applies to every hospital that has an emergency department and participates in Medicare. *Id.* §§ 1395dd(a), (e)(2), 1395cc(a)(1)(I); *see also* 42 C.F.R. § 489.24(b)(4). To receive federal funding, hospitals must agree to comply with EMTALA. 42 U.S.C. § 1395cc(a)(1)(I)(i). If a hospital "fails to comply substantially" with Medicare's conditions of participation, CMS— the component of HHS that administers Medicare—may seek to terminate that hospital's participation in the Medicare program. *Id.* § 1395cc(b)(2)(A); *see also* 42 U.S.C. § 1395dd(d)(1).

No. 23-10246

There are three stages to EMTALA: (1) screening; (2) stabilizing; and (3) transfer. When an individual presents to a Medicare-participating emergency department and requests examination or treatment, the hospital must provide an appropriate medical screening examination "to determine whether or not an emergency medical condition" exists. 42 U.S.C. § 1395dd(a). An "emergency medical condition" means "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in" the following:

> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
>
> (ii) serious impairment to bodily functions, or
>
> (iii) serious dysfunction of any bodily organ or part.

*Id.* § 1395dd(e)(1)(A). In the case of a pregnant woman who is having contractions, an "emergency medical condition" includes:

> (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or
>
> (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.

*Id.* § 1395dd(e)(1)(B).

If the hospital determines that a patient has an "emergency medical condition," the hospital must offer patients "[n]ecessary stabilizing treatment[s]" or a "transfer of the individual to another medical facility." *Id.* § 1395dd(b); *see also* 42 C.F.R. § 489.24(d)–(e). The term "to stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration

No. 23-10246

of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition [of a pregnant woman who is having contractions], to deliver (including the placenta)." 42 U.S.C. § 1395dd(e)(3)(A); *see also* 42 U.S.C. § 1395dd(e)(3)(B). A hospital is deemed to meet the "[n]ecessary stabilizing treatment" requirements if the hospital offers and informs of examination and treatment but the individual refuses to consent to the examination and treatment. 42 U.S.C. § 1395dd(b)(2). The term "transfer" means to move "an individual outside a hospital's facilities at the direction of any person employed by . . . the hospital." *Id.* § 1395dd(e)(4). Transfers occur if the patient is stabilized. *Id.* § 1395dd(c)(1). If a patient has not been stabilized, a transfer may only occur in certain circumstances and if the transfer is "appropriate." *See id.* § 1395dd(c)(1)(A)(i)–(iii), (c)(1)(B), (c)(2).[1]

---

[1] If an individual at a hospital has not been stabilized, a transfer may only occur in three circumstances. First, a hospital may transfer if the individual, having been informed of the hospital's obligations to provide medical treatment and the risk of transfer, in writing requests transfer to another medical facility. 42 U.S.C. § 1395dd(c)(1)(A)(i). Second, a physician certifies that the medical benefits reasonably expected at another medical facility outweigh risks "to the individual and, in the case of labor, to the unborn child from effecting the transfer." *Id.* § 1395dd(c)(1)(A)(ii). And, last, if a physician was not physically present at the time of transfer, a qualified medical person has signed a certification after the physician consulted with that person, determining that the medical benefits reasonably expected at another medical facility outweigh risks to the individual, and that physician subsequently countersigns the certification. *Id.* § 1395dd(c)(1)(A)(iii). Transfers under Section 1395dd(c)(1)(A)(i)–(iii) must be "appropriate." *See id.* § 1395dd(c)(1)(B). With respect to a pregnant woman, an "appropriate transfer" is a transfer in which "the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child." *Id.* § 1395dd(c)(2)(A). The receiving facility must have available space, qualified personnel to treat the individual, have agreed to accept the transfer, and have all medical records related to the emergency condition for which the individual has presented. *Id.* § 1395dd(c)(2)(B)–(C). The transfer must be effected through qualified personnel and transportation equipment. *Id.* § 1395dd(c)(2)(D).

No. 23-10246

EMTALA does not address any specific medical procedures or treatments besides the requirement "to deliver (including the placenta)." *Id.* § 1395dd(e)(3)(A). Moreover, EMTALA contains a savings clause that states its limited preemptive effect: "The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." *Id.* § 1395dd(f).

### B.

On June 24, 2022, the United States Supreme Court issued its decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2279 (2022), holding "that the Constitution does not confer a right to abortion" and that "the authority to regulate abortion must be returned to the people and their elected representatives." In the wake of *Dobbs*, so-called "trigger laws" sprung into effect, meaning laws that were enacted in anticipation of abortion's return to state control automatically went into effect. The Texas Human Life Protection Act ("HLPA") is such a law. *Dobbs* triggered HLPA's 30-day clock and the law went into effect on August 25, 2022. The HLPA prohibits abortions unless the pregnancy "places the female at risk of death or poses a serious risk of substantial impairment of a major bodily function." Tex. Health & Safety Code § 170A.002(b)(2). In such circumstances, the person performing, inducing, or attempting the abortion must be a licensed physician exercising reasonable medical judgment by providing the best opportunity for the unborn child to survive unless, in the physician's reasonable medical judgment, it would pose a greater risk of the pregnant female's death or a serious risk of substantial impairment of a major bodily function of the pregnant female. *Id.* § 170.002(b)(1), (3).[2]

---

[2] Under the HLPA, "abortion" means "the act of using or prescribing an instrument, a drug, a medicine, or any other substance, device, or means with the intent to cause the death of an unborn child of a woman known to be pregnant." Tex. Health &

No. 23-10246

Two weeks after *Dobbs*, on July 11, 2022, CMS issued "Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss" ("the Guidance")[3] and a supporting letter ("the Letter")[4] to state healthcare-agency directors, reminding hospitals of their existing and continuing obligations under EMTALA in light of new state laws prohibiting or restricting access to abortion. Guidance at 1–2. The Guidance is at the forefront of this appeal. Most notably, the Guidance states:

> **If a physician believes that a pregnant patient** presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA, and that abortion is the stabilizing treatment necessary to resolve that condition, the physician **must** provide that treatment. When a state law prohibits abortion and does not include an exception for the life of the pregnant person—or draws the exception more narrowly than EMTALA's emergency medical condition definition— **that state law is preempted**.

*Id.* at 1 (emphasis in original). According to the Guidance, "[e]mergency medical conditions involving pregnant patients may include, but are not limited to, ectopic pregnancy, complications of pregnancy loss, or emergent

---

Safety Code § 245.002(1); *see also* Tex. Health & Safety Code § 170A.001(1) ("abortion" is assigned the meaning under Section 245.002). The term "does not include birth control devices or oral contraceptives." Tex. Health & Safety Code § 245.002(1). And "[a]n act is not an abortion if the act is done with the intent to: (A) save the life or preserve the health of an unborn child; (B) remove a dead, unborn child whose death was caused by spontaneous abortion; or (C) remove an ectopic pregnancy." *Id.* § 245.002(1)(A)–(C).

[3] Ctrs. for Medicare & Medicaid Servs., *Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss (QSO-21-22-Hospitals-UPDATED JULY 2022)* (July 11, 2022).

[4] Dep't of Health & Human Servs., The Secretary of Health & Human Servs., Letter on Enforcement of EMTALA (July 11, 2022).

No. 23-10246

hypertensive disorders, such as preeclampsia with severe features." *Id.* The Guidance notes that "[t]he course of treatment necessary to stabilize such emergency medical conditions is also under the purview of the physician or other qualified medical personnel." *Id.* at 4. The Guidance's enforcement provision warns hospitals of penalties for physicians who refuse to provide "necessary stabilizing care for an individual presenting with an emergency medical condition that requires such stabilizing treatment, or an appropriate transfer." *Id.* at 5. It also informs that "[a]ny state actions against a physician who provides an abortion in order to stabilize an emergency medical condition in a pregnant individual presenting to the hospital would be preempted by the federal EMTALA statute due to the direct conflict with the 'stabilized' provision of the statute." *Id.* Endorsed by HHS Secretary Becerra, the Letter reenforces the same message. *See* Letter at 1–2.

## C.

On July 14, 2022, Texas filed a complaint in the Northern District of Texas challenging the Guidance pursuant to, *inter alia*, the Administrative Procedure Act ("APA") and Medicare Act. The crux of the complaint is that EMTALA does not authorize the federal government to compel healthcare providers to perform abortions, and thus, the Guidance is unlawful and must be set aside. Two weeks later, on July 28, 2022, Texas amended the complaint, adding as co-plaintiffs the American Association of Pro-Life Obstetricians & Gynecologists ("AAPLOG") and Christian Medical & Dental Associations ("CMDA").[5]

---

[5] AAPLOG is an organization of 6,000 pro-life physicians, with 300 members in Texas. CMDA is a nonprofit organization of Christian physicians, dentists, and allied healthcare professionals, with over 12,000 members nationwide and 1,237 members in Texas, of whom 607 are practicing or retired physicians and 35 are OB/GYNs. Both groups oppose elective abortions on medical, ethical, and religious grounds.

No. 23-10246

Thereafter, on August 3, 2022, the Texas plaintiffs moved for a temporary restraining order and a preliminary injunction. After a hearing on the matter, the district court issued an order granting a preliminary injunction and simultaneously denying HHS's motion to dismiss, finding the Texas plaintiffs had requisite standing and thus the district court did not lack subject matter jurisdiction. *Texas v. Becerra*, 623 F. Supp. 3d 696 (N.D. Tex. 2022). As an initial matter, and addressing the claims raised in the Rule 12(b)(1) motion, the district court concluded that the Texas plaintiffs had Article III standing to raise their claims. *Id.* at 709–19. The district court also determined that the Guidance constituted a final agency action. *Id.* at 720–24. As determined by the district court, the Guidance is neither subject to further agency review nor a mere intermediate step in a multi-stage administrative process. *Id.* at 720–21. Rather, it binds HHS and its staff to a particular legal position. *Id.* at 721–24. On the merits, the district court concluded that the Texas plaintiffs were entitled to preliminary injunctive relief because, applying *Chevron*,[6] the Guidance exceeds statutory authority. *Id.* at 724–33. HHS was also required to promulgate the Guidance through notice and comment. *Id.* at 733–35. Having found a likelihood of success on the merits, the district court determined that the other preliminary injunction factors were satisfied. *Id.* at 735–38. Tailoring the injunction to the parties, issues, and evidence before it, the district court enjoined HHS from enforcing the Guidance and Letter within the State of Texas or against the Texas plaintiffs. *Id.* at 738–39.

On September 1, 2022, HHS moved to clarify the district court's injunction. According to HHS, it was unclear whether they could continue to

---

[6] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The district court applied *Chevron* but noted that, even if *Chevron* were not to apply, its "conclusions here would stand on even firmer ground." *Texas*, 623 F. Supp. 3d at 724 n.11.

enforce the Guidance's interpretation of EMTALA in Texas and against the plaintiffs when an abortion would be permitted under state law. HHS filed its first notice of appeal before the district court ruled on the motion.[7] Determining it had jurisdiction to decide the motion to clarify, the district court denied HHS's motion. *Texas v. Becerra*, No. 5:22-CV-185-H, 2022 WL 18034483, at *1–3 (N.D. Tex. Nov. 15, 2022).

On December 20, 2022, the district court entered a partial final judgment, converting the preliminary injunction into a permanent injunction. The parties then filed an unopposed motion to correct judgment under Federal Rule of Civil Procedure 60, noting that the judgment should include the language from the preliminary injunction in its judgment. The district court entered an amended judgment, stayed the Texas plaintiffs' remaining claims pending resolution of any appeal from this judgment and administratively closed the case. *Texas v. Becerra*, No. 5:22-CV-185-H, 2023 WL 2467217, at *1 (N.D. Tex. Jan. 13, 2023). The pertinent language from the permanent injunction for the purpose of this appeal is:

> (1) The defendants may not enforce the Guidance and Letter's interpretation that Texas abortion laws are preempted by EMTALA; and
>
> (2) The defendants may not enforce the Guidance and Letter's interpretation of EMTALA—both as to when an abortion is required and EMTALA's effect on state laws governing abortion—within the State of Texas or against AAPLOG's members and CMDA's members.

---

[7] The first notice of appeal was docketed as No. 22-11037.

No. 23-10246

*Id.* HHS moved to stay the first notice of appeal, and later, dismissed that appeal. *Texas v. Becerra*, No. 22-11037, 2023 WL 2366605 (5th Cir. Jan. 26, 2023). This appeal of the amended judgment followed.

## II.

"We review the trial court's granting . . . of [a] permanent injunction for abuse of discretion." *Peaches Ent. Corp. v. Ent. Repertoire Assocs., Inc.*, 62 F.3d 690, 693 (5th Cir. 1995) (citation omitted). We likewise review *de novo* the scope of an injunction. *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 450 (5th Cir. 2019) (citation omitted) [hereinafter *EEOC*]. Determinations on jurisdiction are reviewed *de novo*. *Id.* at 441 (footnote omitted).

## III.

HHS does not raise standing on appeal. Pertinent to the question of jurisdiction on appeal, however, is (A.) whether the Guidance is a final agency action subject to the court's review.[8] The remaining issues on appeal include (B.) whether the Guidance is consistent with EMTALA, (C.) whether the district court erred in concluding that the Guidance was required to undergo notice and comment under the Medicare Act, and (D.) whether the injunction is overbroad. Each issue will be analyzed in turn.

## A.

The APA provides for judicial review of a "final agency action." 5 U.S.C. § 704. Two conditions must be met for agency action to be "final." "First, the action must mark the 'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). "And second, the action must be one by which 'rights or

---

[8] *EEOC*, 933 F.3d at 440 n.8 ("whether an agency action is final is a jurisdictional issue, not a merits question" (citation omitted)).

No. 23-10246

obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (citation omitted). The Supreme Court takes a "pragmatic approach," viewing the APA finality requirement as "flexible." *EEOC*, 933 F.3d at 441 (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016); and then quoting *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011)).

HHS does not raise the first prong of the *Bennett*-inquiry. "Reviewability *vel non* of the Guidance thus turns on the second *Bennett* prong— whether 'rights or obligations have been determined' by it, or whether 'legal consequences will flow' from it." *EEOC*, 933 F.3d at 441 (quoting *Bennett*, 520 U.S. at 178).

1.

Courts have consistently held that "an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations, thus meeting the second prong of *Bennett*." *EEOC*, 933 F.3d at 441. "Whether an action binds the agency is evident 'if it either appears on its face to be binding[] or is applied by the agency in a way that indicates it is binding.'" *Id.* (alteration in original) (quoting *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015)); *see also Ciba-Geigy Corp. v. U.S. Env't Prot. Agency*, 801 F.2d 430, 436 (D.C. Cir. 1986) (holding that an action is final once the agency makes clear that it "expects regulated entities to alter their primary conduct to conform to [the agency's] position"). The governing case on the matter is *Texas v. Equal Employment Opportunity Commission*, 933 F.3d 433 (5th Cir. 2019). *EEOC* involved the Equal Employment Opportunity Commission's ("EEOC") enforcement guidance that claimed blanket bans on hiring individuals with criminal records were violations of Title VII. *Id.* at 437–38. The court held that the guidance bound the EEOC to a specific legal position to such a degree that noncompliance with the

guidance naturally risked legal consequences for employers. *Id.* at 446. *EEOC* directs courts to determine whether agency action binds the agency by looking for (1) mandatory language, (2) actions that restrict the agency's discretion to adopt a different view of the law, and (3) the creation of safe harbors from legal consequences. *Id.* at 441–43. In some cases, "'the mandatory language of a document alone can be sufficient to render it binding.'" *Id.* at 442 (quoting *Gen. Elec. Co. v. Env't Prot. Agency*, 290 F.3d 377, 383 (D.C. Cir. 2002)); *see also Iowa League of Cities v. Env't Prot. Agency*, 711 F.3d 844, 864 (8th Cir. 2013) (holding that language expressing an agency's position that speaks in mandatory terms is "the type of language we have viewed as binding").

The district court found the Guidance contains all three. *Texas*, 623 F. Supp. 3d at 721–24. The Texas plaintiffs point to mandatory language throughout the Guidance for its binding effect, including the title and body of the text.

In this case, the mandatory language of the Guidance renders it binding. The title itself imposes "obligations." Guidance at 1. The Guidance states that hospitals and physicians "must" provide an abortion as a stabilizing treatment "irrespective of any state laws or mandates." *Id.* at 1, 4–5. It is a part of a "physician's professional and legal duty" to provide such treatment to a patient who presents under EMTALA. *Id.* at 1. The Guidance further states that physicians cannot be shielded from liability for "erroneously complying with state laws that prohibit services such as abortion or transfer of a patient for an abortion when the original hospital does not have the capacity to provide such services." *Id.* at 4. Moreover, the Guidance threatens fines and loss of federal funding for noncompliance. *Id.* at 5. The Letter repeats the same message as the Guidance. Letter at 1–2. The Letter also warns that the enforcement of EMTALA is a complaint driven process and directs that violations of EMTALA should be initiated by a complaint. *Id.* at 2. The

Letter states that violations of EMTALA may lead to civil penalties, including a physician's exclusion from "the Medicare and State health care programs." *Id.* The language as to how EMTALA will be enforced effectively withdraws the agency's discretion "to adopt a different view of the law." *EEOC*, 933 F.3d at 442. Private parties can also rely on the Guidance as a norm or safe harbor to avoid liability. Guidance at 5–6; *see also EEOC*, 933 F.3d at 443–44 ("The Guidance is 'binding as a practical matter' because 'private parties can rely on it as a norm or safe harbor by which to shape their actions.'" (quoting *Cohen v. United States*, 578 F.3d 1, 9 (D.C. Cir. 2009))); *Gen. Elec.*, 290 F.3d at 383 ("private parties can rely on it as a norm or safe harbor by which to shape their actions").

HHS's reliance on *Luminant Generation Co., L.L.C. v. U.S. Environmental Protection Agency*, 757 F.3d 439 (5th Cir. 2014), for the notion that the Guidance has no independent legal force, is distinguishable from *EEOC*. *Luminant* involved notice of violations sent by the Environmental Protection Agency ("EPA") informing the plaintiff power plant of violations under the Clean Air Act. *Id.* at 440. It was the Clean Air Act—not the EPA's notice of violations to the plaintiff power plant—that set forth the plaintiff's rights and obligations. *Id.* at 442. *EEOC* distinguished its guidance from the notice of violations in *Luminant*, holding that "the EPA notices merely expressed the agency's opinion about the legality of the plaintiff's conduct; it did not . . . commit the administrative agency to a specific course of action should the plaintiff fail to comply with the agency's view." *EEOC*, 933 F.3d at 445 (citation and quotation marks omitted). The key, according to *EEOC*, is that the guidance "dictates how EEOC must assess claims of Title VII disparate-impact liability targeting employers with felon-hiring policies. The [g]uidance does not merely comment on a single employer's practices; it tells EEOC staff and all employers what sort of policy is unlawful." *Id.*

No. 23-10246

HHS claims that the Guidance does not dictate how providers exercise their professional judgment regarding the proper stabilizing care, and it does not dictate any particular result. "But as we have explained, whether the agency action binds the *agency* indicates whether legal consequences flow from that action." *Id.* The Guidance is rife with language binding HHS. It instructs hospitals and physicians to provide abortions in certain cases irrespective of state law with clear legal consequences should a physician or hospital violate. Guidance at 4–5. The Letter repeats the same message. Letter at 1–2. The language effectively withdraws HHS's discretion "to adopt a different view of the law." *EEOC*, 933 F.3d at 442. The Guidance also establishes safe harbors. Guidance at 5–6. Legal consequences thus flow from the Guidance, and it determines rights and obligations.

2.

Under the second *Bennett* prong, agency action is not final if it "merely restate[s]" a statutory requirement or "merely reiterate[s] what has already been established." *Nat'l Pork Prods. Council v. U.S. Env't Prot. Agency*, 635 F.3d 738, 756 (5th Cir. 2011) (citations omitted). To constitute a final agency action, "rights, obligations, or legal consequences" created by a challenged action "must be new." *State v. Rettig*, 987 F.3d 518, 529 (5th Cir. 2021) (citations omitted).

HHS argues that the Guidance is not "new." In support, HHS submits two prior guidance documents: (1) a September 2021 guidance issued by CMS ("CMS guidance");[9] and a (2) September 2021 guidance issued by

---

[9] Ctrs. for Medicare & Medicaid Servs., *Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss* (Sept. 17, 2021) (Revised Oct. 3, 2022), available at https://www.cms.gov/files/document/qso-21-22-hospital-revised.pdf.

No. 23-10246

HHS's Office for Civil Rights ("OCR") ("OCR guidance").[10] These documents hardly qualify the Guidance in this case as "not new." First, the September 2021 guidance by CMS does not mention abortion. This document directs hospitals to provide stabilizing treatment for persons who present to the emergency department, including pregnant women. CMS guidance at 1. So does EMTALA. *See* 42 U.S.C. § 1395dd(a), (e)(1)(A). And while the September 2021 CMS guidance repeats similar language as the Guidance in this case, it does not impose any obligations like the Guidance in this case does post-*Dobbs*. The September 2021 CMS guidance falls under *National Pork Producers*' definition of an agency action that does not make a "substantive change" because it "merely restate[s]" EMTALA's prohibition on denying an emergency medical examination to determine whether an emergency medical condition exists for pregnant women. *Nat'l Pork Prods.*, 635 F.3d at 756; *compare* September 2021 CMS guidance at 1, *with* 42 U.S.C. § 1395dd(a), (e)(1).

Second, the September 2021 OCR guidance discusses the nondiscrimination protections under the Church Amendments, 42 U.S.C. § 300a-7. OCR guidance at 1. The Church Amendments protect health care personnel from discrimination related to their employment or staff privileges if they refuse to perform or assist in the lawful performance of an abortion. *Id.* The Church Amendments define "lawful" abortions as those that are lawful under federal law. *Id.* at 2. By citing *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 879 (1992), the OCR guidance relies on law that has since been overruled by the Supreme Court. *See Dobbs*, 142 S. Ct. at 2284. Moreover, the OCR guidance's reference to "[l]awful abortions . . . in order

---

[10] U.S. Dep't of Health & Human Servs., *Guidance on Nondiscrimination Protections under the Church Amendments for Health Care Personnel* (Sept. 17, 2021), available at https://www.hhs.gov/sites/default/files/church-guidance.pdf.

No. 23-10246

to stabilize a patient when required under [EMTALA]" is framed in the pre-*Dobbs* context. OCR guidance at 2.

The Texas plaintiffs claim that the Guidance is "new" for good reasons. HHS even admitted before the district court at the hearing on the preliminary injunction that it "hasn't issued a [G]uidance document specific like this one . . . because there wasn't a need for it. Everybody understood that this is what was required." Tr. of Preliminary Injunction Hearing at 125. At oral argument, HHS sought to clarify that, while there are new factual circumstances, the obligations on hospitals remain the same regarding abortion. Oral Argument Recording at 2:52–3:19; 13:15–25; 13:49–56. We disagree with HHS. The new ingredient here is *Dobbs*, which caused a sea change in the law. Put simply, the Guidance sets out HHS's legal position—for the first time—regarding how EMTALA operates post-*Dobbs*. The Guidance is new policy; it does not "merely restate" EMTALA's requirements. Legal consequences flow from the Guidance, and it determines rights and obligations. The Guidance therefore constitutes final agency action.

## B.

The APA requires courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). The district court applied *Chevron*, finding that the Guidance exceeds HHS's statutory authority and is not a permissible construction of EMTALA. HHS does not invoke *Chevron* but claims that Congress has spoken that EMTALA mandates abortion care when that care is the "necessary stabilizing treatment." *See* Oral Argument Record at 16:25–33. HHS claims that EMTALA's "stabilizing treatment" definition is broad and does not exclude *any* form of medical care. In HHS's view, EMTALA mandates *whatever* a medical provider concludes is medically necessary to stabilize *whatever* condition is present. Various traditional

No. 23-10246

rules of interpretation, in Texas's view, do not support HHS's argument. The question here is whether, pursuant to HHS's Guidance on EMTALA, a physician must provide an abortion when that care is the necessary stabilizing treatment for an emergency medical condition. Employing the traditional tools of statutory interpretation, we hold that HHS's Guidance exceeds the statutory language.[11]

1.

Under EMTALA, if an "individual" is determined to be experiencing an "emergency medical condition," *see* 42 U.S.C § 1395dd(e)(1), Medicare-participating hospitals *must* offer "such treatment as may be required to stabilize the medical condition." 42 U.S.C. § 1395dd(b)(1). A plain reading shows that Congress did not explicitly address whether physicians must provide abortions when they believe it is the necessary "stabilizing treatment" to assure that "no material deterioration of the condition is likely to result" of an individual's emergency medical condition. *Id.* § 1395dd(b)(1), (e)(3)(A). The Supreme Court likewise has not further defined "stabilizing treatment" or "medical treatment" under EMTALA. Neither party claims that EMTALA expressly discusses abortion as a "stabilizing treatment." It simply is silent regarding "abortion." The district court concluded the same. Silence does not connote ambiguity, however. "[L]egal interpretation [is] more than just a linguistic exercise"—it includes the use of canons.

---

[11] There is no need to go through *Chevron*'s two-step framework when a statute unambiguously forecloses an agency's position. *BP Am., Inc. v. Fed. Energy Reg. Comm'n*, 52 F.4th 204, 217 n.6 (5th Cir. 2022) (citing *Esquivel-Quintana v. Sessions*, 581 U.S. 385, 397–98 (2017) ("We have no need to resolve whether . . . *Chevron* receives priority in this case because the statute, read in context, unambiguously forecloses the [agency's] interpretation.")); *see also Am. Hosp. Assoc. v. Becerra*, 596 U.S. 724, 739 (2022) (applying "traditional tools of statutory interpretation" to HHS's interpretation). In such cases, we "follow the statutory command." *BP Am.*, 52 F.4th at 217 n.6.

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts xxvii (2012).

Considering the statute as a whole, the Medicare Act states that "[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395; *see also* Scalia & Garner, *supra*, at 167–69 ("The text must be construed as a whole."). Section 1395 underscores the "congressional policy against the involvement of federal personnel in medical treatment decisions." *United States v. Univ. Hosp., State Univ. of N.Y. at Stony Brook*, 729 F.2d 144, 160 (2d Cir. 1984); *cf. Marshall on Behalf of Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998) (collecting cases) ("[A]n EMTALA 'appropriate medical screening examination' is not judged by its proficiency in accurately diagnosing the patient's illness, but rather by whether it was performed equitably in comparison to other patients with similar symptoms."). Congress expressly prohibits HHS from "direct[ing] or prohibit[ing] any [particular] kind of treatment or diagnosis" in its administration of Medicare. *Goodman v. Sullivan*, 891 F.2d 449, 451 (2d Cir. 1989) (per curiam). Indeed, the purpose of EMTALA is to provide emergency care to the uninsured. 42 U.S.C. § 1395dd(a); *see also Marshall*, 134 F.3d at 322 (collecting cases) ("EMTALA . . . was enacted to prevent 'patient dumping,' which is the practice of refusing to treat patients who are unable to pay.").

EMTALA does not specify stabilizing treatments in general, except one: delivery of the unborn child and the placenta. 42 U.S.C. § 1395dd(e)(3)(A). The inclusion of one stabilizing treatment indicates the others are not mandated. *See Texas v. United States*, 809 F.3d 134, 182 (5th Cir. 2015) (the *expressio unius est exclusio alterius* canon—that is, to include one thing implies the exclusion of the other—can be used for addressing "questions of statutory interpretation by agencies"). A medical provider can

No. 23-10246

nonetheless comply with both EMTALA and state law by offering stabilizing treatment in accordance with state law. *See* 42 U.S.C. § 1395dd(a), (f); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (holding that a state law is not preempted when compliance with state law does not stand as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (citation omitted)); Scalia & Garner, *supra*, at 290–94 (discussing the presumption against federal preemption canon, stating that "[a] federal statute is presumed to supplement rather than displace state law"). EMTALA does not mandate any specific type of medical treatment, let alone abortion.

The Texas plaintiffs' argument that medical treatment is historically subject to police power of the States, not to be superseded unless that was the clear and manifest purpose of Congress, is convincing. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (citation omitted) ("[W]e start with the assumption that the historic police powers of the State were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."); *see also Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 518 (1992) (courts are to construe statutes narrowly due to "the presumption against the pre-emption of state police power regulations"). Congress has not manifested that purpose in EMTALA, or the Medicare Act for that matter. The opposite is true: EMTALA does not impose a national standard of care.[12] *Harry v. Marchant*, 291 F.3d 767, 773 (11th Cir. 2022) ("EMTALA was not intended to establish guidelines for patient care."); *Bryan v. Rectors & Visitors*

---

[12] Amici American College of Emergency Physicians, et al., claim that EMTALA installs a minimum standard of care. Brief for Am. College of Emergency Physicians as Amici Curiae Supporting HHS, at 14–15. Amici note, however, that "EMTALA properly defers to the medical judgment of the physician(s) responsible for treating the patient . . . [and] [t]hat decision-making, in turn, is informed by established clinical guidelines . . . . EMTALA does not specify particular treatments." *Id.* at 16.

No. 23-10246

*of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996) ("Once EMTALA has met that purpose of ensuring that a hospital undertakes stabilizing treatment for a patient who arrives with an emergency condition, the patient's care becomes the legal responsibility of the hospital and the treating physicians."); *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995). And circuits recognize that state law, not EMTALA, governs medical malpractice. *See, e.g.*, *Marshall*, 134 F.3d at 322–23; *Eberhardt*, 62 F.3d at 1258; *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 879–80 (4th Cir. 1992); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1039 (D.C. Cir. 1991).

In sum, EMTALA does not govern the practice of medicine. This is reflected in its purpose, *see* 42 U.S.C. § 1395dd(a), and the prohibition under the Medicare Act from federal agents interfering with the practice of medicine, *see* 42 U.S.C. § 1395. *See, e.g.*, *Marshall*, 134 F.3d at 322 (collecting cases); *Bryan*, 95 F.3d at 351; *Goodman*, 891 F.2d at 451; *Stony Brook*, 729 F.2d at 160. While EMTALA directs physicians to stabilize patients once an emergency medical condition has been diagnosed, *see* 42 U.S.C. § 1395dd(b)(1), the practice of medicine is to be governed by the states. HHS's argument that "any" type of treatment should be provided is outside EMTALA's purview.

2.

Most notably, the district court considered EMTALA's preemptive effects. EMTALA states: "The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). Section 1395dd(f) is an ordinary conflicts-preemption provision. *See Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999). Under the conflicts-preemption test, a state statute directly conflicts with federal law where (1) it is impossible for a person to comply with both the state law

No. 23-10246

and EMTALA, or (2) where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 372–73 (citation omitted). The Supreme Court "construe[s] . . . provisions in light of the presumption against the pre-emption of state police power regulations." *Cipollone*, 505 U.S. at 518.

First, Texas's HLPA law does not directly conflict with EMTALA. EMTALA imposes obligations on physicians with respect to both the pregnant woman and her unborn child. *See* 42 U.S.C. § 1395dd(e)(1)(A)(i). This is a dual requirement. The Texas HLPA provides for abortion care where there is a life-threatening condition that places the female at risk of death or "substantial impairment of a major bodily function" and the physician provides the "best opportunity for the unborn child to survive" unless that would create a greater risk for the pregnant female's death or a "serious risk of substantial impairment of a major bodily function of the pregnant female." Tex. Health & Safety Code § 170A.002(b)(2)–(3). EMTALA's void is answered by Texas state law. Second, as previously discussed, the purpose of EMTALA is to prevent "patient dumping" for both a pregnant woman and her unborn child. *See* 42 U.S.C. § 1395dd(a), (e); *see also Marshall*, 134 F.3d at 322. Texas's law does not undermine that purpose; it does not compel the "rejection of patients." *Harry*, 291 F.3d at 774. Congressional history is telling. Specifically, Congress amended EMTALA in 1989 by adding "unborn child" into the statutory definition of "emergency medical condition" and its discussion of when transfer is "appropriate." *Compare* 42 U.S.C. § 1395dd(c), (e), Pub. L. 99-272, 100 Stat. 164, 165–67 (1986), *with* 42 U.S.C. § 1395dd(c), (e), Pub. L. 101-239, 103 Stat. 2245, 2246–49 (1989). Texas law does not stand in the way of providing stabilizing treatment for a pregnant woman or the unborn child. *See* Tex. Health & Safety Code § 170A.002(b)(2)–(3).

No. 23-10246

EMTALA refers to patients as "individuals" throughout. *See generally* 42 U.S.C. § 1395dd. Citing the Dictionary Act, *see* 1 U.S.C. § 8(a), HHS claims that the word "individual" does not include the "fetus." The Dictionary Act defines "individual" as including "every infant member of the species homo sapiens who is born alive at any stage of development." 1 U.S.C. § 8(a). Thus, according to HHS, EMTALA expressly *only* creates a duty to *only* individuals with respect to screening, stabilization, and transfer, and Congress did not also extend those duties to the "unborn." HHS's reading is misplaced.

Congress specifically chose to define an emergency medical condition as a medical condition that places "the health of the *individual* (or, with respect to a pregnant woman, *the health of the woman* or her *unborn child*) in serious jeopardy." 42 U.S.C. § 1395dd(e)(1)(A) (emphasis added). The text speaks for itself: EMTALA requires hospitals to stabilize both the pregnant woman and her unborn child. *See* SCALIA & GARNER, *supra*, at 56–58 (Under the supremacy-of-text principle, "words are given meaning by their context, and context includes the purpose of the text."). As previously stated, this is a dual requirement. *Matter of Baby K*, 16 F.3d 590, 597 (4th Cir. 1994), does not change this conclusion. There, the Fourth Circuit held that EMTALA preempted state law that permitted physicians "to refuse to provide medical treatment that the physician consider[ed] medically or ethically inappropriate." *Matter of Baby K*, 16 F.3d at 595 (footnote omitted). Differentiated on the facts alone, *Matter of Baby K* involved a baby that had already been delivered and required stabilization under EMTALA. *Id.* at 593–94, 597. The Fourth Circuit determined that the Virginia state law directly conflicted with EMTALA's stabilization requirement. *Id.* at 597. Unlike the discussion here, there was no balancing between the mother and the "unborn child."

Finally, HHS claims that EMTALA mandates the pregnant woman to resolve the conflict between the pregnant "individual" and "unborn child"

22

through consent or refusal of treatment. *See* 42 U.S.C. § 1395dd(b)(2). As previously discussed, EMTALA leaves the balancing of stabilization to doctors, who must comply with state law. *Id.* § 1395dd(e)(1), (e)(3)(A). We agree with the district court that EMTALA does not provide an unqualified right for the pregnant mother to abort her child especially when EMTALA imposes equal stabilization obligations.

The question before the court is whether EMTALA, according to HHS's Guidance, mandates physicians to provide abortions when that is the necessary stabilizing treatment for an emergency medical condition. It does not. We therefore decline to expand the scope of EMTALA.

## C.

Under the Medicare Act, an agency is required to conduct notice-and-comment rulemaking when promulgating any "rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing . . . the payment for services" or "the eligibility of individuals, entities, or organizations to . . . receive services or benefits." 42 U.S.C. § 1395hh(a)(2); *see also Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1808 (2019). Unlike the APA—where statements of policy are not substantive and thus not subject to notice and comment—statements of policy that establish or change a legal standard are subject to notice and comment under the Medicare Act. *Azar*, 139 S. Ct. at 1811–14; *compare* 5 U.S.C. § 553(b)(A), *with* 42 U.S.C. § 1395hh(a)(2). Under the Medicare Act, a "statement of policy" is defined as a policy that " 'let[s] the public know [the agency's] current . . . adjudicatory approach.' " *Azar*, 139 S. Ct. at 1810 (quoting *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997)).

The Guidance, at a minimum, falls under *Azar*'s definition of a "statement of policy" because it lets the public know of HHS's "adjudicatory approach" concerning the application of EMTALA with respect to abortion

No. 23-10246

and state abortion laws. The Texas plaintiffs list out a few obvious reasons, including the civil monetary penalties physicians and hospitals face if they do not provide abortions in various circumstances. Guidance at 5. According to the Guidance, "HHS [Office of the Inspector General] may also exclude physicians from participation in Medicare and State health care programs. CMS may also penalize a hospital by terminating its provider agreement." *Id.* The Guidance also provides safe harbors for physicians, including "as a defense to a state enforcement action, in a federal suit seeking to enjoin threatened enforcement," or under a retaliation provision. *Id.* Plainly then, the Guidance "govern[s] . . . the eligibility of individuals, entities, or organizations to furnish or receive services or benefits" under the Medicare Act. 42 U.S.C. § 1395hh(a)(2).

HHS's argument thus hinges on whether the Guidance "establishes or changes a substantive legal standard"—*i.e.*, alters EMTALA's generally applicable mandate to provide stabilizing treatment for emergency medical conditions. HHS claims it does not and argues that the Guidance addresses obligations that EMTALA itself imposes only if two conditions are met: (1) the medical provider believes that a pregnant patient presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA, and (2) that medical provider concludes that an abortion is the stabilizing treatment necessary.

As discussed at length *infra*, the Guidance goes beyond EMTALA by mandating abortion. Thus, because the Guidance "establishes or changes a substantive legal standard," *see id.*, HHS was required to subject the Guidance to notice and comment.

## D.

In the least, HHS seeks to narrow the injunction, claiming that the language is overbroad. Federal Rule of Civil Procedure 65(d)(1)(B) and (C)

No. 23-10246

requires every injunction must "state its terms specifically; and . . . describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." " 'The specificity requirement is not unwieldy. An injunction must simply be framed so that those enjoined will know what conduct the court has prohibited.' " *EEOC*, 933 F.3d at 451 (quoting *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373 (5th Cir. 1981)). The relevant language here is:

> (1) The defendants may not enforce the Guidance and Letter's interpretation that Texas abortion laws are preempted by EM-TALA; and
>
> (2) The defendants may not enforce the Guidance and Letter's interpretation of EMTALA—both as to when an abortion is required and EMTALA's effect on state laws governing abortion—within the State of Texas or against AAPLOG's members and CMDA's members.

The injunction is not overbroad. As previously discussed, EMTALA does not mandate medical treatments, let alone abortion care, nor does it preempt Texas law. The injunction squarely enjoins HHS from enforcing the Guidance and Letter regarding these two issues within the State of Texas and against the plaintiff organizations. A plain reading of the injunction language also leaves exceptions under the Texas HLPA. *See* Tex. Health & Safety Code § 170A.002(b)(1)–(3). The district court was correct in tailoring the injunction based on the parties, issues, and evidence before it. *See Louisiana v. Becerra*, 20 F.4th 260, 263–64 (5th Cir. 2021).

## VI.

For the foregoing reasons, the injunction is AFFIRMED.